**IN THE UNITED STATES DISTRICT COURT FOR THE**
**EASTERN DISTRICT OF TEXAS**
**TEXARKANA DIVISION**

TRAVELPASS GROUP, LLC,
PARTNER FUSION, INC.,
RESERVATION COUNTER, LLC

        Plaintiffs,

   v.

CAESARS ENTERTAINMENT
CORPORATION, CHOICE HOTELS
INTERNATIONAL, INC., HILTON
DOMESTIC OPERATING COMPANY,
INC., HYATT HOTELS CORPORATION,
MARRIOTT INTERNATIONAL, INC.,
RED ROOF INNS, INC., SIX
CONTINENTS HOTELS, INC.,
WYNDHAM HOTEL GROUP, LLC.

        Defendants.

CIVIL ACTION NO. _____

JURY DEMANDED

---

**ORIGINAL COMPLAINT**

---

# I.    INTRODUCTION

1.    This is an antitrust case involving a horizontal conspiracy among the nation's leading hotel chains (and others) to eliminate interbrand competition for keyword internet searches, which millions of customers use to book hotel rooms online each year. Conspiring with one another—and with so-called gatekeeper online travel agencies ("OTAs") like Expedia and others ("Gatekeeper OTAs")—the Defendant Hotels rigged bids and engaged in a group boycott to eliminate competing paid search advertisements displayed by internet search engines by agreeing not to bid on one another's branded keywords. Over time, their conspiracy effectively divided the market for branded keyword search results between and among the Defendant Hotels, allocating branded keyword territory such that the Defendant Hotels no longer had to compete either with one another or with TravelPass and other internet travel innovators. Taken together, the Defendant Hotels' illegal activities have severely reduced, and in many cases even eliminated, the revolutionary benefits of the internet economy for hotel consumers, taking us back to the "bad old days." The conspiracy has left in its wake an online travel booking marketplace characterized by deliberately limited information and high transaction costs—a marketplace where innovators like Plaintiffs can no longer operate effectively to ensure consumers continue to receive those benefits.

2.    Internet technology has revolutionized the hotel industry. The advent of online shopping, the rise of search engines, and the appearance of OTAs have radically altered the ways in which hotels compete with one another. Before the internet, hotels rarely competed head-to-head for individual consumers—it was simply too costly and time-consuming for most consumers to comparison shop extensively. The rise of the internet and (relatedly) the development of OTAs changed that dynamic, especially as search engines developed into a primary consumer

information source. Consumers thus reaped a variety of benefits from these technological advances, including:

- Access to far more and far better information about competing hotel options, including detailed information about price, room quality, room availability, and hotel amenities;

- Dramatically increased price competition among hotels, which are forced to compete on price because the internet allows consumers to compare rates virtually instantaneously; and

- Substantially lower transaction costs associated with actually booking a room, now that once-complicated and time-consuming comparison shopping and reservations bookings can be handled with a few clicks of the mouse or taps on a touchscreen.

3.    The defendants in this case are the six largest hotel chains in the United States, along with Caesars Entertainment Corporation and Red Roof Inns, Inc. (collectively, "Defendants" or the "Defendant Hotels"). Through direct ownership or franchising relationships, the Defendants together control the substantial majority of the hotel rooms in the United States.

4.    Plaintiff TravelPass Group, LLC ("TravelPass") and its predecessor or related entities, Reservation Counter, LLC and Partner Fusion, Inc. (collectively "Plaintiffs" or "TravelPass")[1] are or were "affiliates" of the Gatekeeper OTAs, obtaining access to the Defendant Hotels' inventory via these Gatekeeper OTAs. As one of the major "Downstream OTAs," TravelPass marketed the Defendant Hotels' rooms online by bidding on branded keywords (like "Marriott Dallas") in auctions conducted by online search engines like Google.

5.    This case addresses what the Federal Trade Commission recently described as "the very means by which and conditions under which retail price competition takes place in the 21st century internet economy."[2] Search engines like Google auction keyword search responses to

---

[1] For all relevant purposes, TravelPass Group, LLC is the legal successor-in-interest to both Reservation Counter, LLC and Partner Fusion, Inc., both of which housed all or part of the relevant business at certain times potentially relevant to this action. For convenience, the Complaint refers to plaintiffs' generically as "TravelPass" unless further demarcation is necessary.

[2] *In the Matter of 1-800 Contacts, Inc.*, Docket No. 9372, Opinion of the Commission, at 2, Nov. 14, 2018.

advertisers. As a result, when an internet user types in keywords as part of a search query, it will trigger certain advertisements at the top of a search engine's results pages ("SERP"). Advertisers bid on keywords that they would like to trigger their ads, and the higher bidding advertisers obtain better placement of their ads on a search engine's results page. These "paid results" generally display at the very top of a search engine's result page, above the "organic search" results driven entirely by the search engine's basic algorithms. Consumers shopping for hotel rooms or other products online generally "click through" to relatively higher-placed search results more frequently than to results appearing lower down the page (or on subsequent pages). Before the Defendant Hotels' illegal conspiracy took hold, the result of this auction was a marketplace characterized by robust advertising and competition on price, quality, and customer service for the potential hotel consumer's business.

6. Before the Defendant Hotels instituted their horizontal conspiracy, the new internet economy forced them to compete with one another by bidding on paid keyword search placement for searches incorporating both *their own* branded keywords and the branded keywords associated *with their competitors*. Thus, before the conspiracy, a consumer using Google to search for one Defendant Hotel's brand(s) would have received prominently placed results for that brand, and *also* results for competing hotel brands, Gatekeeper OTA websites, and Downstream OTA websites. For example, a consumer searching for "Marriott Dallas" would have received prominently placed search results not only for Marriott's Dallas-area properties, but also potentially for Hyatt's or Wyndham's (or another Defendant Hotel chain's) Dallas-area properties. Additionally, she would have received prominently placed search results for the Gatekeeper OTAs and Downstream OTAs that had submitted high bids to Google in connection for searches involving those keywords.

7.     The Defendant Hotels saw this diffusion of information to consumers—and, in particular, the ease with which consumers could now comparison-shop—as a substantial threat to their traditional business model. Thus, the Defendant Hotels entered into a conspiracy to eliminate interbrand competition among themselves and among OTAs for branded keyword search advertising. To effect their conspiracy, the Defendant Hotels teamed up with Gatekeeper OTAs, like Expedia, with the express goal of eliminating competition for branded keyword search advertising.

8.     Gatekeeper OTAs like Expedia coordinated this conspiracy for the Defendant Hotels in three discrete, but interrelated, ways.

9.     First, in at least some cases, the Gatekeeper OTAs acted as go-betweens for the hotel chains, helping them to reach the illegal agreements that ensured a "level playing field" between and among the Defendant Hotels by eliminating interbrand competition for branded keyword search results. Because of their role, the Gatekeeper OTAs' coordination reduced the need for direct communication between the Defendant Hotels themselves.

10.     Second, the Gatekeeper OTAs assisted the Defendant Hotels in extending the scope and effectiveness of the conspiracy by expanding the bid rigging to include the Gatekeeper OTAs themselves. Specifically, the Gatekeeper OTAs agreed with the Defendant Hotels to stop bidding on *all* branded keywords, and to prevent Downstream OTAs like TravelPass from doing the same. However, each Gatekeeper OTA only agreed to these restrictions once the Defendant Hotels reassured it that that Gatekeeper OTA's competitor Gatekeeper OTAs were agreeing to the same restraints.

11.     Third, the Gatekeeper OTAs helped the Defendant Hotels police the conspiracy, especially in its earliest days, by generating and providing monitoring reports to the Defendant

Hotels reporting on the level of compliance with the bid rigging conspiracy by various market participants.

12.     As early as May 2014, one Gatekeeper OTA's account manager admitted in emails sent to certain Downstream OTAs that the conspiracy's goal was to "level the playing field" by "ensuring that [the Defendant Hotels] are not employing similar branded keyword bidding strategies to bid on other chains e.g., Marriott bidding on Hilton."

13.     Viewed in isolation, no individual Hotel Defendant had an independent economic incentive to cease bidding on its competitors' branded keywords. By the time the conspiracy was underway, branded trademark owners' spurious claims that competitor bidding on branded keywords violated federal trademark law had been thoroughly rejected by the courts.[3] As a result, none of the Defendant Hotels had an independent incentive to refrain from bidding on its competitors' branded terms because they were legitimately concerned about infringement claims.

14.     Moreover, any Defendant Hotel who unilaterally "disarmed" by terminating its own bidding on competitors' terms would have faced an untenable situation. Specifically, that Hotel Defendant's competitors would have continued to bid on that Hotel Defendant's own keywords, competing aggressively for customers searching for that Hotel Defendant's keywords. The unilaterally disarming Defendant Hotel would have continued to take competitive fire from its rivals while foregoing its own gains from direct competition.

15.     The data bears this out. Based on internal Google search data recently disclosed to TravelPass by Google, prior to 2015, each of the Defendant Hotels frequently bid in the keyword search auctions not only for their own, but also for their competitors' search terms. But by the end of 2014, interbrand competition between the Defendant Hotels for branded keyword search all but

---

[3] *See, e.g.*, *In the Matter of 1-800 Contacts, Inc.*, Docket No. 9372, Opinion of the Commission, at 38-41, Nov. 14, 2018.

disappeared and remained virtually nonexistent thereafter. This abrupt change is a direct result of the horizontal conspiracies discussed below.

