UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
TEXARKANA DIVISION

| | | |
|---|---|---|
| TRAVELPASS GROUP, LLC, PARTNER | § | |
| FUSION, INC. and RESERVATION | § | |
| COUNTER, LLC | § | |
| | § | |
| v. | § | Case No. 5:18-cv-153-RWS-CMC |
| | § | |
| CAESARS ENTERTAINMENT | § | |
| CORPORATION, ET AL. | § | |

## REPORT AND RECOMMENDATION
## OF THE UNITED STATES MAGISTRATE JUDGE

The above-entitled and numbered civil action was referred to the undersigned United States

Magistrate Judge Caroline M. Craven pursuant to 28 U.S.C. § 636. Before the Court are the

following pending motions:

> **Joint Motion to Dismiss on Behalf of Defendants Hilton Domestic Operating
> Company Inc., Hyatt Hotels Corporation, Marriott International, Inc., Red
> Roof Inns, Inc., Six Continents Hotels, Inc., and Wyndham Hotel Group, LLC
> (Docket Entry # 53);**
>
> **Defendant Caesars Entertainment Corporation's Motion to Dismiss for Failure
> to State a Claim (Docket Entry # 55) and supplement thereto (Docket Entry #
> 159); and**
>
> **Defendant Choice Hotels International, Inc.'s Motion to Dismiss for Failure to
> State a Claim (Docket Entry # 56).**

The Court, having carefully considered the relevant briefing and hearing arguments of counsel April

17, 2019, recommends the motions be **DENIED**.

# I. BACKGROUND

## A.    Plaintiffs' general allegations

On December 16, 2018, Plaintiff TravelPass Group, LLC and its predecessor or related entities, Reservation Counter, LLC, and Partner Fusion, Inc. (collectively, "Plaintiffs" or "TravelPass") filed this antitrust case against Caesars Entertainment Corporation, Choice Hotels International, Inc., Hilton Domestic Operating Company, Inc., Hyatt Corporation,[1] Marriott International, Inc., Red Roof Inns, Inc., Six Continents Hotels, Inc., and Wyndham Hotel Group, LLC., alleging a horizontal conspiracy among these hotel chains and others to eliminate interbrand competition for keyword internet searches, "which millions of customers use to book hotel rooms online each year."  Orig. Compl. (Docket Entry # 1), ¶ 1. The defendants in this case are the "six largest hotel chains in the United States, along with Caesars Entertainment Corporation and Red Roof Inns, Inc." (collectively, "Defendants" or "Defendant Hotels"), which "together control the substantial majority of the hotel rooms in the United States" through "direct ownership or franchising relationships."  *Id.*, ¶ 3.

According to the complaint, Defendants, conspiring with one another and with "so-called gatekeeper online travel agencies ('OTAs') like Expedia and others," ("Gatekeeper OTAs") "rigged bids and engaged in a group boycott to eliminate competing paid search advertisements displayed by internet search engines by agreeing not to bid on one another's branded keywords."  *Id.*, ¶ 1. Plaintiffs are or were "affiliates" of the Gatekeeper OTAs, "obtaining access to the Defendant

---

[1] The Original Complaint named Hyatt Hotels Corporation as a defendant, but Hyatt Corporation has since been substituted as a defendant in this action in place of Hyatt Hotels Corporation, such that all claims made against Hyatt Hotels Corporation are now made against Hyatt Corporation. Docket Entry # 151.

Hotels' inventory via these Gatekeeper OTAs. *Id.*, ¶ 3 (further alleging TravelPass, as one of the major "Downstream OTAs," marketed the Defendant Hotels' rooms online by bidding on branded keywords in auctions conducted by online search engines like Google).[2]

According to Plaintiffs, over time, Defendants' "conspiracy effectively divided the market for branded keyword search results between and among the Defendant Hotels, allocating branded keyword territory such that the Defendant Hotels no longer had to compete either with one another or with TravelPass and other internet travel innovators." *Id.*, ¶ 1.  Plaintiffs allege Defendants' illegal activities, taken together, "have severely reduced, and in many cases even eliminated, the revolutionary benefits of the internet economy for hotel consumers," and have "left in its wake an online travel booking marketplace characterized by deliberately limited information and high transaction costs—a marketplace where innovators like Plaintiffs can no longer operate effectively to ensure consumers continue to receive those benefits." *Id.*

## B.     Online Travel Agencies

### 1.     OTAs generally

"OTAs have provided hotel consumers with, among other things, one-stop comparison-shopping for multiple properties across multiple brands." *Id.*, ¶ 72.  OTAs generally allow hotel consumers to compare many different competing hotels' prices, locations, amenities, and availability on a single screen, and they also provide "significant value to the hotels with which they contract,

---

[2] "Gatekeeper" OTAs are those few OTAs, including Expedia and Priceline, who maintain most direct relationships with Defendants to market Defendants' hotel inventory through the Internet. Docket Entry # 1, ¶ 46. "Downstream" OTAs are OTAs like TravelPass who, for the most part, sign affiliate agreements with Gatekeeper OTAs to obtain access to Defendants' hotel inventory. *See id.*

3

because OTA-driven bookings represent a huge percentage of the Defendant Hotels' overall revenue streams." *Id.*, ¶¶ 72-73.

## 2. TravelPass specifically

"TravelPass is a Downstream OTA whose business model is built around bidding on branded keyword search results to attract hotel consumers to its room inventory. It sells hotel rooms from numerous hotel chains—including Marriott, Hilton, and others—directly to consumers throughout the United States." *Id.*, ¶ 45. TravelPass obtains access to the Defendant Hotels' inventory via the Gatekeeper OTAs and also obtains hotel room inventory through global distributors and wholesale suppliers. *Id.*, ¶¶ 46-47. It relies on branded keyword advertising to draw consumers to its websites and to offer those consumers a wide range of hotel rooms. *Id.*, ¶ 48. "The vast majority of TravelPass's revenues historically have come from commissions paid by the Gatekeeper OTAs for the hotel reservations TravelPass generates. In turn, the vast majority of TravelPass's hotel reservations have come from TravelPass's successful paid search operations." *Id.*, ¶ 76.

## C. Branded keyword search advertising

Search engines like Google auction keyword search responses to advertisers.[3] *Id.*, ¶ 5; *see also id.* at ¶ 54. As a result, when an internet user types in keywords as part of a search query, it will trigger certain advertisements at the top of a search engine's results pages ("SERP"). *Id.*, ¶ 5. Advertisers bid on keywords that they would like to trigger their ads, and the higher bidding advertisers obtain better placement of their ads on a search engine's results page; these "paid results"

---

[3] "Keywords are those words that, when typed by a user as part of a search query, will trigger advertisements at the top of a search engine's results pages." Docket Entry # 1, ¶ 50 ("All other things equal, the higher the advertiser's bid, the better ad placement they receive on a search engine's results page.").

4

generally display at the "very top of a search engine's result page, above the 'organic search' results driven entirely by the search engine's basic algorithms."[4]  *Id.*

"Consumers shopping for hotel rooms or other products online generally 'click through' to relatively higher-placed search results more frequently than to results appearing lower down the page (or on subsequent pages)."  *Id.*, ¶¶ 5, 59. Plaintiffs allege "the new internet economy forced [Defendants] to compete with one another by bidding on paid keyword search placement for searches incorporating both *their own* branded keywords and the branded keywords associated *with their competitors*." *Id.*, ¶ 6 (emphasis in complaint); *see also id.* at ¶¶ 53, 64.

According to Plaintiffs, "before the conspiracy, a consumer using Google to search for one Defendant Hotel's brand(s) would have received prominently placed results for that brand, and *also* results for competing hotel brands, Gatekeeper OTA websites, and Downstream OTA websites." *Id.*, ¶ 6. Additionally, the consumer "would have received prominently placed search results for the Gatekeeper OTAs and Downstream OTAs that had submitted high bids to Google in connection for searches involving those keywords."[5]  *Id.*; *see also id.* at ¶ 67.

---

[4] Regarding "keyword search auctions," Plaintiffs allege, among other things, as follows. Search engines calculate an ad's quality score by evaluating multiple components of that advertisement, including the advertiser's historical clickthrough rate, keyword and advertisement relevance, the quality and relevance of the advertiser's landing page, and the advertiser's historical account performance. Docket Entry # 1, ¶¶ 54-55 (alleging the higher an ad's quality score, the lower the advertiser will have to bid to win a keyword auction and further alleging "even temporary absence from keyword auctions can dramatically increase an advertiser's bidding costs by lowering its quality score"). According to Plaintiffs, keyword search auctions are sealed, and advertisers do not know what other advertisers are bidding when they submit bids to search engines. *Id.*, ¶ 58 ("Nonetheless, because keyword auctions are competitive, the price per click for keyword advertisements is often high, especially compared with other forms of online advertising. These higher prices reflect the high value of keyword search advertising.").

[5] "Furthermore, according to one 2014 Google study of hotel shoppers provided to TravelPass, as of the second quarter of 2014, keyword searching was the number one starting point for consumers looking to book a hotel room online. Indeed, as of early 2014, search volume for hotel room shoppers was on the rise, having increased by almost 20% over the previous year."  Docket Entry # 1, ¶ 61.
"This Google study also found that, as of early 2014, customers who search for one specific hotel brand online, *e.g.,* Hilton, would often end up purchasing a hotel room with another brand, *e.g.,* Marriott. For example, 22% of

**D.      Defendants' alleged conspiracies**

**1.      The primary and secondary conspiracies**

**a.      The primary horizontal conspiracy between the Hotel Defendants**

Plaintiffs allege Defendants "entered into a conspiracy to eliminate interbrand competition among themselves and among OTAs for branded keyword search advertising." *Id*., ¶ 7. To effect their conspiracy, the Defendant Hotels teamed up with Gatekeeper OTAs, like Expedia, with the express goal of eliminating competition for branded keyword search advertising. *Id.*  According to Plaintiffs, the "online hotel reservations business created a situation in which it would only have been in the individual Defendant Hotel's economic interest to enforce dormant contractual restrictions on branded keyword search advertising if those hotels simultaneously conspired with one another and with the OTAs at the interbrand level." *Id*., ¶ 84.  "Although some [of] the Defendant Hotels began incorporating various nominal contractual restrictions on Gatekeeper OTAs and Downstream OTA branded keyword search advertising in 2010 or even earlier, actual enforcement of the contractual restrictions would have been economic suicide unless the hotels simultaneously conspired to eliminate direct interbrand competition for branded keyword search advertising between and among themselves." *Id*., ¶ 87.

> It therefore made no economic sense for any one Defendant Hotel to enforce its contract restrictions against Gatekeeper and Downstream OTAs unilaterally. The OTAs provided too much protection against competitor hotel bidding. Instead, the Defendant Hotels could only resolve the tension inherent in the competing incentives by (1) colluding with one another to eliminate interbrand competition in the branded keyword search auctions; and (2) inducing Gatekeeper OTAs to agree with one another to eliminate bidding in branded keyword search auctions among themselves and their affiliates.

---

consumers searching for Hilton-branded hotels ended up booking with a Marriott-branded hotel instead." *Id*., ¶ 63 ("This is the essence of robust competition, whether Defendant Hotels liked it or not.").

*Id.*, ¶ 91. Plaintiffs allege "[i]n whole or in part, the Defendant Hotels reached this horizontal agreement, using Gatekeeper OTAs as intermediaries or hubs. *Id.*, ¶ 94.

**b.      The secondary conspiracy between the Gatekeeper OTAs and the Defendant Hotels**

Plaintiffs allege Defendant Hotels realized "their primary horizontal conspiracy could not be fully effective without complementary conspiracies designed to ensure that Gatekeeper OTAs and Downstream OTAs like TravelPass *also* stopped bidding on branded keyword search advertising.") (emphasis in original); *see also id.* at ¶ 145.  Plaintiffs allege "[o]ver time, the Gatekeeper OTAs stopped competing with one another in branded keyword SERP auctions" and "also began to insist that their Downstream OTA affiliates stop participating in such auctions, and punished affiliates that continued to engage in branded keyword search advertising by cutting off their access to hotel inventory." *Id.*, ¶ 149.

Plaintiffs allege "the Defendant Hotels implemented a series of additional, or secondary, horizontal conspiracies under which Gatekeeper OTAs (1) agreed to stop bidding on branded search keywords and (2) also agreed to force Downstream OTAs to follow suit." *Id.,* ¶ 16. Specifically, Plaintiffs allege the Gatekeeper OTAs like Expedia coordinated this conspiracy for the Defendant Hotels in "three discrete, but interrelated, ways."[6] *Id.*, ¶ 8.  First, "the Gatekeeper OTAs acted as go-betweens for the hotel chains, helping them to reach the illegal agreements that ensured a 'level playing field' between and among the Defendant Hotels by eliminating interbrand competition for branded keyword search results." *Id.*, ¶ 9 (further alleging that because of their role, the Gatekeeper

---

[6] The original complaint alleges "[v]arious persons, who are known and unknown to Plaintiffs, and not named as defendants in this action, have participated as co-conspirators with Defendants in the offense alleged and have performed acts and made statements in furtherance of the conspiracy."  Docket Entry # 1, ¶ 40 ("These include, among others, Gatekeeper OTAs, trade associations, and industry consultants.").

OTAs' coordination reduced the need for direct communication between the Defendant Hotels themselves).

"Second, the Gatekeeper OTAs assisted the Defendant Hotels in extending the scope and effectiveness of the conspiracy by expanding the bid rigging to include the Gatekeeper OTAs themselves." *Id.*, ¶ 10. "Third, the Gatekeeper OTAs helped the Defendant Hotels police the conspiracy, especially in its earliest days, by generating and providing monitoring reports to the Defendant Hotels reporting on the level of compliance with the bid rigging conspiracy by various market participants." *Id.*, ¶ 11.

Like the Defendant Hotels, Plaintiffs allege the Gatekeeper OTAs had no incentive to agree to these secondary conspiracies without assurances that all OTAs were agreeing to the same restraints; "if one OTA agreed and others did not, the agreeing OTA would be at a substantial competitive disadvantage in the marketplace." *Id.*, ¶ 17. Plaintiffs further allege the OTAs refused to accede to the Defendant Hotels' enforcement demands—either with respect to their own branded search activities or the activities of their affiliates—unless they received reassurance that competing OTAs were agreeing to the same conditions. *Id.* at ¶ 148.

## 2. Allegations regarding evidence of the conspiracies

Among other things, Plaintiffs assert the alleged primary horizontal conspiracy (bid rigging to eliminate interbrand competition for branded keyword search advertising) is evidenced by the following: (1) communications about "level[ing] the playing field" confirming coordination among Gatekeeper OTAs;[7] (2) acts contrary to economic interests;[8] (3) motive to enter the conspiracy,

---

[7] According to the complaint, as early as May 2014, one Gatekeeper OTA's account manager admitted in emails sent to certain Downstream OTAs that the conspiracy's goal was to "level the playing field" by "ensuring that [the Defendant Hotels] are not employing similar branded keyword bidding strategies to bid on other chains e.g., Marriott

including knowledge or assurances that competitors also would enter; (4) post-January 2015 monitoring via monthly and later weekly reports from Expedia identifying the activity of the OTAs and other Defendant Hotels; (5) communications regarding coordination among Defendants and sometimes with the Gatekeeper OTAs "to exchange information and assurances of solidarity to advance the ends of the conspiracy;" and (6) confirmation by Google that Defendants' behavior (interbrand competition between the Defendant Hotels for branded keyword search) abruptly changed by the third quarter of 2014. *Id.*, ¶ 93. The documents and allegations supporting the alleged secondary conspiracy are "intertwined with the allegations supporting the primary conspiracy." *Id.*, ¶ 149.

The original complaint also contains numerous allegations regarding the role of trade associations, industry consultants, and industry conferences and generally asserts that "[i]n light of, the coordinated pattern of the Defendant Hotels' conduct discussed above that actually did arise, trade association activity that occurred at the same time constitutes further evidence of the Defendant Hotels' horizontal conspiracies." *Id.*, ¶ 116; *see also id.* at ¶¶ 117-119 (alleging the American Hotel & Lodging Association ("AHLA") is the most prominent and powerful of the trade associations that

---

bidding on Hilton." Docket Entry # 1, ¶¶ 12, 93. Plaintiffs allege "Expedia representatives revealed [in the May 2014 email chain addressing certain Hotel Defendants' early secondary attempts to curb OTA bidding] both the existence of and mechanism behind the Defendant Hotels' primary conspiracy to eliminate interbrand competition at the hotel level." *Id.*, ¶ 95; *see also id.* at ¶¶ 96-102.

> [8] Specifically, Plaintiffs allege as follows:
> Viewed in isolation, no individual Hotel Defendant had an independent economic incentive to cease bidding on its competitors' branded keywords. By the time the conspiracy was underway, branded trademark owners' spurious claims that competitor bidding on branded keywords violated federal trademark law had been thoroughly rejected by the courts. As a result, none of the Defendant Hotels had an independent incentive to refrain from bidding on its competitors' branded terms because they were legitimately concerned about infringement claims.

Docket Entry # 1, ¶ 13.

serve and coordinate hotel activity nationwide and further alleging "AHLA's leadership is dominated by individuals whose interests align closely with those of the Defendant Hotels and with hotel chains and hotel ownership generally vis-à-vis OTAs"). According to Plaintiffs, the AHLA and other hospitality-industry groups sponsor several recurring meetings at which Defendant Hotels' representatives and hotel operators gather to discuss matters of concern to the industry. *Id*., ¶ 119. The most important of these meetings is the fall Dallas Hotel Conference, "sponsored by a consortium of organizations with interests in the hotel industry" where representatives from AHLA and hotel-industry consultancies make presentations where they discuss market trends and make blanket recommendations to attendees about how to conduct their businesses. *Id*., ¶ 120.

## E.    Injury/harm

### 1.    Harm to competition

Plaintiffs allege internal Google search data recently disclosed to TravelPass by Google shows that before 2015, each of the Defendant Hotels frequently bid in the keyword search auctions not only for their own, but also for their competitors' search terms. *Id*., ¶ 15. However, by the end of 2014, "interbrand competition between the Defendant Hotels for branded keyword search all but disappeared and remained virtually nonexistent thereafter. " *Id.*  Plaintiffs allege this "abrupt change is a direct result of the horizontal conspiracies." *Id.*  Plaintiffs further allege the "competitive marketplace changed around the third quarter of 2014 when, according to Google, each of the Defendant Hotels abruptly stopped bidding in actions for searches incorporating the branded keywords of their competitors." *Id*., ¶ 68.

According to the complaint, today when a consumer runs a search for "Marriott Dallas" on Google, "the almost universal result is only one type of paid advertisement: an ad for Marriott's own websites." *Id*., ¶ 19 (further alleging the same is true for the other Defendant Hotels' brands as well). As a result, these conspiracies have led to a decrease in information to consumers, an increase in the transaction and other costs for consumers seeking to book a hotel, which inevitably leads to overall higher prices and reduced quality for consumers. *Id*., ¶151; *see also id.* at ¶ 152.

