# IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF TEXAS
## TEXARKANA DIVISION

| | |
|---|---|
| TRAVELPASS GROUP, LLC, PARTNER FUSION, INC., RESERVATION COUNTER, LLC<br><br>  Plaintiffs,<br><br>  v.<br><br>CAESARS ENTERTAINMENT CORPORATION, CHOICE HOTELS INTERNATIONAL, INC., HILTON DOMESTIC OPERATING COMPANY, INC., HYATT HOTELS CORPORATION, MARRIOTT INTERNATIONAL, INC., RED ROOF INNS, INC., SIX CONTINENTS HOTELS, INC., WYNDHAM HOTEL GROUP, LLC.<br><br>  Defendants. | Civil Action No. 5:18-cv-153-RWS-CMC<br><br><br><br>JURY DEMANDED<br><br>███████████████ |

---

## AMENDED COMPLAINT

---

## I.    INTRODUCTION

1.      This is an antitrust case involving a horizontal conspiracy among the nation's leading hotel chains to limit or eliminate competition for internet ad placements in response to internet searches for hotel-branded keywords, a technique millions of customers use to book hotel rooms online each year. Specifically, the Defendant Hotels engaged in a comprehensive collusive scheme to limit or eliminate search-engine-driven competition both from each other and especially from Plaintiffs and other Online Travel Agencies ("OTAs"). Defendants' unlawful scheme began with a predicate bid-rigging agreement that protected them from competition with one another, thus allowing them to pursue their collective goal of suppressing OTA growth.

2.      Defendants continued to execute this conspiracy by taking advantage of their ill-gotten leverage in contract negotiations with certain large OTAs, and by engaging in a group boycott to limit or eliminate non-conspirators' competing paid search advertisements. Over time, the conspiracy effectively divided the market for branded keyword search results among the Defendant Hotels, allocating branded keyword territory such that the Defendant Hotels no longer had to compete either with one another or with OTAs like Plaintiffs. Together, the Defendant Hotels severely reduced, and in many cases even eliminated, the revolutionary benefits of the internet economy for hotel consumers, taking us back to the "bad old days." The conspiracy has left in its wake an online travel booking marketplace characterized by deliberately limited information and high transaction costs—a marketplace where innovators like Plaintiffs can no longer operate effectively to ensure consumers continue to receive those benefits.

3.      Internet technology revolutionized the hotel industry. Online shopping, search engines, and OTAs radically altered competition among hotels. Before the internet, hotels rarely competed head-to-head—it was simply too costly and time-consuming for most consumers to comparison shop extensively. The rise of the internet and (relatedly) OTAs changed that dynamic,

especially as search engines developed into a primary consumer information source. Consumers thus reaped a variety of benefits from these technological advances, including:

- Access to far better information about competing options, including detailed information about price, room quality, room availability, and hotel amenities;

- Dramatically increased price competition among hotels, which are forced to compete on price because the internet allows consumers to easily compare rates; and

- Substantially lower transaction costs for booking a room, now that once-complicated and time-consuming comparison shopping and reservations occur with just a few clicks.

4.      The remaining defendants in this case are three of the largest hotel chains in the United States (collectively, "Defendants" or the "Defendant Hotels"). Through direct ownership or franchising relationships, the Defendants, together with their co-conspirators, control a substantial majority of the hotel rooms in the United States.

5.      Plaintiff TravelPass Group, LLC and its predecessor or related entities, Reservation Counter, LLC and Partner Fusion, Inc. (collectively "Plaintiffs" or "TravelPass")[1] are or were "affiliates" of "Gatekeeper" OTAs, like Expedia and Priceline, obtaining access to the Defendant Hotels' inventory via these Gatekeeper OTAs. As one of the major "Downstream" OTAs, TravelPass marketed the Defendant Hotels' rooms online by bidding on branded keywords (like "Marriott Dallas") in online search auctions.

6.      This case addresses the very means by which and conditions under which retail price competition takes place in the modern internet economy. Search engines like Google auction keyword search responses to advertisers. As a result, when an internet user types keywords into a

---

[1] For all relevant purposes, TravelPass Group, LLC is the legal successor-in-interest to both Reservation Counter, LLC and Partner Fusion, Inc., both of which housed all or part of the relevant business at certain times potentially relevant to this action. For convenience, the Complaint refers to plaintiffs' generically as "TravelPass" unless further demarcation is necessary.

2

search query, advertisements appear at the top of a search engine's results pages ("SERP"). Advertisers bid on keywords that they would like to trigger their ads, and the higher-bidding advertisers obtain better placement of their ads on a SERP. These "paid results" generally display at the top of a SERP, above the "organic search" results driven by the search engine's algorithms. Consumers shopping online more frequently "click through" to higher-placed search results on the first page. Absent the Defendant Hotels' conspiracy, these auction results would reflect robust advertising and competition on price, quality, and customer service for the potential hotel consumer's business.

7.      The Defendant Hotels and their co-conspirators came late to the internet party, and—upon arrival—they adapted slowly to the internet's realities. As a result, for years after the September 2001 terrorist attacks that changed demand for hotel stays, OTAs filled the demand for online hotel booking. Before the conspiracy, the new internet economy forced the Defendant Hotels to directly compete by bidding on paid keyword search placement for searches incorporating branded keywords associated with their own brands *and* branded keywords associated *with their hotel chain competitors*. Thus, absent the conspiracy, a Google search for one Defendant Hotel's brand(s) would have likely returned prominent results for that brand, and *also* results for competing hotel brands and OTAs.

8.      For example, absent the conspiracy, a consumer searching for "Marriott Dallas" would have encountered prominent search results for both Marriott's Dallas-area properties, and for Choice's or Six Continents' (or other co-conspirator chain's) Dallas-area properties. That consumer would have also seen prominent search results for OTAs like TravelPass.

9.      By at least 2010, the Defendant Hotels began to see the OTAs as an existential threat. To counter this threat, the Defendant Hotels entered into a conspiracy with the purpose and

3

intent of weakening both Gatekeeper and Downstream OTAs by excluding them from effective participation in branded keyword search advertising.

