UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
TEXARKANA DIVISION

| | |
|---|---|
| TravelPass Group, LLC, Partner Fusion, Inc., Reservation Counter, LLC, *Plaintiffs*, v. Caesars Entertainment Corporation, Choice Hotels International, Inc., Hilton Domestic Operating Company Inc., Hyatt Hotels Corporation, Marriott International, Inc., Red Roof Inns, Inc., Six Continents Hotels, Inc., Wyndham Hotel Group, LLC, *Defendants*. | Case No. 5:18-cv-153-RWS-CMC <br><br> **HEARING REQUESTED** |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION TO EXCLUDE DEFENDANTS' EXPERT BRUCE ISAACSON**

Defendants Choice Hotels International, Inc. ("**Choice**"), Marriott International, Inc. ("**Marriott**"), and Six Continents Hotels, Inc. ("**Six Continents**") (collectively, "**Defendants**") hereby oppose the Motion to Exclude Defendants' Expert Dr. Bruce Isaacson, Dkt. 555, (the "**Motion**") filed by Plaintiffs TravelPass Group, LLC, Partner Fusion, Inc., and Reservation Counter, LLC (collectively, "**TravelPass**").

## I.     INTRODUCTION

Ignoring the proper role of the gatekeeping function under *Daubert*, TravelPass attempts to spin two limited criticisms of Dr. Isaacson's consumer survey into a basis for excluding his testimony. TravelPass's criticisms of Dr. Isaacson's survey are entirely unfounded. And, in any event, those criticisms at most go to the weight, not admissibility, of the survey.

First, TravelPass attacks how Dr. Isaacson used the available demographic information to set the universe of potential survey respondents. Dr. Isaacson's universe of potential respondents were all consumers likely to reserve a hotel room by searching online and likely to consider the hotel brand that they ultimately saw in the survey. The demographic information Dr. Isaacson used to further define his universe of respondents (*i.e.*, age, gender, geography) was based on the *only* demographic information provided by TravelPass, as well as U.S. Census data and data from hotels where it was available. Dr. Isaacson therefore considered all available demographic information and TravelPass does not urge otherwise in its Motion. Indeed, TravelPass does not claim that the demographic profile of the survey respondents is incorrect, *e.g.*, that participants should have been older or younger. Instead, TravelPass quibbles with how Dr. Isaacson incorporated the demographic data into the universe profile using his undisputed expertise in the field. This is the epitome of a criticism that goes to the weight, not admissibility, of expert testimony.

Second, TravelPass argues that Dr. Isaacson's survey, "assumes, rather than tests, initial interest confusion." Motion at 13. But this criticism suffers from the faulty assumption that Dr. Isaacson was testing initial interest confusion. Confusion in this case is not limited to initial interest confusion, as demonstrated by the volumes of <u>actual</u> confusion presented in Defendants' Joint Motion for Summary Judgment on Likelihood of Confusion and Fair Use. *See* Dkt. Nos. 565-566 ("**Defendants' Trademark MSJ**"). Dr. Isaacson's survey therefore did not test initial interest confusion; Dr. Isaacson instead measured actual confusion based on examples of the types of TravelPass sponsored ads and hotel landing pages that have been accused of infringement. The heart of Defendants' likelihood of confusion allegations go to TravelPass's attempts to pretend to be the central reservation counter for the hotels and to mislead consumers into believing that TravelPass was in fact the hotel. It is precisely this type of confusion that Dr. Isaacson's survey measured.

TravelPass's Motion raises no other objections to Dr. Isaacson's survey – not Dr. Isaacson's qualifications, not the survey's questions or format, not the manner of sourcing respondents, not the survey's controls, not the data analysis. TravelPass's Motion to exclude Dr. Isaacson's expert evidence is therefore without merit, the Motion should be denied, and Dr. Isaacson's expert evidence should be admitted and presented to the jury.