16. As the Defendant Hotels' primary conspiracy was taking effect, they also began working to ensure that all OTAs ended the practice as well, with respect to *all* branded keyword bidding. The Defendant Hotels realized that their primary horizontal conspiracy could not be fully effective without complementary conspiracies designed to ensure that Gatekeeper OTAs and Downstream OTAs like TravelPass *also* stopped bidding on branded keyword search advertising. Thus, the Defendant Hotels implemented a series of additional, or secondary, horizontal conspiracies under which Gatekeeper OTAs (1) agreed to stop bidding on branded search keywords and (2) also agreed to force Downstream OTAs to follow suit.

17. As with the Defendant Hotels, the Gatekeeper OTAs had no incentive to agree to these secondary conspiracies without assurances that *all* OTAs were agreeing to the same restraints; if one OTA agreed and others did not, the agreeing OTA would be at a substantial competitive disadvantage in the marketplace. The Defendant Hotels thus assured each Gatekeeper OTA that its competitor OTAs were also participating. The Defendant Hotels therefore acted as the hubs of the secondary conspiracy among OTAs—a conspiracy that the Defendant Hotels needed in place to ensure the success of their primary conspiracy.

18. Although it took time for the Defendant Hotels' illegal scheme to bear fruit, their two-pronged conspiracy ultimately worked.

19. Today, when a consumer runs a search for "Marriott Dallas" on Google, the almost universal result is only one type of paid advertisement: an ad for Marriott's own websites. And the same is true for the other Defendant Hotels' brands as well. TravelPass and other Downstream

OTAs, who up through 2014, played a key role in the branded keyword bidding market, have all been essentially driven from the market.

20.     In the meantime, the Defendant Hotels' conspiracy progressively destroyed a robustly competitive marketplace that once presented online consumers with numerous competitive options, transforming it instead into a series of virtual "company stores" in which consumers keyword searching for a particular Defendant Hotel brand are now presented with the option to book a room for *only* that same Defendant Hotel's brand(s).  The conspiracy has thus virtually eliminated all interbrand competition for online keyword search advertising for hotels.

21.     Given TravelPass's central role in pushing forward this increasingly competitive online marketplace, the massive damage TravelPass has suffered from these conspiracies was inextricably intertwined with the damage hotel consumers nationwide suffered.

22.     Because the Defendant Hotels acted in concert to rig bids and divide the market for branded search keywords, their conduct constitutes a per se violation of Section 1 of the SHERMAN ACT, 15 U.S.C. § 1.  The secondary conspiracies constitute per se illegal bid rigging and per se illegal group boycotts under Section 1 of the Sherman Act, 15 U.S.C. § 1. The primary conspiracy and secondary conspiracies work together to eliminate effective competition—both direct and indirect—between and among the Defendant Hotels for branded search keywords.  The Defendants' illegal activities had the purpose and effect of eliminating TravelPass as a competitive threat to their illegal ends.

## II.     JURISDICTION, VENUE AND INTERSTATE COMMERCE

23.     Plaintiffs bring this case under Section 4 of the CLAYTON ACT, 15 U.S.C. § 15, to recover treble damages, costs, and attorney's fees for injuries sustained by Plaintiff because of the Defendants' violations of Section 1 of the SHERMAN ACT, 15 U.S.C. § 1.

24. This Court has jurisdiction over Plaintiffs' antitrust claims under 28 U.S.C. §§ 1331, 1337, and Sections 4 and 12 of the CLAYTON ACT, 15 U.S.C. §§ 15(a) and 22. This Court has supplemental jurisdiction over the state law claims alleged in this Complaint under 28 U.S.C. § 1367(a) because these state law claims form part of the same case or controversy as the federal claim.

25. Venue is appropriate in this district under Sections 4 and 12 of the CLAYTON ACT, 15 U.S.C. §§ 15 and 22, because all Defendants transact business in this district. With the exception of Defendant Caesars, each of the Defendant Hotels controls one or more properties within this District. Moreover, as set forth below, each of the Defendant Hotels has served and continues to serve countless customers within this District.

26. Numerous consumers within this district have been harmed by the Defendant Hotels' illegal activities. For example, from January 2013 to October 2018, *TravelPass alone* has processed over $20 million in reservations for Defendant Hotels' brands in connection with customers reporting ZIP codes located entirely within this District:

| Defendant Hotel | Bookings | Value |
|---|---|---|
| Caesars | 546 | $143,185 |
| Choice | 10,997 | $2,419,398 |
| Hilton | 19,194 | $6,002,026 |
| Hyatt | 2,881 | $1,198,035 |
| Marriott | 13,081 | $5,183,816 |
| Red Roof Inn | 1,082 | $192,304 |
| Six Continents (IHG) | 10,509 | $2,978,827 |
| Wyndham | 8,986 | $1,927,231 |

27. Given that OTAs as a whole account for only a portion of U.S. hotel bookings and given that TravelPass accounts for only a small percentage of that portion, the actual impact of Defendant Hotels' illegal activities upon residents of this District is undoubtedly many times greater than the impact upon only TravelPass customers within this District.

28.     Defendants' activities were within the flow of and substantially affected interstate commerce, namely the online sale and purchase of hotel lodging nationwide. Defendants' activities also were within the flow of and substantially affected interstate commerce in that they distorted markets for the purchase and sale of SERP associated with consumers' branded term searches for hotel accommodations nationwide.

### III.     PARTIES

29.     Plaintiff TravelPass Group, LLC ("TravelPass") is a limited liability company duly organized and existing under the laws of the State of Utah and with its principal place of business in Lehi, Utah. TravelPass was incorporated on March 23, 2016.

30.     Plaintiff Partner Fusion, Inc. ("Partner Fusion") is a corporation duly organized and existing under the laws of the state of Utah and with its principal place of business in Lehi, Utah. The business relevant to this lawsuit operated as Partner Fusion or a Partner Fusion subsidiary until March 23, 2016, the date of TravelPass's formation.

31.     Plaintiff Reservation Counter, LLC ("Reservation Counter") is a limited liability company organized and existing under the laws of the State of Utah and with its principal place of business in Lehi, Utah. From its creation in 2009 through March 22, 2016, Reservation Counter was a wholly-owned subsidiary of PartnerFusion. On March 23, 2016, Reservation Counter became a wholly-owned subsidiary of TravelPass.

32.     Defendant Caesars Entertainment Corporation ("Caesars") is a corporation duly organized and existing under the laws of the State of Delaware and with its principal place of business in Las Vegas, Nevada. Caesars operates almost fifty hotel casinos in 13 U.S. states and five countries. Caesars owns two casinos in Bossier City, Louisiana and derives significant revenue from customers living within this District.

33.     Defendant Choice Hotels International, Inc. ("Choice") is a corporation duly organized and existing under the laws of the State of Delaware with its principal place of business in Rockville, Maryland. Choice controls over 6,500 hotels in more than 40 countries; its U.S. brands include Comfort Inn, Comfort Suites, Quality Inn, Sleep Inn, Clarion, Cambria Hotel & Suites, Mainstay Suites, Suburban Extended Stay, Econo Lodge, and Rodeway Inn. Choice owns, operates, or franchises hotel properties within this District. Choice also derives significant revenue from customers living within this District.

34.     Defendant Hilton Domestic Operating Company, Inc. ("Hilton") is a corporation duly organized and existing under the laws of the State of Delaware with its principal place of business in McClean, Virginia. Hilton controls over 5,000 hotels in more than 100 countries and territories; its U.S. brands include Hilton Hotels & Resorts, Waldorf Astoria Hotels, Conrad Hotels & Resorts, Canopy by Hilton, Curio Collection by Hilton, Doubletree by Hilton, Tapestry Collection by Hilton, Embassy Suites by Hilton, Hilton Garden Inn, Hampton by Hilton, Tru by Hilton, Homewood Suites by Hilton, and Home2Suites by Hilton. Hilton owns, operates, or franchises hotel properties within this District. Hilton also derives significant revenue from customers living within this District.

35.     Defendant Hyatt Hotels Corporation ("Hyatt") is a corporation duly organized and existing under the laws of the State of Delaware with its principal place of business in Chicago, Illinois. Hyatt controls over 700 hotel properties in 57 countries; its U.S. brands include Park Hyatt, Grand Hyatt, Hyatt Regency, Hyatt, Andaz, Hyatt Centric, The Unbound Collection, Hyatt Place, Hyatt House, and Miraval. Hyatt owns, operates, or franchises hotel properties within this District. Hyatt also derives significant revenue from customers living within this District.

36.     Defendant Marriott International, Inc. ("Marriott") is a corporation duly organized and existing under the laws of the State of Delaware with its principal place of business in Bethesda, Maryland. Marriott controls approximately 6,000 hotel properties in 122 countries and territories; its U.S. brands include The Ritz-Carlton, St, Regis, JW Marriott, W Hotels, Marriott Hotels, Sheraton, Westin, Renaissance Hotels, Courtyard Hotels, Four Points, SpringHill Suites, Fairfield Inn & Suites, TownePlace Suites, and Residence Inn. Marriott owns, operates, or franchises hotel properties within this District. Marriott also derives significant revenue from customers living within this District.

37.     Defendant Red Roof Inns, Inc. ("Red Roof") is a corporation duly organized and existing under the laws of the State of Delaware with its principal place of business in Springfield, Ohio. Red Roof is a subsidiary of WRRH Investments, Inc. Red Roof controls over 580 properties in the United States, Japan, and Brazil; its U.S. brands include Red Roof Inn, Red Roof PLUS+, The Red Collection, and HomeTowne Studios by Red Roof. Red Roof owns, operates, or franchises hotel property within this District. Red Roof also derives significant revenue from customers living within this District.