## 2.    Harm to TravelPass

Plaintiffs allege TravelPass and other Downstream OTAs have all been essentially driven from the market. *Id*., ¶ 151. Plaintiffs allege "[b]efore the Defendant Hotels' horizontal conspiracies began to take effect, TravelPass's data-driven branded keyword advertising success had made it one of the most successful Downstream OTAs; thus, before the conspiracies, TravelPass had grown to become one of the Gatekeeper OTAs' most valuable search partners." *Id*., ¶ 49; *see also id.* at ¶¶ 76, 155-56. According to Plaintiffs, "the Defendant Hotels have succeeded in cutting off virtually all of TravelPass' access to inventory," and, as a result, TravelPass has been seriously harmed because of the Defendant Hotels' illegal conduct. *Id*., ¶ 157.

Plaintiffs further assert in March 2015 before the Defendant Hotels' conspiracies "really took hold" TravelPass was "negotiating with an experienced and well-established private equity firm interested in taking an equity position in TravelPass's business." *Id*., ¶ 160. According to the complaint, shortly before the private equity transaction was scheduled to close, "the private equity firm withdrew its offer." *Id*., ¶ 161. Plaintiffs allege TravelPass's value decreased as a "direct and intended consequence of the Defendant Hotels' illegal activities." *Id*., ¶¶ 160, 162-163.

### F.   Plaintiffs' claims

Plaintiffs assert four causes of action against Defendants, including (1) violation of the Sherman Act,15 U.S.C. § 1 (*per se* bid rigging/group boycott/market division), (2) violation of the Sherman Act,15 U.S.C. § 1 (unreasonable restraint of trade), (3) violation of related Utah Antitrust Act § 1, and (4) tortious interference with prospective business relations. *Id*., ¶¶ 164-94.

## II. MOTIONS TO DISMISS

Hilton, Hyatt, Marriott, Red Roof, Six Continents, and Wyndham jointly filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) ("joint motion").[9]  First, Defendants assert Plaintiffs' antitrust claims based on the "primary" conspiracy fail as a matter of law because "there are no facts to suggest that TravelPass was harmed by the purported horizontal agreement among hotels to not bid on each other's branded keywords." Docket Entry # 53 at p. 9.  Because TravelPass did not suffer injury-in-fact as a result of the agreement, Defendants contend Plaintiffs lack antitrust standing to challenge the primary conspiracy.

Second, Defendants argue Plaintiffs lack antitrust standing to challenge the "secondary" conspiracy involving the Gatekeeper OTAs.  According to Defendants, if any injury to TravelPass flowed from the enforcement of distribution contracts between the Defendant Hotels and the Gatekeeper OTAs, any such injury is not the type of injury the antitrust laws were intended to prevent.  *Id*. at p. 10.

---

[9] Caesars and Choice filed separate motions to dismiss for failure to state a claim.  Docket Entry #s 55, 56. In their separate motions, Caesars and Choice incorporate by reference the arguments set out in the joint motion.

Third, Defendants contend Plaintiffs fail to allege facts sufficient to support the existence of either the primary or secondary conspiracy.  *Id*. at pp. 12-23.

Finally, Defendants argue Plaintiffs' derivative claim for tortious interference with prospective business relations should be dismissed because TravelPass has not plausibly alleged the elements of such a claim.  *Id.* at pp. 23-24.

Caesars filed a separate motion, in conjunction with the joint motion, "to highlight the utter absence of factual allegations in Plaintiffs' complaint that would suggest that Caesars participated in a combination or conspiracy to violate the antitrust laws."  Docket Entry # 55 at p. 1. According to Caesars, "though 194 paragraphs in length, Plaintiffs' Complaint contains only eight (8) paragraphs specifically referencing Caesars at all, with three of those merely describing Caesars as an entity."  *Id*.

In its separate motion, Choice similarly asserts Plaintiffs do not plead a single allegation about when, why, or how Choice joined a supposed conspiracy to refrain from bidding on other hotels' branded keywords.  Docket Entry # 56 at p. 1 (stating the complaint is vague and lumps the defendants together without sufficient detail and should be dismissed).  Plaintiffs' "allegations suffer from an additional fatal flaw," according to Choice.  *Id*.  Choice represents it is "undisputed that Choice is not a member of the American Hotel and Lodging Association, the organization through which 'Defendants' allegedly coordinated their conspiracy."  *Id.* (further stating Choice is not featured in any of the exhibits Plaintiffs attach to their complaint or in any of the alleged studies on which the complaint relies).

### III.  LEGAL STANDARD – RULE 12(b)(6)

The Federal Rules of Civil Procedure require each claim in a complaint include a "short and plain statement . . .  showing that the pleader is entitled to relief." FED. R.CIV. P. 8(a)(2). Each claim must include enough factual allegations "to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

A Rule 12(b)(6) motion allows a party to move for dismissal of an action when the complaint fails to state a claim upon which relief can be granted. FED. R. CIV. P. 12(b)(6). When considering a motion to dismiss under Rule 12(b)(6), the court must accept as true all well-pleaded facts in the plaintiff's complaint and view those facts in the light most favorable to the plaintiff. *Bowlby v. City of Aberdeen*, 681 F.3d 215, 219 (5th Cir. 2012). The court may consider "the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint." *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010). The Court must then determine whether the complaint states a claim for relief that is plausible on its face.

"'A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Gonzalez v. Kay*, 577 F.3d 600, 603 (5th Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (quoting FED. R. CIV. P. 8(a)(2)).

14

In *Iqbal*, the Supreme Court established a two-step approach for assessing the sufficiency of a complaint in the context of a Rule 12(b)(6) motion. First, the court should identify and disregard conclusory allegations, for they are "not entitled to the assumption of truth." *Id.* at 664. Second, the court "consider[s] the factual allegations in [the complaint] to determine if they plausibly suggest an entitlement to relief." *Id.* "This standard 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary claims or elements.'" *Morgan v. Hubert*, 335 Fed. Appx. 466, 470 (5th Cir. 2009) (citation omitted). This evaluation will "be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. Thus, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* at 678 (quoting *Twombly*, 550 U.S. at 570).

Generally, a court should not dismiss an action for failure to state a claim under Rule 12(b)(6) without giving the plaintiff an opportunity to amend. *Walker v. Beaumont Indep. Sch. Dist.*, No. 1:15-CV-379, 2016 WL 6666828, at *16 (E.D. Tex. Mar. 11, 2016), *report and recommendation adopted*, No. 1:15-CV-379, 2016 WL 1156852 (E.D. Tex. Mar. 24, 2016) (citing *Hart v. Bayer Corp.*, 199 F.3d 239, 248 n.6 (5th Cir. 2000) (a plaintiff's failure to meet the specific pleading requirements should not automatically or inflexibly result in dismissal of the complaint with prejudice to refiling); *accord Goldstein v. MCI WorldCom*, 340 F.3d 238, 254 (5th Cir. 2003)). Where, however, a claim is frivolous or the "complaint alleges the plaintiff's best case," a further factual statement from the plaintiff need not be allowed. *Jones v. Greninger*, 188 F.3d 322, 327 (5th Cir. 1999); *see also Spiller v. City of Tex. City*, 130 F.3d 162, 167 (5th Cir. 1997).

## IV. SECTION 1 OF THE SHERMAN ACT[10]

Section 1 of the Sherman Act provides as follows: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." *Golden Bridge Tech., Inc. v. Motorola, Inc.*, 547 F.3d 266, 271 (5th Cir. 2008) (quoting 15 U.S.C. § 1). "Although § 1 could be read to outlaw all contracts, it has long been interpreted to only proscribe unreasonable restraints." *Golden Bridge Tech.,* 547 F.3d at 271 (citing *Leegin Creative Leather Prods. v. PSKS, Inc.,* 551 U.S. 877, 127 S.Ct. 2705, 2712, 168 L.Ed.2d 623 (2007) ("*Leegin I*")).  As opposed to Section 2 of the Sherman Act, Section 1 is only concerned with concerted conduct among separate economic actors rather than their independent or merely parallel action. *Abraham & Veneklasen Joint Venture v. Am. Quarter Horse Ass'n*, 776 F.3d 321, 327 (5th Cir. 2015).

To establish a violation of Section 1 of the Sherman Act, a plaintiff must demonstrate that: "(1) [the defendants] engaged in a conspiracy, (2) the conspiracy had the effect of restraining trade, and (3) trade was restrained in the relevant market." *Marucci Sports, L.L.C. v. Nat'l Collegiate Athletic Ass'n*, 751 F.3d 368, 373 (5th Cir. 2014) (quoting *Apani Sw., Inc. v. Coca–Cola Enters., Inc.,* 300 F.3d 620, 627 (5th Cir.2002)). To satisfy the conspiracy element of a Sherman Act claim, a plaintiff must show "that the defendants engaged in concerted action, defined as having 'a conscious commitment to a common scheme designed to achieve an unlawful objective.'" *Marucci*

---

[10] According to Defendants, the elements of Plaintiffs' claim under the Utah Antitrust Act are identical to those under Section 1 of the Sherman Act.  Docket Entry # 53 at p. 9, n. 8 (citing Utah Code §§ 76-10-3104, 76-10-3118; also citing *Harvey v. Ute Indian Tribe of Uintah & Ouray Reservation*, 416 P.3d 401, 423 (Utah 2017); *Am. Airlines v. Christensen*, 967 F.2d 410, 414 (10th Cir. 1992); *Boisjoly v. Morton Thiokol, Inc.*, 706 F. Supp. 795, 805 (D. Utah 1988)).  Thus, the Court considers Plaintiffs' federal and Utah state antitrust conspiracy claims together.

*Sports*, 751 F.3d at 373–74 (quoting *Golden Bridge Tech.,* 547 F.3d at 271 (quoting *Monsanto Co. v. Spray–Rite Serv. Corp.,* 465 U.S. 752, 764, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984))).

Whether an action violates Section 1 of the Sherman Act depends on whether it is adjudged an *unreasonable* restraint. *Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 289, 105 S. Ct. 2613, 2616, 86 L. Ed. 2d 202 (1985) (emphasis in original). "Once a plaintiff establishes that a conspiracy occurred, whether it violates § 1 is determined by the application of either the *per se* rule or the rule of reason." *Marucci Sports*, 751 F.3d at 374 (quoting *Golden Bridge Tech.,* 547 F.3d at 271 (citation omitted)).

Most arrangements challenged under Section 1 are analyzed under the "rule of reason," which "requires the factfinder to decide whether under all the circumstances of the case the restrictive practice imposes an unreasonable restraint on competition."[11] *EuroTec Vertical Flight Sols., LLC. v. Safran Helicopter Engines S.A.A.*, No. 3:15-CV-3454-S, 2019 WL 3503240, at *14 (N.D. Tex. Aug. 1, 2019) (quoting *Arizona v. Maricopa Cty. Med. Soc'y*, 457 U.S. 332, 343, 102 S.Ct. 2466, 73 L.Ed.2d 48 (1982)). Experience has shown, however, that certain arrangements are generally found to be unlawful under the rule of reason, and so are presumed to unreasonably restrain competition. *EuroTec*, 2019 WL 3503240, at *14 (citing *Maricopa Cty.*, 457 U.S. at 344). These practices are referred to as *per se* violations and include certain types of "price fixing, division of

---

[11] A court's considerations should include the restrictive practice's "history, nature, and effect" and "[w]hether the businesses involved have market power." *Marucci Sports*, 751 F.3d at 374 (quoting *Leegin I,* 551 U.S. at 885–86 (citation and internal quotation marks omitted)). The rule of reason analysis also requires that the plaintiff show that the defendants' activities injured competition. *Marucci Sports*, 751 F.3d at 374 (citing *PSKS, Inc. v. Leegin Creative Leather Prods.,* 615 F.3d 412, 417 (5th Cir.2010) ("*Leegin II*")). The rule of reason is designed to help courts differentiate between "restraints with anticompetitive effect that are harmful to the consumer and restraints stimulating competition that are in the consumer's best interest." *Marucci Sports*, 751 F.3d at 374 (quoting *Leegin I,* 551 U.S. at 886).

17

markets, group boycotts and tying arrangements."[12] *N. Tex. Specialty Physicians v. FTC*, 528 F.3d 346, 360 (5th Cir. 2008) (quoting *Maricopa Cty.*, 457 U.S. at 344 n.15).

Regardless of which rule applies, a court's inquiry should ultimately focus upon "form[ing] a judgment about the competitive significance of the restraint." *Marucci Sports*, 751 F.3d at 374 (quoting *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 103, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984) (citation and internal quotation marks omitted)).

To state a Sherman Act Section 1 claim, a plaintiff must also allege a relevant market. *Acad. of Allergy & Asthma in Primary Care v. Am. Acad. of Allergy*, 2014 WL 12497080, at *9 (citations omitted). A relevant market is comprised of a product market and a geographic market, which is the area in which sellers of the relevant product effectively compete. *Acad. of Allergy & Asthma in Primary Care*, 2014 WL 12497080, at *9 (citing *Apani*, 300 F.3d at 625; also citing *Nat'l Athletic Trainers' Ass'n, Inc. v. Am. Physical Therapy Ass'n,* Civ. Action No. 3:08-CV-0158-G, 2008 WL 4146022, at *12 (N.D. Tex. Sept. 9, 2008)). The definition of a relevant antitrust market is a "highly fact-intensive inquiry." *Acad. of Allergy & Asthma in Primary Care*, 2014 WL 12497080, at *9 (citing *Cont'l Airlines, Inc. v. United Air Lines, Inc.,* 120 F. Supp. 2d 556, 568 (E.D. Va. 2000)). Challenges to facially plausible market definitions are more appropriately addressed at summary judgment or trial. *Id.*

---

[12] Price is the "central nervous system of the economy," and an agreement that "interfere[s] with the setting of price by free market forces" is illegal on its face. *Nat'l Soc. of Prof'l Engineers v. United States*, 435 U.S. 679, 692, 98 S. Ct. 1355, 1365, 55 L. Ed. 2d 637 (1978) (quoting *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 226 n. 59, 60 S.Ct. 811, 845, 84 L.Ed. 1129 (1940) and then *United States v. Container Corp.*, 393 U.S. 333, 337, 89 S.Ct. 510, 512, 21 L.Ed.2d 526 (1969)).

# V. ANTITRUST CLAIMS

## A.    Defendants' assertions, generally

According to the joint motion to dismiss, each of Plaintiffs' antitrust claims should be dismissed "because TravelPass fails to allege facts sufficient to support an antitrust conspiracy that it has standing to challenge."  Docket Entry # 53 at p. 8.  In addition to arguing the complaint fails to plead viable antitrust claims, Defendants argue Plaintiffs lack standing because TravelPass fails to allege injury-in-fact and antitrust injury. *Id*. at pp. 9-12. Before addressing whether Plaintiffs sufficiently allege a conspiracy as required to state an antitrust claim, the Court considers whether Plaintiffs have "antitrust standing" under the Sherman Act.[13]

---

[13] Even though "antitrust standing" supplements Article III standing requirements (as set forth below), the Fifth Circuit has described the question as a preliminary one, to be answered from examination of the allegations of the complaint. *Impala African Safaris, LLC v. Dallas Safari Club, Inc*., No. 3:13-CV-2175-G, 2014 WL 4555659, at *4 (N.D. Tex. Sept. 9, 2014) (quoting *Transource Int'l, Inc. v. Trinity Indust., Inc.,* 725 F.2d 274, 280 (5th Cir.1984) (internal quotation marks omitted)); *see also Sanger Ins. Agency v. HUB Int'l, Ltd.*, 802 F.3d 732, 734 (5th Cir.2015) ("But even before reaching the merits of this antitrust case involving the insurance market for veterinarians, we are faced with two difficult *threshold* determinations," one of which was antitrust standing) (emphasis added).

Because courts sometimes confuse the issues of whether the alleged conduct violates the antitrust laws with that of whether a plaintiff has antitrust standing, some courts assume a violation and then examine whether the plaintiff has antitrust standing to recover damages based on the violation.  John J. Miles, 1 *Health Care and Antitrust Law* § 9:7 (2019) & n. 8 (2019) (citing *Gelboim v. Bank of America Corp*., 823 F.3d 759, 770 (2d Cir. 2016), *cert. denied*, 2017 WL 160462 (U.S. 2017) ("The interplay between [antitrust standing and antitrust violation] has engendered substantial confusion. To avoid that quagmire, the Court (among others) assumes the existence of a violation in addressing the issue of [antitrust] standing. . . . Although we would not ordinarily consider whether the complaints state an antitrust violation when assessing antitrust standing, it is easy to blur the distinction between an antitrust violation and an antitrust injury, as the district court did; so we will examine both for purposes of judicial economy."); *see also Sanger*, 802 F.3d at 738 (citing *Doctor's Hosp.,* 123 F.3d at 306 ("Standing analysis can be most helpful in the atypical antitrust case if the court assumes an antitrust violation has occurred and then determines whether the plaintiff has suffered injury-in-fact, is a proper plaintiff and has experienced 'antitrust injury' from the violation."); also citing Areeda & Hovenkamp, Antitrust Law, ¶ 335f, at 91 (4th ed.2014) ("[T]he court should assume the existence of a violation and then ask whether the . . . standing elements are shown.")).

**B.**      **Whether Plaintiffs have "antitrust standing" under the Sherman Act**

**1.**      **Applicable law**

**a.**      **Standing**

Section 4 of the Clayton Act, 15 U.S.C. § 15, enables a private citizen to bring a suit to enforce the Sherman Act. *Ancar v. Sara Plasma, Inc.,* 964 F.2d 465, 468 (5th Cir.1992); *Jayco Systems, Inc. v. Savin Business Machines Corp.,* 777 F.2d 306, 313 (5th Cir.1985). The Clayton Act allows a plaintiff to sue for treble damages if the plaintiff was "injured in his business or property by reason of anything forbidden in the antitrust laws . . . in any district court of the United States in the district in which the defendant resides. . . ." 15 U.S.C. § 15. While the Clayton Act permits civil suits by "any person who shall be injured in his business or property," courts have long acknowledged that not every person, however tangentially injured by an antitrust violator, may recover treble damages. *Loeb Indus., Inc. v. Sumitomo Corp*., 306 F.3d 469, 480 (7th Cir. 2002) (citing *Blue Shield of Va. v. McCready,* 457 U.S. 465, 477, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982)) (hereafter "*McCready*").

An antitrust plaintiff must show both constitutional standing and "antitrust standing."[14] "Antitrust standing" is a "judicially-created set of threshold requirements that a private plaintiff must show before a court can entertain its antitrust claims." *BRFHH Shreveport, LLC v. Willis Knighton Med. Ctr*., 176 F. Supp. 3d 606, 626 (W.D. La. 2016) (citing *Associated Gen. Contractors of Calif.,*

---

[14] Antitrust standing is distinct from the standing doctrine that traces to Article III of the United States Constitution. *Anderson v. 21st Mortg. Corp*., No. 7:15-CV-00200-KC, 2017 WL 11037113, at *3 (W.D. Tex. Mar. 10, 2017) (citing *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 914, 922 (9th Cir. 2015)). Article III standing is a threshold jurisdictional requirement for civil actions in federal court and is rooted in the bedrock constitutional principle that the judiciary's power extends only to cases and controversies. *Anderson*, 2017 WL 11037113, at *3  (citing U.S. Const. art. III, § 2; also citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). By contrast, antitrust standing is a requirement for plaintiffs seeking damages under the antitrust laws. *Anderson*, 2017 WL 11037113, at *3 (citations omitted).