10.     This conspiracy had three interlocking components.

11.     First, Defendant Hotels and their co-conspirators protected their flanks by entering into a predicate bid-rigging agreement that prevented or eliminated direct competition among themselves for branded keywords.

12.     Second, Defendant Hotels and their co-conspirators agreed to leverage this security to negotiate more favorable terms with Gatekeeper OTAs like Expedia and Priceline. These terms included ever-stronger (and increasingly detailed) restrictions on branded keyword bidding by Gatekeeper and Downstream OTAs.

13.     Third, the Defendant Hotels worked together to deny Downstream OTAs like TravelPass cost-effective access to hotel inventory, reducing or eliminating their ability to compete effectively for branded keyword search advertising placement. Defendants used both the underlying leverage generated by their interbrand bid-rigging agreement *and* the ever-tightening contractual restrictions to raise Downstream OTAs' costs and to prevent them from effectively competing. The Defendant Hotels also took joint extracontractual actions to limit or eliminate Downstream OTAs' access to branded keyword search advertising—a critical input to their businesses.

14.     From its origins in no later than 2010, the Defendant Hotels' conspiracy operated with the goal of limiting or eliminating competition from OTAs.

15.     Alone, no Defendant Hotel had strong economic incentives to exclude OTAs from bidding on their brand-related keywords because without the bid-rigging agreement, any unilateral

attempt by a hotel chain to limit such OTA bidding would have invited competitive bids from other hotels.

16.     Absent the conspiracy's bid-rigging component, the Defendant Hotels also had strong incentives to bid on their competitors' branded keywords. Indeed, by the time the conspiracy began, courts had long rejected branded trademark owners' spurious claims that competitor bidding on branded keywords violated trademark law.[2] As a result, none of the Defendant Hotels had independent incentives to refrain from bidding on its competitors' branded terms due to concerns of trademark infringement.

17.     Besides, any hotel brand who unilaterally "disarmed" by refraining from bidding on competitors' terms would have faced an untenable dilemma. In this "surrender" scenario, competitors would have bid on their neutered competitor's keywords, thus aggressively siphoning customers searching for that hotel brand. The unilaterally disarming hotel would have continued to take competitive fire from its rivals while foregoing its own gains from direct competition.

18.     Once the Defendant Hotels established the bid-rigging component of their conspiracy, they then began working to ensure that all OTAs ended the practice as well, with respect to *all* hotel-branded keyword bidding on terms associated with *all* members of the conspiracy.

19.     Although it took several years for the Defendant Hotels' illegal scheme to bear fruit, their multi-component conspiracy ultimately worked.

20.     Before TravelPass filed their Original Complaint, when a consumer ran a search for "Marriott Dallas" on Google, the almost universal result was only one type of paid advertisement: ads for Marriott's own websites. And the same was true for the other Defendant

---

[2] *See, e.g.*, *In the Matter of 1-800 Contacts, Inc.*, Docket No. 9372, Opinion of the Commission, at 38-41, Nov. 14, 2018.

Hotels as well. Defendants' illegal conduct has now competitively hamstrung TravelPass and other Downstream OTAs, market participants who once played a key role in the branded keyword bidding ecosystem.

21.     The Defendant Hotels' conspiracy progressively destroyed a robustly competitive marketplace that once offered consumers plenty of competitive options, transforming it instead into a series of virtual "company stores" in which consumers keyword searching for a particular Defendant Hotel brand are now presented with the option to book a room for *only* that same Defendant Hotel's brand(s) and *only* through websites associated with that Defendant Hotel. The conspiracy has thus virtually eliminated all interbrand competition for online keyword search advertising for hotels.

22.     Given TravelPass' central role in creating this increasingly competitive online marketplace, the massive damage TravelPass has suffered from this conspiracy was inextricably intertwined with the damage hotel consumers nationwide suffered.

23.     The conspirators' naked anti-OTA scheme consisted of both predicate bid-rigging and an intertwined group boycott.  This unlawful scheme constitutes a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. The Defendants' scheme eliminates effective competition between and among the Defendant Hotels for branded search keywords. More importantly, their scheme had the purpose and effect of reducing competition from OTAs as a whole and significantly reduced Plaintiffs' and other Downstream OTAs' ability to compete.

## II.     JURISDICTION, VENUE AND INTERSTATE COMMERCE

24.     Plaintiffs bring this case under Section 4 of the Clayton Act, 15 U.S.C. § 15, to recover treble damages, costs, and attorney's fees for injuries sustained by Plaintiffs because of the Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

25.    This Court has jurisdiction over Plaintiffs' antitrust claims under 28 U.S.C. §§ 1331, 1337, and Sections 4 and 12 of the Clayton Act, 15 U.S.C. §§ 15(a) and 22.

26.    Venue is appropriate in this district under Sections 4 and 12 of the Clayton Act, 15 U.S.C. §§ 15 and 22, because all Defendants transact business in this district. Each of the Defendant Hotels controls one or more properties within this District. Moreover, as set forth below, each of the Defendant Hotels has served and continues to serve countless customers within this District.

27.    Numerous consumers within this district have been harmed by the Defendant Hotels' illegal activities. For example, from January 2013 to October 2018, *Plaintiffs alone* have processed over $10 million in reservations for Defendant Hotels' brands in connection with customers reporting ZIP codes located entirely within this District:

| Defendant Hotel | Bookings | Value |
|---|---|---|
| Choice | 10,997 | $2,419,398 |
| Marriott | 13,081 | $5,183,816 |
| Six Continents (IHG) | 10,509 | $2,978,827 |

28.    Given that OTAs as a whole account for only a portion of U.S. hotel bookings and given that Plaintiffs account for only a small percentage of that portion, the actual impact of Defendant Hotels' illegal activities upon residents of this District is undoubtedly many times greater than the impact upon only Plaintiffs' customers within this District.

29.    Defendants' activities were within the flow of and substantially affected interstate commerce, namely the online sale and purchase of hotel lodging nationwide. Defendants' activities also were within the flow of and substantially affected interstate commerce in that they distorted markets for the purchase and sale of SERPs associated with consumers' branded term searches for hotel accommodations nationwide.