## II.   BACKGROUND

Defendants commissioned Dr. Bruce Isaacson to conduct a likelihood of confusion survey and testify as to its results in connection with their counterclaims for trademark infringement. Ex. A, Bruce Isaacson Report, Dec. 30, 2020 ("**Isaacson Rpt.**") ¶¶ 1-2. Dr. Isaacson is a veteran survey and marketing expert who has designed, conducted, and analyzed hundreds of research studies including dozens of likelihood of confusion surveys. *Id.* ¶ 26; *id.* at Ex. 1. Dr. Isaacson has

testified before numerous federal and state courts, the Trademark Trial and Appeal Board at the Patent and Trademark Office (USPTO), and the National Advertising Division of the Better Business Bureau. *Id.* ¶ 27. Dr. Isaacson has been retained to conduct surveys on a number of occasions by the Federal Trade Commission (FTC), the Department of Justice, and the USPTO. *Id.* And even within the past few weeks, Dr. Isaacson published an article in *The Trademark Reporter* on *Eveready* surveys, the same format used for his survey in this matter. Dr. Bruce Isaacson & Dr. Keith A. Botner, *When to Conduct an Eveready Survey: The Importance of Aided Awareness*, 111 Trademark Rep. 693 (2021). Dr. Isaacson's extensive experience and renowned reputation conclusively establish him as one of the leading experts on trademark surveys.

Defendants' counterclaims allege that TravelPass leads consumers to believe that they are booking directly with the hotel, and/or through a service that is sponsored or authorized by that hotel, rather than through an online travel agency. Ex. A, ¶¶ 3, 11. To measure the degree of consumer confusion caused by these activities, Dr. Isaacson used the "gold standard" *Eveready* format for his survey to measure the likelihood of confusion between online advertising from TravelPass and Defendants' hotel brands.[1] *Id.* ¶¶ 3-4. Dr. Isaacson's survey replicated the real life process of a consumer searching for a hotel brand in a particular city, encountering online advertising from TravelPass in search results, and clicking through to a landing page that describes the hotel property that was the subject of the consumer's search. *Id.* ¶ 5.

In defining the universe, Dr. Isaacson sought to qualify respondents as actual or potential purchasers of the types of services offered by TravelPass, namely online hotel reservation services. *Id.* ¶ 19. Dr. Isaacson further required that prospective respondents be likely to reserve a hotel

---

[1] In a typical *Eveready* survey, such as Dr. Isaacson's survey, respondents are shown a trademark from one party, often in an ad or on a product, and asked questions to determine whether they believe that the trademark comes from another party. Ex. A, ¶ 40.

3

room online using Google or Bing and likely to consider the brand being tested in the survey. *Id.* ¶ 20. The demographics of the survey, in terms of age, gender, and region, were set after considering demographic data from a variety of sources including: the only demographic data provided by TravelPass[2]; data from Hampton Inn, Comfort Inn, and Harrah's; and data from the U.S. Census. *Id.* at Ex. 5. Table A of Dr. Isaacson's report summarizes the information from these sources and the final demographics of the survey database.



As is apparent from reviewing Table A, the survey's database demographics reflect Dr. Isaacson's efforts, based on his expertise, to incorporate all demographic information available. *See also* Ex. B, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

In the survey, respondents were shown one of five keyword search terms in the Google or Bing search engine, then shown a corresponding page of search results that includes a TravelPass

---

[2] ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

4

listing for a hotel property, then shown the TravelPass listing by itself, and then shown the landing page from TravelPass that is connected to the listing and advertises the hotel property. Ex. A, ¶ 7. These are the same items a consumer would view if they searched on Google or Bing for a hotel brand in a particular location, viewed the search results, and then clicked on a listing from TravelPass to reach a landing page. *Id.* Dr. Isaacson's survey database includes 2,060 interviews, including 1,042 interviews with respondents shown the test images and 1,018 interviews with respondents shown the control images; this is a very large database, with more than sufficient size to be reliable. *Id.* ¶ 22.

After adjusting for the control, the net level of confusion measured by Dr. Isaacson is 15.2%. *Id.* ¶¶ 24, 82. This represents the percentage of consumers who are likely to believe that a TravelPass website on which they may book a hotel room is owned or operated by a Defendant hotel company. *Id.* ¶ 82. ███████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████        █████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████.

### III. ARGUMENT

Pursuant to Rule 702 of the Federal Rules of Evidence ("**FRE**"), "a witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is

5

based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." *See also Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993). "Importantly, in a jury trial setting, the Court's role under *Daubert* is not to weigh the expert testimony to the point of supplanting the jury's fact-finding role; instead, the Court's role is limited to that of a gatekeeper, ensuring that the evidence in dispute is at least sufficiently reliable and relevant to the issue before the jury that it is appropriate for the jury's consideration." *Personalized Media Commc'ns, LLC v. Zynga, Inc.*, No. 2:12-CV-00068-JRG-RSP, 2013 WL 5979627, at *1 (E.D. Tex. Nov. 8, 2013) (citing *Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1391 (Fed. Cir. 2003) (applying 5th Cir. law); *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 249 (5th Cir. 2002)).