38.     Defendant Six Continents Hotels, Inc. ("Six Continents") is a corporation duly organized and existing under the laws of the State of Delaware with its principal place of business in Atlanta, Georgia. Six Continents is a wholly-owned subsidiary of InterContinental Hotels Group, PLC ("IHG"), which controls over 5,000 hotel properties in nearly 100 countries. Six Continents' U.S. brands include Candlewood Suites, Holiday Inn, Holiday Inn Express, Hotel Indigo, Kimpton Hotels, Staybridge Suites, InterContinental, and Crowne Plaza. Six Continents owns, operates, or franchises hotel properties within this district. Six Continents also derives significant revenue from customers living within this District.

39. Defendant Wyndham Hotel Group, LLC ("Wyndham") is a corporation duly organized and existing under the laws of the State of Delaware with its principal place of business in Parsippany, New Jersey. Wyndham controls over 8,000 hotel properties in 122 countries and territories; its U.S. brands include AmericInn, Baymont Inn & Suites, Days Inn, Hawthorn Suites, Howard Johnson, La Quinta Inns & Suites, Microtel by Wyndham, Ramada Worldwide, Super 8, Travelodge, Wingate by Wyndham, Wyndham Hotels & Resorts, Wyndham Garden Hotels, and Wyndham Grand. Wyndham owns, operates, or franchises hotel properties within this District. Wyndham also derives significant revenue from customers living within this District.

## IV.    CO-CONSPIRATORS

40. Various persons, who are known and unknown to Plaintiffs, and not named as defendants in this action, have participated as co-conspirators with Defendants in the offense alleged and have performed acts and made statements in furtherance of the conspiracy. These include, among others, Gatekeeper OTAs, trade associations, and industry consultants.

## V.    FACTS

### A.    THE HOTEL INDUSTRY AND BACKGROUND OF THE CONSPIRACY

41. The U.S. is home to millions of hotel rooms, and the U.S. hotel industry generates hundreds of billions of dollars in annual revenue.

42. Defendants in this case are some of the largest hotel chains in the world. The Defendant Hotels own some of their branded properties and enter into franchise agreements with third parties in connection with other branded properties.

43. Over the last decade, the Defendant Hotels have sold most of their existing properties and the underlying real estate to individual franchisees or large multi-property investment groups. Hotel investment companies often are not only multi-property, but are also

multi-brand. Many hotel investment groups are franchisees of two or more Defendant Hotels brands, and several hotel investment groups are franchisees of most or all of the Defendant Hotels.

44.     Together, the Defendant Hotels' brands represent the majority of the hotel rooms in the United States, and their brands control an even larger percentage of certain business segments.

**B.     TRAVELPASS**

45.     TravelPass is a Downstream OTA whose business model is built around bidding on branded keyword search results to attract hotel consumers to its room inventory. It sells hotel rooms from numerous hotel chains—including Marriott, Hilton, and others—directly to consumers throughout the United States.

46.     Until the Defendant Hotels' illegal conspiracy took effect, TravelPass was one of the major Downstream OTAs affiliated with the Gatekeeper OTAs. As such, it obtained access to the Defendant Hotels' inventory via these Gatekeeper OTAs. The Gatekeeper OTA segment of the travel industry has consolidated substantially over the last five to seven years. Today, virtually all of the economically significant consumer-facing Gatekeeper OTAs are owned by one of two parent companies: Expedia Group and Booking Holdings, Inc. ("BHI").[4] For example, Expedia Group owns and operates Expedia, Hotels.com, Trivago, Orbitz, Travelocity, Hotwire, and several other Gatekeeper OTAs. BHI owns Booking.com, Priceline, and Kayak, among other brands.

47.     TravelPass also obtains hotel room inventory through global distributors and wholesale suppliers.

---

[4] See Frederic Gonzalo, "The OTA duopoly: Priceline vs Expedia" (March 19, 2015), eHotelier, available at http://ehotelier.com/insights/2015/12/16/the-ota-duopoly-priceline-vs-expedia/. Priceline acquired Booking.com in 2005, and changed its corporate name to Booking Holdings Inc. in February 2018.

48.     TravelPass relies on branded keyword advertising to draw consumers to its websites and to offer those consumers a wide range of hotel rooms. It has invested tens of millions of dollars in technology capabilities, marketing expertise, understanding markets, developing data sets and bidding strategies based on its bookings, and branded keyword search advertising campaigns to provide consumers with a broad array of choices for hotel rooms at affordable prices and to ensure success with its business.

49.     Before the Defendant Hotels' horizontal conspiracies began to take effect, TravelPass's data-driven branded keyword advertising success had made it one of the most successful Downstream OTAs; thus, before the conspiracies, TravelPass had grown to become one of the Gatekeeper OTAs' most valuable search partners.

## C.     KEYWORD SEARCH ADVERTISING

50.     Search engines like Google auction keywords to advertisers. Keywords are those words that, when typed by a user as part of a search query, will trigger advertisements at the top of a search engine's results pages. Advertisers bid on keywords that they would like to trigger their ads. All other things equal, the higher the advertiser's bid, the better ad placement they receive on a search engine's results page.

51.     Companies advertise by, among other things, bidding on keywords. For example, Marriott is shown as the paid advertising result for the keywords "marriott dallas" in the following example of Google's search:



Figure 1. Advertisements are labeled with a "Ad" box on Google's results page. A more extensive list of results for this search are attached at Exhibit A.

52.     Branded keyword advertising is also a critical marketing and sales tool for OTAs like TravelPass, who bid on certain keywords to target consumers who are most likely to book a room.

53.     Defendant Hotels also bid on branded keywords to sell hotel rooms. Indeed, before the Defendant Hotels instituted their conspiracy, they each competed with one another by bidding on keyword search advertising for searches incorporating both *their own* branded keywords and the branded keywords associated with *their competitors*. Today, pursuant to their illegal conspiracy, the Defendant Hotels limit their bidding to their own branded keywords.

**D.     KEYWORD SEARCH AUCTIONS**

54.     Search engines use auctions to price their paid search results. Search engines calculate the rank of each advertisement according to the maximum bid the advertiser submits for the ad and the quality score of the advertisement. Search engines calculate an ad's quality score by evaluating multiple components of that advertisement.

55.    For example, Google calculates an advertiser's quality score by assessing that advertiser's historical clickthrough rate, keyword and advertisement relevance, the quality and relevance of the advertiser's landing page, and the advertiser's historical account performance. The higher an ad's quality score, the lower the advertiser will have to bid to win a keyword auction. As a result, even temporary absence from keyword auctions can dramatically increase an advertiser's bidding costs by lowering its quality score.

56.    The perceived relevance of such an ad directly contributes to its quality score and thus makes it more likely to succeed in a keyword auction. In this way, search engines actively encourage bidding on competitive branded keywords.

57.    Once a search engine calculates the winning bidder based on the ad's quality score and the advertiser's bid price, the winning bidder will have its ad displayed on the search engine's results page for specific users whose search queries match the bidder's keywords. Those ads are featured *above* the search engine's organic results, as can be seen in Figure 1. The winning advertiser pays the search engine the minimum amount it could have bid to win the auction; that is, the second highest bid plus $0.01.

58.    Keyword search auctions are sealed. Advertisers do not know what other advertisers are bidding when they submit bids to search engines. Nonetheless, because keyword auctions are competitive, the price per click for keyword advertisements is often high, especially compared with other forms of online advertising. These higher prices reflect the high value of keyword search advertising.

59.    Consumers shopping for hotel rooms or other products online generally "click through" to relatively higher-placed search results more frequently than to results appearing lower down the page (or on subsequent pages).

### E.    CONSUMER BENEFITS FROM KEYWORD SEARCH ADVERTISING

60.    Google saw the pro-competitive benefits of such branded keyword search advertising early on.  Prior to 2004, Google permitted a trademark owner to restrict use of its trademark by third parties as keywords and in the text of advertisements.  In April 2004, Google changed its trademark policy to allow third parties to bid on trademarks as keywords.  Google has maintained this same policy for nearly fifteen years, and, as a result, does not currently restrict keywords available for bidding in advertising auctions.  In fact, as discussed below, it is common in other industries for companies to pay search engines to present their ads in response to a user's search query incorporating another company's brand name.

61.    Furthermore, according to one 2014 Google study of hotel shoppers provided to TravelPass, as of the second quarter of 2014, keyword searching was the number one starting point for consumers looking to book a hotel room online.  Indeed, as of early 2014, search volume for hotel room shoppers was on the rise, having increased by almost 20% over the previous year.

62.    Because branded keyword search advertising targets potential customers' individual searches, this method of advertising is often more successful than others.  This is because, for many consumers, a search for a specific hotel brand in a geographic location is a proxy for interest in any comparable hotel in that location.  The ability to more precisely target specific consumers benefits those consumers by providing them with not only *more* information about competing options, but also *better* information that is more likely to be tailored to their specific individual preferences.

63.    This Google study also found that, as of early 2014, customers who search for one specific hotel brand online, *e.g.,* Hilton, would often end up purchasing a hotel room with another brand, *e.g.,* Marriott.  For example, 22% of consumers searching for Hilton-branded hotels ended

up booking with a Marriott-branded hotel instead. This is the essence of robust competition, whether Defendant Hotels liked it or not.