20

*Inc. v. Calif. State Council of Carpenters,* 459 U.S. 519, 535 n. 31, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983)). The "antitrust standing" requirement of Section 4(a) of the Clayton Act is statutory and limits the universe of parties injured by the violation who can recover damages for antitrust violations. *Loeb*, 306 F.3d at 481.

### b. Antitrust injury

Antitrust injury is a necessary but not sufficient condition for a plaintiff to recover damages. John J. Miles, 1 *Health Care and Antitrust Law* § 9:7 (2019). A plaintiff's injury may reflect "antitrust injury," yet the plaintiff still may not have antitrust standing to recover damages. *Id.* at n. 3 (citing *Tal v. Hogan*, 453 F.3d 1244 (10th Cir. 2006) ("[Antitrust] *standing cannot be established without an antitrust injury*, but the existence of an antitrust injury does not automatically confer [antitrust] standing.") (emphasis in original)). In other words, antitrust injury is a component of antitrust standing. *BRFHH Shreveport*, 176 F. Supp. 3d at 626. While antitrust injury focuses on the nature of plaintiff's injury and its connection to the anticompetitive effects of the violation, antitrust standing is a search for the proper plaintiff to bring the antitrust suit—the most efficient plaintiff to redress the violation. John J. Miles, 1 *Health Care and Antitrust Law* § 9:7 (2019).

In *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489, 97 S. Ct. 690, 697–98, 50 L. Ed. 2d 701 (1977), the Supreme Court held that a plaintiff must prove antitrust injury, "which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation. *Id.*

In *Associated Gen. Contractors of Calif., Inc. v. Calif. State Council of Carpenters,* 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983) (hereafter "*AGC*"), the union plaintiff brought a

purported class action on behalf of numerous affiliated local unions and district councils against against an association of building and construction contractors, alleging the association coerced landowners and general contractors to enter into contracts with nonunion subcontractors. *Id.* at 520-21, 527-28.  The plaintiff alleged the defendants' activities weakened and restrained the trade of "certain contractors."  *Id*. at 528.

The Supreme Court assumed the alleged coercion might restrain the trade of "certain" contractors and subcontractors in violation of the antitrust laws and conducted an analysis of whether the plaintiff union was a person injured by reason of such an alleged violation. *Id.* at 528-29. The question required the Court to evaluate the "plaintiff's harm, the alleged wrongdoing by the defendants, and the relationship between them."  *Id*. at 535. The Supreme Court acknowledged the impracticality inherent in the application of a "black-letter rule" to determine whether a plaintiff has standing to recover for an antitrust violation and opted for a balancing approach to evaluate the standing issue. *Todorov v. DCH Healthcare Auth*., 921 F.2d 1438, 1450-51 (11th Cir. 1991) (citing *AGC*, 459 U.S. at 536).

The Court began its discussion by noting that the complaint alleged a causal connection between the plaintiff's harm and an antitrust violation and that the defendants intended to cause that harm, thus making the claim one "literally encompassed by the Clayton Act." *Todorov*, 921 F.2d at 1451 (citing *AGC*, 459 U.S. at 537). The Court then conducted a more extensive inquiry, noting that a number of factors may be controlled. *AGC*, 459 U.S. at 537-38. The Court focused on the "nature of the plaintiff's alleged injury." *Id*. at 538; *see also Todorov*, 921 F.2d at 1451 (stating this first factor (nature of the injury) was whether the plaintiff suffered antitrust injury).

The Court, after noting the "relevance of this central policy" to the antitrust standing issue, found the plaintiff had suffered no antitrust injury as defined in *Brunswick*. *Todorov*, 921 F.2d at 1451 (citing *AGC*, 459 U.S. at 538, 540). "The Court, however, continued to identify other factors that might be useful in determining whether a party is a proper plaintiff in a particular case; these factors analyze whether the plaintiff would be an efficient enforcer of the antitrust laws."[15] *Todorov*, 921 F.2d at 1451.

"Numerous doctrines have arisen to clarify the circumstances under which a particular person may recover from an antitrust violator. At times these doctrines are rather incautiously lumped together under the umbrella term of 'antitrust standing.'" *Loeb*, 306 F.3d at 480 (further noting the Supreme Court has generally been careful to limit the actual question of standing to the simple inquiry of whether a plaintiff has suffered a redressable injury in fact, entitling the federal courts to hear such a "case or controversy" under Article III); *see also AGC*, 459 U.S. at 535 n. 31("Harm to the antitrust plaintiff is sufficient to satisfy the constitutional standing requirement of injury in fact, but the court must make a further determination whether the plaintiff is a proper party to bring a private antitrust action.").

---

[15] Specifically, the Court in *AGC* "relied on other factors—the remoteness of injury, the existence of parties more directly harmed, and the risk of duplicative or complicated suits—in concluding that construction unions were not 'proper plaintiffs' to sue a group of contractors who, the unions alleged, had coerced landowners and other contractors to hire non-union subcontractors and thereby injured the unions." *McCormack*, 845 F.2d at 1342 (citing *AGC*, 459 U.S. at 538-45). The alleged violations in *AGC* "did not affect the unions directly, and the Supreme Court concluded that the connection between the violations and any injuries to the unions was too speculative and would render damage calculations too difficult." *McCormack*, 845 F.2d at 1342 (citing *AGC*, 459 U.S. at 542, 545). Because of "[t]he existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement," the Supreme Court found that the justification for allowing a more remote party (i.e. one who suffered an indirect injury) privately to enforce the antitrust laws was diminished." *Todorov*, 921 F.2d at 1451 (quoting *AGC*, 459 U.S. at 542). Indeed, "[d]enying the [u]nion[s] a remedy . . . [wa]s not likely to leave a significant antitrust violation undetected or unremedied." *Id.*

c.      **Requirements to show "antitrust standing"**

Prior to the Supreme Court's 1982 and 1983 decisions in *McCready*, *supra*, and *AGC, supra*,

the circuit courts of appeals split on the appropriate test for determining antitrust standing. John J.

Miles, 1 *Health Care and Antitrust Law* § 9:7 (2019). Recognizing that no single black-letter rule

would fit all situations, the Supreme Court in *AGC* set forth a number of factors—relating to the

harm to the plaintiff, the defendant's alleged wrongdoing, and the relationship between them—that

courts should examine to determine antitrust standing. *Id.*  None, except antitrust injury, is an

absolute requirement itself. Rather, the court balances the factors to determine if the plaintiff is an

appropriate party to bring the case.[16]  *Id.*

In the Fifth Circuit, the three "antitrust standing" requirements are "1) injury-in-fact, [i.e.,]

an injury to the plaintiff proximately caused by the defendants' conduct; 2) antitrust injury; and 3)

proper plaintiff status, which assures that other parties are not better situated to bring suit." *BRFHH*

*Shreveport,* 176 F. Supp. 3d at 626 (quoting *Sanger Ins. Agency v. HUB Int'l, Ltd.*, 802 F.3d 732,

737 (5th Cir.2015) (citing *Jebaco, Inc. v. Harrah's Operating Co.*, 587 F.3d 314, 318 (5th

Cir.2009))); *see also Doctor's Hospital of Jefferson, Inc. v. Southeast Med. Alliance,* 123 F.3d 301,

305 (5th Cir.1997). The Fifth Circuit has summarized its "antitrust standing" test as follows:

> Even a plaintiff injured in his business or property [injury-in-fact] must, in order to
> sue for damages, show 'antitrust injury,' that is, 'injury of the type the antitrust laws
> were designed to prevent and that flows from that which makes defendants' acts
> unlawful.' Finally, even if the plaintiff meets these requirements, the court must

---

[16] The Eleventh Circuit Court of Appeals noted in *Todorov*, *supra*, the Supreme Court's approach in *AGC*,
where the antitrust injury issue was dispositive of the case, has "bred much confusion in the lower federal courts."
*Todorov*, 921 F.2d at 1451 n. 20 (further noting because "the Court went on to discuss other factors [it] suggested that
antitrust injury was not a separate threshold question, but was, instead, one of several factors to be balanced when
determining antitrust standing;" and finally noting the Supreme Court in *Cargill, Inc. v. Monfort, Inc.,* 479 U.S. 104, 107
S.Ct. 484, 93 L.Ed.2d 427 (1986) clarified that antitrust injury is a necessary component of antitrust standing)).

> consider whether he is a 'proper plaintiff' to sue for damages, examining such facts as (1) whether the plaintiff's injuries or their causal link to the defendant are speculative, (2) whether other parties have been more directly harmed, and (3) whether allowing this plaintiff to sue would risk multiple lawsuits, duplicative recoveries, or complex damage apportionment. (footnotes omitted).

*Norris v. Hearst Tr.*, 500 F.3d 454, 465 (5th Cir. 2007) (quoting *McCormack v. National Collegiate Athletic Ass'n*, 845 F.2d 1338, 1341 (5th Cir.1988)).

Not only do courts in the various circuits use different terminology, but the circuits also summarize the "antitrust standing" requirement differently.[17] John J. Miles, 1 *Health Care and Antitrust Law* § 9:7 (2019) (stating some courts have synthesized or summarized the antitrust-standing test as requiring proof that the plaintiff (1) suffered antitrust injury, and (2) is an efficient or appropriate enforcer of the antitrust laws, which depends in large part on the directness of the plaintiff's injuries from the alleged violation and an assessment of the other factors from the *AGC* decision); *see also id.* at n. 25 (citing cases within the circuits utilizing some form of this two-pronged approach, and also citing cases within the Fifth Circuit which utilize this circuit's three-part test).

At times it is unclear which element of antitrust standing is implicated by the parties' arguments.  In the joint motion to dismiss, Defendants address the first element (injury-in-fact) and the second element (antitrust injury), emphasizing TravelPass is not a competitor.  Although the joint motion to dismiss does not explicitly argue TravelPass is not a proper plaintiff (nor does it reference any of the *AGC* factors), Caesars' separate motion to dismiss suggests the Court should consider

---

[17] For example, in the Seventh Circuit, a plaintiff must establish two elements: (1) she has suffered an antitrust injury (i.e., that her claimed injuries are of the type the antitrust laws were intended to prevent and reflect the anticompetitive effect of either the violation or of anticompetitve acts made possible by the violation); and (2) she has antitrust standing (i.e., that the alleged harm proximately caused her injury).  *Tichy v. Hyatt Hotels Corp.*, 376 F. Supp. 3d 821, 842 (N.D. Ill. 2019).

whether TravelPass is a proper plaintiff. *See* Docket Entry # 55 at p. 6.  Thus, out of an abundance

of caution, Plaintiffs address the third element in their consolidated response.  Docket Entry # 79 at

pp. 22-23.

In the response, Plaintiffs state all the *AGC* factors, including nature of the injury and whether

the plaintiff is a consumer or competitor in the relevant market, favor Plaintiffs' antitrust standing

as a "proper plaintiff."  *Id.* Rather than address the nature of the injury factor, including whether

TravelPass is a competitor in the relevant market, in its discussion of proper plaintiff status, the

Court will address it in its discussion of antitrust injury.[18] However, the Court notes consideration

of the issue in the context of the third element would not affect the outcome.

With this framework in mind, the Court addresses each "antitrust standing" element below.

**2.**   **Discussion**

**a.**   **Injury-in-fact**

*Applicable law*

A court analyzing antitrust standing must first determine whether the plaintiffs have properly

alleged an injury-in-fact to their business or property. *Sec. Data Supply, LLC v. Nortek Sec. &*

*Control LLC*, No. 3:18-CV-1399-S, 2019 WL 3305628, at *4 (N.D. Tex. July 22, 2019) (citing

---

[18] In *Waggoner v. Denbury Onshore, L.L.C.*, 612 Fed. Appx. 734, (5th Cir. 2015), the principal issue before the court was the second requirement, antitrust injury.  *Id.* at 736.  According to the Fifth Circuit, both the district court and Waggoner's brief quoted the following from *Bell v. Dow Chemical Co.*, 847 F.2d 1179, 1183 (5th Cir.1988)*:* "In making the determination, courts may assess several factors: 1) the nature of plaintiff's alleged injury; 2) the directness of the injury; 3) the speculative measure of the harm; 4) the risk of duplicative recovery; and 5) the complexity in apportioning damages."  612 Fed. Appx. at 737, n. 4. The Fifth Circuit stated that while these *AGC* factors referenced in *Dow* "are indeed appropriate in the *overall* standing inquiry [i.e. proper plaintiff status element], the antitrust-injury standing requirement is analogous to the first *Dow* factor: the nature of the plaintiff's injury. This is evident from *Dow's* citation to *Brunswick* for the proposition that, "[r]egarding the first factor, plaintiff's injury must be the type that the antitrust laws were intended to prevent." Id. (emphasis in original).

*Norris*, 500 F.3d at 465 (collecting cases); *Larry R. George Sales Co. v. Cool Attic Corp.*, 587 F.2d 266, 270 (5th Cir. 1979)). A plaintiff successfully shows injury-in-fact by pleading a decline in sales because of the defendant's conduct, but lacks standing if no actual injury has yet occurred because of the defendant's conduct. *Sec. Data Supply*, 2019 WL 3305628, at *4 (comparing *Impala African Safaris,* 2014 WL 4555659, at *5 (finding no standing where no injury had occurred), with *David L. Aldridge Co. v. Microsoft Corp.*, 995 F. Supp. 728, 748 (S.D. Tex. 1998) (finding standing where the plaintiff suffered a "significant decline in sales")).

### *Parties' assertions*

Focusing only on the "primary conspiracy," Defendants assert Plaintiffs have not claimed TravelPass was injured, nor could it.  Docket Entry # 53 at p. 9.  This is so, according to Defendants, because TravelPass's business model has been to bid on hotel-branded keywords through internet search engines; thus, had there been a conspiracy among Defendant Hotels to refrain from bidding on each other's keywords, TravelPass would only have benefitted from reduced competition, and reduced prices, in the auction process.  *Id*. at pp. 9-10.  Put differently, Defendants maintain the "supposed first conspiracy would have benefitted TravelPass as a bidder on those keywords rather than injured it."  *Id*. at p. 10.  Recognizing Plaintiffs also allege injury based on Gatekeeper OTAs' conduct, Defendants argue the "underlying asserted injury remains limited to restrictions placed on TravelPass's own bidding practices and access to content by Expedia."  *Id.*  According to Defendants, that injury is unrelated to the "primary" conspiracy, "which means that TravelPass does not have standing to assert an antitrust claim regarding that supposed conspiracy."  *Id.*

27

Defendants contend although Plaintiffs attempt to "walk away" from their own complaint and "conflate" the allegations in their response, Plaintiffs' own description of the "primary" and "secondary" conspiracies in the complaint controls.   Docket Entry # 97 at p. 1.   Defendants argue they have shown how Plaintiffs fail to allege a plausible agreement in either category, and Plaintiffs' repeating the phrases "single scheme" and "comprehensive scheme" does not address Plaintiffs' pleading failures.   *Id.*

In their consolidated response, Plaintiffs assert the joint motion to dismiss improperly separates the complaint's factual allegations into two separate alleged conspiracies.   Docket Entry # 79 at p. 13. Plaintiffs argue Defendants ignore Supreme Court precedent by contending this Court should view each of Plaintiffs' allegations piecemeal. According to Plaintiffs, the nature of the internet hotel business is such that Defendants' scheme could only succeed if the hotels throttled all meaningful competition for branded keyword bidding; Defendants had to address both aspects of the competitive "problem" presented by the "new world of internet commerce; their collective plan to exclude TravelPass and other Downstream OTAs from competing on branded keyword bidding was thus a necessary component of their overall scheme."   *Id.* at p. 17.   Plaintiffs state their complaint alleges Defendants' plan would not have worked if they eliminated only direct interbrand competition from other conspirator hotel chains, nor would it have worked if they had eliminated only indirect interbrand competition from Gatekeeper OTAs and their Downstream OTA affiliates. *Id*. (citing Docket Entry # 1, ¶¶ 87-94, 145-146, 150). Thus, Plaintiffs contend they have "alleged a single, comprehensive and integrated scheme by Defendants to eliminate competition in hotel-related branded keyword search bidding."   Docket Entry # 79 at p. 15.

Plaintiffs assert the Supreme Court has held a court cannot dismember an alleged conspiracy and must look at the whole picture.  Plaintiffs further contend this Court has also rejected such "divide and conquer" strategies when evaluating conspiracy claims.  Docket Entry # 108 at pp. 5-6 (citing *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699, 82 S. Ct. 1404, 1410, 8 L. Ed. 2d 777 (1962); also citing *Z–Tel Commc'ns, Inc. v. SBC Commc'ns, Inc.,* 331 F. Supp.2d 513, 535 (E.D. Tex.2004)).  Plaintiffs assert their allegations, viewed together as a whole, are sufficient to state a claim and establish antitrust standing.

### Analysis

As noted above, Plaintiffs allege "Defendants conspired to rig bids and divide the market for online hotel-related branded keyword search among themselves, simultaneously excluding TravelPass and other downstream online travel agencies from that business."  Docket Entry # 79 at p. 1.  Specifically, Plaintiffs allege as follows. Defendants are eight of the largest hotel chains in the United States. Docket Entry # 1, ¶ 42. Like TravelPass, Defendants sell hotel rooms to consumers by bidding on branded keywords.  *Id.*, ¶ 53. Until around May 2014, Defendants competed vigorously with one another and with OTAs like TravelPass for branded keyword search advertising. *Id.*, at ¶ 86. Around that time, however, Defendants[19] entered into a bid rigging and market division horizontal conspiracy in which they agreed among themselves to not bid on one another's branded keywords in search auctions conducted by Google and other search engines. *Id.* at ¶ 92. According to Plaintiffs, this would ensure that if a consumer searched for "Marriott" through Google, the SERP would be filled with "Marriott" advertisements and no advertisements for any of the other

---

[19] According to the original complaint, this does not include Defendants Caesars and Red Roof, who joined the conspiracy later. Docket Entry # 79 at p. 3, n. 2 (citing Docket Entry # 1, ¶¶ 141-44).

Defendant-competitors. Docket Entry # 79 at p. 3.  The complaint further alleges that "Defendants' horizontal conspiracy was made complete by their use of Gatekeeper OTAs like Expedia to comply with, monitor, and police its conspiracy to restrain trade." *Id*. at p. 7 (citing Docket Entry # 1, ¶ 92).