### III.   PARTIES

30.     Plaintiff TravelPass Group, LLC ("TravelPass") is a limited liability company duly organized and existing under the laws of the State of Utah and with its principal place of business in Lehi, Utah. TravelPass was incorporated on March 23, 2016.

31.     Plaintiff Partner Fusion, Inc. ("Partner Fusion") is a corporation duly organized and existing under the laws of the state of Utah and with its principal place of business in Lehi, Utah. The business relevant to this lawsuit operated as Partner Fusion or a Partner Fusion subsidiary until March 23, 2016, the date of TravelPass's formation.

32.     Plaintiff Reservation Counter, LLC ("Reservation Counter") is a limited liability company organized and existing under the laws of the State of Utah and with its principal place of business in Lehi, Utah. From its creation in 2009 through March 22, 2016, Reservation Counter was a wholly-owned subsidiary of Partner Fusion. On March 23, 2016, Reservation Counter became a wholly-owned subsidiary of TravelPass.

33.     Defendant Choice Hotels International, Inc. ("Choice") is a corporation duly organized and existing under the laws of the State of Delaware with its principal place of business in Rockville, Maryland. Choice controls over 6,500 hotels in more than 40 countries; its U.S. brands include Comfort Inn, Comfort Suites, Quality Inn, Sleep Inn, Clarion, Cambria Hotel & Suites, Mainstay Suites, Suburban Extended Stay, Econo Lodge, and Rodeway Inn. Choice owns, operates, or franchises hotel properties within this District. Choice also derives significant revenue from customers living within this District.

34.     Defendant Marriott International, Inc. ("Marriott") is a corporation duly organized and existing under the laws of the State of Delaware with its principal place of business in Bethesda, Maryland. Marriott controls approximately 6,000 hotel properties in 122 countries and territories; its U.S. brands include The Ritz-Carlton, St, Regis, JW Marriott, W Hotels, Marriott

Hotels, Sheraton, Westin, Renaissance Hotels, Courtyard Hotels, Four Points, SpringHill Suites, Fairfield Inn & Suites, TownePlace Suites, and Residence Inn. Marriott owns, operates, or franchises hotel properties within this District. Marriott also derives significant revenue from customers living within this District.

35.     Defendant Six Continents Hotels, Inc. ("Six Continents") is a corporation duly organized and existing under the laws of the State of Delaware with its principal place of business in Atlanta, Georgia. Six Continents is a wholly-owned subsidiary of InterContinental Hotels Group, PLC ("IHG"), which controls over 5,000 hotel properties in nearly 100 countries. Six Continents' U.S. brands include Candlewood Suites, Holiday Inn, Holiday Inn Express, Hotel Indigo, Kimpton Hotels, Staybridge Suites, InterContinental, and Crowne Plaza. Six Continents owns, operates, or franchises hotel properties within this district. Six Continents also derives significant revenue from customers living within this District.

## IV.     CO-CONSPIRATORS

36.     Various persons, who are known and unknown to Plaintiffs, and not named as defendants in this action, have participated as co-conspirators with Defendants in the offense alleged and have performed acts and made statements in furtherance of the conspiracy. These include, among others, other hotel chains, trade associations, and industry consultants.

## V.     FACTS

## A.     THE HOTEL INDUSTRY AND BACKGROUND OF THE CONSPIRACY

37.     The U.S. is home to millions of hotel rooms, and the U.S. hotel industry generates hundreds of billions of dollars in annual revenue.

38.     Defendants are some of the largest hotel chains in the world. The Defendant Hotels own some of their branded properties and enter into franchise agreements with third parties in connection with other branded properties.

39.     Over the last decade, the Defendant Hotels have sold most of their existing properties and the underlying real estate to individual franchisees or large multi-property investment groups. Hotel investment companies often are not only multi-property, but are also multi-brand. Many hotel investment groups are franchisees or owners of two or more Defendant Hotels brands, and several hotel investment groups are franchisees of most or all of the Defendant Hotels.

40.     Together, the Defendant Hotels' brands and the brands of their co-conspirators represent the majority of the hotel rooms in the United States, and their brands control an even larger percentage of certain business segments.

**B.      TRAVELPASS**

41.     TravelPass is a Downstream OTA who has built a business model on bidding on branded keywords to attract consumers to its room inventory. It sells hotel rooms from numerous hotel chains—including Marriott, Choice, IHG, and others—directly to consumers throughout the United States.

42.     Until the conspiracy took effect, TravelPass was one of the major Downstream OTAs in the market. As such, it obtained access to the Defendant Hotels' inventory via Gatekeeper OTAs. The Gatekeeper OTA segment of the travel industry has consolidated substantially over the last several years. Today, almost all of the economically significant consumer-facing Gatekeeper OTAs are owned by one of two parent companies: Expedia Group or Booking Holdings, Inc. ("BHI"). Expedia Group owns and operates Expedia, Hotels.com, Trivago, Orbitz, Travelocity, Hotwire, and several other Gatekeeper OTAs. BHI owns Booking.com, Priceline, and Kayak, among other brands.

43.     TravelPass also obtains a consistently small portion of its hotel room inventory through global distributors and wholesale suppliers.

44.     TravelPass relies on branded keyword advertising to draw consumers to its websites and to offer those consumers a wide range of hotel rooms. It has invested tens of millions of dollars in technology capabilities, marketing expertise, understanding markets, developing data sets and bidding strategies based on its bookings, and branded keyword search advertising campaigns to provide consumers with a broad array of choices for hotel rooms at affordable prices and to ensure success with its business.

45.     Before the conspiracy, TravelPass' data-driven success had made it one of the most successful Downstream OTAs; thus, before the co-conspirators had turned their attention to TravelPass in earnest, TravelPass had grown to become one of the Gatekeeper OTAs' most valuable partners.

## C.     KEYWORD SEARCH ADVERTISING

46.     Search engines like Google auction keywords to advertisers. Keywords are those words or phrases that, when typed by a user as part of a search query, will trigger advertisements at the top of a search engine's results pages. Advertisers bid on keywords that they would like to trigger their ads. All other things equal, the higher the advertiser's bid, the better ad placement they receive on a SERP.