Moreover, it is well established in this Court that excluding expert testimony is the exception and not the rule. *See McCord v. Prudential Ins. Co. of Am.*, No. 1:10-CV-413, 2011 WL 6176473, at *4 (E.D. Tex. Aug. 17, 2011); *see also* FRE 702 Advisory Committee's Note to 2000 Amendment ("[T]he rejection of expert testimony is the exception rather than the rule."). "As a general rule, questions relating to the bases and sources of an expert's opinions affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration." *Primrose Operating Co. v. Nat'l Am. Ins. Co.*, 382 F.3d 546, 562 (5th Cir. 2004). *Daubert* "makes clear...the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system: 'Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'" *Id*. (quoting *Daubert*, 509 U.S. at 596).

This is particularly the case with respect to survey experts as the Fifth Circuit routinely finds that "[f]laws in a survey generally bear on weight, not admissibility." *Scrum All., Inc. v.*

*Scrum, Inc.*, No. 4:20-CV-227, 2021 WL 1691136, at *3 (E.D. Tex. Apr. 29, 2021) (quoting *Shell Trademark Mgmt. B.V. v. Warren Unilube, Inc.*, 765 F. Supp. 2d 884, 890 (S.D. Tex. 2011)); *Firebirds Int'l, LLC v. Firebird Rest. Grp., LLC*, No. 3:17-CV-2719-B, 2019 WL 3957846, at *2 (N.D. Tex. Aug. 21, 2019) (quoting *Scott Fetzer Co. v. House of Vacuums Inc.*, 381 F.3d 477, 487-88 (5th Cir. 2004)). "Only when 'serious flaws in a survey will make any reliance on that survey unreasonable' and '[n]o reasonable jury could view the proffered survey as evidence of confusion among relevant consumers' should the survey be discounted entirely." *RE/MAX Int'l, Inc. v. Trendsetter Realty, LLC*, 655 F. Supp. 2d 679, 705 (S.D. Tex. 2009) (quoting *Scott Fetzer*, 381 F.3d at 488). Indeed, even in the case cited in the opening line of TravelPass's Motion, the court held that survey's criticisms "affect[ed] only the weight the survey should receive" and not its admissibility. *See Viacom Int'l v. IJR Cap. Invs., L.L.C.*, 891 F.3d 178, 198 (5th Cir. 2018).

TravelPass's Motion to exclude Dr. Isaacson's expert evidence should be denied because (1) Dr. Isaacson's testimony will assist the jury, (2) Dr. Isaacson properly defined the survey universe and considered the available demographic information, and (3) Dr. Isaacson's survey measures the exact type of confusion Defendants allege to result from TravelPass's infringement.

### A. Dr. Isaacson's Survey is Reliable, Relevant, and Helpful to the Trier of Fact.

TravelPass does not dispute, nor could it credibly do so, that Dr. Isaacson is a highly experienced and qualified expert. *See, e.g.*, Ex. A, Ex. 1. Dr. Isaacson's trademark surveys and related testimony have been well-regarded and considered relevant and reliable in many trademark cases, including in the Fifth Circuit. *See T-Mobile US, Inc. v. AIO Wireless LLC*, 991 F. Supp. 2d 888 (S.D. Tex. 2014).

Further, Dr. Isaacson's likelihood of confusion survey is highly relevant to the trademark infringement issues in this case as consumer surveys may be used to demonstrate the seventh digit

7

of likelihood of confusion – actual confusion. *See*, *e.g.*, *Viacom Int'l*, 891 F.3d at 197. Dr. Isaacson's findings methodically corroborate what the extensive record of actual confusion in this case already demonstrates: TravelPass's activities have caused, are causing, and will continue to cause widespread consumer confusion. *See* Defendants' Trademark MSJ.