64. The Defendant Hotels recognize the value of competitive branded keyword bidding. Before the Defendant Hotels instituted their conspiracy, they each competed with one another by bidding on each other's branded keywords for searches incorporating both *their own* branded keywords and the branded keywords *associated with their competitors*. In other words, before the conspiracy it was common for companies like Hilton to bid not only on terms like "Hilton Garden Inn" or "Hampton Inn," but also on parallel competitor keywords like "Residence Inn" or "Courtyard by Marriott." In fact, according to a 2013 research study by Brand Verity, a digital marketing research firm, in July 2013, hotel-related branded keyword Google searches typically returned not only 1.2 branded ads per SERP, but also 0.3 *competitor* ads per SERP.

65. Because the Defendant Hotels have entered into a bid rigging and market division conspiracy that eliminates targeted interbrand competition for branded search results, it is difficult to find current examples of such competition from the hotel industry.

66. However, examples from another industry demonstrate the dynamic perfectly. A recent search performed for "2019 Audi Q5" produced as its *first result* a link entitled "All-New Acura RDX | Compare SUVs Side by Side." The link takes consumers to an Acura.com subpage with the URL "www.acura.com/Compare/RDX_vs_Audi_Q5." (Screenshot attached as Exhibit B; search performed December 5, 2018). The RDX is Acura's direct competitor to the Audi Q5.

67. Before 2014, a consumer using Google to search for one of a Defendant Hotel's brands would have received prominently placed results for the brand for which she searched, and also for competing hotel brands, Gatekeeper OTA websites, and Downstream OTA websites.

68.     As discussed below, this competitive marketplace changed around the third quarter of 2014 when, according to Google, each of the Defendant Hotels abruptly stopped bidding in actions for searches incorporating the branded keywords of their competitors.

### F.     THE CONSUMER BENEFITS FROM ONLINE TRAVEL AGENCIES

69.     The advent of online shopping, the rise of search engines, and the appearance of Gatekeeper OTAs radically changed the ways in which hotels compete with one another. Before the online era, hotels rarely competed head-to-head for individual consumers making hotel reservations, beyond possible billboard-level competition on the highway. Instead, pre-internet interbrand competition between hotels mostly consisted of a combination of Yellow Pages listings and advertisements combined with generic, wide-broadcast brand advertising and inducements to the travel agents, motor clubs, and others who then served as gatekeepers for many consumers.

70.     In order to comparison shop on price or any other relevant variable (quality, amenities, etc.), pre-internet hotel consumers would have had to call multiple hotels to obtain the relevant information. This was time-consuming and costly, if the consumers could even locate the relevant long-distance telephone numbers for the hotels in their travel destination in the first place. As a result, the pre-internet marketplace insulated the Defendant Hotels from direct interbrand price competition with one another because, before the internet, it was simply too costly and time-consuming for most consumers to comparison shop effectively.

71.     The internet shattered that dynamic, especially as search engines developed into a primary consumer information source. And with the rise of branded keyword search advertising—as well as online booking—direct, targeted, consumer-level interbrand competition between hotel brands was possible for the first time. Hotels began to compete with one another for high-value consumers by bidding on one another's branded keywords in the search auctions run by Google, Bing, and other search engines.

72. Since the emergence of the internet as a commercial tool, OTAs have provided hotel consumers with, among other things, one-stop comparison-shopping for multiple properties across multiple brands. That is, OTAs generally allow hotel consumers to compare many different competing hotels' prices, locations, amenities, and availability on a single piece of display "real estate"—typically either a computer monitor or mobile device screen.

73. OTAs also provide significant value to the hotels with which they contract, because OTA-driven bookings represent a huge percentage of the Defendant Hotels' overall revenue streams.

### G. THE TRAVELPASS BUSINESS MODEL

74. Before the conspiracy, TravelPass marketed the Defendant Hotels' rooms online by bidding on branded keywords (like "Marriott Dallas") with online search engines like Google.

75. TravelPass built its business atop a highly sophisticated data analysis operation, which includes complex algorithms that allow it to be uniquely effective when bidding in branded keyword search auctions.

76. The vast majority of TravelPass's revenues historically have come from commissions paid by the Gatekeeper OTAs for the hotel reservations TravelPass generates. In turn, the vast majority of TravelPass's hotel reservations have come from TravelPass's successful paid search operations. Before the conspiracy, almost all of TravelPass's hotel reservations were a product of TravelPass's bidding in branded keyword search auctions.

77. Compared to other Downstream OTAs, TravelPass was remarkably successful, generating hundreds of millions of dollars in annual bookings. It therefore became a primary target of the Defendant Hotels as they were planning and implementing their horizontal conspiracies.

## H.    COMPETING INCENTIVES IN THE MODERN HOTEL INDUSTRY

78.    The hotel business has high fixed costs. That is, much of the typical hotel's operating budget goes to service real estate debt, pay franchise fees, and/or other costs that do not depend upon the hotel's occupancy rate.

79.    The hotel business also has low marginal or variable costs. As a result, any hotel that is operating with vacancies on a given night can typically add another guest for relatively little in additional cost.

80.    Hotels face two primary competing incentives with respect to filling their vacant rooms. First, hotels want to fill their properties every night, so long as each customer generates more revenue than the marginal costs associated with that customer's stay. This incentive, in turn, encourages hotels to seek alternative distribution channels, like OTAs, for their room inventories. Hotels must pay a commission to the OTAs, but the existing relationships between hotels and OTAs help the hotels secure additional customers who pay more than the hotel's marginal cost for their stay.

81.    The hotels' second incentive stands in significant tension with the first. Although hotels want to fill their every bed they can fill with a customer willing to pay more than the hotel's marginal cost, they also want to extract the maximum possible revenue from each guest. This would occur when the hotel receives the full retail room rate directly from the customer. Accordingly, hotels ideally want to sell as many rooms as possible directly to consumers.

82.    The real nature of the hotel business is such that hotels generally must attempt to *both* fill their beds *and* extract maximum revenues from each consumer, striking an optimal balance between the two.

83.    Hotels depend upon OTAs to maximize occupancy, but they extract maximum per-customer revenue only through their own direct sales. As a general rule, the highest-value

customers for any hotel chain are those who have an idiosyncratic preference for one or more of that particular hotel chain's brands. At the same time, hotels want OTAs to undertake the time and cost-intensive work of locating (and then selling to) lower-value customers in order to fill their properties night after night.

84. The unique nature of the online hotel reservations business created a situation in which it would only have been in the individual Defendant Hotel's economic interest to enforce dormant contractual restrictions on branded keyword search advertising if those hotels simultaneously conspired with one another and with the OTAs at the interbrand level in violation of the SHERMAN ACT.

85. And that is just what the Defendant Hotels did.

## I.    THE DEFENDANT HOTELS' INCENTIVE TO CONSPIRE

86. Before the Defendants entered into their bid rigging conspiracy, interbrand competition for keyword search advertising was common in the hotel industry, and it benefitted consumers substantially. In fact, as discussed above, the Defendant Hotels competed vigorously with one another for branded keyword search advertising at least through early 2014.

87. Although some the Defendant Hotels began incorporating various nominal contractual restrictions on Gatekeeper OTAs and Downstream OTA branded keyword search advertising in 2010 or even earlier, actual enforcement of the contractual restrictions would have been economic suicide unless the hotels simultaneously conspired to eliminate direct interbrand competition for branded keyword search advertising between and among themselves.

88. The reason for this was simple: if any Defendant Hotel had actively enforced its contractual restrictions against OTAs *before* entering into their primary conspiracy, it would risk losing substantial business to its direct competitors—in most cases, the other Defendant Hotels.

89. Thus, in the absence of the primary conspiracy, if one Defendant Hotel barred OTAs from branded keyword search advertising, then any search engine results pages for that Defendant Hotels' search terms would have filled up with direct links to competing hotels. So unless the Defendant Hotels expended the time and effort to shut down *every* possible alternative distribution channel, its unilateral enforcement would still generate OTA and competitor results from any OTA not subject to aggressive enforcement measures.

90. As a result, in the absence of a horizontal conspiracy to eliminate interbrand competition, a single Defendant Hotel enforcing its contract restrictions aggressively but unilaterally would either (1) have to spend outrageous amounts of money to ensure that only its own properties appeared in response to a search incorporating its branded keywords, or (2) deal with a keyword search results page dominated by direct links to competing hotels and *still* containing OTA links.

91. It therefore made no economic sense for any one Defendant Hotel to enforce its contract restrictions against Gatekeeper and Downstream OTAs unilaterally. The OTAs provided too much protection against competitor hotel bidding. Instead, the Defendant Hotels could only resolve the tension inherent in the competing incentives by (1) colluding with one another to eliminate interbrand competition in the branded keyword search auctions; and (2) inducing Gatekeeper OTAs to agree with one another to eliminate bidding in branded keyword search auctions among themselves and their affiliates.

## VI.    DEFENDANTS' UNLAWFUL ACTS

### A.    THE PRIMARY HORIZONTAL CONSPIRACY: BID RIGGING TO ELIMINATE INTERBRAND COMPETITION FOR BRANDED KEYWORD SEARCH ADVERTISING

92. Beginning in or around May 2014, the six largest Defendant Hotels entered into a bid rigging horizontal conspiracy in which they agreed among themselves not to bid on one

another's branded keywords in search auctions conducted by Google and other search engines. To put their conspiracy into effect, these Defendant Hotels teamed up with Gatekeeper OTAs like Expedia, with the express goal of eliminating online branded keyword search competition. By January 2015, these Defendant Hotels began to receive keyword monitoring reports provided to them directly from the Gatekeeper OTAs.[5] These reports listed in great detail the branded keyword bidding activity of the other Gatekeeper OTAs, as well as all of the Downstream OTAs, and continued through 2016 and later as the conspiracy began to bear fruit.