 Throughout the joint motion, Defendants separately address Plaintiffs' conspiracy claims and assert TravelPass lacks antitrust standing to challenge both the "primary" horizontal conspiracy among Defendants not to bid on one another's branded keywords and the "secondary" conspiracy among the Defendant Hotels and Gatekeeper OTAs. In *Biovail Corp. Int'l v. Hoechst Aktiengesellschaft*, 49 F. Supp. 2d 750 (D.N.J. 1999), the defendants, in an "effort to compartmentalize [sic] Biovail's factual allegations," argued, "at various points in their brief, that one particular allegation or another did not cause Biovail injury and, therefore, must be dismissed." *Id*. at 760. The court acknowledged that antitrust injury must be shown before a private party has standing to bring an antitrust claim but noted the allegations, under *Continental Ore,* should not be so "tightly compartmentaliz[ed]." *Id*.  The court noted in *Continental Ore*, the Supreme Court stated "plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each" and also that "the character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole. . . .").  *Id*. (quoting *Continental Ore*, 370 U.S. at 699 (internal quotations and citations omitted)).

In light of this directive, the court in *Biovail* stated the defendants' behavior would be evaluated, and all inferences would be drawn, in light of the allegations as a whole.[20]  *Biovail*, 49 F.

---

[20] However, it was clear to the court "from the facts and reasoning of *Continental Ore* itself that the Supreme Court never intended [this oft-quoted] language to bar a probing analysis of antitrust . . . claims." *Biovail*, 49 F. Supp. 2d at 760 (quoting *Zenith Radio Corp. v. Matsushita Elec. Indus. Co., Ltd.,* 513 F. Supp. 1100, 1167 (E.D. Pa.1981),

Supp. 2d at 760. In analyzing the antitrust claims, rather than consider whether each allegation resulted in antitrust injury, the court in *Biovail* first examined whether an antitrust violation had been alleged and then examined whether—as a result of all of the violations alleged—Biovail had suffered "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Id.* (quoting *Brunswick,* 429 U.S. at 489 (defining antitrust injury)).

In this case, before examining whether an antitrust violation has been alleged the Court is first considering antitrust standing, including whether Plaintiffs have sufficiently alleged injury-in-fact and antitrust injury.  Similar to the court in *Biovail*, however, throughout the Court's analysis of the issues Defendants' behavior will be evaluated, and all inferences will be drawn, in light of the allegations as a whole.  *Biovail*, 49 F. Supp. 2d at 760; *see also Z–Tel Commc'ns,* 331 F. Supp.2d at 535 (holding under *Continental Ore* and its progeny that the anticompetitive conduct element of a Section 2 Sherman Act claim is satisfied when a plaintiff alleges the aggregate effect of a defendant's anticompetitive practices is reduced competition and creation or maintenance of a monopoly). Accordingly, the Court views Plaintiffs' allegations holistically.

So viewed, Plaintiffs have alleged a "single comprehensive scheme" rather than "two distinct, economically and legally unrelated courses of conduct."  Docket Entry # 79 at pp. 12, 18.  The complaint describes this alleged scheme as "effectively divid[ing] the market for branded keyword search results between and among Defendants, allocating branded keyword territory such that Defendants no longer had to compete either with one another or with TravelPass and other internet travel innovators."  Docket Entry # 1, ¶ 1. According to Plaintiffs, the complaint contains no less

---

*rev'd sub nom. on other grounds,* 723 F.2d 238 (1983)).

than ten allegations "explaining that the Defendants are engaged in a single anticompetitive scheme that must eliminate competition between and among Defendants *and* the Downstream OTAs in order to succeed." Docket Entry # 79 at p. 15 (emphasis in original).

- The Defendant Hotels entered into a conspiracy to eliminate interbrand competition among themselves and among OTAs for branded keyword search advertising. To effectuate their conspiracy, the Defendant Hotels teamed up with Gatekeeper OTAs, like Expedia, with the express goal of eliminating competition for branded keyword search advertising. (Docket Entry # 1, ¶ 7).
- Gatekeeper OTAs like Expedia coordinated this conspiracy in three discrete, but interrelated, ways. *Id.*, ¶¶ 8, 9-11 (describing the three ways in which Gatekeeper OTAs helped administer the single scheme).
- The Defendant Hotels realized that their primary horizontal conspiracy could not be fully effective without complementary conspiracies designed to ensure that Gatekeeper OTAs and Downstream OTAs like TravelPass also stopped bidding on branded keyword search advertising. Thus, the Defendant Hotels implemented a series of additional, or secondary, horizontal conspiracies under which the Gatekeeper OTAs (1) agreed to stop bidding on branded search keywords and (2) also agreed to force Downstream OTAs to follow suit. *Id.*, ¶ 16.
- Although it took time for the Defendant Hotels' illegal scheme to bear fruit, their two-pronged conspiracy ultimately worked. *Id.*, ¶ 18.
- The primary conspiracy and secondary conspiracies *work together* to eliminate effective competition—*both direct and indirect*—between and among the Defendant Hotels for branded search keywords. The Defendant' illegal activities had the purpose and effect of eliminating TravelPass as a competitive threat to their illegal ends. *Id.*, ¶ 22 (emphasis added).

Docket Entry # 79 at p. 15 (quoting Docket Entry # 1, ¶¶ 6-8, 10-11, 16, 18, 20, 22).

In their discussion of injury-in-fact, Plaintiffs contend this comprehensive scheme had "clear intended winners (the hotel chains) and losers (Downstream OTAs, and ultimately consumers)." Docket Entry # 79 at p. 18.  According to Plaintiffs, by Defendants' design, "TravelPass had to be one of the losers, because destroying TravelPass and other Downstream OTAs that bid on branded keywords was essential to their conspiracy to destroy competition by rigging branded keyword

auctions." *Id.* (citing Docket Entry # 1 at ¶¶ 1, 19-21, 153-63). Plaintiffs maintain Defendants'
collusive agreements with one another and with Gatekeeper OTAs largely destroyed TravelPass's
and other Downstream OTA's businesses by severely restricting—and in many cases
eliminating—their access to hotel inventory unless they agreed to cease bidding on branded
keywords.

Among other things, the complaint alleges "TravelPass relies on branded keyword
advertising to draw consumers to its websites and to offer those consumers a wide range of hotel
rooms" and "has invested tens of millions of dollars in technology capabilities, marketing expertise,
understanding markets, developing data sets and bidding strategies based on its bookings, and
branded keyword search advertising campaigns to provide consumers with a broad array of choices
for hotel rooms at affordable prices and to ensure success with its business." *Id.*, ¶ 48; *see also id.*
at ¶ 75. Plaintiffs allege "[b]efore the Defendant Hotels' horizontal conspiracies began to take effect,
TravelPass's data-driven branded keyword advertising success had made it one of the most
successful Downstream OTAs; thus, before the conspiracies, TravelPass had grown to become one
of the Gatekeeper OTAs' most valuable search partners." *Id.*, ¶ 49; *see also id.* at ¶ 76; *see also id.*
at ¶¶ 155-156. Plaintiffs further allege TravelPass and other Downstream OTAs, "who up through
2014, played a key role in the branded keyword bidding market, have all been essentially driven from
the market." *Id.*, ¶ 151; *see also id.* at ¶ 157.

Additionally, Plaintiffs allege as follows:

As the conspiracies took root, Defendant Hotels ultimately demanded that the
Gatekeeper OTAs each cut the 'feed' of the Defendant Hotels' room inventory
available to TravelPass and other Downstream OTAs who continued to follow their
branded-keyword-bidding based business models. In fact, several of the Defendant

> Hotels attempted to cut off TravelPass's access to hotel rooms associated with their brands entirely. Other Defendant Hotels allowed TravelPass continued access to their inventory, but only on the condition that TravelPass not bid on branded keywords associated with their properties. The functional result: TravelPass has lost Gatekeeper-OTA-driven access to a significant percentage of the Defendant Hotels' inventory and retains access to most of the remainder only by complying against its will with the inherently anticompetitive terms of the Defendant Hotels' bid rigging/market division conspiracies.

*Id.*, ¶ 158. Finally, Plaintiffs allege in March 2015 (just before the Defendant Hotels' conspiracies "really took hold") TravelPass was "negotiating with an experienced and well-established private equity firm interested in taking an equity position in TravelPass's business." *Id.*, ¶ 160. According to the complaint, shortly before the private equity transaction was scheduled to close, "the private equity firm withdrew its offer." *Id.*, ¶ 161( further alleging their "decision resulted in large part from the havoc the Hotel Defendants' inventory feed cut-off wreaked on TravelPass's revenues and profitability—cut-offs TravelPass later learned were a direct and intended result of the Defendant Hotels' conspiracies"). Plaintiffs allege TravelPass's value decreased as a "direct and intended consequence of the Defendant Hotels' illegal activities." *Id.*, ¶¶ 160, 162-163.

Plaintiffs' allegations, if true, indicate TravelPass has suffered harm to its "business or property" as a result of Defendants' alleged actions. According to Plaintiffs, TravelPass competed directly with Defendants for years, until Defendants conspired with one another to eliminate branded keyword competition. Plaintiffs allege the alleged actions of Defendant Hotels have cut off TravelPass' access to inventory and decreased TravelPass's value. This constitutes injury-in-fact.

b.      **Antitrust injury**

*Applicable law*

The second component of antitrust standing, antitrust injury, requires that a plaintiff's injury is "of the type the antitrust laws were intended to prevent and . . . flows from that which makes the defendant's acts unlawful." *BRFHH Shreveport*, 176 F. Supp. 3d at 626 (quoting *Brunswick*, 429 U.S. at 489). The injury should reflect "the anticompetitive effect either of the violation or of the anticompetitive acts made possible by the violation." *Anago, Inc. v. Tecnol Med. Products, Inc.*, 976 F.2d 248, 249 (5th Cir. 1992) (citing *Brunswick,* 429 U.S. at 489). The Fifth Circuit "has narrowly interpreted the meaning of antitrust injury, excluding from it the threat of decreased competition." *Id.* Typically, parties with antitrust injury are either competitors, purchasers, or consumers in the relevant market. *Waggoner v. Denbury Onshore, L.L.C.*, 612 Fed. Appx. 734, 737 (5th Cir. 2015) (citing John J. Miles, 1 *Health Care and Antitrust Law* § 9:7 & n. 30 (2014) (collecting cases)).

The antitrust injury requirement is embodied in the third *AGC* factor—the nature of the plaintiff's injury—and "normally mandates that the plaintiff be either a competitor or customer in the relevant market."  John J. Miles, 1 *Health Care and Antitrust Law* § 9:7 (2019).  Although in most situations, antitrust standing is limited to participants in the relevant market who are competitors, purchasers, or sellers because only they suffer antitrust injury, there are exceptions. *Id*. In *McCready*, for example, the Supreme Court held that Section 4's protection is not necessarily limited to these entities. There, the Supreme Court explained that plaintiffs whose injuries are "inextricably intertwined" to the injury to competition also have antitrust standing—i.e., where the

plaintiff's injury is so integral a part of the antitrust violation that its loss is the type of injury that the alleged violation would be likely to cause.[21] *Id.* (citing *McCready*, 457 U.S. at 484).

Lower courts have held that a plaintiff's injury is sufficiently "inextricably intertwined" when the plaintiff was the "fulcrum" for the violation—i.e., that to restrain competition in the relevant market, the defendant had to injure the plaintiff, even though it was not a customer or competitor in that market. John J. Miles, 1 *Health Care and Antitrust Law* § 9:7 (2019) & n. 35 (citing cases in various circuits).  "That the plaintiff was a fulcrum does not mean it necessarily has standing but only that, as a noncompetitor and nonconsumer in the relevant market affected by the conduct, it is not automatically precluded from standing."  John J. Miles, 1 *Health Care and Antitrust Law* § 9:7 (2019). The court then considers the other relevant factors identified by the Supreme Court in *AGC*. *Id*. Thus, that a party is not a consumer or competitor in the relevant market is not always a bar to antitrust standing, but it is a very important factor.  *Id*.

After the Supreme Court noted in its discussion in *AGC* that the union plaintiff was "neither a consumer nor a competitor in the market in which trade was restrained," 459 U.S. at 539, the Fifth Circuit followed that reasoning in *Bell v. Dow* and stated "[r]estraint in the market affects consumers and competitors in the market; as such, they are the parties that have standing to sue." *Dow*, 847 F.2d at 1183. The Fifth Circuit later stated in *Jebaco, Inc. v. Harrah's Operating Co.*, 587 F.3d 314 (5th Cir. 2009), "the focus of remedies available under federal antitrust laws is principally upon consumers or competitors affected by anticompetitive conduct."  *Id.* at 319 (citing *AGC*, 459 U.S.

---

[21] Interestingly, however, the plaintiff in *McCready* was a consumer in the market in which competition was allegedly restrained. John J. Miles, 1 *Health Care and Antitrust Law* § 9:7 (2019) & n. 35 (2019) (citing *Jebaco, Inc. v. Harrah's Operating Co., Inc.*, 587 F.3d 314 (5th Cir. 2009) (noting that the "key" to the *McCready* decision "was plaintiff's status as consumer in the relevant market"); also citing *Serpa Corp. v. McWane, Inc.*, 199 F.3d 6 (1st Cir. 1999)).

at 538–39; also citing *Norris v. Hearst Trust,* 500 F.3d 454, 465–66 (5th Cir.2007) ("Plaintiffs [newspaper distributors] were not consumers of the [newspaper] or its advertising services, and they were not producers or sellers of competing publications or media.")).

In *Norris*, former distributors of the *Houston Chronicle* newspaper alleged antitrust claims against the newspaper owners, based upon the alleged wrongful termination of their distributor contracts in retaliation for complaining about the owners' alleged coercion of its distributors to produce fraudulent circulation reports, further alleging such would be used to increase advertising sales and revenue. 500 F.3d at 457, 464; *see also id.* at 463 (stating there was no allegation of any harm– or increased price or cost to –subscribers (or readers)).  *Id.* at 463. Assuming the owners' alleged conduct was violative of the antitrust statute, the Fifth Circuit stated the only parties affected by the alleged conduct were either the consumers of the paper's advertising services or competitors selling advertising in the relevant market. *Id.* at 466.  Stating the plaintiffs were neither consumers nor competitors, the court held the plaintiffs had not suffered antitrust injury. *Id.*

In *Norris*, the Fifth Circuit found the plaintiffs' reliance on *McCready* misplaced. *Id*. It noted the Supreme Court in *McCready* found McCready was an appropriate plaintiff, noting that "[a]s a consumer of psychotherapy services entitled to financial benefits under the Blue Shield plan, we think it clear that McCready was 'within that area of the economy . . .  endangered by [that] breakdown of competitive conditions' resulting from Blue Shield's selective refusal to reimburse." *Id.* at 467 (quoting *McCready*, 102 S.Ct. at 2549) (citation omitted in *Norris*)). The Fifth Circuit in *Norris* believed that was the key to *McCready. Norris,* 500 F.3d at 467 (further noting that in *AGC* the Supreme Court distinguished *McCready,* noting "the Sherman Act was enacted to assure customers the benefits of price competition" and that "McCready . . . was a consumer of

psychotherapeutic services . . .  injured by defendants' conspiracy to restrain competition in the market for such services," *id.,* 103 S.Ct. at 908, while "[in] this case, however, the [plaintiff] Union was neither a consumer nor a competitor in the market in which trade was restrained." *Id.,* 103 S.Ct. at 909). The court in *Norris* stated "[t]hat is likewise the present situation as plaintiffs here are neither consumers nor competitors in the market attempted to be restrained."  500 F.3d at 467.

Both plaintiffs and defendants have since cited *Norris* for the following two propositions: (1) that the antitrust injury requirement is met when an injury is inflicted on a business consumer or competitor of a defendant, and (2) that an antitrust plaintiff in the Fifth Circuit must be either a competitor or consumer in the market to have standing to bring an antitrust claim related to that market. *See Vaughn Med. Equip. Repair Serv., L.L.C. v. Jordan Reses Supply Co.*, No. CIV.A. 10-00124, 2010 WL 3488244, at *12 (E.D. La. Aug. 26, 2010) ("The plaintiff seeks recognition of its injuries as both a consumer of Respironics' and ResMed's products, and a competitor of Jordan Reses' distribution services. Under the plaintiff's suggested interpretation of *Norris,* such recognition would establish the requisite antitrust injury"); *see also Universal Hosp. Servs., Inc. v. Hill-Rom Holdings, Inc*., No. CIV.A. SA-15-CA-32, 2015 WL 6994438, at *12 (W.D. Tex. Oct. 15, 2015) ("Under Hill–Rom's suggested interpretation of *Norris,* only through pleading that Universal was a competitor or consumer in the standard hospital bed market can Universal establish the requisite antitrust injury.").

In both cases, the courts noted the suggested interpretation of *Norris* was inaccurate because, among other things, it "drastically oversimplifie[d] the question of whether the defendants' activities

resulted in antitrust injury." *Vaughn*, 2010 WL 3488244, at *12;[22] *see also Universal Hospital Services*, 2015 WL 6994438, at *12.  Nevertheless, in both cases, the courts concluded the plaintiff's "alleged losses and competitive disadvantage" resulting from its exclusion from the relevant market fell "within the conceptual bounds of antitrust injury."  *Id*.

### *Parties' assertions*

Focusing on the "secondary conspiracy" involving Gatekeeper OTAs, which Defendants theorize was "developed in an effort to overcome [TravelPass's] lack of injury-in-fact from the 'primary conspiracy,'" Defendants argue any injury suffered by TravelPass from the enforcement of distribution contracts between Defendants and Gatekeeper OTAs is not "antitrust injury," "which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendant's acts unlawful." Docket Entry # 53 at p. 10.  Defendants argue this requirement ensures that a plaintiff can recover "only if the loss stems from a competition-*reducing* aspect or effect of the defendant's behavior."  *Id*. at p. 11 (quoting *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 345–46, 110 S. Ct. 1884, 1895, 109 L. Ed. 2d 333 (1990) ("*ARCO*") (emphasis in original)).  Defendants assert Plaintiffs fail to meet this requirement.  Docket Entry # 97 at pp. 3-4.

According to Defendants, the complaint lacks any allegations of consumer benefit from TravelPass's business model.[23] Putting aside the FTC consent decree, Defendants argue TravelPass

---

[22] The court in *Vaughn* further suggested that the Fifth Circuit in *Norris* was "commenting less on the dynamics of anticompetitive conduct and more on which parties are most likely to bring suit under the federal antitrust laws.  Thus, it was focused on the third element" – the issue of whether the plaintiff is a proper party to the antitrust claim.  2010 WL 3488244, at *12.

[23] Defendants assert TravelPass did not provide customers with competitive information that reduces their transaction costs when it bid on Defendants' branded keywords; rather, it deceived consumers through its use of hotel brand names in search engine advertisements, thereby misleading consumers to believe that the source of a particular listing was the hotel itself. In support of this argument, Defendants rely on a December 2017 complaint filed by the Federal Trade Commission ("FTC") against TravelPass.  *See* Docket Entry # 53 at p. 11; *see also id.* at p. 6 (citing

does not allege its own branded keyword advertising provided consumers with information on competing hotels and hotel rooms or that it sold Defendants' hotel rooms at lower prices than Defendants sold those identical rooms.  Docket Entry # 53 at pp. 11-12; *see also* Docket Entry # 97 at p. 4 ("TravelPass does not allege that its distribution of rooms from branded keyword bidding offered lower prices or any other benefit to consumers, through hotel price comparisons or otherwise. Rather, when TravelPass bid on a particular Defendant's branded keywords, it did so to sell *that particular Defendant's rooms*.") (emphasis in original).  Defendants further argue as follows:

> Recognizing this, TravelPass claims that its injury is 'inextricably intertwined' with the harm the posited conspiracies allegedly caused hotel consumers. (*Id.* ¶¶ 153, 159.) But TravelPass, which distributes *Defendants'* hotel room inventory and thus is in a vertical relationship with them . . . is neither a consumer nor a competitor in the market for hotel rooms where the alleged consumer harm occurred. Thus any injury it experienced by being cut off from access to that inventory is not 'inextricably intertwined' with the alleged competitive harm.