47.     Companies advertise by, among other things, bidding on keywords. For example, Marriott is shown as the paid advertising result for the keywords "marriott dallas" in the following example of Google's search:



Figure 1. Advertisements are labeled with an "Ad" box on Google's results page. A more extensive list of results for this search are attached at Exhibit A.

48.     Branded keyword advertising is also a critical marketing and sales tool for OTAs like TravelPass, who bid on certain keywords to target consumers who are most likely to book a room.

49.     Defendant Hotels also bid on branded keywords to sell hotel rooms. Indeed, before the Defendant Hotels instituted their conspiracy, they each competed with one another by either bidding on keyword search advertising for searches incorporating both *their own* branded keywords and the branded keywords associated with *their competitors* or "broad matching" into search queries that included other Defendant Hotels' brand-related keywords. Today, pursuant to their illegal conspiracy, the Defendant Hotels limit their bidding to their own branded keywords and, further yet include "negative keywords" in their advertising accounts of their co-conspirators' brand-related keywords.

### D.     KEYWORD SEARCH AUCTIONS

50.     Search engines use auctions to price their paid search results. Search engines calculate the rank of each advertisement according to the maximum bid the advertiser submits for

the ad and the quality score of the advertisement. Search engines calculate an ad's quality score by evaluating multiple components of that advertisement.

51.    For example, Google calculates an advertiser's quality score by assessing that advertiser's historical clickthrough rate, keyword and advertisement relevance, the quality and relevance of the advertiser's landing page, and the advertiser's historical account performance. The higher an ad's quality score, the lower the advertiser will have to bid to win a keyword auction. As a result, even temporary absence from keyword auctions can dramatically increase an advertiser's bidding costs by lowering its quality score.

52.    The perceived relevance of such an ad directly contributes to its quality score and thus makes it more likely to succeed in a keyword auction. In this way, search engines actively encourage bidding on competitive branded keywords.

53.    Once a search engine calculates the winning bidder based on the ad's quality score and the advertiser's bid price, the winning bidder will have its ad displayed on the SERP for specific users whose search queries match the bidder's keywords. Those ads are featured *above* the search engine's organic results, as can be seen in Figure 1. The winning advertiser pays the search engine the minimum amount it could have bid to win the auction; that is, the second highest bid plus $0.01.

54.    Keyword search auctions are sealed. Advertisers do not know the full array of other advertisers that are bidding when they submit bids to search engines. Nonetheless, because keyword auctions are competitive, the price per click for keyword advertisements is often high, especially compared with other forms of online advertising. These higher prices reflect the high value of keyword search advertising.

55.     Consumers shopping for hotel rooms or other products online generally "click through" to relatively higher-placed search results more frequently than to results appearing lower down the page (or on subsequent pages).

**E.      CONSUMER BENEFITS FROM KEYWORD SEARCH ADVERTISING**

56.     Search engines saw the pro-competitive benefits of such branded keyword advertising early on. Before 2004, Google permitted a trademark owner to restrict use of its trademark by third parties as keywords and in the text of advertisements. But in April 2004, Google changed its trademark policy to allow third parties to bid on trademarks as keywords. Google has maintained this same policy since 2004, and, as a result, does not currently restrict keywords available for bidding in advertising auctions. In fact, as discussed below, it is common in other industries for companies to pay search engines to present their ads in response to a user's search query incorporating another company's brand name.

57.     Furthermore, according to one 2014 Google study of hotel shoppers provided to TravelPass, as of the second quarter of 2014, keyword searching was the number one starting point for consumers looking to book a hotel room online. Indeed, as of early 2014, search volume for hotel room shoppers was on the rise, having increased by almost 20% over the previous year.

58.     Because branded keyword search advertising targets potential customers' individual searches, this method of advertising is often more successful than others. This is because, for many consumers, a search for a specific hotel brand in a geographic location is a proxy for interest in any comparable hotel in that location. The ability to more precisely target specific consumers benefits those consumers by providing them with not only *more* information about competing options, but also *better* information that is more likely to be tailored to their specific individual preferences.

14

59.    This Google study also found that, as of early 2014, customers who search for one specific hotel brand online, *e.g.,* IHG's Holiday Inn Express, would often end up purchasing a hotel room with another brand, *e.g.,* Choice. For example, 17% of consumers searching for Holiday Inn Express hotels ended up booking with a competitor branded hotel instead. This is the essence of robust competition, whether Defendant Hotels liked it or not.

60.    Defendants now claim they each were acting independently and unilaterally when they chose not to bid on competitor-related hotel-branded keywords. ████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ███████████████████ Such evidence constitutes indisputable direct evidence of Defendants' horizontal conspiracy.

61.    Also, although each Defendant now insists that they acted unilaterally, the co-conspirators' ████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████

62.     Because the bid-rigging component of Defendants' conspiracy has stifled targeted interbrand competition for branded search results; accordingly, it is difficult to find current examples of such competition from the hotel industry.

63.     However, examples from another industry demonstrate the dynamic perfectly. A recent search performed for "2019 Audi Q5" produced as its *first result* a link entitled "All-New Acura RDX | Compare SUVs Side by Side." The link takes consumers to an Acura.com subpage with the URL "www.acura.com/Compare/RDX_vs_Audi_Q5." (Screenshot attached as Exhibit B; search performed December 5, 2018). The RDX is Acura's direct competitor to the Audi Q5.

64.     Before the conspiracy, a consumer using Google to search for one of a Defendant Hotel's brands might have received prominently placed results for the brand for which she searched, and also for competing hotel brands, Gatekeeper OTA websites, and Downstream OTA websites.

65.     As discussed below, the competitive marketplace changed over time as the Defendant Hotels and their co-conspirators first ensured they would face no competition from one another, and then, with their flanks protected, engaged in a group boycott, applying ever-increasing, coordinated pressure against both Gatekeeper OTAs and their Downstream OTA affiliates.

## F.     THE CONSUMER BENEFITS FROM ONLINE TRAVEL AGENCIES

66.     The advent of online shopping, the rise of search engines, and the appearance of OTAs radically changed the ways in which hotels compete with one another. Before the online era, hotels rarely competed head-to-head for individual consumers making hotel reservations, beyond possible billboard-level competition on the highway. Instead, pre-internet interbrand competition between hotels mostly consisted of a combination of Yellow Pages listings and

advertisements combined with generic, wide-broadcast brand advertising and inducements to the travel agents, motor clubs, and others who then served as gatekeepers for many consumers.