Dr. Isaacson's survey is also reliable. Dr. Isaacson followed the widely-used and well-accepted *Eveready* format to test for likelihood of confusion. Ex. A, ¶¶ 3-4. *See generally* 6 McCarthy § 32:174 (stating that the *Eveready* format "has become a standard and widely accepted format to prove the likelihood or non-likelihood of confusion"); Jerre B. Swann, *Likelihood of Confusion Studies and the Straitened Scope of Squirt*, 98 Trademark Rep. 739, 739 (2008) ("Over time, [the *Eveready*] format has become the gold standard in cases involving strong marks"). Courts in the Fifth Circuit routinely admit surveys using the *Eveready* format. *See*, *e.g.*, *Viacom Int'l Inc. v. IJR Cap. Invs., LLC*, 242 F. Supp. 3d 563, 572 (S.D. Tex. 2017), *aff'd*, *Viacom,* 891 F.3d at 198; *Bell v. Starbucks U.S. Brands Corp.*, 389 F. Supp. 2d 766, 776 (S.D. Tex. 2005), *aff'd*, 205 F. App'x 289 (5th Cir. 2006). This includes *Eveready* surveys performed by Dr. Isaacson. *See*, *e.g.*, *T-Mobile*, 991 F. Supp. 2d at 925; *Diageo N. Am., Inc. v. Mexcor, Inc.*, No. H-13-856, 2015 WL 12777381 (S.D. Tex. Sept. 30, 2015).

TravelPass does not object to Dr. Isaacson's survey questions, the manner of sourcing respondents, the controls, or the data analysis. Instead, TravelPass critiques how Dr. Isaacson incorporated the available demographic data into the survey's universe and his purported assumptions concerning initial interest confusion. Motion at 2. As explained below, these criticisms are not valid and at most would go to the weight afforded Dr. Isaacson's testimony, and not its admissibility.

8

### B.    Dr. Isaacson's Survey Universe is Appropriate.

A survey's "appropriate universe should include <u>a fair sampling</u> of those purchasers most likely to partake of the alleged infringer[']s goods or services." *Exxon Corp. v. Texas Motor Exch. of Houston, Inc.*, 628 F.2d 500, 507 (5th Cir. 1980) (emphasis added). That is exactly the approach followed by Dr. Isaacson in setting the universe for his survey.

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████████████████████████████ TravelPass has not disputed this. Also, because TravelPass sells reservations based on searches for specific hotel brands, potential purchasers here are not only purchasers of online hotel reservations offered by TravelPass, but also purchasers of online hotel reservations for the brands being tested. *See* Ex. B, ███████. Dr. Isaacson's survey therefore sought to qualify respondents who would use Google or Bing to purchase online hotel reservations and who would thus encounter TravelPass's online advertising and hotel landing pages for the brands at issue. Ex. A, ¶¶ 19, 42-43. To qualify for the survey, respondents were asked a series of questions on, *inter alia*, whether they were likely to make a hotel reservation, to make the reservation using Google or Bing, and to consider certain brands, as well as their gender, age, and geographic location. *Id.* ¶ 42; *id.* at Ex. 4. Contrary to TravelPass's allegation that Dr. Isaacson failed to define the target universe, Motion at 6-7, he clearly defined that universe as set forth in his report. Ex. A, ¶¶ 19, 42-43, Ex. 5.

TravelPass's objections to Dr. Isaacson's universe focus only on the demographics portion of the survey universe. Motion at 6-7. As an initial matter, even a cursory review of Dr. Isaacson's Table A shows that TravelPass's arguments regarding the demographics of the survey universe are

9

overblown. With very limited exceptions, which Dr. Isaacson thoroughly explains, the demographics of the survey database are within a few percentage points of most every available data source. Ex. B, ██████. ████████████████████████████████████████████████████████████████████ ██████████████████████████████ For TravelPass to suggest that the demographic profile of the survey respondents justifies excluding the survey is absurd.

TravelPass's motion alleges that Dr. Isaacson improperly used "judgment calls" to "skew" the database in an "arbitrary" manner using "irrelevant and incomplete data." Motion at 4, 6. But Dr. Isaacson did not use an arbitrary manner or irrelevant or incomplete data – he used the data available from TravelPass, hotels, and the U.S. Census to create a fair sampling. Ex. A, Ex. 5. TravelPass criticizes this process as not involving "mathematical calculations or identifiable methodology." Motion at 8. TravelPass cites no authority for requiring a "mathematical calculation" to create a fair sampling of potential purchasers. Dr. Isaacson explained at length during his deposition his process for setting demographic targets, including how the process differed for age, gender, and region. Ex. B, ██████. Dr. Isaacson further testified that he considered and based his decisions on all of the data available to him at the time. *See id.* ██████ ████; *see also* Ex. A, Ex. 5. Indeed, Defendants had requested demographic data from TravelPass yet were not provided any information beyond what Dr. Isaacson reviewed and upon which he relied. *See supra* FN 2. If TravelPass had better data, it should have been provided during discovery. But TravelPass identifies no such data in its Motion.