93.  As set forth in detail in section VI.B, below, the evidence of the conspiracy is substantial and includes:

- Direct evidence of the conspiracies.  Emails sent by Expedia, a Gatekeeper OTA, in May 2014 identifying the conspiracy's goal as "level[ing] the playing field" by "ensuring that [the Defendant Hotels] are not employing similar branded keyword bidding strategies to bid on other chains e.g., Marriott bidding on Hilton."

- Acts contrary to economic interests.  It would have been contrary to the economic interests of any Defendant Hotel acting alone to restrict OTAs from bidding on branded keyword search advertising because unilateral enforcement of those restrictions would have meant their own keyword search results page would be dominated by direct links to competing hotels.

- Motive to enter the conspiracy, including knowledge or assurances that competitors also will enter.  The Defendant Hotels were motivated by a desire to avoid the price competition and free flow of information generated by competitive branded keyword search advertising.  They were also motivated by the knowledge that if one of the Defendant Hotels did not enter into the conspiracy, then that Defendant would successfully bid on competitive keywords and obtain an advantage in this growing market.  Beginning in January 2015, they received monthly—and, later, weekly—reports from Expedia identifying the activity of the OTAs and other Defendant Hotels.  Expedia faced an incentive to ensure that it continued to receive inventory from the Defendant Hotels and to avoid competition from the Downstream OTAs.

- Practices facilitating a horizontal conspiracy.  The Defendant Hotels communicated regularly, both in person, on the telephone and in emails to with the Gatekeeper OTAs and, in some instances, with each other to exchange information and assurances of solidarity to advance the ends of the conspiracy.  They also regularly

---

[5] TravelPass received a few of these monitoring reports in the ordinary course of business from Expedia.

communicated directly with Gatekeeper OTAs as facilitators of the primary horizontal conspiracy.

- <u>Abrupt, continuous shift from past behavior.</u> Based on Google search data recently disclosed to TravelPass by Google, as well as research studies conducted by Brand Verity in 2013 and 2014, by the third quarter of 2014 interbrand competition between the Defendant Hotels for branded keyword search had abruptly stopped. Prior to the third quarter of 2014, however, each of the Defendant Hotels routinely bid at keyword search auctions not only for their own, but also for their competitors' search terms. As a result of the conspiracy, the Defendant Hotels abruptly stopped this practice.

94. In whole or in part, the Defendant Hotels reached this horizontal agreement, using Gatekeeper OTAs as intermediaries or hubs.

## B. THE DEFENDANT HOTELS' PRIMARY HORIZONTAL CONSPIRACY WITH EACH OTHER AND BY WAY OF THE GATEKEEPER OTAS

95. Because unilateral disarmament would have been suicide, the Defendant Hotels needed to act together to stop horizontal interbrand competition in branded keyword auctions. To accomplish this end, the Defendant Hotels used one or more Gatekeeper OTAs as "go-betweens" or "hubs." At roughly the same time, the Defendant Hotels were beginning to work on their long-term goal of eliminating *all* competitor *and OTA* branded keyword bidding. In a May 2014 email chain addressing certain Hotel Defendants' early secondary attempts to curb *OTA* bidding, Expedia representatives revealed both the existence of and mechanism behind the Defendant Hotels' primary conspiracy to eliminate interbrand competition at the hotel level.[6]

96. Specifically, on May 6, 2014, employees of Expedia's Hotels.com unit engaged in email correspondence with representatives of Expedia affiliates following Expedia's discussions with Defendants Hilton and Six Continents/IHG in which those Defendants apparently discussed

---

[6] Because Gatekeeper OTAs were involved in both the primary horizontal conspiracy as intermediaries and the secondary conspiracies as horizontal competitors, the relevant correspondence often relates to both arms of the Defendant Hotels' overall plan to fully rig the bidding for branded keyword SERP across all market participants. The May 2014 email chain is just one example of such overlap.

issues related to branded keyword search advertising.[7] Expedia's representatives initially intended this correspondence to address Hilton's and IHG's concerns about the Downstream OTAs bidding on branded keywords associated with those chains.

97.     In the opening email from Expedia/Hotels.com employee Kim Covington to Downstream OTA representatives Yatin Patel, Skip Gibson, and Sherman Distin, Covington states in relevant part, "[a]ttached is a recent keyword violation doc from Hilton. Also, IHG is requesting that you cease bidding on their brand names – see attached. *We are investigating ways to ensure a level playing field, more to come on this.*" (Attached as Exhibit C) (emphasis added).

98.     The conversation quickly shifted into Expedia's admission that it was helping to coordinate the horizontal conspiracy among the Defendant Hotels to rig bids for branded keyword search auctions.

99.     Several minutes after Covington's initial email, Distin responded to Covington with a one-line email: "What's your definition of a level playing field?" (Attached as Exhibit D). Patel's response was virtually identical: "What is this means? 'We are investigating ways to ensure a level playing field,'" [*sic*]. (Attached as Exhibit E).

100.     Later that afternoon, Expedia executive Nick Smith explained precisely what Expedia understood "level playing field" to mean on behalf of the Defendant Hotels (or, "chains," in Expedia's terminology):

---

[7] TravelPass had no knowledge of this email chain until 2018, when a representative of another Downstream OTA provided it to them independently.

```
From:    Nick Smith <nicsmith@expedia.com>
Sent:    Tue 5/06/2014 4:02 PM (GMT-00:00)
To:      yatin patel <patelyatin@hotmail.com>;Kim Covington <kimcovington@hotels.com>:
Cc:      distin.sherman@gmail.com;Chad Montgomery <cmontgomery@hotels.com>:
Bcc:
Subject: RE: Hilton & IHG


Hi Yatin,

What Kim means is we're trying to ensure a few things:

1) the chains understand the value our affiliates bring to them e.g. the holistic value of traffic you generate, including through
non branded keywords, SEO, advertising and other channels, and your ability to handle traffic for them in peak periods
2) also, that they understand the 'whack a mole' nature of what they're trying to do, and don't just go after the largest affiliates

3) Ensure that they are not employing similar branded keyword bidding strategies to bid on other chains e.g. Marriott bidding
on Hilton
```

(Exhibit E) (emphasis added).

101.    In other words, Expedia's executives expressly admitted to a third-party that Expedia was facilitating the primary horizontal conspiracy.

102.    By the third quarter of 2014, Expedia had delivered on its promise; interbrand competition between the Defendant Hotels for branded term SERP had abruptly stopped.

103.    Recently, a TravelPass executive spoke by phone with Google's Head of Travel Industry and several other Google employees.[8]    During that conversation, the Google representatives noted that the Defendant Hotels routinely bid in branded search term auctions for their competitors' search terms before the third quarter of 2014, but that their interbrand bidding stopped abruptly sometime in the third quarter of 2014. Google confirmed to TravelPass that the Defendant Hotels' abrupt change in bidding patterns was unlike any shift in keyword bidding strategy that they had seen before.

104.    The Defendant Hotels' sudden shift in behavior is confirmed elsewhere. In 2013, digital marketing research company Brand Verity prepared a hotel industry-specific report on

---

[8] This conversation occurred on or around August 2, 2018.

branded keyword bidding. Using data collected in July 2013—just under a year *before* the Defendant Hotels initiated their primary horizontal conspiracy—that report found that hotel-related branded keyword Google searches typically returned approximately 1.2 brand ads per SERP and 0.3 competitor ads per SERP.

105. By contrast, in Brand Verity's regular multi-industry report for the third quarter of 2014—just eight weeks after the May 2014 email discussed above—competitor bidding on hotels' branded keywords had already been reduced to zero. The Defendant Hotels have not meaningfully competed with one another in this space since the third quarter of 2014.

106. Certain Expedia communications with TravelPass beginning in January 2015 provide additional support for the existence of the primary horizontal conspiracy, although, given the allegations below, TravelPass did not understand the anticompetitive implications of Expedia's communications at the time.

107. Specifically, in late December 2014, Expedia told TravelPass, that the Defendant Hotels were focused upon TravelPass because TravelPass had developed such an effective branded keyword search advertising system.

108. In January 2015, Expedia provided to TravelPass directly a PowerPoint presentation discussing Expedia's own efforts to curb OTA bidding on branded keywords on behalf of the Defendant Hotels. In particular, this PowerPoint reflected a weekly "Chain Bidding Review" in which the Defendant Hotels' coordinated "Asks" were listed, along with the status of the Gatekeeper OTA's enforcement statistics. Notably, each Defendant Hotels' "Ask" is identical—"reduce [or keep] instances to zero."

| Chain | Asks, Risks | Status |
|---|---|---|
| Hilton | • **Ask** - Reduce instances to zero (Jan 23)<br>• **Risk** – Non-compliance results in less favorable renewal negotiating position and re-opens broad negative discussion | • Instances trending down WOW (-28%)<br>• However the same phrases remain WOW |
| Hyatt | • **Ask** - Reduce instances to zero (Dec 11) | • Instances increasing WOW trailing 4 weeks |
| IHG | • **Ask** – Reduce instances to zero (Dec 16) | • 3k+ instances weekly trailing 4 weeks |
| LQ | • **Ask** – Keep instances at zero | • No instances trailing 4 weeks |
| Marriott | • **Ask** – Reduce instances to zero (Jan 29) | • Instances trending down WOW (-24%) and has remained low YTD<br>• 24 unique keywords to address |
| Starwood | • **Ask** – Keep instances at zero<br>• **Risk** – Any new instances may result in removal of Starwood from feed | • No instances trailing 2 weeks |

(Attached as Exhibit F)

109.    In early 2015, Expedia expanded its efforts to effectuate the complementary secondary conspiracy on behalf of the Defendant Hotels.  On March 31, 2015, Matt Duckworth of Expedia issued a renewed demand to TravelPass that it cease bidding on branded keyword search advertising.  Importantly, Duckworth made this request *jointly* on behalf of all of the originally participating Defendant Hotels, including on behalf of, among others, Hilton, IHG, Four Seasons, Hyatt, and Marriott.