Docket Entry # 53 at p. 12 (emphasis in original) (citing *Norris*, 500 F.3d at 467-68 for the proposition that plaintiffs lacked antitrust standing where they were neither consumers nor competitors in the allegedly restrained market such that their injury was not "inextricably intertwined" with harm to competition under *McCready*).

    In their consolidated response, Plaintiffs assert TravelPass has suffered "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts

---

Compl., *Fed. Trade Comm'n v. Reservation Counter, LLC, TravelPass Group, LLC, and Partner Fusion, Inc.*, No. 2:17-cv-01301, Dkt. No. 2 (D. Utah Dec. 26, 2017), attached to the joint motion as Exhibit 3).

    According to Defendants, the FTC's complaint against TravelPass, and the subsequent consent decree, are both matters of public record and, thus, properly considered on a motion to dismiss. Docket Entry # 53 at p. 6, n. 7 (citing *Paternostro v. Custer*, No. 4:15CV71-RC-CMC, 2016 WL 11473560, at *4 n.1 (E.D. Tex. Feb. 16, 2016) ("While reviewing a motion to dismiss, courts may take judicial notice of court pleadings in other cases, because pleadings are public records.")).

    Although the Court may consider documents attached to or incorporated by reference into the complaint and also matters of public record, the Court does not do so here because it would not aid in the analysis of the pertinent issues.

unlawful." Docket Entry # 79 at p. 21 (citing *Brunswick*, 429 U.S. at 489 ("The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation.")).  Plaintiffs argue *Brunswick* expressly recognizes "there are two kinds of legitimate antitrust plaintiffs: those who pay the higher prices and suffer the lower output resulting from defendants' successful violations, and those who stand in the way of that success and must be neutralized." Docket Entry # 79 at p. 21. According to Plaintiffs, TravelPass is the second type of legitimate antitrust plaintiff—a competitor whose continued presence in the branded keyword space would have spelled doom for the Defendants' illegal plans.  *Id*.

### Analysis

As part of its overarching argument that TravelPass's injury does not stem from the harm to competition alleged in the complaint, Defendants claim TravelPass is neither a customer or competitor in the market for hotel rooms where the alleged consumer harm occurred. To the contrary, Plaintiffs contend TravelPass is in fact a "competitor in the market for hotel rooms where the alleged consumer harm occurred," because TravelPass also distributes hotel inventory for other hotels not named as defendants in this action. Docket Entry # 79 at p. 20. More specifically, Plaintiffs maintain whenever TravelPass sells a hotel room from a non-defendant brand, it is competing with each of the defendants, and every time TravelPass sells inventory associated with one of the defendants, TravelPass competes directly with every other defendant.[24] According to Plaintiffs, viewing all of the allegations as a whole and viewing TravelPass "through the appropriate lens –as one of several *competitor*-victims that Defendants deliberately excluded from the market

---

[24] Plaintiffs further explain that when TravelPass sells a Hilton room, it stands in a vertical relationship with Hilton only, but "in that moment, it is simultaneously a horizontal competitor of every other brand." Docket Entry # 79 at p. 20. According to Defendants' reply, TravelPass's "undisputed business practices illustrate the fallacy of that argument." Docket Entry # 97 at p. 4.

as an integral and necessary component of their comprehensive bid rigging scheme– it quickly becomes apparent that TravelPass has suffered. . . antitrust injury." *Id*. at p. 14 (emphasis in original).

At this stage of the proceedings, the Court accepts as true all well-pleaded facts in the complaint and views those facts in the light most favorable to the plaintiff.[25] The original complaint alleges TravelPass is a competitor of Defendants. *See, e.g.* Docket Entry # 1, ¶ 1 (alleging Defendants' "conspiracy effectively divided the market for branded keyword search results between and among the Defendant Hotels, allocating branded keyword territory such that the Defendant Hotels no longer had to *compete either with one another or with TravelPass* and other internet travel innovators" (emphasis added)); *see also id.*, ¶ 22 ("The Defendant' illegal activities had the purpose and effect of *eliminating TravelPass as a competitive threat* to their illegal ends.") (emphasis added)). Taking Plaintiffs' allegations as true, TravelPass is not simply an indirect victim of the alleged scheme. Instead, TravelPass is a direct competitor and participated in the bidding process, "alleged to be manipulated by the defendants." *United States ex rel. Univ. Loft Co. v. Avteq, Inc.*, No. SA-14-CA-528-OLG, 2015 WL 13548950, at *12 (W.D. Tex. Dec. 22, 2015), *report and recommendation adopted*, No. 14-CV-528-OLG, 2016 WL 9461763 (W.D. Tex. Jan. 8, 2016).

---

[25] The Court would further note the Fifth Circuit stated in *Sanger* that antitrust standing, like other issues, "may present disputed issues of fact which must be resolved at the summary judgment stage in favor of the nonmoving party. . . ." 802 F.3d at 738 (citations omitted). According to the court in *Biovail*, "the existence of an 'antitrust injury' is not typically resolved through a motion to dismiss." *Biovail*, 49 F. Supp. 2d at 773 (quoting *Brader v. Allegheny General Hospital,* 64 F.3d 869, 876 (3d Cir.1995)) (noting the adequacy of a physician's contentions regarding the effect on competition is typically resolved after discovery, either on summary judgment or after trial and further noting even in antitrust cases that do not involve physicians suggest the existence of an antitrust injury is not typically resolved through motions to dismiss). "Circumstances may, however, warrant dismissing antitrust claims on a motion to dismiss, particularly after *Iqbal* and *Twombly*, when the allegations do not show antitrust injury or one of the other elements of a Section 1 claim." *Natkin v. Am. Osteopathic Ass'n*, No. 3:16-CV-01494-SB, 2018 WL 452165, at *6 (D. Or. Jan. 17, 2018).

Importantly, even though the Fifth Circuit has noted consumers and competitors are the parties often injured by the harm of competition caused by alleged antitrust violations, as pointed out by the court in *Universal Hospital Services*, the Fifth Circuit has not held as a matter of law that antitrust standing is limited to competitors and consumers exclusively. *Universal Hosp. Servs.*, 2015 WL 6994438, at *12. Rather, it has recognized that the Sherman Act is "comprehensive in its terms and coverage, protecting all who are made victims of the forbidden practices." *Id.* (quoting *American Cent. E. Tex. Gas Co. v. Unio Pac. Res. Grp., Inc.,* 93 Fed. Appx. 1, 7 (5th Cir.2004) (quoting *McCready,* 457 U.S. at 472).

In *American Central,* the Fifth Circuit rejected the argument the plaintiff lacked standing because it was a distributor, not a competitor. *Universal Hosp. Servs.*, 2015 WL 6994438, at *12 (citing *American Central*, 93 Fed. Appx. at 7). The court held that "[c]ompetitor status is not required to establish standing" and "[r]elief for antitrust claims is not confined to consumers, or to purchasers, or to competitors, or to sellers." *Id.* And in *McCormack*, the Fifth Circuit was willing to assume that college football players, neither consumers nor competitors, had standing to sue for alleged antitrust injuries suffered by the university. 845 F.2d at 1343. Thus, even if the Court were to accept Defendants' argument that TravelPass is not a competitor, this would not be determinative of the issue.

In its overarching argument that TravelPass has not alleged antitrust injury, Defendants also contend there is no alleged harm to competition that resulted in injury to TravelPass; rather, it has only alleged injury to itself. Docket Entry # 97 at pp. 3-5. Defendants insist a prohibition on TravelPass bidding for a hotel's branded keywords could not produce the alleged "consumer harm" that Plaintiffs allege: "a decrease in information to consumers, [and] an increase in the transaction

43

and other costs for consumers seeking to book a hotel," allegedly leading to higher overall prices and reduced quality for consumers.  Docket Entry # 53 at p. 11 (quoting Docket Entry # 1, ¶ 151); *see also* Docket Entry # 97 at p. 5.  Nor could it "impact the interbrand competition that TravelPass describes throughout the Complaint," according to Defendants.  Docket Entry # 97 at p. 5.

In support of this argument, Defendants rely primarily on the language in *Atlantic Richfield Co. v. USA Petroleum Co. (ARCO)*, 495 U.S. 477 (1977) regarding the "competition-*reducing* effect of a defendant's behavior."  Docket Entry # 97  at p. 3 (citing *ARCO*, 495 U.S. at 489 (emphasis in *ARCO*)). According to Defendants, "the injury TravelPass asserts from the purported secondary conspiracy had nothing to do with any alleged injury to competition." *Id.* at p. 6. Based on their contention that any injury to TravelPass did not flow from harm to competition, Defendants argue TravelPass has not alleged antitrust injury, and hence lacks antitrust standing.  *Id.*

Defendants' argument is unpersuasive. This argument was raised, and rejected, in *Vaughn*, 2010 WL 3488244, at *12 ("Specifically, defendants assert that the plaintiff cannot state an antitrust claim because it has not alleged facts to show a market-wide injury to competition.").  As noted by the court in *Vaughn*, and by at least one court within this district, the Fifth Circuit has repeatedly distinguished between antitrust injury and injury to competition. *Id.* (citations omitted); *see also Games People Play, Inc. v. Nike, Inc.*, No. 1:14-CV-321, 2015 WL 13657672, at *5 (E.D. Tex. Feb. 13, 2015) (citing, among other cases, *Doctor's Hospital*, 123 F.3d at 305).

In *Doctor's Hospital*, the Fifth Circuit set forth the *Brunswick* rule relied upon by Plaintiffs in their briefing: antitrust injury should reflect the anticompetitive effect either of the violation *or* of anticompetitive acts made possible by the violation. *Doctor's Hosp.*, 123 F.3d at 305 (emphasis

added). According to the court in *Doctor's Hospital*, "[s]ince 1983, [the Fifth Circuit has] pointed

out a distinction between antitrust injury and injury to competition, the latter of which is often a

component of substantive liability. *Id.* (citing *Multiflex, Inc. v. Samuel Moore & Co.,* 709 F.2d 980,

986 n. 6 (5th Cir.1983)). "And in 1984, th[e] court explained, albeit in a motion for rehearing, that

the antitrust laws do not require a plaintiff to establish a market-wide injury to competition as an

element of standing." *Doctor's Hosp.,* 123 F.3d at 305 (citing *Walker v. U–Haul Co.,* 747 F.2d 1011,

1016 (5th Cir.), *modifying,* 734 F.2d 1068 (5th Cir.1984)).

More recently, the Fifth Circuit, in addressing antitrust injury, quoted only the *Brunswick*

rule, without also citing *ARCO* for the proposition that a plaintiff can recover only if the loss stems

from a competition-reducing aspect or effect of the defendant's behavior.  *See Waggoner v. Denbury*

*Onshore, L.L.C.*, 612 Fed. Appx. 734, 736-37 (5th Cir. 2015).  There, the Fifth Circuit stated in a

footnote that the antitrust injury requirement of antitrust standing is sometimes confused with "injury

to competition[,] . . . which is often a component of substantive liability." *Id.* at 736 n. 3 (5th Cir.

2015) (quoting *Doctor's Hosp.,* 123 F.3d at 305). Injury to competition then, while often a necessary

component to substantive liability, need not be pleaded for a plaintiff's antitrust claims to survive

a motion to dismiss. *Games People Play,* 2015 WL 13657672, at *5 (citing *Doctor's Hosp.*, 123 F.3d

at 305).

The Fifth Circuit in *Waggoner* stated that in the standing context, injury "should be viewed

from the perspective of the plaintiff's position in the marketplace, not from the merits-related

perspective of the impact of a defendant's conduct on overall competition."[26] *Waggoner*, 612 Fed.

---

[26] The Fifth Circuit further explained that parties with antitrust injury are typically either competitors, purchasers, or consumers in the relevant market but also noted "standing is not necessarily limited to this group."  612 Fed. Appx. at 737 (citing *McCready,* 457 U.S. at 472) ("As we have recognized, '[§ 4 of the Clayton Act] does not confine its protection to consumers, or to purchasers, or to competitors, or to sellers. . . .)'" (quoting *Mandeville Island*

Appx. at 736, n. 3. In *Doctor's Hospital*, when the antitrust injury was viewed from the perspective of the plaintiff's position in the marketplace, not from the merits-related perspective of the impact of a defendant's conduct on overall competition, the plaintiff's "alleged losses and competitive disadvantage because of its exclusion from SMA [fell] easily within the conceptual bounds of antitrust injury, whatever the ultimate merits of its case." *Doctor's Hosp.*, 123 F.3d at 305.

At this stage of the litigation, viewing the alleged antitrust injury from the perspective of TravelPass's position in the marketplace, the Court finds the alleged losses and competitive disadvantage resulting from the alleged neutralization of TravelPass fall within the "conceptual bounds of antitrust injury, whatever the ultimate merits of its case." *Id.* Antitrust laws were intended to prohibit firms from restraining trade by harming other competitors, which in turn harms consumers by restricting competition, increasing prices, and decreasing output. *Stewart Glass & Mirror, Inc. v. U.S.A. Glas, Inc.*, 940 F. Supp. 1026, 1035 (E.D. Tex. 1996) (citing *Anago, Inc. v. Tecnol Medical Prods. Inc.,* 976 F.2d 248, 249 (5th Cir.1992), *cert. dismissed,* 510 U.S. 985, 114 S.Ct. 491, 126 L.Ed.2d 441 (1993); also citing Phillip Areeda & Donald F. Turner, Antitrust Law: An Analysis of Antitrust Principles and Their Application ¶¶ 103–104 (1978)).  An antitrust injury "should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation."  *Brunswick*, 429 U.S. at 489.

In addition to the allegations set forth above regarding TravelPass as a competitor, Plaintiffs allege Defendants' illegal activities, taken together, "have severely reduced, and in many cases even eliminated, the revolutionary benefits of the internet economy for hotel consumers," and have "left

---

*Farms, Inc. v. Am. Crystal Sugar Co.,* 334 U.S. 219, 236, 68 S.Ct. 996, 92 L.Ed. 1328 (1948) (alteration in original)).

in its wake an online travel booking marketplace characterized by deliberately limited information and high transaction costs—a marketplace where innovators like Plaintiffs can no longer operate effectively to ensure consumers continue to receive those benefits."  Docket Entry # 1, ¶ 1. Plaintiffs allege the two-pronged conspiracy has led to a decrease in information to consumers, an increase in the transaction and other costs for consumers seeking to book a hotel, which inevitably leads to overall higher prices and reduced quality for consumers.  *Id*., ¶¶ 18, 151; *see also id.* at ¶ 152 ("As a result, between the third quarter of 2014 and the present, a robustly competitive market presenting online search consumers with numerous competitive options now presents them instead with an advertisements for a single brand. The conspiracy has virtually eliminated all interbrand competition in the online keyword search market for hotels.").

Viewing the allegations in the complaint as a whole in the light most favorable to Plaintiffs, Plaintiffs have adequately pleaded that TravelPass suffered antitrust injury. The injury alleged—the intentional attempt to divide the market for branded keyword search results between and among the Defendant Hotels such that they no longer had to compete with each other or with TravelPass—is the type of injury the antitrust laws were intended to prevent and that flows from that which makes Defendants' alleged acts unlawful.

However, "even if the plaintiff meets these requirements, the court must consider whether he is a 'proper plaintiff' to sue for damages, examining such factors as (1) whether the plaintiff's injuries or their causal link to the defendant are speculative, (2) whether other parties have been more directly harmed, and (3) whether allowing this plaintiff to sue would risk multiple lawsuits, duplicative recoveries, or complex damage apportionment." *McPeters v. LexisNexis*, 11 F. Supp. 3d 789, 798 (S.D. Tex. 2014) (quoting *McCormack*, 845 F.2d at 1341) (citing *AGC,* 459 U.S. at 545).

c.      **Proper plaintiff status**

*Parties' assertions*

None of the three motions to dismiss explicitly argue that TravelPass lacks standing because it is not a proper plaintiff.  However, as noted above, Caesars' separate motion does suggest that the Court should consider whether TravelPass is a proper plaintiff.  *See* Docket Entry # 55 at p. 6 ("Indeed, to assess whether there is any properly alleged antitrust injury, the Court 'must consider whether [the plaintiff] is a proper plaintiff to sue for damages, examining such facts as whether the plaintiff's injuries or their causal link to the defendant are speculative.").  According to Plaintiffs' consolidated response, the "same holistic lens" of the complaint "also reveals that TravelPass and other Downstream OTAs are likely the best possible plaintiffs to challenge defendants' illegal conduct." Docket Entry # 79 at pp. 14-15 (citing *Tichy*, 1:18-cv-1959-RRP-MDW (N.D. Ill.), Docket Entry # 65 at pp. 20-25 (stating that a proper plaintiff is one who is a "participant in the market in which [it] claims the challenged conduct occurred")).

*Applicable law, generally*

More than one type of plaintiff may have antitrust standing, depending on the type of violation and conduct alleged. John J. Miles, 1 *Health Care and Antitrust Law* § 9:7 (2019) (stating that were a firm to monopolize a market by unlawfully excluding its competitors and then increase its prices to consumers, both the excluded firms and the monopolist's customers would have antitrust standing to recover damages and further stating the damages would not be duplicative).  "The same would be true of an unlawful exclusive contract that resulted in a party's obtaining market power and

48

then raising prices. Both those foreclosed from the market by the unlawful contract and customers of the party obtaining market power would have antitrust standing."  *Id.*

Indeed, in its discussion of "proximate causation,"[27] the court in *Tichy* stated "different injuries in distinct markets may be inflicted by a single antitrust conspiracy;" therefore, "differently situated plaintiffs might be able to raise claims." *Tichy*, 376 F. Supp. 3d at 845 (quoting *Loeb*, 306 F.3d at 481). The Court in *Tichy* stated consumers, like the plaintiff in that case, who searched for and purchased hotel rooms online are "undoubtedly participants in that market." *Id.* Finding their alleged injuries are distinct from, not derivative of, harm that online search engines may have suffered, the court in *Tichy* concluded the plaintiff properly asserted claims arising from these injuries. *Id.*

### Analysis

Plaintiffs argue TravelPass has demonstrated "proper plaintiff status" because TravelPass and other Downstream OTAs are likely best situated among all potential plaintiffs to hold Defendants accountable for their wrongdoing.  Docket Entry # 79 at p. 12.  According to Plaintiffs, five of the defendants "implicitly recognized this fact when they challenged plaintiffs' antitrust standing" in

---

[27] The court in *Tichy* noted the Seventh Circuit Court of Appeals has explained that "antitrust standing" (which as noted above is the second element of the Seventh Circuit's two-part "antitrust standing" test) refers to "proximate causation." *Tichy*, 376 F. Supp. 3d at 842, n. 6 (citing *Supreme Auto Transport, LLC v. Arcelor Mittal USA, Inc.*, 902 F.3d 735, 743 (7th Cir. 2018)). According to the *Tichy* court, the Seventh Circuit "eschew[ed] the term 'antitrust standing'" and instead referred only to requirements plaintiffs had to meet to prevail under the statutes at issue.  *Id.*

In the Seventh Circuit, in considering whether a plaintiff has "standing" under Section 4 of the Clayton Act, courts consider certain *AGC* factors such as "the potential for duplicative recovery, the complexity of apportioning damages, and the existence of other parties that have been more directly harmed." *Greater Rockford Energy and Tech. Corp. v. Shell Oil Co.*, 998 F.2d 998 F.2d 391, 396 (7th Cir. 1993) (quoting *Cargill*, 479 U.S. at 111 n. 6, 107 S.Ct. at 490 n. 6 (citing *AGC*, 459 U.S. at 544–45)).