67.     In order to comparison shop on price or any other relevant variable (quality, amenities, etc.), pre-internet hotel consumers would have had to call multiple hotels to obtain the relevant information. This was time-consuming and costly, if the consumers could even locate the relevant long-distance telephone numbers for the hotels in their travel destination in the first place. As a result, the pre-internet marketplace insulated the Defendant Hotels from direct interbrand price competition with one another because, before the internet, it was simply too costly and time-consuming for most consumers to comparison shop effectively.

68.     The internet shattered that dynamic, especially as search engines developed into a primary consumer information source. And with the rise of branded keyword search advertising—as well as online booking—direct, targeted, consumer-level interbrand competition between hotel brands was possible for the first time. Hotels began to compete with one another for high-value consumers by either bidding on one another's branded keywords in the search auctions run by Google, Bing, and other search engines or "broad matching" into search queries that included other Defendant Hotels' brand-related keywords.

69.     Since the emergence of the internet as a commercial tool, OTAs have provided hotel consumers with, among other things, one-stop comparison-shopping for multiple properties across multiple brands. That is, OTAs generally allow hotel consumers to compare many different competing hotels' prices, locations, amenities, and availability on a single piece of display "real estate"—typically either a computer monitor, tablet, or mobile device screen.

70.     OTAs also provide significant value to the hotels with which they contract. Indeed, OTAs have driven billions of dollars' worth of bookings for each of the Defendant Hotels.

### G.     THE TRAVELPASS BUSINESS MODEL

71.     Before the conspiracy took full effect, TravelPass successfully marketed the conspirators' hotel rooms (and hotel rooms associated with many other brands) online by bidding on branded keyword combinations (like "Marriott Dallas") in auctions run by online search engines.

72.     TravelPass built its business atop sophisticated data analyses, which included complex algorithms that allowed it to be uniquely effective in branded keyword search auctions.

73.     The vast majority of TravelPass's revenues historically have come from commissions paid by the Gatekeeper OTAs for the hotel reservations TravelPass generates. In turn, the vast majority of TravelPass's hotel reservations have come from TravelPass's successful paid search operations. Before the conspiracy, almost all of TravelPass's hotel reservations were a product of TravelPass's bidding in branded keyword search auctions.

74.     Compared to other Downstream OTAs, TravelPass was remarkably successful, generating hundreds of millions of dollars in annual bookings. It therefore became the primary target of the Defendant Hotels as they were planning and implementing the later components of their conspiracy.

### H.     COMPETING INCENTIVES IN THE MODERN HOTEL INDUSTRY

75.     The hotel business has high fixed costs. That is, much of the typical hotel's operating budget goes to service real estate debt, pay franchise fees, and/or other costs that do not depend upon the hotel's occupancy rate.

76.     The hotel business also has low marginal or variable costs. As a result, any hotel that is operating with vacancies on a given night can typically add another guest for relatively little in additional cost.

77.     Hotels face two primary competing incentives with respect to filling their vacant rooms. First, hotels want to fill their properties every night, so long as each customer generates more revenue than the marginal costs associated with that customer's stay. This incentive, in turn, encourages hotels to seek alternative distribution channels, like OTAs, for their room inventories. Hotels must pay a commission to the OTAs, but the existing relationships between hotels and OTAs help the hotels secure additional customers who pay more than the hotel's marginal cost for their stay.

78.     The hotels' second incentive stands in significant tension with the first. Although hotels want to fill every bed they can with a customer willing to pay more than the hotel's marginal cost, they also want to extract the maximum possible revenue from each guest. This would occur when the hotel receives the full retail room rate directly from the customer. Accordingly, hotels ideally want to sell as many rooms as possible directly to consumers.

79.     The real nature of the hotel business is such that hotels generally must attempt to *both* fill their beds *and* extract maximum revenues from each consumer, striking an optimal balance between the two.

80.     Hotels depend upon OTAs to maximize occupancy, but they extract maximum per-customer revenue only through their own direct sales. As a general rule, the highest-value customers for any hotel chain are those who have an idiosyncratic preference for one or more of that particular hotel chain's brands. At the same time, hotels want OTAs to undertake the time and cost-intensive work of locating (and then selling to) lower-value customers in order to fill their properties night after night.

81.     The unique nature of the online hotel reservations business created a situation in which it would only have been in the individual Defendant Hotel's economic interest to enforce

dormant contractual restrictions on branded keyword search advertising consistently if those hotels simultaneously conspired with one another to eliminate competition from a critical mass of co-conspirator hotels.

82.     And that is precisely how the Defendant Hotels kicked off their illegal anti-OTA crusade.

## I.     THE DEFENDANT HOTELS' INCENTIVE TO CONSPIRE

83.     The 2008 financial collapse highlighted the rising OTA threat to the Defendant Hotels. In particular, the hotels worried that lower occupancy rates would shift the balance of power away from the hotels' pre-internet oligopoly, and towards competition-promoting OTAs.

84.     With this OTA threat looming, the Defendant Hotels decided they wanted to have their cake and to eat it. That is, the hotels wanted to reduce the OTAs' rising influence but avoid either (1) direct online competition from other hotel brands, or (2) the losses that would result from challenging the OTAs alone. So, instead, the Defendant Hotels and their co-conspirators chose to act together, jointly developing a comprehensive anti-OTA strategy that protected themselves from inter-brand competition while, at the same time, weakening the OTAs' competitive threat.

85.     As an initial step in the conspiracy, the Defendant Hotels decided to rig online search bids with one another to avoid competing on their co-conspirator's branded keywords. This bid-rigging arrangement was a necessary component of the overall conspiracy because it allowed the Defendants to attack both Gatekeeper and Downstream OTAs without facing competition from other hotel chains.