TravelPass also contends that Dr. Isaacson should not have adjusted TravelPass's customer data with data from the United States Census. Motion at 8. Dr. Isaacson never testified that he made any *post-facto* adjustments to the survey's demographics based on U.S. Census data. *See* Ex.

10

B, ███████████. TravelPass also claims that Dr. Isaacson's demographic data from the Defendants' hotel brands was incomplete as it was missing demographic data for Marriott Marquis and Holiday Inn Express and that the demographic data from Comfort Inn, Harrah's, and Hampton Inn do not apply to those other two brands. Motion at 9. But neither Marriott Marquis or Holiday Inn Express had such data available; Dr. Isaacson could not rely on information that was not available. Dr. Isaacson relied upon five data sources, three of which were from hotels and one of which was from TravelPass. Ex. A, Ex. 5. ██████████████████████████████████████████████████████████████████████████████████████████████.[3] *Id.* As noted above, when comparing the demographic data Dr. Isaacson relied upon with the demographics of the survey universe shown in Isaacson Rpt. Ex. 5 (shown above), it is clear that the survey universe was a fair sampling of potential purchasers of TravelPass's services.

Tellingly, TravelPass's Motion never indicates what the survey's demographics should have been, how the demographic data should have been calculated, nor how the survey's measures would have changed given different demographics.[4] TravelPass therefore claims that Dr.

---

[3] TravelPass also argues that the survey's measures and demographics reflect two parties who are no longer relevant to this litigation, Motion at 10, and that "there is no basis in law or fact" for this consideration. *Id.* at 9. Marketers frequently set different demographic targets for different products or segments than they might measure in a survey. *See, e.g.,* Philip Kotler & Gary Armstrong, Principles of Marketing 189-90, 198-99 (17th ed. 2017) ("Demographic factors are the most popular bases for segmenting customer groups…Even when marketers first define segments using other bases, such as benefits sought or behavior, they must know a segment's demographic characteristics to assess the size of the target market and reach it efficiently."). Dr. Isaacson provided measures for *all* hotel brands in the survey and his survey measured confusion relative to any hotel brand surveyed, not only three specific hotel brands surveyed. Ex. B, ██████████████.

[4] TravelPass relies upon *Water Pik, Inc. v. Med-Sys., Inc.*, 10-CV-01221-PAB-CBS, 2012 WL 2153162, at *5 (D. Colo. June 13, 2012) *aff'd*, 726 F.3d 1136 (10th Cir. 2013) in support of its claims that Dr. Isaacson's decisions regarding survey universe and demographics were improper. However, TravelPass's reliance upon this case is unhelpful because in that case the survey expert **intentionally** deviated from **known** demographic data. Here, TravelPass has not proffered any competing demographic data that Dr. Isaacson deviated from, let alone identified which

11

Isaacson's universe is inappropriate without explaining *how* or providing any support for why that is the case. In this way, TravelPass's arguments regarding survey universe and demographics are entirely without any basis.

Finally, the selection of an appropriate universe for a survey is routinely held to bear upon the weight of expert evidence and not its admissibility. *See Scrum All.*, 2021 WL 1691136 at *3 ("Courts have previously found each of the critiques Defendants levy against Franklyn's survey to bear solely on the weight afforded to a survey, not its admissibility.") (citing *Firebirds Int'l*, 2019 WL 3957846 at *3); *Shell Trademark*, 765 F. Supp. 2d at 892-93 ("an imperfect universe is not fatal to the surveys' admissibility"); *see also* 6 McCarthy § 32:162 ("The selection of an inappropriate universe generally affects the weight of the resulting survey data, not its admissibility."). This clear Fifth Circuit precedent demonstrates that Dr. Isaacson's survey and testimony should not be withheld from jury consideration due to TravelPass's unfounded objections regarding the nature of the survey universe.