110.    By 2016, Expedia's attempts to police the conspiracies on behalf of the defendants had expanded.  For example, in 2016, Expedia provided TravelPass with copies of the formal weekly "monitoring" spreadsheets that Expedia also sent to the Defendant Hotels on a regular basis.

111.    But these monitoring spreadsheets did not simply record TravelPass's or other Downstream OTA's alleged "violations" of the relevant Defendant Hotel's previously unenforced OTA contract language.

112.     Instead, they *also* included information about *competitor* bidding on branded keywords associated with the relevant Defendant Hotel.   In the March 22, 2016 tracking spreadsheet, for instance, Expedia provided to Marriott (and later to TravelPass) a summary of each instance of Marriott-related branded keyword search bidding Expedia recorded between January and March of 2016.

113.     But this report highlights far more than instances of Expedia and Expedia affiliate bidding on Marriott-related keywords.   It also includes instances of other Gatekeeper OTA bidding, despite the fact that those Gatekeeper OTAs are Expedia's direct competitors.

114.     Even more telling, this same spreadsheet also reports on limited instances of *Hilton* bidding directly on Marriott-related terms.

115.     Because Marriott and Hilton are direct competitors, the implication is clear: Expedia was reporting on Hilton's Marriott-related bidding not because of any legitimate contractual obligation flowing from Hilton to Marriott by way of Expedia, but rather because Expedia was monitoring and enforcing the Defendant Hotels' horizontal agreement to eliminate interbrand competition by bid rigging the branded keyword SERP auctions.   Each of the Defendant Hotels regularly received reports like these from Expedia and from independent monitoring companies.   These monitoring efforts and reports enabled the Defendant Hotels to ensure that all co-conspirators were complying with the terms of the conspiracy.

## C.     THE ROLE OF TRADE ASSOCIATIONS, INDUSTRY CONSULTANTS, AND INDUSTRY CONFERENCES

116.     In light of, the coordinated pattern of the Defendant Hotels' conduct discussed above that actually did arise, trade association activity that occurred at the same time constitutes further evidence of the Defendant Hotels' horizontal conspiracies.

117.    The U.S. lodging industry is a uniquely tight-knit community. Several trade associations serve and coordinate hotel activity nationwide. The American Hotel & Lodging Association ("AHLA") is the most prominent and the most powerful of these trade groups.

118.    The AHLA's leadership is dominated by individuals whose interests align closely with those of the Defendant Hotels, and with hotel chains and hotel ownership generally vis-à-vis OTAs.

119.    The AHLA and other hospitality-industry groups or consulting firms sponsor several recurring meetings at which Defendant Hotels' representatives and hotel operators gather to discuss matters of concern to the industry.

120.    Aside from the AHLA's annual Legislative Action Summit, the most important of these meetings is the fall Dallas Hotel Conference, sponsored by a consortium of organizations with interests in the hotel industry. Representatives from AHLA and hotel-industry consultancies routinely make presentations at the Dallas Hotel Conference in which they discuss market trends and make blanket recommendations to the attendees about how to conduct their businesses.

121.    Around 2012, the AHLA became concerned about the ways in which "distribution"—*i.e.*, the increasing prominence of OTAs and other online sales channels—was affecting hotel profitability.

122.    Accordingly, the AHLA combined forces with the Hospitality Sales & Marketing Association International ("HSMAI") and hotel consulting firm STR in 2012 to produce a 214-page report entitled "Distribution Channel Analysis: A Guide for Hotels" ("2012 DCA Report"). (Relevant excerpts attached as Exhibit G.)

123.    This seemingly innocuous document, however, planted the seed for what ultimately matured into the Defendant Hotels' *per se* illegal horizontal conspiracies several years later.

124.     The 2012 DCA Report touches on a number of major themes:  (1) demand for hotel rooms is "price inelastic," meaning that lowering prices does not appreciably increase demand; (2) therefore, price competition among hotel brands is a "zero-sum game" that can result in a "race to the bottom" as "all hotels in the comp[etitive] set may well continue to lower rates to try to be the one hotel in the comp set that gets the short-term bump in demand;" (3) OTAs are the primary driver of "share shift" between hotels, which costs the hotels money because of OTA commission rates; (4) hotels should therefore concentrate on driving customers to "brand.com"—*i.e.*, to purchase directly from the hotels' own branded websites—instead of using OTAs to engage in customer "acquisition;" and (5) the rise of the OTAs has dramatically shifted the hotels' pricing model.  In the "old days," hotel rates generally derived from the "rack rate;" that is, the maximum published rate or "sticker price" for a room.  Now the competitive OTA rate drives pricing, and "other rates are likely to cascade from that."

125.     The 2012 DCA report thus recognizes the reality that the rise of internet search and OTAs brought an unprecedented (and unwanted) amount of direct price and quality competition permanently into the picture for hotels; the logical implication of the report is that hotels should therefore act to minimize the impact of that competition by protecting their brands from the OTAs and from one another.

126.     Presentations at the Dallas Hotel Conference beginning no later than 2013 emphasized the same themes.  In particular, presentations made by industry consultant Daniel Lesser and by AHLA representatives strongly reinforced that message.

127.     For example, in 2013, Lesser presented a "Strengths, Weaknesses, Opportunities, & Threats" ("SWOT") analysis to conference attendees.  Among the "Weaknesses" Lesser

identifies is "Continued room pricing pressure from OTA's (Rapidly changing technology)." He also lists "[r]apidly changing technology" as a "Threat."

128. Lesser identified the same problem in his 2014 presentation, noting that "Technology advances with OTA's continue negative pressure on room pricing."

129. In a section entitled "Random Dan Lesser Thoughts" in that same 2014 presentation, Lesser makes a pointed suggestion: "**<u>RAISE ROOM RATES aggressively NOW</u>**." (boldface emphasis, underlining, and capitalization in original.)

130. In that same presentation, Lesser laments that there are "Too many hotel brands," a position to which he returns in subsequent presentations.

131. The AHLA Dallas Hotel Conference presentation in 2014 struck the same notes, emphasizing that its new plan to "[t]ackle digital and distribution challenges" was one of its top three priorities, and articulating a strategy to use pretextual "deceptive practices" claims against OTAs to attempt to curb what it self-interestedly and inaccurately described as "Deceptive Ad Buys: Unauthorized Purchase of Words."

132. Lesser's presentations to the Defendant Hotels do not hide his preference that the hotels should act to reduce competition in this industry. For example, in his 2015 Dallas presentation, Lesser suggests an industry response to the threat posed by Airbnb. In his "Random Dan Lesser Thoughts" section of that presentation, Lesser suggests that the solution to that competitive problem is simple: "A hotel company should merge with Airbnb" to eliminate the threat. In 2016, Lesser's industry analysis again beat the drum against the OTAs, stating once more that, "OTA's place negative pressure on room pricing" in his "Weaknesses" section.

## D. THE DEFENDANT HOTELS' OWN PUBLICLY AVAILABLE DOCUMENTS INDICATE AN HORIZONTAL AGREEMENT TO CONSPIRE.

133.    Defendant Marriott's own publicly available documents support the existence of the primary horizontal conspiracy. These documents, from deep within Marriott's own public website, detail the terms and conditions associated with Marriott's internal affiliate program. As with Downstream OTAs, Marriott's affiliates earn commissions for Marriott rooms booked through affiliate websites.

134.    The April 2, 2009 version of Marriott's "US Operating Agreement Marriott International—Affiliate Agreement" contains language prohibiting Marriott affiliates that engage in "Paid Search" activities from "[p]lac[ing] Marriott ads in search engines based on the purchase of competitive brand keyword (*e.g.*: Hilton hotel), used alone or in conjunction with any other word or phrase." (Attached as Exhibit H).

135.    The 2009 version also requires that Marriott affiliates "agree to implement Marriott's Negative Keyword List," which, if enforced, would have the effect of preventing Marriott affiliates from bidding on any Marriott branded keywords. Thus, under the 2009 version of the Marriott affiliate terms and conditions, Marriott affiliates could not bid on branded keyword searches for Marriott's own brands. But the 2009 version does not contain any restrictions limiting the extent to which Marriott's own affiliates can bid on Marriott's *competitors'* branded keywords.

136.    This changed immediately following the implementation of the conspiracy. Marriott's most recent terms and conditions, reflected in a 2015 document entitled "Marriott International—Affiliate Operating Agreement" adds two new sequential sections under the heading "Paid Search." (Attached as Exhibit I.)

137.    Oddly, both sections have the same title: "Protected SEM Bidding Keywords." In the first "Protected SEM Bidding Keywords" section in the 2015 agreement, Marriott states that

its own affiliates are "expressly prohibited from bidding on Protected Keywords, as well as any variations or misspellings thereof, or confusingly similar terms in any search engines." Rather than refer affiliates to a separate list of prohibited terms, the Agreement lists seventy-seven Marriott brand keywords and variants affiliates are required to include in their "negative keyword list at the highest level possible."