*Tichy,* arguing there that the putative consumer class plaintiff lacked standing because they are "not [] participant[s] in the market in which [they] claim[] the challenged conduct occurred." *Id*. at p. 12, n. 8.

Turning to the relevant *AGC* factors, Plaintiffs state the causal connection between TravelPass's harm and the alleged antitrust violation is direct, and Defendants intended to inflict that harm.  Docket Entry # 79 at p. 12.  Plaintiffs contend the injuries are not speculative, and "the Court will be able to calculate TravelPass's damages more easily and reliably than in most commercial litigation contexts." *Id*. at p. 13 (citing Docket Entry # 1, ¶¶ 153-163). "Finally, because TravelPass's damages are those they suffered because the Defendants needed to exclude them from the market to succeed in their overall bid rigging scheme," Plaintiffs assert "there is zero risk of duplicative recovery in any other action involving similar allegations, and there is no more direct victim of the conduct that harmed TravelPass."  Docket Entry # 79 at p. 13.

As discussed above, Plaintiffs have alleged losses and a competitive disadvantage due to Defendants' alleged bid-rigging and market division, which appear to come within the "conceptual bounds of antitrust injury, whatever the ultimate merits of this case." *Avteq,* 2015 WL 13548950, at *12 (quoting *Doctor's Hosp.*, 123 F.3d at 305).  TravelPass "is no remote or indirect victim of the alleged scheme." *Doctor's Hosp*., 123 F.3d at 306. There is no indication from Defendants that TravelPass's injuries are speculative. Nor have they argued other parties have been more directly harmed or that allowing TravelPass to sue would present complex damage apportionment.  The Court finds Plaintiffs have sufficiently alleged they are proper plaintiffs to bring this suit.

Finding Plaintiffs have adequately pleaded the requisite elements for antitrust standing, the Court now considers whether Plaintiffs have adequately pleaded violations of Section 1 of the Sherman Act, specifically the first element concerning engagement in a conspiracy.

**C.     Whether Plaintiffs have sufficiency alleged conspiracy**

**1.     Parties' assertions**

In their joint motion to dismiss, Defendants assert Plaintiffs fail to plead facts from which any conspiracy can be inferred, contending the complaint does not contain allegations "directly evidencing an actual agreement among Defendants not to bid on each other's branded keywords, relying instead on conclusions and innuendo." Docket Entry # 53 at p. 13. According to Defendants, there are no allegations of communications among the Defendants – no locations, no names of participants, no statements, and no dates of any conversations through which the alleged agreement among eight hotel companies was formed.

Defendants further assert Plaintiffs improperly group "Defendants" together and attempt to allege a "hub and spoke conspiracy" involving the Gatekeeper OTAs. *Id.* at pp. 13-14.  Again, Defendants argue there are no factual allegations of any meetings, conversations, or other communications evidencing such a hub and spoke conspiracy.  *Id*. at p. 14.  Defendants argue Plaintiffs' complaint is the "type of conclusory, speculative allegation of conspiracy that courts will not credit on a motion to dismiss."  *Id*. (generally citing *Marucci Sports*, 751 F.3d at 375).

Defendants assert Plaintiffs' allegations of circumstantial evidence of the "primary" conspiracy, consisting largely of allegations regarding opportunities to conspire at trade association meetings and "mischaracterizations of unambiguous documents," are insufficient to state a claim. Docket Entry # 53 at p. 15. Regarding the "secondary" Hotel Defendants-Gatekeeper OTA

conspiracy, Defendants claim the complaint fails to state a claim as a matter of law, because Plaintiffs fail to allege anything more than parallel conduct, and the allegations in the complaint "are rooted in purportedly similar terms in the vertical distribution contracts between individual hotel Defendants and OTAs, which it acknowledges were in place long before the alleged conspiracy began." *Id*. at p. 19.

Defendants maintain Plaintiffs' "parallel conduct allegations" are the same as those addressed in *In re OTC*: "the alleged existence of similar provisions across Defendants' individual, bilateral distribution agreements with OTAs." *Id.* at p. 20 (generally citing *In re OTC*, 997 F. Supp. 2d at 537). Defendants assert Plaintiffs fail to plead any facts to place the alleged parallel conduct in a context suggestive of conspiracy; rather, the complaint affirmatively explains there are independent economic motivations or incentives of each defendant to adopt the challenged provisions absent any agreement with its competitors. *Id*. at p. 21.

## 2.    Applicable law

### a.    Generally

To establish a violation of Section 1 of the Sherman Act, Plaintiffs must demonstrate that: "(1) [Defendants] engaged in a conspiracy, (2) the conspiracy had the effect of restraining trade, and (3) trade was restrained in the relevant market." *Marucci Sports*, 751 F.3d at 373 (quoting *Apani Sw., Inc. v. Coca–Cola Enters., Inc.,* 300 F.3d 620, 627 (5th Cir.2002)). The United States Supreme Court case *Bell Atlantic v. Twombly* specifically addressed the level of detail in which a plaintiff must plead a claim brought pursuant to Section 1 of the Sherman Act. 550 U.S. at 556. The Court provided that to state a plausible claim for conspiracy, there must be "enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Id.* With respect

to parallel conduct by competitors, the Court found that "when allegations of parallel conduct are set out in order to make a § 1 claim, they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Id.* at 557. Thus, although parallel conduct "gets the complaint close to stating a claim," in order to establish plausibility, a plaintiff must provide further "factual enhancement."[28] *Id.* Accordingly, if a plaintiff pleads only parallel conduct allegations without a context demonstrating "a meeting of the minds, an account of a defendant's commercial efforts stays in neutral territory." *Id.*

b.     **Concerted action**

Under the first element of an antitrust claim, concerning engagement in a conspiracy, the Court must determine whether Plaintiffs sufficiently allege the Defendant Hotels "engaged in concerted action—that is, a 'conscious commitment to a common scheme designed to achieve an unlawful objective.'" *Marucci Sports*, 751 F.3d at 374-75 (quoting *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984) (citation and internal quotation marks omitted)).  Because Section 1 of the Sherman Act "does not prohibit [all] unreasonable restraints of trade . . . but only restraints effected by a contract, combination, or conspiracy, [t]he crucial question is whether the challenged

---

[28] The court *In re Online Travel Co. (OTC) Hotel Booking Antitrust Litig.*, 997 F. Supp. 2d 526 (N.D. Tex. 2014) explained that courts sometimes refer to these "factual enhancements" as "plus factors," defined as "facts that tend to ensure that courts punish concerted action—an actual agreement—instead of the unilateral, independent conduct of competitors." *Id*. at 536, n. 13 (quoting *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 323 (3d Cir.2010) (brackets and quotations omitted)). According to the Third Circuit Court of Appeals, although courts have referenced "plus factors" in analyzing the plausibility of Section 1 claims at the pleadings stage, "those references have invariably been drawn from cases evaluating the merits of an antitrust plaintiff's conspiracy claim at the summary judgment and trial stages of litigation, when there is significantly more information available regarding whether complex analyses of pricing structures and other information suggest agreement."  *Evergreen Partnering Grp., Inc. v. Pactiv Corp.*, 720 F.3d 33, 46 (1st Cir. 2013) (citing *In re Ins. Brokerage*, 618 F.3d at 321–22 (relying on *In re Flat Glass Antitrust Litig*, 385 F.3d 350, 359–60 (3d Cir. 2004), which explains that "plus factors" are "proxies for direct evidence of an agreement")).

To avoid confusion, the court in *In re OTC* followed *Twombly's* language by using "factual enhancements." 997 F. Supp. 2d at 536, n. 13.

anticompetitive conduct stem[s] from independent decision or from an agreement, tacit or express." *Avteq*, 2015 WL 13548950, at *13 (quoting *Twombly*, 550 U.S. at 553).

Concerted action may be shown by either direct or circumstantial evidence. *Golden Bridge Tech.,* 547 F.3d at 271. "Direct evidence explicitly refers to an understanding between the alleged conspirators, while circumstantial evidence requires additional inferences . . . to support a conspiracy claim." *Id.* (citing *Tunica Web Advertising v. Tunica Casino Operators Ass'n, Inc.*, 496 F.3d 403, 409 (5th Cir. 2007)).

Independent parallel conduct, or even conduct among competitors that is consciously parallel, does not alone establish the contract, combination, or conspiracy required by Section 1. *Golden Bridge Tech.*, 547 F.3d at 271 (citing *Twombly*, 127 S.Ct. at 1964). "[A]n allegation of parallel conduct and a bare assertion of conspiracy will not suffice." *Kjessler v. Zaappaaz, Inc.*, No. CV 4:18-0430, 2019 WL 3017132, at *9 (S.D. Tex. Apr. 24, 2019) (quoting *Twombly*, 550 U.S. at 557). What pushes a Section 1 claim from "possible" to "plausible" is "some further factual enhancement"—that is, some "context," "setting," or "further circumstance pointing towards a meeting of the minds." *Id.*

Courts have identified numerous "factual enhancements" potentially supporting the inference of a conspiracy, including the following:

> a common motive to enter into a price fixing conspiracy, beyond merely making more money, *see Burch v. Milberg Factors, Inc.*, 662 F.3d 212, 227 (3d Cir. 2011); conduct that would be irrational in a competitive market, *see In re Blood Reagents Antitrust Litig.*, 266 F. Supp. 3d 750, 772 (E.D. Pa. 2017); 'whether the defendants have exchanged or have had the opportunity to exchange information relative to the alleged conspiracy,' *see Hyland v. HomeServices of Am., Inc.*, 771 F.3d 310, 318 (6th Cir. 2014); and 'evidence that the industry is conducive to collusion,' *see In re Pool Prods. Distrib. Mkt. Antitrust Litig.*, 158 F. Supp. 3d 544, 569 (E.D. La. 2016).

*Kjessler*, 2019 WL 3017132, at *10.

**3.    Analysis**

At the outset of this discussion, the Court is cognizant that the issues before it do not fall under a heightened pleading standard and are not presented at the summary judgment stage of this litigation. *Marucci Sports,* 751 F.3d at 373 ("Antitrust claims do not necessitate a higher pleading standard. . . ."). The Court is also guided by the principle set forth above that Plaintiffs' allegations should be viewed holistically. A recent decision from within the Fifth Circuit illustrates these guiding principles.

In *Kjessler*, the defendants argued the complaint revealed "discrete conspiracies," not one vast industry-wide conspiracy among the defendants to fix prices on three different products. *Kjessler*, 2019 WL 3017132, at *10. Among other things, the defendants contended there was no plausible basis to infer that they collectively participated in an overarching price fixing conspiracy. *Id*. The court was unpersuaded with regard to wristbands and pin buttons (the only products presently in issue) and stated as follows:

> Defendants contest "not whether any conspiracy existed, only how far it reached"—a question "of fact" that "cannot be resolved in the present procedural posture, where the court tests only the sufficiency of the pleadings." *See In re Lithium Ion Batteries Antitrust Litig.*, No. 13-MD-2420 YGR, 2014 WL 309192, at *2 (N.D. Cal. Jan. 21, 2014) (Rogers, J.). "Defendants' atomizing approach is inconsistent with the principle that 'the character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole.'" *Id.* at *11 (internal quotation marks omitted) (quoting *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 738 F. Supp. 2d 1011, 1019 (N.D. Cal. 2010) (Conti, J.)). The Supreme Court has warned against "tightly compartmentalizing the various factual components" of a plaintiff's case "and wiping the slate clean after scrutiny of each." *See Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962).

2019 WL 3017132, at *10.  Viewing the plaintiffs' allegations "holistically," the court concluded the plaintiffs had satisfied their pleading burden and had plausibly alleged a single conspiracy among all the defendants covering wristbands and pin buttons. *Id.* at *12.

Here, Plaintiffs assert the complaint alleges a comprehensive illegal scheme, not what Defendants characterize as separate and legally independent acts.  Docket Entry # 108 at p. 6.  In Defendants' reply, Defendants urge the Court, in assessing the adequacy of Plaintiffs' allegations, to follow the lead of the court in *In re Online Travel Co. (OTC) Hotel Booking Antitrust Litigation*, 997 F. Supp. 2d 526 (N.D. Tex. 2014) (hereafter "*In re OTC*"), not the Northern District of Illinois's recent decision in *Tichy v. Hyatt Hotels Corp., et al.*, 376 F. Supp. 3d 821 (N.D. Ill. 2019) (hereafter "*Tichy*"), the putative nationwide class action involving the same underlying antitrust conspiracy. Docket Entry # 97 at p. 2.

In *In re OTC*, the defendants, who included major U.S. hotel chains and OTAs, jointly moved to dismiss the putative class action brought by consumers claiming they paid inflated prices on hotel rooms booked online. *In re OTC*, 997 F. Supp. 2d at 529.  In their consolidated amended complaint, the plaintiffs alleged the OTAs and hotel chains entered into an "industry-wide conspiracy" to impose "rate parity" across hotel room booking websites.  *Id.* at 530.  "Put differently, Defendants allegedly conspired to eliminate, on an industry-wide basis, *intra*-brand competition—that is, competition among each hotel's online distribution channels, including its own website and OTA-run websites." *Id.* (emphasis in original).

According to the complaint, the conspiracy involved an "express or tacit agreement" among all the defendants, and there were at least two additional agreements holding this "wider conspiracy

together." *Id*. at 531. First, the OTA defendants allegedly agreed not to compete with each other. *Id.* Second, each hotel defendant allegedly signed a vertical written contract, called a resale price maintenance ("RPM") contract, with each OTA defendant. *Id.*

While the complaint in *In re OTC* "hint[ed]" at an agreement between the hotel defendants to impose rate parity in the online bookings market in accordance with the wider conspiracy, the plaintiffs in that case "made clear that they [were] not alleging 'a horizontal conspiracy between the Hotel Defendants' to restrain *inter*-brand competition on hotel room prices." *Id*. at 534 (emphasis in original). In addition, the plaintiffs "clarified that their antitrust claims [were] based on the industry-wide conspiracy, rather than either of the two individual sub-agreements holding the broader scheme together." *Id.* "Thus, while the Complaint contain[ed] facts directly showing that pairs of Hotel–OTA Defendants individually entered into written RPM agreements, Plaintiffs' antitrust claims rest[ed] entirely on the circumstantial facts purportedly showing that Defendants entered into an 'express or tacit' industry-wide conspiracy not to compete." *Id.* The issue before the court was whether the complaint's circumstantial facts plausibly alleged an industry-wide conspiracy to restrain competition in the online hotel bookings market. *Id.*

The court in *In re OTC* determined that "common economic experience and the Complaint itself" offered an "obvious" explanation for the individual RPM agreements, which were the real "nub" of the complaint. *Id.* at 537. The court found that for the hotel defendants an RPM agreement allowing them to control the prices at which their rooms were sold online made "perfect economic sense." *Id*. According to the court, hotels "highly value" "the right to control online pricing for their rooms." *Id.* at 538. Regarding the OTAs, the court stated "[h]aving given up the right to discount

prices below each Hotel Defendant's published rate, each OTA Defendant would naturally want an assurance that competitors will also be prohibited from offering a lower price than the published rate." *Id.*

The court next found the defendants' common motives for the parallel conduct were, "at best, merely consistent with a conspiracy." *Id.* The court further characterized the plaintiffs' contention that the defendants' actions went against their economic interests as an "unsupported conclusion." *Id.* at 539. The court then considered whether the plaintiffs' eight remaining "factual enhancements" placed the "ambiguous parallel conduct allegations in a context that raise[d] the suggestion of a conspiracy," and concluded they did not. *Id.* (finding three of the "enhancements" were "nothing more than additional parallel conduct allegations, one [was] irrelevant to the issue at hand, and the remaining three [were] merely consistent with, rather than suggestive of, a conspiracy").

In conclusion, the court held the complaint failed to adequately allege its Section 1 claims. *Id.* at 544. Even though the plaintiffs had amended the complaint once before, the court dismissed the industry-wide conspiracy claims without prejudice to re-file or amend. *Id.* at 548-49.

The court in *Tichy* disagreed with *In re OTC* and denied the hotel defendants' motion to dismiss the plaintiff's two antitrust claims. *Tichy*, 376 F. Supp. 3d at 826, 839. In their motion to dismiss in *Tichy*, the defendants argued the plaintiff's factual allegations of conspiracy concerning branded keyword advertising in the hotel industry "demonstrate[d] nothing more than parallel conduct by Defendants." *Id.* at 833. Noting the plaintiff did not allege any direct evidence of an illegal agreement, the court considered whether the plaintiff had sufficiently alleged parallel conduct

and additional "factual circumstances."   *Id.* at 834. It also considered whether there were "alternative, non-conspiratorial explanations for Defendants' conduct."   *Id.*

Among other things, the court examined the plaintiff's argument that any defendant's unilateral choice to stop bidding on competitors' keywords would be contrary to its economic self-interest.   *Id.* at 836.   The court held the plaintiff's factual allegations, viewed in the light most favorable to her, reasonably suggested "the practice of bidding on competitors' keywords benefits each Defendant" and also that by unilaterally ceasing the practice, a defendant "(say, Marriott) would be acting against its economic interest."   *Id.* (further explaining that "without coordinated action, all other Defendants' advertisements could appear at the top of the results for a Marriott-branded search").   According to the court, similar inferences could "reasonably be drawn regarding the Defendant-OTA bidding practices."   *Id.*

The defendants responded there were "obvious, alternative business reasons that would prompt a Defendant to unilaterally stop bidding on each other's keywords."   *Id.* at 836-37.   The defendants made similar arguments regarding parallel adoption of the alleged OTA agreements.   *Id.* at 837.   The court in *Tichy* found the defendants' alternative explanations unconvincing.   *Id.*

However, even if the defendants' alternative explanations were plausible, the court stated they would "not negate the plausibility of Plaintiff's competing explanation: that Defendants would not have unilaterally restricted branded keyword advertising as alleged without a preceding agreement, because doing so would harm their economic interests."   *Id.* The court noted that at the pleading stage, the court is not "to stack up inferences side by side and allow the case to go forward

only if the plaintiff's inferences seem more compelling than the opposing inferences."[29] *Id.* (quoting *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010). The court then discussed several cases relied upon by the defendants, including *In re OTC*, stating none of them persuaded the court it should credit the defendants' alternative explanations for parallel conduct.  *Tichy*, 376 F. Supp. 3d at 838.