86.     This dynamic bears out in a 2013 study by internet search monitoring company Brand Verity (which, at the time, knew nothing about the conspiracy). In that study, Brand Verity acknowledges that OTA ads appearing on the SERP cost hotel brands commissions, but it also notes that those same OTA ads could be a "useful line of defense" for the hotel brands, because

they sometimes produced "A Direct Booking for the Hotel Brand, with OTA Ads Blocking Out Competitor Ads on the SERP." In either case, the result is better for the hotel brand than the worst-case scenario in which a competitor books the consumer through competitive keyword bidding.[3]

87.     Thus, the bid-rigging arrangement obviated the Defendants' need to rely on OTAs as protection against branded keyword conquesting. Without this, the hotels could not carry out the group boycott component of the plan.

88.     Although certain Defendant Hotels began incorporating nominal contractual restrictions on Gatekeeper OTAs and Downstream OTA branded keyword search advertising by 2010, those restrictions were not comprehensive. Those restrictions were also enforced infrequently (typically during periods of predictably high demand). For the reasons mentioned above, consistent enforcement of these early restrictions would have been economic suicide unless the hotels simultaneously conspired to eliminate direct interbrand competition for branded keyword search advertising between and among themselves.

89.     The reason for this was simple: if any Defendant Hotel had actively enforced its contractual restrictions against OTAs *before* protecting their flanks through a bid-rigging arrangement, it would risk losing substantial business to its competitors—in most cases, the other co-conspirators.

90.     Thus, without rigging bids, if one Defendant Hotel barred OTAs from branded keyword search advertising, any SERP for that Defendant Hotels' search terms would have filled up, at least in part, with direct links to competing hotels. So, unless the Defendant Hotels undertook to shut down *every* possible alternative distribution channel, its unilateral enforcement would still

---

[3] Of course, the Defendants also dislike most OTA bidding on branded keywords because most OTA websites (including TravelPass's websites) provide consumers with portals to competitive options not controlled by Defendants.

generate ads from competing hotel brands as well as ads from any OTA not subject to aggressive enforcement measures.

91.     As a result, without the bid-rigging component of the conspiracy, a Defendant Hotel enforcing its contract restrictions unilaterally would either have to (1) spend outrageous sums to ensure that only its own properties appeared on searches for its branded keywords, or (2) deal with a SERP dominated by direct links to competing hotels and *still* containing OTA links.

92.     It therefore made no economic sense for any one Defendant Hotel to enforce its patchwork contract restrictions against Gatekeeper and Downstream OTAs unilaterally—much less to insist upon even stronger contractual restrictions—because the OTAs provided too much protection against competitor hotel bidding.

93.     By bid-rigging, Defendants and their co-conspirators could enforce then-existing contractual restrictions both aggressively and consistently. Rigging bids for online search markets also bestowed on the hotels increased bargaining power vis-à-vis the OTAs that would permit them to insist on even more restrictive limitations. These new restrictions—agreed to jointly—directly targeted Downstream OTAs like TravelPass.

94.     Finally, the Hotel Defendants' bid-rigging allowed for aggressive collective action intended to hamstring the operations of Downstream OTAs like TravelPass. They did this both by threatening the supply sources of Gatekeeper OTAs who failed to prevent Downstream OTAs from bidding, and by engaging in extracontractual attempts to eliminate or limit TravelPass' and other Downstream OTA's ability to compete.

### J.   THE DEFENDANTS' OVERARCHING CONSPIRACY

#### i.   *Bid-Rigging to Eliminate Interbrand Competition for Branded Keyword Search Advertising*

95.   Beginning in at least 2010, the Defendant Hotels executed the bid-rigging component of their conspiracy in which they agreed not to bid on one another's branded keywords in search auctions. This aspect of their scheme protected them from interbrand competition and gave them significant additional leverage as they pressed for their ultimate goal—suppressing the growth of the OTAs.

96.   Evidence of the Hotel Defendants' bid rigging is substantial and includes:

- Direct evidence of predicate bid-rigging. ███████████████████████████
  ███████████████████████████████████████████████████

- <u>Acts contrary to economic interests</u>. It would have been contrary to the economic interests of any Defendant Hotel acting alone to restrict OTAs from bidding on branded keywords without the bid-rigging component of the agreement because unilateral enforcement or enhancement of contractual restrictions would have meant SERPs generated in response to a search for branded keywords associated with one Defendant Hotel would risk aggressive competition from ads for competing hotel chains.

- <u>Motive to enter the conspiracy, including knowledge or assurances that competitors also will enter.</u> The Defendant Hotels were motivated by a desire to avoid the price competition and free flow of information generated by competitive branded keyword search advertising. They were also motivated by the knowledge that if one of the Defendant Hotels did not enter into the conspiracy, that Defendants would successfully bid on competitive keywords and obtain an advantage in this growing market.

- <u>Practices facilitating a horizontal conspiracy</u>. The Defendant Hotels communicated regularly, both in person and in emails with each other (both directly and through intermediaries) to enforce the bid-rigging component of their plan.

#### ii.   *Defendants Wield Their Joint Power to Tighten Contractual Restrictions with the Gatekeeper OTAs*

97.   Hotel chains typically enter into multi-year contracts with Gatekeeper OTAs. The Defendant Hotels and their co-conspirators had contracts with most or all of the major Gatekeeper

OTAs when they implemented the bid-rigging component of their conspiracy, but those contracts expired at different times.

98.     With the bid-rigging component shielding their flanks, the Defendant Hotels began to exercise the collective power each time a Gatekeeper OTA contract was up for renegotiation. In each renegotiation, Defendants and their co-conspirators could ratchet up ever-stronger contractual prohibitions on branded keyword bidding among their demands to the OTAs.

99.     For example, the Defendants Hotels capitalized on their bid-rigging by insisting on a requirement that Gatekeeper OTAs implement "negatives" in their own keyword bidding. The identification of a particular branded keyword as a "negative" means that a search containing that keyword will not generate an ad for the entity identifying it as a "negative," even if *other* search terms in the query would have yielded an ad for that entity.

100.    Defendants also used their power to demand provisions obligating Gatekeeper OTAs to enforce branded keyword bidding restrictions aggressively against Downstream OTAs like TravelPass.