   **C.** **TravelPass's Argument that Dr. Isaacson's Survey Fails to Measure Keyword Advertising and Initial Interest Confusion Misunderstands the Nature of Defendants' Infringement Allegations.**

TravelPass contends that Dr. Isaacson's survey does not test potential confusion arising in the first two of three alleged steps in the internet search process: (1) a consumer conducts a branded keyword search, (2) the consumer sees and potentially clicks on a confusing ad on the search engine results page, and (3) the consumer lands on TravelPass's website. Motion at 2, 11, 13. TravelPass also contends that Dr. Isaacson's survey "assumes 100% confusion" in steps one and two. *Id*. TravelPass goes on to argue that the survey does not test confusion attributable to

---

demographics targets would have been more appropriate. This is because TravelPass did not produce during discovery any alternative demographic data to rely upon.

12

TravelPass's use of Defendants' trademarks as keywords. *Id.* at 12. TravelPass's arguments are grounded in its misunderstanding of—or attempt to misconstrue—Defendants' counterclaims. The confusion TravelPass has caused is not limited to its use of branded keywords and paid search ads.

The Motion itself acknowledges that Defendants claim that "a host of things" are confusing to consumers, *id.* at 3, n.6, **not** merely TravelPass's keyword bidding. *See*, *e.g.*, Ex. E, ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ Dr. Isaacson's report clearly identifies the elements of TravelPass's activities that Defendants object to and that his survey measures. Ex. A, ¶¶ 11-12. Dr. Isaacson's survey replicated the process of searching for a hotel online and presented stimuli to respondents in the order that such stimuli would be encountered by consumers in the real world. *Id.* ¶ 5. Dr. Isaacson's survey does not measure confusion stemming from keyword bidding alone because Defendants do not base their infringement claims on keyword bidding alone. Rather, Defendants infringement claims extend to, *inter alia*, TravelPass's sponsored ads as well as TravelPass's hotel landing pages on its websites. *See* Ex. B, ▬▬▬▬▬▬▬; Ex. A, ¶ 5. This is precisely what Dr. Isaacson tested and exactly the stimuli shown to respondents. *Id. See also id.* ¶¶ 7-9. His survey makes no assumptions about confusion in any predicate steps nor provides measures for these steps because this matter involves "the entire user experience" (as the Motion readily acknowledges), which is what Dr. Isaacson's survey measures.

It is not uncommon for litigation surveys to test online processes consisting of multiple steps without measuring confusion at each step of that online process. *See* the trademark plaintiffs' surveys in *Rosetta Stone Ltd. v. Google, Inc.*, 676 F.3d 144 (4th Cir. 2012) and *Select Comfort Corp. v. Baxter*, 996 F.3d 925 (8th Cir. 2021). TravelPass cannot claim that Dr. Isaacson's survey

13

is somehow "irrelevant" because he measures confusion in the overall process of booking with TravelPass and not at each incremental step of that process.

TravelPass then argues that Dr. Isaacson's "assumption of 100% initial interest confusion…artificially inflates the final confusion rate" such that Dr. Isaacson's final likelihood of confusion percentage (15.2%) should be multiplied by a click-through-rate (CTR) percentage.[5] Motion at 15. But Dr. Isaacson's survey did not set out to measure initial interest confusion. TravelPass's attempt to equate CTR percentages to likelihood of confusion percentages reveals TravelPass's own misunderstanding of the confusion that Dr. Isaacson's survey was designed to measure. While CTR percentages may be relevant to measuring initial interest confusion based on the use of branded keywords and whether such activity "lures away" consumers, Dr. Isaacson was not measuring such confusion. Rather, Dr. Isaacson was measuring the overall confusion among respondents that the TravelPass website was owned or operated by the hotels. Specifically, Dr. Isaacson's survey measured the likelihood of confusion among respondents who go through the online search process, see a sponsored ad, and then arrive at a TravelPass hotel landing website page, which is exactly how nearly all of TravelPass's customers arrive at the TravelPass websites in question. The confusion Dr. Isaacson measured is the exact type of confusion that is evidenced

---

[5] The Motion cites to *1-800 Contacts, Inc. v. Lens.com, Inc.*, 722 F.3d 1229, 1244 (10th Cir. 2013) which used a CTR of 1.5% as the "upper limit" for initial interest confusion. Reliance upon this citation is irrelevant. First, 1-800 Contact's trademark allegations related to Lens.com's keyword bidding activities *alone* (**not** the appearance of Lens.com's sponsored ads or landing pages). Defendants' infringement claims here are not based on keyword bidding alone; they are instead based on the confusing nature of the entire process of booking with TravelPass. Second, while *1-800 Contacts* and this case both involve surveys that relate to online purchases, that is where the similarity ends. Dr. Isaacson's survey measures the likelihood of actual confusion relative to TravelPass's activities whereas the survey in *1-800 Contacts* measured initial interest confusion alone, *i.e.*, whether Lens.com's keyword bidding was impermissibly "luring away" consumers. TravelPass's attempt to equate this case with *1-800 Contacts* is a strawman argument that improperly attempts to cabin Defendants' allegations to mere keyword bidding when keyword bidding alone does not form the basis of Defendants' trademark allegations.