138.    In the second "Protected SEM Bidding Keywords" section, Marriott states, "We ask you not to bid on *Non-Compete Keywords*, as well as any variations or misspellings thereof, or confusingly similar terms in any search engines. *Please include these in your negative keyword lists in all your search engines: . . .*" (emphasis added) The second "Protected SEM Bidding Keywords" section goes on to list fifty-six (56) branded keyword terms associated in one way or another *with Marriott's competitors*. The list includes most of the Defendant Hotel brands that compete most closely with Marriott's own flagship brands. It also includes keywords associated with several other significant hotel companies, including Fairmont, Four Seasons, Pacifica, and Red Lion. It also lists Cendant and Amerihost, two terms that have not been relevant to the hotel business since 2006, when the Cendant Corporation spun off its hotel operations (including Amerihost) to Defendant Wyndham, which immediately renamed the Amerihost properties "Baymont Inn" or "Baymont Inn & Suites."

139.    In other words, beginning in 2015, Marriott instructed its own OTA "affiliates" not to compete with at least some of Marriott's own direct competitors. Also, the list of "Non-Compete Keywords" in the 2015 Marriott Affiliate Operating Agreement was obviously amended at least once to add additional terms. The list begins in alphabetical order for the first 32 terms, but then begins to add new terms—"days inn, omni, Fairmont, Radisson, garden inn, interclub . . ."— haphazardly.

140.    Defendant Wyndham's current affiliate agreement includes similar language: "Affiliates are not allowed to bid on competitor's branded terms and direct traffic to any of the above brand sites." Inclusion of this language demonstrates the Defendant Hotels' refusal to compete on branded keyword search advertising in a manner that is directly contrary to their interests.

### E.    THE PRIMARY HORIZONTAL CONSPIRACY GROWS

141.    On November 14, 2016, the AHLA announced that senior executives from two new hotel chains—Caesars and Red Roof—would be joining its board of directors.

142.    Before their executives joined the AHLA board, neither Caesars nor Red Roof had participated actively or aggressively in the other conspirators' attempts to restrain branded keyword bidding.

143.    Within weeks of this announcement, Defendants Caesar and Red Roof began participating actively in the other Defendants' illegal activities.

144.    By the end of December 2016, both Red Roof and Caesars had sent TravelPass spurious "cease and desist" letters, and had begun complaining to Gatekeeper OTAs about OTA branded keyword bidding. Red Roof attempted to cut off TravelPass's access to Red Roof inventory in January 2017; in March 2017, Caesars followed suit.

### F.    THE SECONDARY CONSPIRACY BETWEEN THE GATEKEEPER OTAS AND THE DEFENDANT HOTELS

145.    The Defendant Hotels' primary conspiracy faced a problem: that conspiracy would not be effective unless and until the Defendant Hotels also eliminated third-party branded keyword bidding by Gatekeeper OTAs and their affiliates. Without that piece of the puzzle, the primary conspiracy would not work, because OTAs with access to the Defendant Hotels' inventories could

engage in precisely the sort of interbrand competition for search results that the Defendant Hotels' designed the primary conspiracy to eliminate.

146. Accordingly, at about the same time the primary conspiracy was getting started, the Defendant Hotels began their first large-scale effort to prevent OTAs from bidding on branded keyword search results. While the Defendant Hotels ostensibly based their demands upon largely unenforced OTA contract language, no Defendant Hotel could, as a practical matter, unilaterally insist that one OTA and its affiliates stop bidding on branded keywords without simultaneously ensuring (and reassuring that OTA) that the Hotel Defendant's other OTAs were agreeing to the same restraints.

147. The Gatekeeper OTAs were only willing to agree to this additional bid rigging scheme once they received assurances from the Defendant Hotels that *all* Gatekeeper OTAs would be subject to the same restrictions. If only a single OTA were subject to the restriction, what Expedia described in its correspondence with TravelPass as the "whack a mole" problem would arise. That is, any unrestrained Gatekeeper OTAs, Downstream OTAs, and other players would appear in branded term search auctions. As a result, the single restricted OTA would lose enormous amounts of business without solving the hotel's perceived problem.

148. Thus, the OTAs refused to accede to the Defendant Hotels' enforcement demands—either with respect to their own branded search activities or the activities of their affiliates—unless they received reassurance that competing OTAs were agreeing to the same conditions. For example, on February 13, 2017, a Gatekeeper OTA manager contacted TravelPass about Defendant Caesars' demand that OTAs stop bidding on Caesars-related keywords. The manager's email to TravelPass states, "We're still working with Caesars on this. They said that they are asking all these brands to cease bidding although I still see Expedia there today. We've

said that if everyone else complies, we will also comply." In a follow-up email sent on March 12, 2017, that same manager confirmed the existence of Caesars' secondary conspiracy. After informing TravelPass that the Gatekeeper OTA was going to comply with Caesars' demand to cut TravelPass off completely from Caesars supply, the manager stated, "We've also been told that EAN [Expedia Affiliate Network] and others are also taking the same action and so we will monitor this. If the inventory is still being made available to you or any others on this list, or if others are still bidding on the brand terms, we will be taking this back to Caesars."

149. Once the Defendant Hotels provided these assurances to the Gatekeeper OTAs, the secondary conspiracies gathered steam. Over time, Gatekeeper OTAs stopped competing with one another in branded keyword SERP auctions. They also began to insist that their Downstream OTA affiliates stop participating in such auctions, and punished affiliates that continued to engage in branded keyword search advertising by cutting off their access to hotel inventory. The documents and allegations supporting this secondary conspiracy are discussed above and are intertwined with the allegations supporting the primary conspiracy.

150. Thus, the Defendant Hotels facilitated and participated in a series of secondary bid rigging conspiracies with the purpose and effect of reducing or eliminating competition in search engine auctions for branded keyword SERP.

## VII. <u>INJURY/HARM</u>

### A. HARM TO COMPETITION

151. The conspiracies worked. Today, when a consumer runs a search for "Marriott Dallas" on Google, they typically see only one type of advertisement: ads linking directly to Marriott's own websites and properties. TravelPass and other Downstream OTAs, who prior to 2014 played a key role in the branded keyword bidding market, have all been essentially driven out of the branded keyword search business. As a result, these conspiracies have led to a *decrease*

in information to consumers, an *increase* in the transaction and other costs for consumers seeking to book a hotel, which inevitably leads to overall higher prices and reduced quality for consumers.

152.     As a result, between the third quarter of 2014 and the present, a robustly competitive market presenting online search consumers with numerous competitive options now presents them instead with an advertisements for a single brand. The conspiracy has virtually eliminated all interbrand competition in the online keyword search market for hotels.

### B.     HARM TO TRAVELPASS

153.     Given its key role in this increasingly competitive online marketplace, the damage TravelPass suffered was staggering. It was also inextricably intertwined with the damage hotel consumers nationwide suffered as a result of the Hotel Defendants' horizontal conspiracies.

154.     TravelPass and its predecessor entities Partner Fusion, Inc. and Reservation Counter, LLC have been OTA affiliates since at least 2010. From September 28, 2009 to present, TravelPass or one of its predecessors has been an affiliate of Booking Holdings Inc. and its predecessor entities. From 2009 to April 30, 2017 TravelPass or one of its predecessors was an affiliate of Expedia.

155.     As discussed above, TravelPass built its business around a highly sophisticated data analysis operation and complex algorithms that allow TravelPass to be uniquely effective when bidding for branded keyword search advertising. Thus, the vast majority of TravelPass's revenues historically have come from commissions paid by the OTAs for the hotel reservations TravelPass generates. Similarly, the vast majority of TravelPass's hotel reservations have in turn come from TravelPass's successful paid search operations. Before the conspiracy, virtually all of TravelPass's hotel reservations were a product of TravelPass's bidding on branded keyword search advertising.

156.     Compared to other Downstream OTAs, TravelPass was remarkably successful before the conspiracy; accordingly, it became a primary target of the Defendant Hotels as they were planning and implementing their conspiracies. Even if the Defendant Hotels were unable to prevent every Downstream OTA from bidding on branded keyword search advertising, simply preventing TravelPass from doing so would make their primary conspiracy significantly more effective.

157.     TravelPass received its hotel inventory supply for several Gatekeeper OTA's. And it took time (and a considerable amount of effort) for the Defendant Hotels to identify all the Gatekeeper OTA sources of TravelPass' inventory. Slowly, but surely, however the Defendant Hotels have succeeded in cutting off virtually all of TravelPass' access to inventory. And, as result, today, TravelPass has been seriously harmed because of the Defendant Hotels' illegal conduct.

158.     As the conspiracies took root, Defendant Hotels ultimately demanded that the Gatekeeper OTAs each cut the "feed" of the Defendant Hotels' room inventory available to TravelPass and other Downstream OTAs who continued to follow their branded-keyword-bidding-based business models. In fact, several of the Defendant Hotels attempted to cut off TravelPass's access to hotel rooms associated with their brands entirely. Other Defendant Hotels allowed TravelPass continued access to their inventory, but only on the condition that TravelPass not bid on branded keywords associated with their properties. The functional result: TravelPass has lost Gatekeeper-OTA-driven access to a significant percentage of the Defendant Hotels' inventory and retains access to most of the remainder only by complying against its will with the inherently anticompetitive terms of the Defendant Hotels' bid rigging/market division conspiracies.

159.    The Defendant Hotels' illegal activities thus caused TravelPass extraordinary harm—harm intrinsically and inextricably related to the harm their collusive conduct also caused to hotel consumers.