Although *In re OTC* presented the closest analogy to the plaintiff's case, the court in *Tichy* disagreed with the court's findings in *In re OTC* to the extent they are inconsistent with the *Tichy* court's opinion.  *Id.* at 838-39.  After considering the plaintiff's factual allegations concerning branded keyword advertising in the hotel industry, "including the defendants' pre-conspiracy use of it and the potential it creates even for brand-interested consumers to change their purchasing behavior in response to strategically-placed advertisements," the court in *Tichy* concluded the plaintiff went beyond offering "unsupported conclusion[s]" in contending that a defendant would damage its economic interest by unilaterally adopting the alleged advertising restrictions.[30] *Id.* at 839 (citing *In re OTC*, 997 F. Supp. 2d at 539).

---

[29] At the April 17, 2019 hearing, Defendants' counsel argued that unlike Seventh Circuit law that allows "these sort of equally consistent inferences" to go forward, Fifth Circuit law is different.  Hearing Tr. (Docket Entry # 123) at p. 69:21-70:5 (mentioning *Marucci Sports*).  According to counsel, in the Fifth Circuit "when there are these kinds of conclusory allegations that are subject to many inferences, that's not sufficient at Rule 12."  *Id.* at 70:6-8.

However, the court in *Tichy* found the defendants' alternative explanations unconvincing. It was only in assuming the defendants' alternative explanations were plausible that the *Tichy* court stated they would "not negate the plausibility of Plaintiff's competing explanation" and further referenced the Seventh Circuit law that, at the pleading stage, the court is not "to stack up inferences side by side and allow the case to go forward only if the plaintiff's inferences seem more compelling than the opposing inferences."

Additionally, as explained in further detail below, not only does the Court find Plaintiffs' allegations are not conclusory, but the Court also notes Plaintiffs' complaint contains more detailed allegations than those pleaded in *Tichy*.

[30] The *Tichy* court reached this conclusion even though vertical restrictions on advertisements might be less overtly anticompetitive than the alleged vertical price restrictions in *In re OTC*. *Tichy*, 376 F. Supp. 3d at 839.

After considering other "less compelling" circumstances the plaintiff identified as indicative of conspiracy (i.e., 2014 Dallas Hotel Conference and AHLA membership, suspicious timing of industry events, and abrupt shift in internet search results), *id*. at 839-42, the court in *Tichy* concluded as follows:

> But Plaintiff does plausibly allege that each Defendant would have acted against its economic interest by unilaterally restricting branded advertising as alleged. . . . Plaintiff's allegations in this regard are, if not overwhelming, certainly sufficient to support an inference that Defendants reached a preceding agreement to restrict branded advertising. . . . Here, the court is satisfied that Plaintiff has moved her claims beyond the 'conceivable' to the 'plausible.' *Twombly*, 550 U.S. at 570, 127 S.Ct. 1955.

*Id*. at 842.

Plaintiffs in this case have alleged the same conspiracy claims raised in *Tichy*, but with even greater detail. Similar to the arguments raised in *Tichy*, Defendants here contend Plaintiffs have not made any allegations that place the parallel conduct in a context suggestive of conspiracy. *See Tichy*, 376 F. Supp. 3d at 835. Defendants also assert alternative explanations. *See id.* at 836. Among other things, Defendants argue there are independent incentives of each defendant to adopt the challenged provisions absent any agreement with its competitors. Docket Entry # 53 at p. 21 (citing *In re OTC*, 997 F. Supp. 2d at 537 ("As a general matter, it is quite natural for a seller to want to control the online [advertising] of its product.")).

In *Tichy*, the court found unconvincing the same alternative explanations for the parallel behavior as asserted here and concluded it would be improper at the motion to dismiss stage to credit them when the plaintiff had placed the defendants' parallel behavior in a context suggestive of a conspiracy. 376 F. Supp. 3d at 837, 839. Although the court in *In re OTC* found the defendants had

61

strong unilateral economic incentives to control OTA pricing of their hotel rooms and that none of the other "factual enhancements" alleged by the plaintiff in that case placed the "ambiguous parallel conduct allegations" in a context that raised the suggestion of a conspiracy, Plaintiffs' allegations here differ from the allegations in that case.

As an initial matter, as pointed out by the *Tichy* court, the putative class of consumers in *In re OTC* alleged a vertical *intra*-brand industry-wide conspiracy. *Id.* at 838 (citing *In re OTC*, 997 F. Supp. 2d at 530, 534).  Here, viewing Plaintiffs' allegations as a whole, the complaint alleges a horizontal interbrand conspiracy.  Like the consumer plaintiff in *Tichy*, Plaintiffs allege Defendants conspired among themselves and with Gatekeeper OTAs to eliminate interbrand competition for branded keyword bidding.

Second, whereas the court in *In re OTC* held common economic experience and the complaint itself offered "obvious" explanations for the RPM agreements (including the fact that hotels "highly value" the right to control online pricing for their rooms), 997 F. Supp. 2d at 537-38, the court in *Tichy* found the plaintiff had "plausibly alleged that curtailing an existing, effective form of competition would, absent the conspiracy, damage Defendants' economic interests." *Tichy*, 376 F. Supp. 3d at 838.  The Court finds the court's reasoning in *Tichy* persuasive.

Third, unlike *In re OTC*, Plaintiffs' allegations in this case, as in *Tichy*, go "beyond offering 'unsupported conclusion[s]' in contending that a Defendant would damage its economic interest by unilaterally adopting the alleged advertising restrictions."  *Tichy*, 376 F. Supp. 3d at 839 (quoting *In re OTC*, 997 F. Supp. 2d at 539). Compared to the allegations the court in *In re OTC* considered, Plaintiffs' complaint includes numerous nonconclusory factual allegations that go beyond allegations

62

of mere parallel conduct. *Compare, e.g. In re OTC,* 997 F. Supp. 2d at 537-38 *with* Docket Entry # 1, ¶¶ 92-150.  As explained above, instead of merely claiming without factual support that unilateral action was against the defendants' economic interest, *see In re OTC*, 997 F. Supp. 2d at 537, 539, Plaintiffs' complaint alleges in detail—"with independent third-party factual support—why Defendants *needed* to conspire to accomplish their illegal ends."  Docket Entry # 79 at p. 11, n. 6 (generally citing Docket Entry # 1, ¶¶ 13-17, 78-85, 87-91, 93, 95, 104) (emphasis in original).

Although the Court could recommend denying the motions to dismiss on the basis of the *Tichy* court's reasoning alone, the Court would note the allegations in this case are even more detailed than those before Judge Pallmeyer in *Tichy*.  Unlike the plaintiff in *Tichy*, here Plaintiffs maintain they have direct evidence of a conspiracy: specifically a 2014 email chain from Expedia discussed at length in the complaint.  *See* Docket Entry # 1, ¶¶ 95-101.  The complaint alleges as follows:

> 97. In the opening email from Expedia/Hotels.com employee Kim Covington to Downstream OTA representatives Yatin Patel, Skip Gibson, and Sherman Distin, Covington states in relevant part, '[a]ttached is a recent keyword violation doc from Hilton. Also, IHG is requesting that you cease bidding on their brand names – see attached. *We are investigating ways to ensure a level playing field, more to come on this. . . .*
>
> 98. The conversation quickly shifted into Expedia's admission that it was helping to coordinate the horizontal conspiracy among the Defendant Hotels to rig bids for branded keyword search auctions.
>
> 99. Several minutes after Covington's initial email, Distin responded to Covington with a one-line email: 'What's your definition of a level playing field?' . . . .

*Id.* at ¶¶ 97-99.

As alleged in the complaint, later that afternoon "Expedia executive Nick Smith explained precisely what Expedia understood 'level playing field' to mean on behalf of the Defendant Hotels. . . ." *Id.* at ¶ 100 (further providing a copy of the May 6, 2014 email from Smith with a subject line "RE: Hilton & IHG," wherein Smith tells Yatin Patel (who Plaintiffs' counsel represented at the hearing is affiliated with a different downstream OTA) to "[e]nsure that they are not employing similar branded keyword bidding strategies to bid on other chains e.g. Marriott bidding on Hilton)"; *see also* Hearing Tr. (Docket Entry # 123) at p. 81:17-20.  Plaintiffs allege "Expedia's executives expressly admitted to a third-party that Expedia was facilitating the primary horizontal conspiracy." Docket Entry # 1, ¶ 101.

Regardless of whether the email chain is considered direct evidence (requiring no inferences to establish the proposition being asserted), circumstantial evidence may also support a finding of an agreement.  *See Tichy*, 376 F. Supp. 3d at 834. The court in *Tichy* stated, "[i]n considering whether Plaintiff's allegations are sufficient under that theory, the court asks whether Plaintiff has sufficiently alleged (1) parallel conduct and (2) additional factual circumstances, or 'plus factors,' indicating an agreement." *Id.* (citing among other cases *Twombly*, 550 U.S. at 556-57 & n. 4).

Not only have Plaintiffs made a threshold showing of parallel conduct, but they have also asserted additional nonconclusory allegations of actions against economic self-interest that the *Tichy* court found sufficient to nudge the plaintiff's claims "across the line from conceivable to plausible." *Tichy*, 376 F. Supp. 3d at 835 (quoting *Twombly*, 550 U.S. at 570).  Plaintiffs have alleged the same

economic motivations which indicate that by acting unilaterally it would have been detrimental to a defendant's economic interest.[31]

In addition to the allegations of parallel conduct and actions against economic self-interest, Plaintiffs here allege further factual circumstances which Plaintiffs contend enhances a plausible inference of a common scheme or conspiracy: abrupt change in bidding; monitoring/monitoring report; and operating agreements. In their consolidated response, Plaintiffs argue Defendants either ignore or misconstrue their additional factual allegations which directly support TravelPass's claims and must be taken as true at the motion to dismiss stage.   Docket Entry # 79 at p. 8. Plaintiffs specifically reference the following allegations (which relate to the above enhancements): (1) August 2, 2018 conversation between a TravelPass executive and Google's Head of Travel Industry, in which Google noted that, before mid-2014, Defendants had routinely bid on one another's branded search terms, but that such bidding abruptly stopped in the third quarter of 2014 (Docket Entry # 1, ¶ 103); (2) January 2015 PowerPoint presentation TravelPass received from Expedia reflecting, on a single page, specific and identical "asks" from Hilton, Hyatt, IHG, La Quinta (now Wyndham), Marriott, and Starwood "to reduce instances [of branded keyword bidding] to zero;" (3) March 31, 2015 renewed demands to TravelPass to cease bidding on branded keyword search terms from Expedia's Matt Duckworth, who made the request jointly on behalf of, among others, Hilton, IHG,

---

[31] Specifically, Plaintiffs allege unilateral activity "would have been economic suicide unless the hotels simultaneously conspired to eliminate direct interbrand competition for branded keyword search advertising between and among themselves." Docket Entry # 1, ¶ 87.  Plaintiffs allege "unless the Defendant Hotels expended the time and effort to shut down *every* possible alternative distribution channel, its unilateral enforcement would still generate OTA and competitor results from any OTA not subject to aggressive enforcement measures."  *Id.* at ¶ 89 (emphasis in original).  Plaintiffs have also alleged the Gatekeeper OTAs had no independent economic incentive to agree with the hotel chains to impose branded keyword bidding restrictions on themselves and their affiliates.  *Id.* at ¶¶ 145-50. According to Plaintiffs, if "a single Gatekeeper OTA like Expedia agreed to such restrictions, a competitor like Priceline would take Expedia's (and its downstream affiliates) former share of the branded keyword business without helping the hotels achieve their goal of eliminating competition in branded keyword search."  Docket Entry # 108 at p. 5 (citing Docket Entry # 1, ¶¶ 145-50).

Four Seasons, Hyatt, and Marriott (Docket Entry # 1, ¶ 109); (4) specific allegations regarding American Hotel & Lodging Association statements from just before the conspiracy took effect targeting OTAs like TravelPass as a threat to Defendants' bottom line and suggesting actions to address that threat (Docket Entry # 1, ¶¶ 116-31); (5) "monitoring report" allegations, including that by 2016 Defendants were receiving monitoring reports detailing instances of "violations" of the agreement not to bid on branded keywords (Docket Entry # 1, ¶¶ 111-15); (6) Marriott and Wyndham's own publicly available documents (including Marriott's 2015 "Marriott International—Affiliate Operating Agreement" which prohibits its own affiliates from bidding on "Non-Compete Keywords" including several of the other defendants' branded keywords) which Plaintiffs assert indicate a horizontal agreement and conspiracy (Docket Entry # 1, ¶¶ 133-140); and (7) series of emails reflecting evidence of the conspiracy establishing efforts to turn would-be competitors (Gatekeeper OTAs) into co-conspirators willing to impose and enforce anticompetitive restrictions on branded keyword bidding (i.e. February 13, 2017 email from Priceline reminding TravelPass that Caesars had demanded that all OTAs cease bidding on its branded keywords and March 12, 2017 email from Priceline, in which it explains to TravelPass that they had reminded Caesars that "if everyone else complies, [Priceline] will also comply") (Docket Entry # 1, ¶ 148).

In their reply, Defendants assert these allegations do not alter the grounds for dismissal, because they "are either conclusory, relate exclusively to Expedia without factual allegations tying any—let alone all—Defendants to that conduct, relate only to the primary conspiracy, and/or are

properly viewed as permissible parallel conduct that individual hotel companies engaged in to manage their own respective downstream distribution channel."[32] Docket Entry # 97 at p. 7.

Along those same lines, Defendants argue, beyond parallel conduct, the only factual allegation in support of the existence of the alleged "second conspiracy is an email from an OTA (neither drafted nor received by Defendants) in which the OTA is considering whether to comply with Defendant Caesars' unilateral request that the OTA cease bidding on Caesars' keywords." Docket Entry # 53 at p. 22 (citing Docket Entry # 1, ¶ 148). Defendants argue the "OTA's compliance with that request, and its alleged awareness of other OTAs having received similar

---

[32] Specifically, Defendants assert as follows:

First, regarding an alleged Google employee statement that hotels stopped bidding on branded search terms sometime in the third quarter of 2014 (Docket Entry # 1, ¶ 103), Defendants assert this allegation relates solely to the primary conspiracy.

Second, regarding an Expedia PowerPoint sent to its own downstream affiliates that purportedly aggregated requests from several hotels to reduce branded keyword bidding (Docket Entry # 1, ¶ 108), Defendants state the allegation that Gatekeeper OTA Expedia "had a PowerPoint tracking its own compliance and that of its downstream OTAs with Expedia's own separate, bilateral agreements does not suggest a conspiracy between the Gatekeeper OTAs and the hotel Defendants." Docket Entry # 97 at p. 7. According to Defendants, at most, this allegation reflects parallel conduct.

Third, regarding an email from Expedia to TravelPass allegedly requesting that TravelPass stop bidding on branded keyword search advertising (Docket Entry #1, ¶ 109), Defendants again assert this allegation reflects, at most, parallel conduct and does not suggest a conspiracy among the Defendants or all Defendants and Expedia. Id.

Fourth, regarding TravelPass's trade association allegations (Docket Entry # 1, ¶¶ 116-132), Defendants explain in both their motion and reply that the opportunity to conspire at trade association events does not evidence wrongdoing. Id. at p. 8; see also Docket Entry # 53 at pp. 15-16.

Fifth, regarding TravelPass's "monitoring report" allegations (Docket Entry # 1, ¶¶ 111-15), Defendants argue TravelPass's allegation that monitoring reports allegedly sent by Expedia to some of the Defendants were "attempts to police the conspiracies" is the kind of conclusory allegation that Twombly rejects. Docket Entry # 97 at p. 8.

Sixth, Defendants address certain "affiliate agreements" of Marriott and Wyndham, which provide various keyword bidding restrictions, including requesting that the affiliate not bid on the keywords of other hotel chains (Docket Entry # 1, ¶¶ 133-140). According to Defendants, rather than being contrary to the economic interests of a hotel company, "there are logical, self-interested economic motivations for these two hotel companies to limit affiliates from attempting to attract consumers who already had indicated their preference for a certain brand, including, as TravelPass concedes, the additional cost associated with a guest booking an equally-priced room through an affiliate rather than directly through the hotel's website." Id.

Seventh, regarding an email from Priceline to TravelPass reminding TravelPass that Caesars had demanded that its downstream affiliates stop bidding on branded keywords (Docket Entry # 1, ¶ 148), Defendants assert the fact that Caesars allegedly requested Priceline to comply with its vertical contractual obligations does not evidence a conspiracy among all Defendants and Gatekeeper OTAs. Id.

requests, does not convert parallel conduct into an antitrust conspiracy." *Id*. In its separate motion to dismiss, Caesars argues "[i]n no way can alleged vertical dealings between Caesars and a[] downstream or vertical OTA support an inference of horizontal dealings between Caesars and the other competitor Defendants." Docket Entry # 55 at p. 5. According to Caesars, "Plaintiffs offer nothing to suggest that Caesars entered into a horizontal agreement with any competitor to deny access to its hotel rooms to anyone." *Id*.

For the reasons discussed in detail above, the Court does not find Defendants' arguments persuasive. Plaintiffs have made clear they are alleging a single interbrand horizontal conspiracy and that to effectuate that conspiracy Defendant Hotels teamed up with Gatekeeper OTAs with the express goal of eliminating competition. Although an allegation of parallel conduct and a bare assertion of conspiracy will not suffice, here Plaintiffs have alleged much more than parallel conduct alone. What pushes a Section 1 claim from "possible" to "plausible" is "some further factual enhancement"—that is, some "context," "setting," or "further circumstance pointing towards a meeting of the minds." *Kjessler*, 2019 WL 3017132, at *9 (quoting *Twombly*, 550 U.S. at 557). Plaintiffs have offered sufficient additional factual enhancements to move their claims beyond the "conceivable" to the "plausible." *See Tichy*, 376 F. Supp. 3d at 842 (quoting *Twombly*, 550 U.S. at 570). Taking all allegations as true, the Court cannot say there are insufficient facts to state a claim and that it is implausible that Defendants engaged in a conspiracy, effectively restraining trade.

### 4.      Motions to dismiss by Caesars and Choice

### a.      Caesars' and Choice's assertions

Although incorporating by reference the joint motion to dismiss filed by six other defendants, Caesars filed a separate motion to dismiss setting forth independent grounds for dismissal of the antitrust claims brought against it. According to Caesars, aside from the paragraphs describing Caesars as an entity, the complaint contains only a "small handful of allegations" specifically regarding Caesars.[33]   Caesars argues these allegations do not satisfy *Twombly*.