101.    This aspect of the Defendant Hotels' anti-OTA conspiracy comprised a horizontal group boycott that aimed to eliminate branded keyword bidding competition from Gatekeeper OTAs and to grant the Defendants additional firepower through which they could attack TravelPass and other Downstream OTAs

> iii.    ***Group Boycott of TravelPass and Other Downstream OTAs.***

102.    With their flanks fully protected from competition from other hotels and their contracts with Gatekeeper OTAs strengthened, Defendants increased the pressure on Downstream OTAs like TravelPass.

103.    Evidence of this component of Defendants' plan is also significant, and includes:

- <u>Direct evidence of horizontal coordination of efforts to restrict Downstream OTAs.</u>

  ████████████████████████████████████████████
  ████████████████████████████████████████████
  ██████████████████

- <u>Direct evidence of horizontal coordination of efforts to reduce TravelPass' ability to compete by jointly instigating government investigations.</u>

  ████████████████████████████████████████████
  ████████████████████████████████████████████
  ███████████

- <u>Direct evidence of inter-conspirator communications assisting in enforcement of the group boycott.</u>

  ████████████████████████████████████████████
  ████████████████████████████████████████████
  █████

- <u>Multiple acts by co-conspirators that are inconsistent with economic incentives except as part of a coordinated collusive scheme.</u> Given the overwhelming documentary evidence of the Defendants' bid-rigging arrangement enforcement against Downstream OTAs would be an economically necessary component of the overall scheme, because without it, the bid-rigging agreement would not be effective and thus would not provide the conspirators with the leverage they needed to succeed in their broader plan of attack against both classes of OTAs.

## K.  THE ROLE OF TRADE ASSOCIATIONS, INDUSTRY CONSULTANTS, AND INDUSTRY CONFERENCES

104.    In light of the coordinated pattern of the Defendant Hotels' conduct, trade association activity that occurred at the same time constitutes further evidence of the Defendant Hotels' conspiracy. This coordinated activity occurred through joint ventures, trade organizations and industry consultants, including, among others, through Roomkey, the Hotel Consumer Protection Coalition ("HCPC"), the Consumer Innovation Forum ("CIF"), Kalibri Labs, and (more generally) the American Hotel & Lodging Association ("AHLA").

## VI.   INJURY/HARM

### A.   HARM TO COMPETITION

105.   The conspiracy worked. Before TravelPass filed suit, when a consumer ran a search for "Marriott Dallas" on Google, they typically saw only one type of advertisement: ads linking directly to Marriott's own websites and properties. TravelPass and other Downstream OTAs, who once played a key role in the branded keyword bidding market, had all been rendered ineffective by Defendants' illegal joint conduct. As a result, the conspiracy led to a *decrease* in information to consumers, an *increase* in the transaction and other costs for consumers seeking to book a hotel, which inevitably led to overall higher prices and reduced quality for consumers.

106.   The conspiracy has also virtually eliminated all interbrand competition in the online keyword search market for hotels, and has dramatically reduced both the amount and the net effectiveness of competition from both Gatekeeper and Downstream OTAs like TravelPass.

### B.   HARM TO TRAVELPASS

107.   Given its key role in this increasingly competitive online marketplace, the conspiracy inflicted staggering damage on TravelPass . TravelPass' harm was also inextricably intertwined with the damage hotel consumers nationwide suffered as a result of the Hotel Defendants' conspiracy.

108.   TravelPass and its predecessor entities Partner Fusion, Inc. and Reservation Counter, LLC have been OTA affiliates since at least 2010. From September 28, 2009 to present, TravelPass or one of its predecessors has been an affiliate of Booking Holdings Inc. and its predecessor entities. From 2009 to April 30, 2017 TravelPass or one of its predecessors was an affiliate of Expedia.

109.   As discussed above, TravelPass built its business around sophisticated data analyses and complex algorithms that allowed TravelPass to be uniquely effective in branded

keyword search advertising. Thus, the vast majority of TravelPass's revenues historically have come from commissions paid by the OTAs for the hotel reservations TravelPass generates. Similarly, the vast majority of TravelPass's hotel reservations have in turn come from TravelPass's successful paid search operations. Before the conspiracy, virtually all of TravelPass's hotel reservations were a product of TravelPass's bidding on branded keyword search advertising.

110.    Compared to other Downstream OTAs, TravelPass was remarkably successful before the conspiracy; accordingly, it became a primary target of the Defendant Hotels as they were planning and implementing the conspiracy. Even if the Defendant Hotels were unable to prevent every Downstream OTA from bidding on branded keyword search advertising, simply preventing TravelPass from doing so would make their primary conspiracy significantly more effective.

111.    TravelPass received its hotel inventory supply from several Gatekeeper OTAs. And it took time (and a considerable amount of effort) for the Defendant Hotels to identify all the Gatekeeper OTA (and other) sources of TravelPass' inventory. Slowly, but surely, the Defendant Hotels succeeded in severely cutting off and limiting TravelPass' access to inventory, causing constant chaos for TravelPass as they sought to grow their company. As result, TravelPass has been seriously harmed because of the Defendant Hotels' illegal conduct.

112.    As the conspiracy took root, Defendant Hotels ultimately demanded that the Gatekeeper OTAs each cut the "feed" of the Defendant Hotels' room inventory available to TravelPass and other Downstream OTAs who continued to follow their branded-keyword-bidding-based business models. In fact, several of the Defendant Hotels attempted to cut off TravelPass's access to hotel rooms associated with their brands entirely. Other Defendant Hotels allowed TravelPass continued access to their inventory, but only on the condition that TravelPass not bid

on branded keywords associated with their properties. The functional result: TravelPass lost Gatekeeper-OTA-driven access to a significant percentage of the Defendant Hotels' inventory and retained access to most of the remainder only by complying against its will with the inherently anticompetitive terms of the Defendant Hotels' conspiracy.

113.    The Defendant Hotels' illegal activities thus caused TravelPass extraordinary harm—harm intrinsically and inextricably related to the harm their collusive conduct also caused to hotel consumers.