14

by a voluminous record of actual confusion in this case, demonstrating that consumers regularly believed that TravelPass was the hotel itself. *See*, *e.g.*, ██████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████

## IV.   CONCLUSION

Dr. Isaacson's survey is relevant, reliable, and will be helpful to the jury. TravelPass's criticisms bear at most upon the weight to be afforded Dr. Isaacson's testimony and not its admissibility. For the foregoing reasons, Defendants respectfully request that the Court DENY Plaintiffs' Motion to Exclude Defendants' Expert Dr. Bruce Isaacson.

Dated: July 13, 2021

*/s/ Jennifer H. Doan*
Jennifer H. Doan
Texas Bar No. 08809050
Cole A. Riddell
Texas Bar No. 24105423
HALTOM & DOAN
6500 Summerhill Rd., Ste. 100
Texarkana, Texas 75503
Tel: (903) 255-1000
Fax: (903) 255-0800
jdoan@haltomdoan.com
criddell@haltomdoan.com

Shari Ross Lahlou
DECHERT LLP
1900 K Street, NW
Washington, DC 20006
Tel: (202) 261-3300
Fax: (202) 261-3333
shari.lahlou@dechert.com

Jeffrey L. Poston
Luke van Houwelingen
CROWELL & MORING LLP
1001 Pennsylvania Ave., NW
Washington, DC 20004
Tel: (202) 624-2500
Fax: (202) 628-5116
JPoston@crowell.com
LvanHouwelingen@crowell.com

*Counsel for Defendant Marriott International, Inc.*

*Respectfully submitted,*

*/s/ Michael E. Jones*
Michael E. Jones
POTTER MINTON PC
110 North College Avenue, Suite 500
Tyler, TX 75702
Tel: (903) 597-8311
Fax: (903) 593-0846
mikejones@potterminton.com

Maria Wyckoff Boyce
HOGAN LOVELLS US LLP
609 Main Street, Ste. 4200
Houston, TX 77002
Tel: (713) 632-1410
Fax: (713) 632-1401
maria.boyce@hoganlovells.com

Justin W. Bernick
HOGAN LOVELLS US LLP
Columbia Square
555 Thirteenth Street, NW
Washington, DC 20004
Tel: (202) 637-5600
Fax: (202) 637-5910
justin.bernick@hoganlovells.com

*Counsel for Defendant Choice Hotels International, Inc.*

*/s/ Deron R. Dacus*
Deron R. Dacus
Texas Bar No. 00790553
Shannon Dacus
Texas Bar No. 00791004
THE DACUS FIRM, P.C.
821 ESE Loop 323, Suite 430
Tyler, Texas 75701
Tel: (903) 705-1117
Fax: (903) 581-2543
ddacus@dacusfirm.com
sdacus@dacusfirm.com

Jeffrey S. Cashdan
Emily Shoemaker Newton
Russell Blythe
Danielle Chattin
Lohr Beck
Logan Hobson
KING & SPALDING LLP
1180 Peachtree Street, NE
Atlanta, GA 30309-3521
Tel: (404) 572-4818
Fax: (713) 572-5100
jcashdan@kslaw.com
enewton@kslaw.com
rblythe@kslaw.com
dchattin@kslaw.com
lohr.beck@kslaw.com
lhobson@kslaw.com

Steven M. Zager
Texas Bar No. 2241500
KING & SPALDING LLP
500 W. 2d Street
Suite 1800
Austin, Texas 78701
Tel: (512) 457-2040
Fax: (512) 457-2100
szager@kslaw.com

*Counsel for Defendant Six Continents Hotels, Inc.*

17

## CERTIFICATE OF SERVICE

    The undersigned certifies that the foregoing document was filed electronically in compliance with Local Rule CV-5(a).  As such, this document was served on all counsel who have consented to electronic service, on this 13th day of July, 2021.

                                            */s/ Michael E. Jones*
                                            Michael E. Jones