160.    Just before the Defendant Hotels' conspiracies really took hold, TravelPass was negotiating with an experienced and well-established private equity firm interested in taking an equity position in TravelPass's business.    In March of 2015, that firm forwarded to TravelPass a term sheet outlining the details of their proposed investment.    In exchange for a minority equity stake amounting to just under 22% of TravelPass's voting shares, that firm offered TravelPass a cash investment of $40 million ($40,000,000).    Moreover, the private equity firm's proposal included its own independent valuation of TravelPass's overall business; it valued TravelPass at $165 million ($165,000,000)—just as the Defendant Hotels' scheme was beginning to take root.

161.    Shortly before the private equity transaction was scheduled to close, the private equity firm withdrew its offer.    Their decision resulted in large part from the havoc the Hotel Defendants' inventory feed cut-off wreaked on TravelPass's revenues and profitability—cut-offs TravelPass later learned were a direct and intended result of the Defendant Hotels' conspiracies.

162.    The best evidence of this?  TravelPass received another purchase offer in December outright in December 2017, well after the conspiracies had nearly destroyed TravelPass's business. That bid for 100% of the company:  $25 million ($25,000,000).

163.    This decrease in TravelPass's value was the direct and intended consequence of the Defendant Hotels' illegal activities.

# VIII.  CAUSES OF ACTION

### Count I
### Sherman Act Section 1
### Per Se Bid Rigging/Group Boycott/Market Division

164.    TravelPass hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

165.    Beginning in or around 2014, and continuing to the present, Defendants and their co-conspirators have engaged in a conspiracy and agreement in unreasonable restraint of interstate trade and commerce, constituting a violation of Section 1 of the SHERMAN ACT, 15 U.S.C § 1.

166.    The conspiracy and agreement are among Defendants and their co-conspirators to refuse to bid on each other's branded keywords and has restrained trade and the free flow of information from sellers to buyers. In particular, the conspiracy restricted advertisements for the sale of hotel rooms on the internet by prohibiting competitors from presenting paid advertisements on the search engine results page in response to searches for the Defendant Hotels' branded search terms. This conspiracy has thus interfered with the flow of information from sellers to buyers and raised the costs to consumers of finding the most suitable offering.

167.    For the purpose of forming and effectuating this agreement and conspiracy, some of all of the Defendant Hotels did the following things, among others:

168.    Regularly communicated, both in person, on the telephone and in emails with the Gatekeeper OTAs and with each other through trade associations and, on information and belief, otherwise to exchange information and assurances of solidarity to advance the ends of the conspiracy;

169.    Received regular monitoring reports from Gatekeeper OTAs about any potential violations of the conspiracy;

170. Eliminated the ability for all OTAs and other Defendant Hotels to bid competitively on each other's branded keywords; and

171. Abruptly discontinued in the third-quarter of 2014 the bidding on competitive branded keywords.

172. The agreement not to compete by bidding on one another's branded keywords by the Defendant Hotels and the Gatekeeper OTAs is a horizontal *per se* bid rigging and group boycott.

173. Viewed in the aggregate, Defendant Hotels' conduct also constitutes a *per se* illegal horizontal market division or territorial allocation scheme. Specifically, the combination of Defendants' primary and secondary conspiracies had the purpose and effect of "fencing off" branded keyword territory. Each Defendant Hotel agreed to stay out of the other Defendant Hotels' branded keyword territories, and the secondary conspiracies further ensured a successful market division by preventing Gatekeeper OTAs and their Downstream OTA affiliates from entering *any* of the territories the Defendant Hotels wrongfully claimed. Freed from the threat of competition within their respective branded keyword territories, the Defendant Hotels were free to exploit their advantages to the detriment of consumers, TravelPass, other Downstream OTAs, and internet search engines.

174. Moreover, the Defendant Hotels' conspiracy and agreement have resulted in obvious and demonstrable anticompetitive effects on consumers and Downstream OTAs like TravelPass such that they constitute an unreasonable restraint on trade in violation of Section 1 of the SHERMAN ACT, 15 U.S.C § 1.

175.    TravelPass was injured in its business or property by the collusion and conspiracy alleged above, which facilitated, enabled, assisted, or furthered Defendants' substantial foreclosure and exclusion of competition.

## Count II
## Sherman Act Section 1
## Unreasonable Restraint of Trade

176.    TravelPass hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

177.    These conspiracies constitute contracts, combinations, and conspiracies that substantially, unreasonably, and unduly restrain trade.

178.    TravelPass was injured in its business or property by the conspiracies alleged above which facilitated, enabled, assisted, or furthered the Hotel Defendants' substantial foreclosure and exclusion of competition.

## Count III
## Utah Antitrust Act Section 1
## Per Se Bid Rigging/Group Boycott/Market Division

179.    TravelPass hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

180.    Beginning in or around 2014, and continuing to the present, Defendants and their co-conspirators have engaged in a conspiracy and agreement in unreasonable restraint of trade and commerce, constituting a violation of Section 1 of the UTAH ANTITRUST ACT, U.C.A. § 76-10-3104.

181.    The conspiracy and agreement consist of an understanding and concert of action among Defendants and their co-conspirators to refuse to bid on each other's branded keywords and have restrained trade and the free flow of information from sellers to buyers. In particular, the

conspiracy restricted advertisements for the sale of hotel rooms on the internet by prohibiting competitors from presenting paid advertisements on the search engine results page in response to searches for the Defendant Hotels' branded search terms. This conspiracy has thus interfered with the flow of information from sellers to buyers and raised the costs to consumers of finding the most suitable offering.

182. For the purpose of forming and effectuating this agreement and conspiracy, some of all of the Defendant Hotels did the following things, among others:

183. Regularly communicated, both in person, on the telephone and in emails to with the Gatekeeper OTAs and, in some instances, with each other to exchange information and assurances of solidarity to advance the ends of the conspiracy;

184. Received regular monitoring reports from Gatekeeper OTAs about any potential violations of the conspiracy;

185. Eliminated the ability for all OTAs and other Defendant Hotels to bid competitively on each other's branded keywords; and

186. Abruptly discontinued in the third quarter of 2014 the bidding on competitive branded keywords.

187. The agreement not to compete by bidding on one another's branded keywords by the Defendant Hotels and the Gatekeeper OTAs is a horizontal *per se* bid rigging and group boycott.

188. In the aggregate, the Defendant Hotels' conspiracies also constitute a *per se* illegal horizontal market division scheme.

189. Moreover, the Defendant Hotels' conspiracy and agreement have resulted in obvious and demonstrable anticompetitive effects on consumers and Downstream OTAs like

TravelPass such that they constitute an unreasonable restraint on trade in violation of Section 1 of the UTAH ANTITRUST ACT, U.C.A. § 76-10-3104.

190.    TravelPass was injured in its business or property by the collusion and conspiracy alleged above, which facilitated, enabled, assisted, or furthered Defendants' substantial foreclosure and exclusion of competition in the relevant market(s). As a citizen and/or resident of Utah who has been injured by this conduct, TravelPass is entitled to relief pursuant to U.C.A. § 76-10-3109(1)(a).

**Count IV**
**Tortious Interference With Prospective Business Relations**

191.    TravelPass hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

192.    Beginning in or around 2014, and continuing to the present, Defendants and their co-conspirators have individually and collectively intentionally interfered with TravelPass's existing and potential economic relations with customers and potential customers of TravelPass's websites.

193.    This interference was through improper and/or unlawful means, including but not limited to the violation of the statutes alleged above.

194.    This interference has caused injury to TravelPass by preventing customers and potential customers of TravelPass' websites from obtaining information about available hotel rooms through branded keyword bidding by TravelPass, which in turn caused a dramatic reduction in TravelPass' commission revenue.

# IX.  PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests the following:

A.  Defendants' actions described herein be adjudged and decreed to be in violation of Section 1 of the SHERMAN ACT, 15 U.S.C. § 1 and Section 1 of the UTAH ANTITRUST ACT, C.A. § 76-10-3104;

B.  Plaintiff recover damages, as provided by law, that it is determined to have sustained, and that judgment in favor of Plaintiff be entered against Defendants;

C.  Plaintiff recover its costs of this suit, including reasonable attorneys' fees, as provided by law; and

D.  Plaintiff be granted such other, further and different relief as the nature of the case may require or as may seem just and proper to this Court.

# X.  JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

DATE: December 6, 2018

Respectfully submitted,

_/s/ Christopher J. Schwegmann_
Christopher J. Schwegmann
cschwegmann@lynnllp.com
Jeremy A. Fielding
jfielding@lynnllp.com
Christopher J. Schwegmann
cschwegmann@lynnllp.com
Christopher W. Patton
cpatton@lynnllp.com
Ruben Garcia
rgarcia@lynnllp.com
**LYNN, PINKER, COX & HURST, L.L.P.**
2100 Ross Avenue, Suite 2700
Dallas, Texas 75201
(214) 981-3800 Telephone
(214) 981-3839 Facsimile

-and-

Todd M. Schneider (_pro hac vice pending_)
tschneider@schneiderwallace.com
Jason H. Kim (_pro hac vice pending_)
jkim@schneiderwallace.com
**SCHNEIDER WALLACE COTTRELL KONECKY WOTKYNS LLP**
2000 Powell Street, Suite 1400
Emeryville, California 94608
(415) 421-7100 Telephone
(415) 421-7105 Facsimile

_Attorneys for Plaintiff_
_TravelPass, Partner Fusion and Reservation Counter._