Choice has also filed a separate motion to dismiss.  Choice argues Plaintiffs fail to allege knowing participation in the wrongdoing with appropriate specificity, and therefore, the claims against it should be dismissed.  According to Choice, Plaintiffs do not plead a single allegation about when, why, or how Choice joined a supposed conspiracy to refrain from bidding on other hotels' branded keywords. Docket Entry # 56 at p. 1 (further stating the complaint is vague and lumps the defendants together without sufficient detail).  Plaintiffs' "allegations suffer from an additional fatal flaw," according to Choice.  *Id*.  Choice represents it is "undisputed that Choice is not a member of

---

[33] In the original complaint, under a section titled "THE PRIMARY HORIZONTAL CONSPIRACY GROWS," Plaintiffs allege as follows regarding Caesar and Red Roof:

141. On November 14, 2016, the AHLA announced that senior executives from two new hotel chains—Caesars and Red Roof—would be joining its board of directors.

142. Before their executives joined the AHLA board, neither Caesars nor Red Roof had participated actively or aggressively in the other conspirators' attempts to restrain branded keyword bidding.

143. Within weeks of this announcement, Defendants Caesar and Red Roof began participating actively in the other Defendants' illegal activities.

144. By the end of December 2016, both Red Roof and Caesars had sent TravelPass spurious 'cease and desist' letters, and had begun complaining to Gatekeeper OTAs about OTA branded keyword bidding. Red Roof attempted to cut off TravelPass's access to Red Roof inventory in January 2017; in March 2017, Caesars followed suit.

Docket Entry # 1, ¶¶ 141-144; *see also id.* at ¶ 148 (alleging a Gatekeeper OTA manager contacted TravelPass about Defendant Caesars' demand that OTAs stop bidding on Caesars-related keywords).

the American Hotel and Lodging Association, the organization through which 'Defendants' allegedly coordinated their conspiracy." *Id.* (further stating Choice is not featured in any of the exhibits Plaintiffs attach to their complaint or in any of the alleged studies on which the complaint relies).

**b.     Analysis**

***Caesars***

According to Plaintiffs' consolidated response, Plaintiffs have alleged Caesars knowingly joined the ongoing conspiracy, and these facts, combined with the allegations that such acts unilaterally would have been contrary to Caesars' economic interests, plausibly support Plaintiffs' allegations that Caesars knowingly joined and was a continuing participant in the conspiracy. Caesars recently filed a supplemental brief in support of its separate motion to dismiss.

In its supplement, Caesars states it asked TravelPass numerous times to produce the "cease and desist" letters referenced in paragraph 144 of the complaint, but it was "only in response to notice under Rule 11" that TravelPass admitted there were no such letters from Caesars to TravelPass.  Docket Entry # 159 at pp. 1-2.  The purpose of the supplemental brief is to argue "that on a corrected record regarding TravelPass' cease and desist allegation, TravelPass' claims against Caesars must be dismissed" and also to advise the Court that the *Noerr Pennington* argument made in direct response to the alleged cease and desist letters no longer needs to be considered as there are no such letters.  *Id*. at p. 2.

In Plaintiffs' response to Caesars' supplement, Plaintiffs argue the "significance of the cease-and-desist *communications* that TravelPass has alleged lies not in their specific form, but rather in their *substance* and *timing*."  Docket Entry # 179 at p. 2 (emphasis in original). Plaintiffs contend

70

"Caesars has not and cannot deny that it began demanding that TravelPass cease all bidding on Caesars-related keywords within weeks of joining the board of the American Hotel and Lodging Association ('AH&LA')." *Id.*  Plaintiffs state Caesars' motion and supplemental brief improperly characterize Plaintiffs' allegations as nothing more than a "vertical refusal to deal." According to Plaintiffs:

> TravelPass alleges that Caesars did not enforce any branded keyword restriction provisions with respect to TravelPass until late 2016 and early 2017, at which point, they did so aggressively, going so far as to cut off all of TravelPass's access to Caesars's hotel inventory for online distribution by March 2017. *See* [Dkt. 1] at ¶¶ 142-44; *see also* Dkt. 158-4 at 8-17. As alleged in the Complaint, this aggressive enforcement did not manifest spontaneously; rather, it immediately followed Caesars representatives joining the board of the AH&LA in November 2016, indicating more to Caesars's actions than a mere 'vertical refusal to deal.' *See* Compl., Dkt. 1 at ¶¶ 141. Indeed, as TravelPass alleges: the AH&LA routinely engaged in public conduct bordering dangerously close to suggesting that hotel chains collude in various ways; Caesars did not have a representative on the AH&LA Board at the conspiracy's inception; and Caesars had not aggressively enforced nominal branded keyword bidding restrictions against TravelPass prior to joining the Board of the AH&LA. *See, e.g.*, Compl., Dkt. 1 at ¶¶ 124-31, 142-44.

*Id.* at pp. 2-3.

According to Plaintiffs, "the facts alleged regarding Caesars's joining and participating in the conspiracy, as evidenced by keyword bidding restriction enforcement (and its *timing*), viewed in the light most favorable to TravelPass, go far beyond the requisite allegations of an antitrust conspiracy at the motion to dismiss stage."  *Id*. at p. 3 (emphasis in original).  The Court agrees. Dismissal is not warranted, at least at this juncture. The Court recommends Caesars' separate motion to dismiss be denied.

### *Choice*

Choice cites *Wiltfong v. California State Bd. of Accountancy*, No. EP-17-CV-0355-PRM, 2018 WL 935398 (W.D. Tex. Feb. 16, 2018) for the proposition that when asserting an antitrust claim, a plaintiff "cannot assemble some collection of defendants and then make vague, non-specific allegations against all of them as a group." *Id*. at \*2 (quoting *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 422 (4th Cir. 2015), *as amended on reh'g in part* (Oct. 29, 2015), *cert. denied*, 136 S. Ct. 2485 (2016)).  According to the court in *Wiltfong*, a "complaint must 'specify how these defendants [were] involved in the alleged conspiracy,' without relying on 'indeterminate assertions' against all 'defendants.'" 2018 WL 935398, at \*2 (quoting *SD3,* 801 F.3d at 422 (citing *In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 905 (6th Cir. 2009)); and also citing *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) (expressing a similar rule where the plaintiff's complaint was pleaded "in entirely general terms without any specification of any particular activities by any particular defendant; it [was] nothing more than a list of theoretical possibilities, which one could postulate without knowing any facts whatever")).

The Court finds Choice's argument without merit.  In *Wiltfong*, the *pro se* plaintiff filed an amended complaint following the court's order to do so. 2018 WL 935398, at \* 1.  In the order, the court directed the plaintiff to detail specifically how each one of the 127 defendants he named in the original complaint "are responsible for each of the described harms."  *Id.* Despite the court's previous direction to explain each of the 127 defendants' roles in the alleged conspiracy, in the amended complaint the plaintiff continued to plead in general terms, with the most specific

allegation being "that many of the 'members of the cartel' sit on various state regulatory boards and are employed by the 'Big 4' accounting firms." *Id*. at *2.

The plaintiff also alleged they engaged in anticompetitive behavior "for their collective benefit and to the detriment of the public." *Id.* Beyond that, however, the court noted "it [was] impossible to determine who is allegedly conspiring with whom, when they agreed to conspire, the scope of the conspiracy, or how their conduct ha[d] affected Plaintiff specifically." *Id.* Thus, the plaintiff failed to state a claim stemming from damages inflicted by the alleged cartel. *Id.*

Here, Plaintiffs have alleged nonconclusory, substantive allegations directed to all defendants. The complaint is not pleaded in entirely general terms without any specification. Even though Plaintiffs dispute there is a requirement in the Fifth Circuit requiring a plaintiff to describe each defendant's "specific role" in the alleged conspiracy, Plaintiffs argue "TravelPass has indeed alleged that *each* Defendant (including Choice) ceased bidding on one another's branded keywords, and that *each* Defendant (including Choice) extended and completed the illegal agreement by collective imposition and enforcement of branded keyword bidding restrictions on Gatekeeper and Downstream OTAs." Docket Entry # 79 at p. 29 (emphasis in original) (citing Docket Entry # 1, ¶¶ 93-115).

As urged by Plaintiffs, there is no requirement that TravelPass particularly name each defendant as having committed what TravelPass has alleged because that fact is inherent in the allegations made against each defendant; without each defendant (including Choice) fulfilling these specific roles, the conspiracy would have failed as economically impractical for the many reasons included in the complaint. *See e.g.* Docket Entry #1, ¶¶ 86-91, 93. That Choice is not named in

certain allegations that apply to certain defendants does not negate the fact that there are numerous core allegations that do apply to each defendant. In viewing the complaint as a whole and taking all allegations as true, the Court cannot say that Plaintiffs have failed to plead enough facts to state a claim for relief against Choice that is plausible on its face. The Court recommends Choice's separate motion to dismiss also be denied.

**5.      Conclusion**

Plaintiffs have pleaded facts sufficient to demonstrate standing under the antitrust laws at issue and Plaintiff have pleaded sufficient facts to state a claim under Section 1 of the Sherman Act. Accordingly, the Court recommends the joint motion to dismiss Plaintiffs' antitrust claims be denied. The Court further recommends Caesars' and Choice's separate motions to dismiss be denied.

## VI.  TORTIOUS INTERFERENCE CLAIM

**A.      Defendants' assertions**

Defendants argue Plaintiffs' derivative claim for tortious interference with prospective business relations should be dismissed because TravelPass has not plausibly alleged the elements of such a claim.  First, Defendants assert TravelPass does not plausibly allege intentional interference with TravelPass's relationship with existing or potential customers. Second, Defendants contend TravelPass does not plausibly allege improper means. Third, Defendants argue TravelPass fails to adequately allege any resulting injury.

**B.      Applicable law**

Federal law directs this Court to look to the final decisions of the highest court of the state in determining state law, as well as applying state substantive law to any issue or claim which has its source in state law. *Whitehurst v. Showtime Networks, Inc.*, No. CIV.A 1:08-CV-47, 2009 WL

74

3052663, at *4, n. 4 (E.D. Tex. Sept. 22, 2009) (citing *Camacho v. Texas Workforce Comm'n,* 445 F.3d 407, 409 (5th Cir.2006) (citing C. Wright, A. Miller & E. Cooper, 19 Federal Practice and Procedure (2d ed.2002) § 4520); *Transcontinental Gas Pipeline v. Transportation Ins. Co.,* 953 F.2d 985, 988 (5th Cir.1992)). Accordingly, in considering Plaintiffs' tortious interference claim over which the Court has supplemental jurisdiction, the Court looks to Utah law, which the parties have apparently agreed governs.[34] *Id.*

"Under Utah law, the elements of tortious interference are: (1) *intentional interference* with plaintiff's existing or potential business relationships, (2) the interference is accomplished by *improper means*, and (3) *injury* suffered by plaintiff." *SCO Grp., Inc. v. Int'l Bus. Machines Corp.*, 879 F.3d 1062, 1081 (10th Cir. 2018) (citing *Eldridge v. Johndrow*, 345 P.3d 553, 556 (Utah 2015) (emphasis in *SCO Grp.*)).

## C.    Analysis

### 1.    Intentional interference

Relying on *SCO Grp.,* Defendants assert the Tenth Circuit Court of Appeals, applying Utah law, has refused to extend tortious interference prohibitions to alleged market-wide injury. According to Defendants, "TravelPass does not allege any sort of direct contact between Defendants and those customers designed to interfere with TravelPass's business. Instead, TravelPass appears to claim that the alleged interference was directed broadly to the general public and the general market, through branded keyword bidding restrictions in Defendants' individual distribution

---

[34] However, because the case is before the Court on federal question jurisdiction because it also involves federal antitrust claims, the Court will of course apply federal substantive law in considering those issues. *Whitehurst*, 2009 WL 3052663, at *4, n. 4 (citing *Summers v. Tex. Dep't of Crim. Justice,* No. 06–70046, 206 F. App'x 317, 319–320 (5th Cir. Oct.25, 2006)).

agreements with gatekeeper OTAs." Docket Entry # 53 at pp. 23-24. Whereas Defendants argue the alleged interference was directed broadly to the general public, Plaintiffs assert "Defendants' interference by prohibiting the use of branded keywords in search engine auctions was (as the final piece of its own horizontal conspiracy) directed specifically at TravelPass and other OTAs." Docket Entry # 79 at p. 25.

In *SCO Grp.,* the Tenth Circuit discussed precedent from Utah courts and first recognized that "Utah law clearly embraces a theory of intentional interference based on evidence that potential customers or prospective customers—rather than merely existing customers—were driven away by the defendant's improper intermeddling." 879 F.3d at 1082 (citing *Anderson Dev. Co. v. Tobias*, 116 P.3d 323, 331 (Utah 2005)). Second, the court recognized that "Utah law does not require that a defendant *directly* confront the third party to induce that person to cut economic ties with the plaintiff." *SCO Grp.,* 879 F.3d at 1082 (citing *Leigh Furniture & Carpet Co. v. Isom*, 657 P.2d 293, 306 (Utah 1982), *overruled on other grounds by Eldridge*, 345 P.3d at 556) (emphasis in *SCO Grp.*). Third, the court recognized Utah law does not require that a defendant directly confront the third party to induce that person to cut economic ties with the plaintiff and discussed "Utah Supreme Court's seminal decision in *Leigh Furniture & Carpet Co. v. Isom*" to illustrate the point. *SCO Grp.,* 879 F.3d at 1082.

> In that case, the defendant committed tortious interference when its representatives frequently visited plaintiff's 'store during business hours to confront him, question him, and make demands and inquiries regarding the manner in which he was conducting his business.' . . . These disruptive intrusions 'repeatedly interrupted sales activities, caused [plaintiff]'s customers to comment and complain, and more than once caused a customer to leave the store.' . . . Although there was no direct communication between defendant and the third-party customers who were driven away from plaintiff's business, the Utah Supreme Court nevertheless found this to be actionable interference by the defendant.

*SCO Grp.*, 879 F.3d at 1082–83 (quoting *Leigh Furniture*, 657 P.2d at 306).

According to the Tenth Circuit, to be sure, "*Leigh Furniture* endorsed a tortious-interference claim based on *potential* customers who were *not directly contacted* by the defendant, but it does not follow clearly from *Leigh Furniture* that any improper conduct directed toward the public and the general market would be actionable as a claim for tortious interference whenever a competitor's business relationships suffer as a result of the improper conduct." *SCO Grp.*, 879 F.3d at 1083 (emphasis in original). "That, in effect, would convert almost any claim for illegal market-based activities into a tortious-interference claim," and the Tenth Circuit found "no indication in Utah case law that the state supreme court would accept such an expansive interpretation." *Id.*

The Tenth Circuit agreed with the district court that SCO's indirect-interference theory was not actionable under Utah law, noting "IBM's alleged improper conduct was directed toward the *public* and the *market generally*." *Id.* (emphasis in original). As urged by Plaintiffs, the deficiency in the tortious interference claim asserted by the plaintiff in *SCO Grp.* was that the relationship between defendant's conduct and the injury to the plaintiff was tenuous: "The evidence, when construed in SCO's favor, suggests that IBM improperly disclosed confidential Monterey materials to a public community of interested software developers who then used those contributions to strengthen the open-source Linux platform, which ultimately became a preferable alternative to SCO's fee-based UNIX product, thereby diminishing SCO's customer base." 879 F.3d at 1083.

Here, Plaintiffs allege Defendants specifically agreed among one another and targeted TravelPass and other OTAs rather than the market generally. The Court agrees with Plaintiffs there is "no attenuated chain of causation between Defendants' conduct and the resulting interference with

TravelPass's relationship with existing and potential customers. Rather, the very purpose and result of Defendants' conspiratorial conduct was to divert TravelPass's existing and potential customers to Defendants' own websites."  Docket Entry # 79 at p. 26 (citing *Leigh Furniture*, 657 P.2d at 306 ("Driving away an individual's existing or potential customers is the archetypical injury this cause of action was devised to remedy.")).

2.     **Improper means**

Second, Defendants contend TravelPass does not plausibly allege improper means.  Under Utah law, to qualify as improper means, an action must be "contrary to law, such as violations of statutes, regulations, or recognized common-law rules," including "violence, threats or other intimidation, deceit or misrepresentation, bribery, unfounded litigation, defamation, or disparaging falsehood." *SCO Grp.,* 879 F.3d at 1084 (internal quotation marks omitted) (citing *Leigh Furniture*, 657 P.2d at 308). As stated by the Tenth Circuit, a "competitor's attempt merely to convince third parties not to deal with a plaintiff does not meet this requirement." *SCO Grp.*, 879 F.3d at 1084.

Defendants argue TravelPass fails to allege improper means because the underlying antitrust claims are deficient as a matter of law. Having recommended Defendants' motions to dismiss the antitrust claims be denied, the Court finds this argument without merit.

3.     **Injury**

Finally, Defendants argue TravelPass fails to adequately allege any resulting injury. According to Defendants, although "TravelPass offers the generalized allegation that customers and potential customers of TravelPass's websites were prevented from obtaining information about hotel rooms through branded keyword bidding by TravelPass," "a more plausible explanation for any harm

to TravelPass's business is its adoption of a fraudulent business model, which was subject to a Federal Trade Commission action and the resulting consent judgment against TravelPass." Docket Entry # 53 at p. 24.

As set forth in detail above, TravelPass has alleged Defendants caused injury because Defendants "essentially destroyed TravelPass's business model by implementing and enforcing a vast antitrust conspiracy to agree with each other to not and subsequently prevent TravelPass and other OTAs to bid on Defendants' branded keywords in search engine auctions." Docket Entry # 79 at p. 26 (citing Docket Entry # 1, ¶¶ 160-63). Those alleged injuries are sufficient to support a plausible claim for tortious interference.

Finding Plaintiffs have plausibly alleged the claim for tortious interference with prospective business relations, the Court recommends this part of Defendants' joint motion to dismiss be denied.

## VII. RECOMMENDATION

Based on the foregoing analysis, it is hereby

**RECOMMENDED** that Joint Motion to Dismiss on Behalf of Defendants Hilton Domestic Operating Company Inc., Hyatt Hotels Corporation, Marriott International, Inc., Red Roof Inns, Inc., Six Continents Hotels, Inc., and Wyndham Hotel Group, LLC (Docket Entry # 53); Defendant Caesars Entertainment Corporation's Motion to Dismiss for Failure to State a Claim (Docket Entry # 55) and supplement thereto (Docket Entry # 159); and Defendant Choice Hotels International, Inc.'s Motion to Dismiss for Failure to State a Claim (Docket Entry # 56) be **DENIED.**

<u>Objections</u>

Within fourteen (14) days after service of the magistrate judge's report, any party must serve and file specific written objections to the findings and recommendations of the magistrate judge. 28 U.S.C. § 636(b)(1)(C).  In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's report and recommendation where the disputed determination is found.  An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific.

Failure to file specific, written objections will bar the party from appealing the unobjected-to factual findings and legal conclusions of the magistrate judge that are accepted by the district court, except upon grounds of plain error, provided that the party has been served with notice that such consequences will result from a failure to object. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996) (en banc), *superseded by statute on other grounds*, 28 U.S.C. § 636(b)(1) (extending the time to file objections from ten to fourteen days).

**SIGNED this 29th day of August, 2019.**

CAROLINE M. CRAVEN
UNITED STATES MAGISTRATE JUDGE