114.    Just before the conspiracy really took hold, TravelPass was negotiating with an experienced and well-established private equity firm interested in taking an equity position in TravelPass's business. In March of 2015, that firm forwarded to TravelPass a term sheet outlining the details of their proposed investment. In exchange for a minority equity stake amounting to just under 22% of TravelPass's voting shares, that firm offered TravelPass a cash investment of $40 million ($40,000,000). Moreover, the private equity firm's proposal included its own independent valuation of TravelPass's overall business; it valued TravelPass at $165 million ($165,000,000)— just as the Defendant Hotels' scheme was beginning to take root.

115.    Shortly before the private equity transaction was scheduled to close, the private equity firm withdrew its offer. Their decision resulted in large part from the havoc the Hotel Defendants' inventory feed cut-off wreaked on TravelPass's revenues and profitability—cut-offs TravelPass later learned were a direct and intended result of the Defendant Hotels' conspiracy.

116.    The best evidence of this? TravelPass received another purchase offer in December outright in December 2017, well after the conspiracy had nearly destroyed TravelPass's business. That bid for 100% of the company: $25 million ($25,000,000).

117.    This decrease in TravelPass's value was the direct and intended consequence of the Defendant Hotels' illegal activities.

118.    Moreover, TravelPass has also suffered actual damages well in excess of $65,000,000 when measured by way of the lost profits TravelPass experienced because of the Defendant Hotels' illegal conduct.

## VII.    CAUSES OF ACTION

**Count I**
**Sherman Act Section 1**
***Per Se* Bid Rigging/Group Boycott/Market Division**

119.    TravelPass hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

120.    Beginning no later than 2010 and perhaps earlier, and continuing to the present, Defendants and their co-conspirators have engaged in a conspiracy and agreement in unreasonable restraint of interstate trade and commerce, constituting a violation of Section 1 of the Sherman Act, 15 U.S.C § 1.

121.    The conspiracy and agreement among Defendants and their co-conspirators to refuse to bid on each other's branded keywords has restrained trade and the free flow of information from sellers to buyers. More important, this component of their scheme also formed the necessary foundation for a coordinated campaign against OTAs. But even by itself, this component of the conspiracy restricted advertisements for the sale of hotel rooms on the internet by prohibiting competitors from presenting paid advertisements on the search engine results page in response to searches for the Defendant Hotels' branded search terms. This conspiracy has thus interfered with the flow of information from sellers to buyers and raised the costs to consumers of finding the most suitable offering.

122.     For the purpose of forming and effectuating this agreement and conspiracy, some or all of the Defendant Hotels and their co-conspirators did, among other things, the following:

>  a.      Regularly communicated both internally and with each other to explain, discuss, and enforce this component of their conspiracy; and

>  b.      Reduced and/or eliminated the ability of all OTAs and other Defendant Hotels to bid competitively on conspirator-related branded keywords.

123.     Defendants' scheme constitutes horizontal *per se* bid rigging and a group boycott.

124.     Viewed in the aggregate, Defendant Hotels' conduct also constitutes a *per se* illegal horizontal market division or territorial allocation scheme. Specifically, the totality of Defendants' conduct had the purpose and effect of "fencing off" branded keyword territory. Each Defendant Hotel agreed to stay out of the other Defendant Hotels' branded keyword territories, so that they could then successfully prevent Gatekeeper OTAs and their Downstream OTA affiliates from competing effectively in *any* of the territories the Defendant Hotels wrongfully claimed as their own. Freed from the threat of competition within their respective branded keyword territories, the Defendant Hotels could exploit their advantages to the detriment of consumers, TravelPass, other Downstream OTAs, and internet search engines.

125.     Moreover, the Defendant Hotels' conspiracy and agreement have resulted in obvious and demonstrable anticompetitive effects on consumers and Downstream OTAs like TravelPass such that they constitute an unreasonable restraint on trade in violation of Section 1 of the Sherman Act, 15 U.S.C § 1.

126.    TravelPass was injured in its business or property by  the collusion and conspiracy alleged above, which facilitated, enabled, assisted, or furthered  Defendants' substantial foreclosure and exclusion of competition.

**Count II**
**Sherman Act Section 1**
**Unreasonable Restraint of Trade**

127.    TravelPass hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

128.    This conspiracy constitutes contracts, combinations, and conspiracies that substantially, unreasonably, and unduly restrain trade.

129.    TravelPass was injured in its business or property by the conspiracy alleged above which facilitated, enabled, assisted, or furthered the Hotel Defendants' substantial foreclosure and exclusion of competition.

## VIII.   <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs respectfully request the following:

A.    Defendants' actions described herein be adjudged and decreed to be in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

B.    Plaintiffs recover damages, as provided by law, they are determined to have sustained, and that judgment in favor of Plaintiffs be entered against Defendants;

C.    Plaintiffs recover their costs of this suit, including reasonable attorneys' fees, as provided by law; and

D.    Plaintiffs be granted such other, further and different relief as the nature of the case may require or as may seem just and proper to this Court.

## IX.    <u>JURY DEMAND</u>

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated:  May 11, 2021

By   /s/ Christopher J. Schwegmann

Christopher J. Schwegmann
State Bar No. 24051315
cschwegmann@lynnllp.com
Samuel B. Hardy, IV
State Bar No. 24074360
shardy@lynnllp.com
Christopher W. Patton
State Bar No. 24083634
cpatton@lynnllp.com
Ruben A. Garcia
State Bar No. 24101787
rgarcia@lynnllp.com
Cory C. Johnson
State Bar No. 24046162
cjohnson@lynnllp.com
Rebecca L. Adams
State Bar No. 24098255
radams@lynnllp.com
**LYNN, PINKER, HURST &
SCHWEGMANN, L.L.P.**
2100 Ross Avenue, Suite 2700
Dallas, Texas 75201
(214) 981-3800 Telephone
(214) 981-3839 Facsimile

-and-

Todd M. Schneider (*pro hac vice*)
tschneider@schneiderwallace.com
Jason H. Kim (*pro hac vice*)
jkim@schneiderwallace.com
**SCHNEIDER WALLACE COTTRELL
KONECKY, L.L.P.**
2000 Powell Street, Suite 1400
Emeryville, California 94608
(415) 421-7100 Telephone
(415) 421-7105 Facsimile

*Attorneys for Plaintiffs
TravelPass Group, LLC, Partner Fusion,
Inc., and Reservation Counter, LLC.*

