# Exhibit A

Expert Report of Dr. Bruce Isaacson and Selected Exhibits,
dated December 30, 2020

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF TEXAS**

**TEXARKANA DIVISION**

| | |
|---|---|
| TRAVELPASS GROUP, LLC, PARTNER FUSION, INC., RESERVATION COUNTER, LLC | Case No. 18-CV-00153-RWS-CMC |
|         Plaintiffs, | |
| v. | **EXPERT REPORT SUBMITTED BY DR. BRUCE ISAACSON MEASURING THE LIKELIHOOD OF CONFUSION BETWEEN ONLINE ADVERTISING FROM PLAINTIFFS, AND CERTAIN HOTELS** |
| CAESARS ENTERTAINMENT CORPORATION, CHOICE HOTELS INTERNATIONAL, INC., HILTON DOMESTIC OPERATING COMPANY, INC., HYATT HOTELS CORPORATION, MARRIOTT INTERNATIONAL, INC., RED ROOF INNS, INC., SIX CONTINENTS HOTELS, INC., WYNDHAM HOTEL GROUP, LLC. | |
|         Defendants and         Counterclaim Plaintiffs. | |

1

**TABLE OF CONTENTS**

2

3   Overview of My Likelihood of Confusion Survey ................................................................. 1

4   My Qualifications ................................................................................................. 15

5   Materials Reviewed and Compensation ............................................................................ 18

6   Methodology for the Likelihood of Confusion Survey ....................................................... 20

7   Findings from the Likelihood of Confusion Survey ......................................................... 26

8   Conclusions and Implications........................................................................................ 37

9

10   Exhibit 1: Dr. Bruce Isaacson CV and Testimony Experience

11   Exhibit 2: Test and Control Images Shown in the Survey

12   Exhibit 3: Modifications to the Test Images to Create the Control Images

13   Exhibit 4: Survey Qualifying Questions and Main Questionnaire

14   Exhibit 5: Description of Survey Demographics

15   Exhibit 6: Recruiting Methods and Panels for the Survey

16   Exhibit 7: Quality Control Measures for the Survey

17   Exhibit 8: Termination and Removal Summary

18   Exhibit 9: Codes for Analyzing Verbatim Responses

19   Exhibit 10: Cross Tabulation Tables

20   Exhibit 11: All Responses from All Survey Respondents

21   Exhibit 12: TravelPass Advertising That Was Not Measured in the Survey

22

23

24

25

26

27

28

1.      I have been retained by certain defendants and counterclaim plaintiffs in the above litigation.  At the time I conducted the survey described in this report, I was retained by Caesars Entertainment Corporation, Choice Hotels International, Inc., Hilton Domestic Operating Company, Inc., Marriott International, Inc., and Six Continents Hotels, Inc. (collectively, the "Hotel Companies").  I am now retained by three of these parties: Choice Hotels International, Inc., Marriott International, Inc., and Six Continents Hotels, Inc. (collectively, the "Counterclaim Plaintiff Hotel Companies").

2.      This report provides the results of a survey I conducted measuring the likelihood of confusion between online advertising from the Plaintiffs in this matter, including TravelPass Group, LLC, Partner Fusion, Inc., and Reservation Counter LLC (collectively "TravelPass"), and the Hotel Companies.  The opinions expressed in this report are based on materials I reviewed, research I conducted, and my experience.  I reserve the right to supplement this report in light of the ongoing discovery in this matter.

### Overview of My Likelihood of Confusion Survey

3.      The Counterclaim Plaintiff Hotel Companies allege that online advertising from TravelPass, including listings that appear in online searches and "landing pages" that advertise hotel properties, is likely to confuse consumers.  For example, they allege that advertising from TravelPass leads consumers to believe that they are booking directly with the hotel, and/or through a service that is sponsored or authorized by that hotel, rather than through an online travel agency, or that certain ads from TravelPass lead consumers to believe that the ads link to a hotel company, rather than to an online travel agency.[1]

4.      My survey used the Eveready format to measure the likelihood of confusion between advertising from TravelPass, and the Hotel Companies.  The Eveready format is widely used to

---

[1] For example, *see* Defendant Choice Hotels International, Inc.'s Answer to Plaintiffs' Complaint and Counterclaims, dated October 11, 2019, ¶¶ 33, 39, 40; Defendant Marriott International, Inc.'s Answer to Plaintiffs' Complaint and Counterclaims, dated October 11, 2019, ¶¶ 29, 30, 40, 46, 52; Defendant Six Continents Hotels, Inc.'s Answer and Defenses to Plaintiffs' Original Complaint and Counterclaims Against Plaintiffs, dated October 11, 2019, ¶¶ 52, 54, 55, 81.

Expert Report of Dr. Bruce Isaacson
Case No. 18-CV-00153-RWS-CMC

measure likelihood of confusion, and has been called a "now-standard survey format."[2] Another source describes Eveready as "... a relevant, reliable and objective test of likelihood of confusion," and as the "gold standard" for confusion surveys, particularly in regard to well-known marks.[3]

5.    To measure whether advertising from TravelPass is confusing, my survey replicated the process of a consumer searching for a hotel brand in a particular city, and encountering online advertising from TravelPass in search results and landing pages that describe hotel properties. My survey showed respondents listings and landing pages from TravelPass that they might see if they searched online for a hotel room reservation using keyword searches for "Comfort Inn Virginia Beach," "Holiday Inn Express Savannah," "Marriott Marquis San Francisco," "Hampton Inn Dallas," or "Harrah's Las Vegas."

6.    The survey measured five different hotel brands that vary along dimensions such as price, or the amount and type of services and amenities they provide.  Similarly, the survey reflected five different cities that vary along dimensions such as region of the country and size of the city.  Because the survey reflects such a wide range of hotels and cities, the measures from the survey represent a wide range of contexts and environments.

7.    In the survey, respondents were shown one of the keyword search terms in the Google or Bing search engine, then shown a corresponding page of search results that includes a TravelPass listing for a hotel property, then shown the TravelPass listing by itself, and then shown the landing page from TravelPass that is connected to the listing and advertises the hotel property.  These are the same items a consumer would view if they searched on Google or Bing for a hotel brand in a particular location, viewed the search results, and then clicked on a listing from TravelPass to reach a landing page.

---

[2]  McCarthy, J. Thomas.  §32:174 "Survey formats—Eveready confusion format."  *McCarthy on Trademarks and Unfair Competition*, Fourth ed., Thomson Reuters, database updated June 2015, p. 1.

[3] Swann, Jerre B.  "Likelihood of Confusion."  *Trademark and Deceptive Advertising Surveys:  Law, Science, and Design*, edited by Shari Seidman Diamond and Jerre B. Swann, ABA Publishing, 2012, pp. 54, 63.

Expert Report of Dr. Bruce Isaacson
Case No. 18-CV-00153-RWS-CMC

8.      For example, Figure 1 below shows images from the survey relating to the search term "Comfort Inn Virginia Beach," including the keyword search on Google, the search results, a TravelPass listing from those search results, and the landing page from TravelPass reached by clicking on the listing.  All of these images were located online by a keyword search for "Comfort Inn Virginia Beach" on Google.com.[4]

9.      Figure 1 shows the images in a smaller size than they were shown in the survey, and only shows the top portion of the web pages that were shown in the survey.  In the actual survey, respondents were shown images in a size consistent with how they would likely encounter those images online, were shown the entire web pages that a consumer would encounter during that keyword search, and were not shown explanatory descriptions in Figure 1, such as "Keyword Search on Google."

10.     Exhibit 2 shows the entirety of each image for each hotel measured in the survey.

---

[4] The materials shown in the survey were located online by using keyword searches conducted by entering a hotel name and city at Google.com or Bing.com, viewing the search results, clicking on a TravelPass listing from the search results, and then viewing a landing page from TravelPass for a hotel property.  Staff at my firm, under my supervision, conducted these keyword searches, and downloaded materials including TravelPass advertising, in October and November, 2020.

Expert Report of Dr. Bruce Isaacson
Case No. 18-CV-00153-RWS-CMC

**Figure 1: Test Images for Comfort Inn Measured in the Survey**

**Keyword Search on Google**



Expert Report of Dr. Bruce Isaacson
Case No. 18-CV-00153-RWS-CMC

1

**Search Results[5]**

2



20

21

22

23

24

25

26

27

---

[5] This figure shows only the top portion of this page, but the survey showed the entire page.  Exhibit 2 provides the complete image shown to respondents.

28

Expert Report of Dr. Bruce Isaacson
Case No. 18-CV-00153-RWS-CMC

1

**Listing from the Search Results**

2

3



4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Expert Report of Dr. Bruce Isaacson
Case No. 18-CV-00153-RWS-CMC

**Landing Page Reached by the Listing[6]**



---

[6] This figure shows only the top portion of this page, but the survey showed the entire page.  Exhibit 2 provides the complete image shown to respondents.

11.    The Counterclaim Plaintiff Hotel Companies object to certain elements of the advertising that TravelPass conducts.  Specifically, they assert that certain elements in TravelPass advertising are likely to cause consumers to confuse the advertising as owned or operated by a hotel company.  These elements include the following:[7]

   i.    TravelPass using hotel trademarks, such as hotel names and logos, in multiple instances on web pages, website addresses (URLs), links, and other locations.

   ii.    TravelPass using hotel trademarks, such as logos or brand names, that are shown more prominently than TravelPass' trademarks and logos.

   iii.    TravelPass displaying TravelPass phone numbers on web pages near the hotel's trademarks and images.

   iv.    TravelPass using certain wording, such as "us," "Reservation Counter," or "Book Direct," that fail to clarify that "us," the "Reservation Counter" or the entity that would make the booking, is not the hotel company.

12.    My survey measured the amount of confusion specifically associated with TravelPass' use of these and other disputed elements in their advertising.  To do so, my survey incorporated control images, which were similar to the test images, except that the control images removed or altered the disputed elements in the TravelPass advertising.

13.    The results from any survey can be affected by elements that the survey is intended to measure, as well as other extraneous elements, such as pre-existing knowledge and attitudes among respondents, guessing or inattentiveness by respondents, or factors other than those the survey was designed to measure.[8]  For example, in this matter, a respondent taking the survey may know that online travel websites, such as Reservation Counter, Reservation Desk,

---

[7] *See, e.g.,* Defendant Choice Hotels International, Inc.'s Answer to Plaintiff's Complaint and Counterclaims, ¶ 38 (p. 82), ¶ 40 (p. 83); Defendant Six Continents Hotels, Inc.'s Answer and Defenses to Plaintiff's Original Complaint and Counterclaims Against Plaintiffs, ¶ 34 (p. 71), ¶ 50 (p. 75),  ¶¶ 76-77 (p. 83); Defendant Marriott International, Inc.'s Answer to Plaintiffs' Complaint and Counterclaims, ¶ 29, 30 (p. 45), ¶ 131 (p. 70), ¶ 133 (p. 70), ¶ 172 (p. 76).

[8] Diamond, Shari Seidman.  "Reference Guide on Survey Research."  *Reference Manual on Scientific Evidence*, Third ed., National Academies Press, 2011, p. 398.

Expert Report of Dr. Bruce Isaacson
Case No. 18-CV-00153-RWS-CMC

1    or other online travel agencies, provide reservations for hotel rooms, or that some hotel

2    companies own or operate a variety of hotel brands.  This and other types of pre-existing

3    knowledge may affect the answers that the respondent provides to survey questions.

4    14.    Controls allow my survey to isolate the effect specifically associated with the disputed

5    advertising practices from TravelPass, because they provide a means to adjust my survey's

6    measures for the effect of extraneous factors, such as the effect of pre-existing knowledge.

7    15.    Typically, a control item for a survey is designed to be reasonably similar to the test

8    item, except that the control does not include the elements under dispute.[9]  The control

9    materials in my survey were similar to the test materials, because they retained elements of

10   text and graphics that are not disputed in this matter, and they modified elements that are

11   disputed in this matter.[10]

12   16.    Exhibit 3 describes the modifications made to the survey's test images to create the

13   control images.  Those modifications are designed to address the specific elements of

14   TravelPass advertising that are disputed in this matter.

15   17.    For example, Figure 2 below shows three of the four control images for the keyword

16   search "Comfort Inn Virginia Beach."[11]  As described in Exhibit 3, some of the modifications to

17   create the control versions of the landing pages for this keyword search are as follows:

18

19

20

21

22

---

[9] A control should share "as many characteristics with the experimental stimulus as possible, with the key exception of the characteristic whose influence is being assessed."  Diamond, Shari Seidman. "Reference Guide on Survey Research."  *Reference Manual on Scientific Evidence*, Third ed., National Academies Press, 2011, p. 399.

[10] As noted earlier, the test images come from web searches conducted by MMR staff on Google and Bing using a hotel name and a location.  The control images were developed by using graphics software to alter the test images.

[11] The first image, which showed the keyword search on Google, was not altered.

i.  In the test landing page, the logo of the hotel brand, the name of the hotel in large letters, the address of the hotel, and the text "ReservationCounter.com:" with a phone number all appear in the upper part of the landing page, directly above the picture of the hotel.  The control landing page removes the logo of the hotel brand, reduces the size of the hotel property name, and removes the text "ReservationCounter.com:" and the phone number.

ii.  In the test landing page, the words "Call us:" appear next to a phone number immediately below the picture of the hotel.  The control landing page changes this text to "Call ReservationCounter.com:," and moves this text and the phone number to the right side of the page.

iii.  In the test landing page, "RESERVATION COUNTER" and "PART OF TRAVELPASS GROUP$^{TM}$" appear at the top of the page, in a light-colored font, with both in relatively small print.  The control landing page increases and bolds the font size, changes the font color to white, adds a blue banner behind the text, and adds the disclaimer, "An independent travel agency not part of Comfort Inn."[12]

iv.  In the test landing page, text further down the landing page reads, "Have questions? We're here." Underneath this text is a phone number in a blue box.  The control landing page adds a disclaimer between the text and the blue box.  The disclaimer reads, "Call Reservation Counter, an independent travel agency not part of Comfort Inn."

---

[12] The survey measured five different keyword searches, each with a different hotel brand.  Disclaimers for each keyword search used phrasing that reflected the applicable hotel brand for the keyword search.

1

**Figure 2: Control Images for Comfort Inn Measured in the Survey**

2

**Control Image of Search Results[13]**

3



4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

---

[13] This figure shows only the top portion of this page, but the survey showed the entire page. Exhibit 2 provides the complete image shown to respondents.

1

**Control Image of the Listing from the Search Results**

2

3



4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Control Image of the Landing Page[14]**



---

[14] This figure shows only the top portion of this page, but the survey showed the entire page. Exhibit 2 provides the complete image shown to respondents.

Expert Report of Dr. Bruce Isaacson
Case No. 18-CV-00153-RWS-CMC

18.     The control materials from the survey are plausible, not only because they resemble the test materials (except for disputed elements), but because the alterations to the test materials reflect consideration of design elements on the websites of other online travel agencies, such as www.tripadvisor.com, www.expedia.com, www.booking.com, www.priceline.com, and www.orbitz.com.

19.     The respondents interviewed in my survey are representative of consumers who might see TravelPass advertising and landing pages in the real world.  Among other criteria, prospective respondents were qualified as, if not for the COVID-19 pandemic, likely in the next 12 months to reserve a hotel room; likely to reserve that room by searching online using Google or Bing; and, if they were making a hotel room reservation, likely to consider at least one of the brands measured in the survey.[15]

20.     After prospective respondents qualified for the survey, they were shown images for the search process that leads from a Google or Bing search to a landing page operated by TravelPass advertising a hotel property, and then asked questions to measure the likelihood of confusion associated with that process.

21.     Respondents were shown either the test or control version of one keyword search, including their assigned keyword search, search results, listing, and landing page.  After viewing this search, respondents were asked Question 1, which asked, "What company or brand do you think owns or operates this website?"  Next, Question 2 asked, "What makes you think that?"

22.     The survey was conducted in a manner consistent with generally accepted principles for litigation surveys, including procedures for double-blind research, in which respondents did not know the survey's purpose or sponsor.  The survey database includes 2,060 interviews, including 1,042 interviews with respondents shown the test images and 1,018 interviews with

---

[15] The survey interviews were conducted in December of 2020.  At that time, due to the COVID-19 pandemic, many Americans were either traveling less or not traveling at all, and the end of pandemic travel restrictions was largely unknown.  Under such conditions, many respondents might not know whether and when they would be likely to reserve a hotel room.

Expert Report of Dr. Bruce Isaacson
Case No. 18-CV-00153-RWS-CMC

1  respondents shown the control images. This is a very large database, with more than sufficient
2  size to be reliable.[16]

3  23.     Among respondents shown test images, 45.5% provided responses indicating confusion
4  as to source, such as referencing the hotel brand shown, or another hotel, as the company or
5  brand that owns or operates the website they were shown. Among respondents shown the
6  control images, 30.3% provided responses indicating confusion as to source, such as
7  referencing the hotel brand shown or another hotel.

8  24.     After adjusting for the control, the net likelihood of confusion percentage is 15.2%
9  (calculated as 45.5% minus 30.3%).[17]

10  25.     After reviewing certain background information, I will discuss the survey and my
11  findings in detail.

12

13  **My Qualifications**

14  26.     I am the President of MMR Strategy Group ("MMR"), a marketing research and
15  consulting firm, and am experienced in research, surveys, and marketing. During my career, I
16  have designed, conducted, and analyzed many hundreds of research studies, including many
17  surveys for matters involving intellectual property and false advertising litigation. I have
18  provided testimony, by written report and/or deposition, regarding surveys that I or others
19  conducted in more than 100 matters, including about 25 matters involving likelihood of
20  confusion surveys.

21

22

23

---

24  [16] For surveys, statistics can provide general indicators of reliability. *See* Diamond, Shari Seidman.
25  "Reference Guide on Survey Research." *Reference Manual on Scientific Evidence,* Third ed., National
   Academies Press, 2011, pp. 382-383. For example, the test measure of 45.5% at a sample size of 1,042
26  interviews would have a margin of error of approximately +/- 3.0% at the 95% level of confidence. See
   Moore, David S., George P. McCabe and Bruce A. Craig. "Inference for Proportions." *Introduction to the*
27  *Practice of Statistics,* Sixth ed., W.H. Freeman and Company, 2009, pp. 487-524.

28  [17] The net percentage is calculated as the test percentage minus the corresponding control percentage.

- 15 -

Expert Report of Dr. Bruce Isaacson
Case No. 18-CV-00153-RWS-CMC

27.    I have provided testimony relating to surveys in matters before federal courts, state courts, the National Advertising Division of the Better Business Bureau (NAD), the Trademark Trial and Appeal Board (TTAB), the U.S. International Trade Commission, the U.S. Court of Federal Claims, and other venues and authorities.  Also, I have been retained to conduct surveys on a number of occasions by the U.S. Federal Trade Commission, the U.S. Department of Justice, and the U.S. Patent and Trademark Office.

28.    For more than 45 years, MMR Strategy Group has provided marketing research and consulting, consisting primarily of the design, execution, and analysis of thousands of surveys, as well as expertise related to marketing and strategy.  I have been President of MMR for more than 15 years.  During that time, I have provided marketing research and consulting for such well-known organizations as Farmers Insurance Group, Allstate Insurance, Goodyear Tire & Rubber Company, Nestlé USA, Inc., RE/MAX, Kaplan Test Prep, and many other organizations.

29.    I have provided these and other companies with advice on topics such as marketing products and services, managing and growing brands, sizing and segmenting markets, measuring and improving customer experiences, identifying and analyzing new markets, evaluating and launching new products, satisfying and retaining customers, pricing products and services, and other topics relating to marketing, consumer behavior, and strategy.

30.    I received a Bachelor of Science degree in engineering from the Technological Institute at Northwestern University in 1985, and Master of Business Administration and Doctor of Business Administration degrees from the Harvard Graduate School of Business Administration in 1991 and 1995, respectively.  At Harvard, I received my MBA with highest distinction as a Baker Scholar and was a Dean's Doctoral Fellow, writing publications on marketing and strategy, including best-selling teaching materials.  For research I conducted, I won awards from institutions including The Institute for the Study of Business Markets at Penn State University and Harvard University.  My education included masters-level and doctoral-level coursework in marketing, research design, statistics, buyer behavior, strategy, and other topics.

Expert Report of Dr. Bruce Isaacson
Case No. 18-CV-00153-RWS-CMC

31.    I have taught marketing and strategy for executive groups and executive MBA programs.  Since 1994, I have been on the editorial board of the *Journal of Business-to-Business Marketing*, which publishes peer-reviewed research on business marketing.  Since 2010, I have been a member of *The Trademark Reporter* Committee of the International Trademark Association; this Committee publishes peer-reviewed research on trademarks.  I am also a member of the American Marketing Association and the Insights Association (a merger of the former Marketing Research Association and the former Council of American Survey Research Organizations).  My firm is a member of the International Trademark Association.

32.    I regularly consult with clients regarding marketing, research, and strategy, and also address conferences and groups on these issues.  My public speaking includes addressing law firms and bar associations on the use of surveys in litigation, and related topics.  For example:

    i.    In March 2020, I was a speaker at a seminar held at a law firm to discuss the use of consumer perception surveys in litigation matters.

    ii.    In May 2018, at the annual conference of the International Trademark Association, I was a speaker on a panel discussing, among other topics, conducting surveys to support claims on packaging and advertising for litigation matters.

    iii.    In 2018, 2016, 2013, and 2010, I led roundtable discussions on litigation surveys at the annual conference of the International Trademark Association.

    iv.    In October 2015, I was co-presenter for a Continuing Legal Education seminar on litigation surveys sponsored by the Bar Association of San Francisco.

    v.    In March 2015, I presented to the U.S. Department of Justice, Civil Division, Commercial Litigation Branch on the topic of using surveys to measure attitudes and behaviors.

    vi.    In October 2013, I was a speaker at the Corporate Researchers Conference hosted by the Marketing Research Association.

33.     In terms of professional experience, I have been a marketing and strategy consultant at a global consulting firm called The Boston Consulting Group, Senior Vice President at a publicly traded data processing company that is now a division of Intuit, Division President at a media services company that is now a division of News Corporation, and Vice President responsible for marketing and strategy at a financial services company.  I also served as the West Coast Practice Leader of an executive education practice at a strategy consulting firm, where I developed and taught educational programs for marketing and strategy.

34.     I have authored or co-authored more than 18 publications on the subjects of marketing, surveys, and business strategy, for publications including *The Trademark Reporter*; the *Intellectual Property Law Newsletter* of the American Bar Association's Section of Intellectual Property Law; *Intellectual Property Today*; *Intellectual Property Magazine*; *Quirk's Marketing Research Review*; and others. My publications have included book chapters as well as teaching materials on marketing, consumer behavior, and other topics published by Harvard Business Publishing and used for business school curricula.

35.     Exhibit 1 shows my curriculum vitae and testimony experience, including but not limited to matters in which I have testified as an expert during the previous four years.

**Materials Reviewed and Compensation**

36.     For purposes of this report, I have gathered and/or reviewed a wide variety of materials, including the following:

      i.     The Original Complaint, dated December 6, 2018.

      ii.     Defendant Choice Hotels International, Inc.'s Answer to Plaintiff's Complaint and Counterclaims, dated October 11, 2019; Defendant Six Continents Hotels, Inc.'s Answer and Defenses to Plaintiffs' Original Complaint and Counterclaims Against Plaintiffs, dated October 11, 2019; Hyatt Corporation's Counterclaims, dated October 11, 2019; Answer of Defendant Red Roof Inns, Inc., dated October 11, 2019; Answer of Defendant Hilton Domestic Operating Company, Inc. and Counterclaims of Defendant and Counterclaim-Plaintiff Hilton Domestic

1  Operating Company, Inc. and Counterclaim-Plaintiff Hilton International

2  Holdings LLC, dated October 11, 2019; Defendant Marriott International, Inc.'s

3  Answer to Plaintiffs' Complaint and Counterclaims, dated October 11, 2019; and

4  Defendant Caesars Entertainment Corporation's Answer with Affirmative

5  Defenses to Plaintiffs' Original Complaint and Counterclaimant Plaintiffs Caesars

6  Entertainment Corporation, Caesars License Company, LLC, and Flamingo Las

7  Vegas Operating Company, LLC's Counterclaims, dated October 11, 2019.

8  iii.  Documents relating to a 2017 matter between TravelPass and the Federal Trade

9  Commission, including the FTC's Complaint for Permanent Injunction and Other

10  Equitable Relief, and a Stipulated Order for Permanent Injunction and

11  Judgment.  Both were filed in the District of Utah in December, 2017.

12  iv.  ████████████████████████████████████

13  ████████████████████████████████████

14  ██████████████████

15  v.  Images of landing pages from TravelPass websites for properties owned by the

16  Hotel Companies.  Also, images of search engine ads and search results from

17  TravelPass for properties owned by the Hotel Companies, including results

18  directing the searcher to Reservation Counter and Reservation Desk.

19  vi.  Searches on Google.com and Bing.com for terms relevant to this matter,

20  including searches for the brand names owned by the Hotel Companies and

21  measured in my survey.  Also, visits to TravelPass websites, including

22  www.travelpass.com, www.reservationdesk.com, and

23  www.reservationcounter.com.

24  vii.  Searches for hotels on websites of online travel agencies including

25  www.expedia.com, www.tripadvisor.com, www.orbitz.com, www.priceline.com,

26  and www.booking.com.

27

28

viii.   Demographic research from the U.S. Census Bureau on the general population of the U.S. ████████████████████████

████████████████████████████████████

████████████████████████████████████████

██████████████████████

37.   In addition, I consulted published literature and cases, which are cited in this report, and I also rely on my knowledge in fields such as surveys, consumer behavior, and marketing.

38.   ███████████████████████████████████████████████

██████████████████████████████████████████

█████████████████████████████████████████████

███████

39.   The next section describes my likelihood of confusion survey.

**Methodology for the Likelihood of Confusion Survey**

40.   All aspects of the confusion survey were designed and carried out by me or under my supervision.  As described earlier, my survey used the Eveready format, a well-accepted format to measure likelihood of confusion.  In a typical Eveready survey, such as this survey, respondents are shown a trademark from one party, often on an ad or product, and asked questions to determine whether they believe that the trademark comes from another party.

41.   Exhibit 4 shows the questions used to qualify prospective respondents for the survey, as well as the survey questions that measured confusion.[19]  Exhibit 5 discusses the age, gender, and geographic distribution of the survey database, showing how they correspond with either the general population of the U.S., or the target audience for TravelPass.

42.   The survey used these questions to qualify prospective respondents for the survey:

---

[18] ████████████████████████████████████████
████████████████████████████████████████████████

[19] Exhibit 4 contains programming instructions that were not visible to respondents.

i.   Gender: Question A asked respondents their gender.  The database of respondents is 50.7% female and 49.3% male.

ii.   Age: Question B asked respondents their age.  The survey database reflects three age groups, including 21 to 34 years old (9.7% of respondents), 35 to 54 years old (30.3%), and 55 years old or older (60.0%).

iii.   Geography: Question C asked respondents for the ZIP code of their home address.  The database reflects the four regions of the U.S. established by the U.S. Census Bureau, including the South (36.4% of respondents), West (24.8%), Midwest (22.5%), and Northeast (16.4%).[20]

iv.   Likely to make a hotel room reservation: Question D asked,[21]

> "This question asks about certain activities.  Due to the COVID-19 pandemic, some of these activities may or may not be available, or you may or may not do them now.  Please answer thinking about your likelihood to do these activities if the pandemic had not occurred.
>
> If it were not for the COVID-19 pandemic, which, if any, of the following activities would you be likely to do in the next 12 months?"

The question asked about four activities.  Respondents qualified if they answered that they would be likely to "Make a hotel room reservation."

v.   Likely to make the reservation using Google or Bing: Question E asked, "In the next 12 months, if you were going to make a reservation for a hotel room, which, if any, of the following methods would you be likely to use?"  Respondents qualified if they answered affirmatively to "Searching online using Google," or "Searching online using Bing."

---

[20] "Census Regions and Divisions of the United States." *Census.gov*, Geography Division, U.S. Census Bureau, Economics and Statistics Administration, U.S. Department of Commerce, https://www2.census.gov/geo/pdfs/maps-data/maps/reference/us_regdiv.pdf.

[21] This section summarizes certain survey questions, and does not describe elements such as the rotation of affirmative and negative response options.  Exhibit 4 provides the survey questionnaire, which describes the survey questions in greater detail.

Expert Report of Dr. Bruce Isaacson
Case No. 18-CV-00153-RWS-CMC

vi.    Likely to consider certain hotel brands: Question F asked, "If you were making a hotel room reservation in the next 12 months, which, if any, of the following hotel brands would you be likely to consider?"  Respondents qualified if they answered affirmatively to "Comfort Inn," "Harrah's," "Hampton Inn," "Marriott Marquis," and/or "Holiday Inn Express."

43.    Prospective respondents also were screened on other criteria, such as not working for certain types of companies where they could have gained unusual knowledge;[22] not participating in more than two surveys about hotels or travel in the past 30 days; and taking the survey on a desktop computer or laptop computer.

44.    After qualifying for the main survey, respondents were randomly assigned to view the search process for one keyword search, consisting of a hotel brand and a city for which they had qualified.[23]  They were also randomly assigned to see either test or control images for that search, including a Google or Bing search page, a search results page, a listing from the search results, and a landing page.  In this part of the survey, the question phrasing for each respondent referenced the particular search engine, hotel brand, and city assigned to them.[24]

45.    After qualifying for the main survey, respondents were provided an initial instruction. All instructions and questions in the survey used phrasing appropriate for the search engine, brand, and city assigned to the respondent.  For a respondent assigned to Marriott Marquis San Francisco, which started on Google, the initial instruction was as follows:

---

[22] The types of companies included an advertising or public relations agency, a marketing research company, a company that owns or operates a hotel, an Internet search engine, and a travel agency or website that makes travel reservations.

[23] Respondents qualified to view a search process involving a brand they had indicated in Question F that they would be likely to consider, and a search engine they indicated in Question E that they would be likely to use.  If respondents qualified for more than one search process, they were randomly assigned to one search process.

[24] Of the five keyword searches measured in the survey, four started with a Google search page, while one search, involving Holiday Inn Express, started with Bing.  Respondents qualified to see a search process that started with Google if they had answered in Question E that they would likely use Google to search for a hotel room.  They qualified to view a search process that started on Bing if they had answered that they would likely use Bing.

1
2
3

Imagine that you are using Google to search for a hotel room at a Marriott Marquis hotel in San Francisco.  The image below shows the web page on Google with the search term "Marriott Marquis San Francisco" entered in the search bar.

4

Because this is an image, any links in the image are not active.

5
6
7

Please look at the web page as you normally would if you saw it while searching on Google for a hotel room at a Marriott Marquis hotel in San Francisco.  You may need to scroll to see the entire web page.

8    46.    The survey then showed the Google or Bing search page with the assigned hotel brand

9    and city in the search bar.  If the respondent confirmed they could see the search page clearly,

10    they continued to a second instruction, which was worded as follows for the Marriott Marquis

11    search:

12
13
14

Please imagine that your search on Google for a hotel room at a Marriott Marquis hotel in San Francisco provided the search results shown in the image below.

15

Because this is an image, any links in the image are not active.

16
17
18

Please look at the search results as you normally would if you saw these search results while searching for a hotel room on Google. You may need to scroll to see all of the search results.

19    47.    The second image showed the search results.  If the respondent confirmed they could

20    see the search results clearly, they were shown a third instruction, worded as follows for this

21    keyword search:

22
23

Below is one of the search results that was displayed in the image you just viewed.  As before, any links in the image are not active.

24
25
26

Please look at the search result as you normally would if you saw it while searching for a hotel room on Google.  You may need to scroll to see the entire search result.

27
28

Expert Report of Dr. Bruce Isaacson
Case No. 18-CV-00153-RWS-CMC

48.     The third image showed a single listing from the search results.  If the respondent confirmed they saw the listing clearly, they were given this instruction:

> Imagine you clicked the link displayed in the search result you just viewed, and the link directs you to the page from a website displayed in the image below.  As before, any links in the image are not active.
>
> Please look at the page as you normally would if you saw it while searching for a hotel room on the Internet.  You may need to scroll to see the entire page.

49.     The respondent was then shown the landing page for the hotel property they were assigned.  If they again confirmed that they saw the image clearly, the respondent received the following instruction:

> Below is the image you just viewed, which displays a page from a website.  To proceed, please answer the question which is located below the image.
>
> As before, please do not guess.  If you do not know the answer to a question or do not have an opinion, please indicate that you do not know.

50.     Next, Question 1 asked, "What company or brand do you think owns or operates this website?  Please be as specific as possible.  If you don't know, please select the box labeled 'I don't know.'"  Question 1 was an open-ended question, and respondents either answered in their own words or checked the box labeled "I don't know."

51.     Next, respondents who had not checked the box for "I don't know" were asked Question 2, "What makes you think that?  Please be as specific as possible."  This was also an open-ended question, and respondents again answered in their own words or checked the box labeled "I don't know."[25]

52.     The remaining questions in the survey asked respondents to confirm their home ZIP code, and affirm whether their responses were truthful.

---

[25] Some Eveready surveys provide multiple questions that ask about several different types of confusion. In my survey in this matter, Questions 1 and 2 measure confusion as to company or brand.  My survey only asks about the type of confusion that is most relevant to this matter.

53.    The survey was conducted online, with respondents entering their own answers to questions.  The survey located and recruited prospective respondents through online panels provided by two companies:[26]

    i.    Dynata (formerly Research Now SSI), a well-respected company that has provided sampling and data collection for 40 years, currently serves more than 6,000 client organizations, and employs a variety of quality control processes relating to panelists and responses.[27]

    ii.    ProdegeMR, a leading sample provider for the marketing research industry. Their research panels have more than 60 million panelists globally through a wide range of recruitment channels and offerings.  ProdegeMR  also uses a variety of quality control processes relating to panelists and responses.[28]

54.    Exhibit 6 provides more information on Dynata and ProdegeMR, including descriptions of their quality control procedures and the panels used for the survey.  Exhibit 7 describes quality control measures relating to interviewing, including procedures to validate respondents.

55.    The interviews were conducted from December 4 to December 15, 2020, and resulted in an initial database of 2,137 completed interviews.  Of these, 77 respondents (3.6%) were removed during quality control or validation, leaving 2,060 respondents in the final database. Exhibit 8 provides a termination summary indicating how many respondents were screened out at each qualifying question.

---

[26] Panels offer managed access to prospective survey respondents who have previously indicated their willingness to take surveys from time to time.

[27] For example, the Dynata panel uses double opt-in recruitment (respondents must opt in to the panel twice upon joining), IP address verification (verifies the unique address of computers associated with specific respondents), response time checks (searches for surveys completed suspiciously quickly), and straight-line checks (searches for surveys where the same response letter is selected for multiple questions).

[28] For example, ProdegeMR uses double opt-in registration, digital fingerprinting, physical address verification, device verification, CAPTCHA software, and third-party verification methods.

56.     For any survey, the "margin of error" indicates the stability of a survey measure, taking into account the effect of random chance.  The margin of error provides a range; smaller margins of error indicate greater precision in a survey measure, and larger margins of error indicate greater uncertainty or instability in the survey measure.  As described earlier, the large database for this survey provides more than sufficient size to be reliable, as demonstrated by the survey's relatively small margin of error.[29]

57.     The next section describes my findings from the survey.

**Findings from the Likelihood of Confusion Survey**

58.     Questions 1 and 2, which measured confusion, were answered in respondents' own words.  To analyze these responses and determine whether or not each respondent was confused as to company or brand, I assigned codes to each verbatim response reflecting the themes inherent in the response.[30]  Exhibit 9 lists the codes used to analyze the survey data.

59.     Exhibit 10 presents crosstabulation tables from the data analysis, which show detailed results for all survey questions.  Exhibit 11 shows all responses to all questions from all respondents, including a data map indicating which survey responses correspond to each variable in the database.

60.     This section summarizes the data provided in those exhibits.

---

[29] For surveys, statistics (such as margins of error) can provide general indicators of reliability.  See Diamond, Shari Seidman. "Reference Guide on Survey Research." *Reference Manual on Scientific Evidence,* Third ed., National Academies Press, 2011, pp. 382-383.  For this survey, the test measure of 45.5% at a sample size of 1,042 interviews would have a margin of error of approximately +/- 3.0% at the 95% level of confidence.  See Moore, David S., George P. McCabe and Bruce A. Craig.  "Inference for Proportions." *Introduction to the Practice of Statistics,* Sixth ed., W.H. Freeman and Company, 2009, pp. 487-524.

[30] I was assisted in the coding by MMR staff working under my supervision.  I have personally reviewed and/or assigned every code for every response from every respondent.

Expert Report of Dr. Bruce Isaacson
Case No. 18-CV-00153-RWS-CMC

61.    Question 1 asked respondents what company or brand they think owns or operates the website they were shown in the survey.  Question 2 asked, "What makes you think that?"  Table A shows the company or brand that respondents mentioned in their responses to these questions.  Most of the companies or brands were mentioned in response to Question 1, but the analysis also includes companies or brands identified in answers to Question 2.

62.    Table A also provides the percentage of respondents who are confused as to source, because they thought the website was owned or operated by the hotel shown in the keyword search or by another hotel.  In either scenario, a consumer might believe that they could book directly with the hotel shown in the keyword search, or directly with another hotel, perhaps one they believe is affiliated or owned jointly with the hotel shown in the keyword search.

**Table A: Company or Brand Mentioned as Owning or Operating the Website (in Q.1 and/or Q.2, Unduplicated)[31]**

| Q.1 What company or brand do you think owns or operates this website?  OR  Q.2 What makes you think that? | All Test Images | All Control Images |
|---|---|---|
| Sample size | 1042 | 1018 |
| **Confused as to source[32]** | **45.5%** | **30.3%** |
|   Mentioned the hotel shown in the keyword search[33] | 44.4% | 29.3% |
|   Mentioned another hotel[34] | 1.4% | 1.1% |
| Mentioned TravelPass[35] | 45.1% | 57.0% |
| Mentioned another online travel agency[36] | 2.0% | 3.3% |
| I don't know | 9.0% | 10.7% |

63.    Table A shows that 45.5% of all respondents shown the test images provided a response to Question 1 or 2 that indicated confusion as to source, including respondents who indicated that the website was owned or operated by the hotel brand shown in the keyword search, or by another hotel.  Table A also shows that 45.1% of respondents shown test images mentioned TravelPass, including Reservation Counter or Reservation Desk.

64.    For the test images, which included the landing page from TravelPass, the percentage of respondents who were confused as to source was as high or higher than the percentage of respondents who indicated that the website was owned or operated by TravelPass.[37]

---

[31] If a respondent mentioned or referenced a brand or company in Question 1 and referenced the same brand or company in Question 2, they were not counted as confused more than once.

[32] Reflects the unduplicated sum of the two rows below, namely the hotel shown in the keyword search, or another hotel brand.  Due to unduplication, the two rows below add up to more than this row.

[33] Reflects responses that mentioned the hotel brand shown in the keyword search, another hotel brand owned by the same company, or the corporate parent of that brand.

[34] Reflects responses that mentioned a hotel brand other than that shown in the keyword search, or unspecified hotel brands.

[35] Reflects responses that mentioned TravelPass, Reservation Counter, or Reservation Desk.

[36] Reflects responses that mentioned Travelocity, Expedia, TripAdvisor, or other online travel agencies.

[37] Although 45.5% is numerically greater than 45.1%, the numbers are close in magnitude.

65.      Among all respondents shown control images, 30.3% provided a response indicating that they were confused as to source, and 57.0% mentioned TravelPass.

66.      Table B provides examples of responses to Questions 1 and 2 from respondents shown the test images who provided a response that mentioned the hotel brand shown in the keyword search.  Table C provides examples of responses from those shown the test images who mentioned TravelPass.

Expert Report of Dr. Bruce Isaacson
Case No. 18-CV-00153-RWS-CMC

**Table B: Examples of Responses that Mentioned the Hotel Shown in the Keyword Search, From Respondents Shown Test Images[38]**

| Respondent ID Number | Response to Question 1 | Response to Question 2 |
|---|---|---|
| 391244 | "Holiday in express" | "It is a hotel owned website that is hosted by google" |
| 391410 | "Marriott" | "It shows it on the website. Plus its a famous hotel company around the world." |
| 391670 | "Marriott? San Francisco Marriott Marquis" | "The name of the hotel at the top of the page, the name of the website, the big 'Marriot' next to the name" |
| 392098 | "Holiday Inn for the Holiday Inn Express Hotels" | "The page tab says Holiday Inn Express. The information on the page is on for Holiday Inn." |
| 392662 | "Marriott Hotels" | "It looks like a typical hotel website with information about that specific property." |
| 393026 | "marriot marquis san Francisco" | "written everywhere" |
| 394292 | "Marriott" | "the logo appears in the upper left hand corner of the page and the phone number given appears to be that of the hotel reservation contact |
| 394492 | "Holiday Inn Express" | "Their logo shows and the colors match the logo." |
| 395354 | "This site is owned by Comfort Inn & Suites Virgina Beach" | "Because it is listed on the site address." |
| 396182 | "Holiday Inn" | "It says it a lot in the listing" |
| 396308 | "Comfort Inn" | "It clearly states Comfort Inn & Suites" |
| 396620 | "Marriott" | "Everything that I can see identifies as Marriott. I do not see any other brands or logos that would indicate that the site was owned by a third party." |
| 397214 | "Holiday Inn" | "Because the site directed me to Holiday Inn" |
| 397438 | "Mariott" | "It says Marriott when you put in information to book Hotel" |
| 397464 | "Holiday Inn" | "The logo in the top left corner of the page" |

---

[38] Verbatim responses are shown exactly as typed by the respondents, including any punctuation and spelling errors.

**Table B: Examples of Responses that Mentioned the Hotel Shown in the Keyword Search, From Respondents Shown Test Images[39] (Continued)**

| Respondent ID Number | Response to Question 1 | Response to Question 2 |
|---|---|---|
| 397470 | "Marriott would seem to be the owner." | "Has Marriott in the heading and before the heading." |
| 397628 | "Holiday Inn" | "It has their logo and name. I cant see the name of any other travel website." |
| 397920 | "Holiday Inn Express" | "their logo is at the top of the page" |
| 398090 | "Marriott" | "Logo and URL" |
| 398770 | "Holiday Inn" | "The name of the hotel in the heading." |
| 398896 | "Marriott" | "The first logo I see is at the top and it is familiar as Marriotts logo." |
| 399958 | "Comfort Inn" | "The brand name and logo at the top" |
| 400568 | "IHG - Holiday Inn Express" | "Because it says Holiday Inn Express. Duh!" |
| 404536 | "Holiday Inn Express" | "The big words that say that, and its there multiple times." |
| 406032 | "Holiday Inn, its logo is all over the place. Its completely obvious." | "The giganitc and obvious Holiday Inn Express logo up in the upper right hand corner." |
| 407630 | "Comfort Inn" | "Its in the name of the hotel and also the Comfort Inn logo." |
| 408276 | "Holiday Inn Express" | "The logo is in the corner left top." |
| 408410 | "Holiday Inn" | "The name Holiday Inn is mentioned throughout the information about the hotel." |
| 408530 | "Comfort Inn" | "Because it is the largest and most prominent thing Ive seen on each page." |
| 409764 | "Holiday Inn" | "The Holiday Inn Logo" |
| 411766 | "Comfort Inn" | "The Comfort Inn logo, and the numerous mentions to Comfort Inn and Suites." |
| 412430 | "comfort inn" | "I see the Comfort Inn logo to the left of the hotel name, and Comfort Inn is also in the title" |
| 417000 | "comfort inn" | "logo and major heading" |

Expert Report of Dr. Bruce Isaacson
Case No. 18-CV-00153-RWS-CMC

**Table C: Examples of Responses that Mentioned TravelPass, Reservation Counter, or Reservation Desk, From Respondents Shown Test Images[40]**

| Respondent ID Number | Response to Question 1 | Response to Question 2 |
|---|---|---|
| 391256 | "Reservation Counter - Travel Pass Group" | "Its clearly marked at the top & bottom of the page." |
| 391632 | "Reservation Counter" | "At the top and bottom, left side, is the Reservation Counter logo" |
| 391678 | "Travel Pass Group" | "It shows on the page 'Reservation Counter, Part of Travel Pass Group'." |
| 392092 | "Reservation Counter Part of Traveler Group" | "It is listed at the top of the screen" |
| 392870 | "reservationcounter.com" | "Its what is in the URL" |
| 392880 | "Reservation Counter" | "The part at the bottom of the page that has all the options like "company," "support," and "legal." Thats the brand thats listed down there." |
| 394414 | "travel pass group" | "it says at the bottom that it is reservation counter that is a part of travelpass group" |
| 394562 | "Reservation Counter part of Travelpass Group" | "It is on the search bar and listed twice within the web page." |
| 395030 | "Reservation Counter, part of travelpass group" | "At the bottom of most web pages the owner of the site is usually listed." |
| 395068 | "reservation counter" | "its the name at the bottom next to the company stuff and support spot" |
| 397550 | "reservation counter part of travelpass group" | "Because it shows their logo at the bottom" |
| 401638 | "TravelPass Group" | "It says it at the bottom - Reservation Counter, part of TravelPass Group" |
| 406728 | "Reservation Counter" | "The company has a copyright at the bottom of the page." |

---

[39] Verbatim responses are shown exactly as typed by the respondents, including any punctuation and spelling errors.

[40] Verbatim responses are shown exactly as typed by the respondents, including any punctuation and spelling errors.

69.     Table A provides test and control measures based on responses to Questions 1 and 2. Table D below calculates the net measure for likelihood of confusion, which indicates the effect specifically associated with the disputed elements of TravelPass advertising, after accounting for other extraneous elements, such as pre-existing attitudes among respondents.  As with Table A, the measure for likelihood of confusion in Table D considers a respondent confused if their response indicates that they believe the website is from a hotel company, rather than from TravelPass.

**Table D: Net Measure for Likelihood of Confusion from Questions 1 and 2 (Unduplicated)**

| Likelihood of confusion from Questions 1 and 2 | Test Images | Control Images | Net Measure[41] |
|---|---|---|---|
| Sample size | 1042 | 1018 | |
| **Confused as to source[42]** | **45.5%** | **30.3%** | **15.2%** |

70.     The net percentage based on respondents who mentioned any hotel brand, including the hotel brand shown in the keyword search or a different hotel brand, is 15.2%, which is calculated as 45.5% minus 30.3%.  The net measure is unduplicated, meaning that each respondent is counted only once, even if the respondent provided an answer indicating confusion in response to both Question 1 and Question 2.

71.     The measures summarized in this section so far have reflected all hotel companies combined.  Table E provides results for the company or brand identified in response to Questions 1 and 2, broken out for each of the five hotel brands measured in the survey.

---

[41] Calculated as the test percentage minus the corresponding control percentage.

[42] Reflects responses indicating that the respondent believed the website was owned or operated by the hotel brand shown in the keyword search, or by another hotel (including an unspecified hotel).

**Table E: Company or Brand Mentioned as Owning or Operating the Website, by Hotel Brand (in Q.1 and/or Q.2, Unduplicated)**

| **Q.1** What company or brand do you think owns or operates this website? **OR** **Q.2** What makes you think that? | Hampton Inn | | Holiday Inn Express | | Marriott Marquis | |
|---|---|---|---|---|---|---|
| | **Test** | **Control** | **Test** | **Control** | **Test** | **Control** |
| Sample size | 218 | 202 | 200 | 206 | 213 | 199 |
| **Confused as to source**[43] | **53.2%** | **34.7%** | **48.5%** | **36.9%** | **42.7%** | **24.1%** |
| Mentioned TravelPass[44] | 41.3% | 55.4% | 43.5% | 48.5% | 48.4% | 62.3% |
| Mentioned another online travel agency[45] | 3.7% | 2.0% | 2.0% | 3.4% | 1.9% | 3.5% |
| I don't know | 7.8% | 7.9% | 7.5% | 11.7% | 7.5% | 9.5% |

| **Q.1** What company or brand do you think owns or operates this website? **OR** **Q.2** What makes you think that? | Harrah's | | Comfort Inn | |
|---|---|---|---|---|
| | **Test** | **Control** | **Test** | **Control** |
| Sample size | 196 | 199 | 215 | 212 |
| **Confused as to source** | **42.3%** | **26.1%** | **40.5%** | **29.2%** |
| Mentioned TravelPass | 43.4% | 59.3% | 48.8% | 59.4% |
| Mentioned another online travel agency | 1.5% | 4.5% | 0.9% | 3.3% |
| I don't know | 10.7% | 12.1% | 11.6% | 12.3% |

72.     Table F provides net likelihood of confusion measures from Questions 1 and 2 for each hotel brand individually.  As with prior tables, Table F is unduplicated, meaning that it counts each respondent only once, even if they mentioned a hotel brand or company in response to more than one question.  As before, net likelihood of confusion is calculated as the test percentage minus the corresponding control percentage.

---

[43] Reflects responses that mentioned the hotel shown in the keyword search, or another hotel (including an unspecified hotel).

[44] Reflects responses that mentioned TravelPass, Reservation Counter, or Reservation Desk.

[45] Reflects responses that mentioned Travelocity, Expedia, TripAdvisor, or another online travel agency.

Expert Report of Dr. Bruce Isaacson
Case No. 18-CV-00153-RWS-CMC

**Table F: Net Measures for Likelihood of Confusion From Questions 1 and 2, By Hotel Brand (Unduplicated)**

| Likelihood of confusion from Questions 1 and 2 | Test Images | Control Images | Net[46] |
|---|---|---|---|
| **Confused as to source**[47] | | | |
| Marriott Marquis | 42.7% | 24.1% | 18.6% |
| Hampton Inn | 53.2% | 34.7% | 18.5% |
| Harrah's | 42.3% | 26.1% | 16.2% |
| Holiday Inn Express | 48.5% | 36.9% | 11.6% |
| Comfort Inn | 40.5% | 29.2% | 11.3% |

73.    As described earlier, Question 1 asked respondents what company or brand they think owns or operates the website they were shown in the survey.  Question 2 asked, "What makes you think that?"  Table G below summarizes the reasons that respondents mentioned for the companies or brands that they identified in their responses.  Most of the reasons were identified in response to Question 2, but the analysis also includes any reasons that were identified in response to Question 1.

---

[46] The net percentage is calculated as the test percentage minus the control percentage.

[47] Reflects responses indicating that the respondent believed the website was owned or operated by the hotel brand shown in the keyword search, or by another hotel (including an unspecified hotel).

Expert Report of Dr. Bruce Isaacson
Case No. 18-CV-00153-RWS-CMC

**Table G: Reasons Provided for Responses
(Q.2 and/or Q.1, Unduplicated)[48]**

| **Q.2.** What makes you think that?<br>    OR<br>**Q.1** What company or brand do you think owns or operates this website? | **All Test Images** | **All Control Images** |
|---|---|---|
| Sample size | 1042 | 1018 |
| Visual elements (logo, graphics, pictures, layout, etc.) | 44.0% | 37.9% |
| Website address, URL, or link | 20.6% | 9.8% |
| "It says it," "I can see it," or "It looks like it" | 16.8% | 20.3% |
| Disclaimer ("Part of TravelPass Group"), "trademark," or "copyright"[49] | 10.2% | 20.8% |
| Prior experience (such as "I know it," or "I've used it before") | 6.3% | 4.1% |
| I don't know or no reason provided | 12.6% | 15.1% |

74.    Table G shows that among respondents who viewed the test images or the control images, the most common reason provided for their answer related to visual elements, such as a logo of the hotel brand, graphics, pictures, or the layout on the page. This reason was cited by 44.0% of respondents shown test images, and 37.9% of respondents shown control images.

75.    Among respondents shown test images, 20.6% mentioned a reason related to the website address, URL, or link. Among respondents shown control images, 20.8% mentioned a reason related to a disclaimer (including "Part of TravelPass Group"), trademark, or copyright. Another 20.3% of those shown control images mentioned a reason such as, "It says it," "I can see it," or "It looks like it."

---

[48] If a respondent mentioned or referenced a reason in Question 2 and referenced the same reason in Question 1, they were not counted more than once.

[49] Reflects comments that mentioned all or part of the "Part of TravelPass Group" disclaimer, or that mentioned the word "trademark" or the word "copyright."

**Conclusions and Implications**

76.    As described earlier in this report, the survey database includes 2,060 interviews, including 1,042 interviews with respondents shown test images and 1,018 interviews with respondents shown the control images. This is a very large database, with more than sufficient size to be reliable.

77.    Among respondents shown the test images, which included TravelPass advertising, 45.5% provided responses reflecting confusion as to source.  Among respondents shown the control images, which were similar but removed the disputed elements of TravelPass advertising, 30.3% provided responses reflecting confusion as to source.  After adjusting for the control, the net likelihood of confusion is 15.2% (calculated as 45.5% minus 30.3%).

78.    Also as described earlier, the Counterclaim Plaintiff Hotel Companies have identified certain elements in TravelPass advertising that they assert are likely to confuse consumers by causing them to believe that the advertising comes directly from a hotel, rather than from TravelPass.  Those elements include the following:

      i.    TravelPass using hotel trademarks, such as hotel names and logos, in multiple instances on web pages, website addresses (URLs), links, and other locations.

      ii.    TravelPass using hotel trademarks, such as logos or brand names, that are shown more prominently than TravelPass' trademarks and logos.

      iii.    TravelPass displaying TravelPass phone numbers on web pages near the hotel's trademarks and images.

      iv.    TravelPass using certain wording, such as "us," "Reservation Counter," or "Book Direct," that fail to clarify that "us," the "Reservation Counter" or the entity that would make the booking, is not the hotel company.

79.    The likelihood of confusion survey described in this report measured advertising from TravelPass that was located online through searches that started on Google or Bing, and that includes these disputed elements.  The Counterclaim Plaintiff Hotel Companies have identified many other examples of advertising from TravelPass that reflect these elements.

80.     Exhibit 12 provides examples of other TravelPass advertising that the Counterclaim Plaintiff Hotel Companies have identified that were not measured in the survey, and that reflect these disputed elements.[50]  Some of the examples of TravelPass advertising in Exhibit 12 contain more uses, or more prominent uses, of these disputed elements than the TravelPass advertising measured in the survey.

81.     My survey was designed to measure the effect associated with these disputed elements on likelihood of confusion.  To the extent that the examples of TravelPass advertising in Exhibit 12, or other examples of TravelPass advertising, use the same elements that are measured in the survey, it is reasonable to expect that the measures from the survey are likely to apply to those other examples of advertising from TravelPass.

82.     As described earlier, the net level of confusion measured by my survey is 15.2%.   This represents the percentage of consumers who are likely to believe that a TravelPass website on which they may book a hotel room is owned or operated by a hotel company.  This percentage should be considered in light of the large number of bookings made each year through TravelPass. ███████████████████████████████████████████

████████████████████████████████████████

83.     Given this large number of bookings, the question about likelihood of confusion is important both for the Counterclaim Plaintiff Hotel Companies and for consumers.  For the Counterclaim Plaintiff Hotel Companies, likelihood of confusion reflects the possibility that some percentage of consumers who might otherwise book with them become confused, and instead book with TravelPass.  For such consumers, the Counterclaim Plaintiff Hotel Companies may lose some portion of revenues, and consumers are diverted into a brand experience that involves their brands and trademarks, but that the Counterclaim Plaintiff Hotel Companies do

---

[50] The survey also did not measure confusion relating to TravelPass activities in call centers.

[51] ████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████

HIGHLY CONFIDENTIAL --
SUBJECT TO PROTECTIVE ORDER

Expert Report of Dr. Bruce Isaacson
Case No. 18-CV-00153-RWS-CMC

1   not control.

2   84.     Likelihood of confusion also poses potential risks to consumers.  The Counterclaim

3   Plaintiffs allege that a consumer who books with TravelPass rather than on the hotel brand's

4   website may have a diminished experience.  For example, they allege that such a consumer

5   may not receive the lowest price, may not earn reward points, or may have less flexibility with

6   regard to cancellations.[52]  Given the likelihood of confusion, some consumers may incorrectly

7   attribute their diminished experience to the Counterclaim Plaintiffs, rather than to TravelPass.

---

[52] *See, e.g.,* Defendant Choice Hotels International, Inc.'s Answer to Plaintiff's Complaint and Counterclaims, ¶¶ 33-37 (p. 82); Defendant Six Continents Hotels, Inc.'s Answer and Defenses to Plaintiff's Original Complaint and Counterclaims Against Plaintiffs, ¶ 74 (p. 83), ¶ 78 (p. 83); Defendant Marriott International, Inc.'s Answer to Plaintiffs' Complaint and Counterclaims, ¶¶ 71-72 (p. 54), ¶¶ 160-164 (p. 75).

Expert Report of Dr. Bruce Isaacson
Case No. 18-CV-00153-RWS-CMC

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my belief.

Executed in Encino, California, on December 30, 2020.

Dr. Bruce Isaacson

**Exhibit 1:**

**Dr. Bruce Isaacson CV and Testimony Experience**

**MMR STRATEGY GROUP**
*Creating growth through customer insight.™*

16501 Ventura Boulevard, Suite 601, Encino, CA 91436  •  Phone (818) 464-2400  •  www.mmrstrategy.com

# DR. BRUCE R. ISAACSON, DBA, MBA

***MMR Strategy Group, Encino, CA***                                    2005 - Present
**PRESIDENT**

MMR provides surveys, analysis, and consulting to measure the attitudes and behaviors of customers and prospective customers.  MMR has three primary practice areas:

1. Marketing Research and Consulting:  MMR provides marketing research and consulting to help clients grow sales, develop marketing strategies, and improve products and services.

2. Claim Substantiation:  MMR provides research and consulting to substantiate claims that involve consumer perceptions, and are made in packaging, advertising, and other types of marketplace communications.

3. Litigation Surveys:  MMR provides surveys and testimony for intellectual property matters.  MMR has been retained by law firms, as well as the Federal Trade Commission and the U.S. Department of Justice.

- As President, I design studies, manage research projects, and provide consulting services relating to marketing, research, consumer behavior, and strategy.

- I have conducted many hundreds of surveys during my career.  I regularly provide surveys, testimony, and rebuttals for intellectual property litigation and claim substantiation matters.

- I have provided testimony relating to litigation surveys in a wide variety of venues, including federal courts, state courts, the Trademark Trial and Appeal Board (TTAB), the National Advertising Division (NAD) of the Better Business Bureau, the International Trade Commission, the Court of Federal Claims, the Federal Trade Commission, and other venues.

- I speak and write on topics relating to marketing research, marketing strategy, litigation surveys, and consumer behavior.

**MMR**

## Education

- Doctor of Business Administration in Marketing, **Harvard Business School**, 1995.  Awarded Dean's Doctoral Fellowship.

- MBA with High Distinction, **Harvard Business School**, 1991.  Graduated in top 5% of class as a Baker Scholar.

- Bachelor of Science in Engineering with focus on Regional Development, Northwestern University Technological Institute, 1985.

## Prior Professional Experience

*Fairview Company, Calabasas, CA*                                          2002 - 2004
**Managing Director**

- **West Coast Practice Leader of Executive Development for Monitor Group.**
  Designed and managed marketing and strategy executive education programs.
  Developed curriculum, served as lead faculty on programs for Fortune 100 clients.

- **Consulted with clients in technology, software, and financial services.**
  Provided consulting services in marketing and strategy.

*Intuit/Digital Insight, Calabasas, CA*                                    2001 - 2002
**Senior Vice President For Products, Marketing, and Alliances**

- **Managed business lines for $130 million provider of outsourced banking services/software.**
  Directed marketing, strategy, alliances, mergers, acquisitions, resellers, and pricing for 9 business lines.  Managed $29 million budget and staff of 40.

- **Built product management and strategy functions.**
  Set priorities for $22 million R&D budget.  Directed $51 million acquisition and post-merger conversion of 150 new clients.

*Move, Inc., Westlake Village, CA*                                         1999 - 2001
**President, Home Services**

- **Founded home services division for software/services provider to real estate industry.**
  Directed business unit for new division.  Built alliances with associations including National Association of Homebuilders and American Institute of Architects.

**MMR**

**PHH Corporation (NYSE: PHH)**, *Mortgage Division, Mount Laurel, NJ*     1997 - 1999
**Vice President, Marketing**

- **Directed marketing for $26 billion outsourced mortgage services division.**
  Company provided private label loans and loan servicing for customers and partners, including Wells Fargo, USAA, Coldwell Banker, Century 21.  Served on 14-member Executive Committee.  Managed $14 million budget and 60 people in marketing, research, public relations, advertising, strategic planning, business development and e-commerce.

- **Created collateral for selling, processing, and closing loans distributed to 750,000 customers annually.**
  Redesigned sales materials used by 150-person sales force.  Created point-of-sale materials and placed in 1,600 real estate offices nationwide.  Negotiated co-marketing deals.

- **Built online platform to originate, close and service mortgages.**
  Created co-branded system used by 1,400 partners to originate $700 million in mortgages in 2000.  Integrated system with more than 2,000 sales and customer service reps.


**Boston Consulting Group, Chicago, IL**     1995 to 1997
**Consultant**

- **Consulted in marketing, strategy and distribution for $1 billion international strategy consulting firm.**
  Designed and rolled out database marketing program for international supermarket chain.
  Developed purchasing strategy for $3 billion consumer goods company.
  Evaluated market strategy for $800 million division of paper goods company.


**Harvard Business School, Cambridge, MA**     1991 to 1995
**Dean's Doctoral Fellow**

- **Developed and implemented multi-year research project analyzing buyer-supplier alliances.**
  Authored 14 publications including best-selling case studies and articles in distribution, sales, supplier management, purchasing, branding, new products.  Taught in Babson College Executive MBA program.


**E&J Gallo Winery, Modesto, CA**     1990
**MBA Intern**

- Summer intern at global winery.  Developed packaging strategy, distribution and retailer incentive programs for the wine cooler category.

***Long Wharf Trading Company, Danvers, MA***                                    1986 to 1989
**President & Co-Founder**

- **Co-founded company manufacturing high quality sewn products for advertising premiums.**
  Directed 30 employees.  Clients included banks, universities, corporations, schools and museums.  Company was featured with full-page story in *Inc. Magazine*.


***Parsons Corporation/Barton-Aschman Associates, Evanston, IL***               1985 to 1986
**Associate Consultant**

- **Conducted strategic and operations planning for public transportation systems at global construction and regional planning company.**
  Received *President's Award* for outstanding initiative and performance.


## Honors, Appointments, Affiliations

- Member, American Marketing Association (AMA)

- Member, International Trademark Association (INTA)

- Member, Marketing Research Association (MRA)

- Member, Brand Activation Association (BAA)

- Editorial Board, *Journal of Business-to-Business Marketing,* 1994 – present

- Member, *The Trademark Reporter* Committee, International Trademark Association, 2010 - present

- Policy Advisory Board, Joint Center for Housing Studies at Harvard University, 1999 - 2001

- Winner, Doctoral Dissertation, Institute for Study of Business Markets, Penn State, 1994

- George S. Dively Award for Innovative Research, Harvard Business School, 1993

- George F. Baker Scholar, Harvard Business School (top 5% of class), 1991

- Dean's Doctoral Fellowship, Harvard Business School, 1993 -1995

**MMR**

**Selected Speaking Engagements**

Frequent speaker at industry conferences and client events on topics relating to marketing and strategy, including:

- Speaker on panel titled, "Survey Says: The Use of Consumer Perception Surveys in Advertising-Related Litigation," held at Davis & Gilbert, LLP, March, 2020.

- Speaker on a panel titled, "What Can Trademark Practitioners Learn from Advertising and Marketing Professionals?" International Trademark Association Annual Conference, May, 2018.

- Moderator for round table discussion titled, "Trademark Surveys: How Requirements Differ by Venue and Authority," International Trademark Association Annual Conference, May, 2018.

- Guest lecturer on "Litigation Surveys" to advertising law class at Loyola Law School, October, 2019, and October, 2018.

- Moderator for round table discussion titled, "Using Surveys to Measure Product Usage, Configuration and Damages in Trademark, Copyright and Patent Matters," International Trademark Association Annual Conference, May, 2016.

- Panelist for "Battle of the Experts – Deploying the Proper Scientific Methodology for Supporting or Challenging Claims," Advanced Forum on Resolving & Litigating Advertising Disputes, March, 2015.

- Guest lecturer on the legal aspects of marketing to MBA classes held at University of California – Irvine, November, 2015, and December, 2015.

- Speaker for presentation titled, "Using Surveys to Measure Attitudes and Behaviors," U.S. Department of Justice, Civil Division, Commercial Litigation Branch, March, 2015.

- Speaker for presentation titled, "Improving Customer Experience with Customer Journey Maps," Corporate Researchers Conference, sponsored by the Marketing Research Association, October, 2013.

- Speaker on panel for seminar titled "Trademark Protection in Cyberspace," sponsored by the Los Angeles County Bar Association (LACBA), May, 2013.

- Moderator for round table discussion titled, "Using Survey Evidence for Claim Substantiation," International Trademark Association Annual Conference, May, 2013.

- Speaker and panelist for multi-day conference titled, "Advertising Claims Support: Case Histories and Principles," conference hosted by The Institute for Perception, April, 2013.

**MMR**

- Moderator for round table discussion titled, "Replicating Marketplace Conditions in Trademark Surveys," International Trademark Association Annual Conference, 2011.

- Moderator for round table discussion titled, "The Use of Surveys in Intellectual Property Litigation," International Trademark Association Annual Conference, 2010.

- Faculty on panel at expert forum titled, "Litigating & Resolving Advertising Disputes," American Conference Institute, June, 2010.

- Speaker for presentation titled, "The Use of Online Surveys in Intellectual Property Litigation."  National Advertising Division (NAD) Annual Conference, October, 2009.

- Speaker for presentation titled, "Integrating Research Techniques for Deeper Customer Insights: Blurring Boundaries Between Research Methods," American Marketing Association Annual Marketing Research Conference, September, 2008.

- Speaker for presentation titled, "Understanding Your Customer and Making Tough Strategic Choices," International Restaurant & Foodservice Show of New York, March, 2008.

- Presented Continuing Legal Education (CLE) seminar titled, "Measuring Consumer Attitudes and Behaviors in Intellectual Property Litigation." Presented to:

  - Orange County Bar Association, November 2007.

  - Baker Botts, LLP, March, 2008.

  - Amster, Rothstein & Ebenstein LLP,  March, 2008.

  - Fulwider Patton, LLP, March, 2008.

- Speaker for presentation titled, "Understanding Today's Customers and Making Tough Choices – Lessons Learned From Starbucks," Western Foodservice & Hospitality Expo, August, 2007.

- Speaker for presentation titled, "What Can We Learn from Customer Satisfaction Studies?" Real Trends Marketing & Technology Expo, September, 2006.

**Publications and Works in Process**

Book Review of ***Trademark and Deceptive Advertising Surveys:  Law, Science, and Design***, **edited by Shari Seidman Diamond and Jerre B. Swann.**  *The Trademark Reporter*, September, 2013.

**Playing Nice With Legal:  How Research Can Help Keep Marketing Claims in Compliance.** *Quirk's Marketing Research Review*, January, 2013.

**The Quantity of Presidential Polls and the Quality of Marketing Research.**  *Green Book Blog*, October, 2012.

**Three Critical Questions to Evaluate Intellectual Property Surveys.**  *Intellectual Property Today*, September, 2012.  Co-authors Professor Jonathan Hibbard and Professor Scott Swain.

**Asking the Right Questions (in Litigation Surveys).**  *Intellectual Property Magazine*, October, 2012.

**Conducting Litigation Surveys in an Online World.**  Manuscript in process with co-author, planning to submit for publication to *The Trademark Reporter*.

**Why Online Consumer Surveys Can Be a Smart Choice in Intellectual Property Cases** (with Professor Jonathan Hibbard and Professor Scott Swain).  Intellectual Property Law Newsletter of the American Bar Association, Intellectual Property Law Section, May 2008.

**Bose Corporation:  The JIT II Program (A), (B), (C), and (D)** (with Professor Roy Shapiro).  Harvard Business School cases 9-694-001, -002, -003, and –004.

**Bose Corporation:  The JIT II Program Teaching Note.**  Harvard Business School teaching note 5-695-017.

**Buyer-Supplier Relationships:  Antecedents, Management and Consequences.**  Harvard Business School doctoral dissertation, 1996.

**Goodyear:  The Aquatred Launch** (with Professor John Quelch).  Harvard Business School case 9-594-106.  Best seller.

**Goodyear:  The Aquatred Launch Teaching Note** (with Professor John Quelch).  Harvard Business School teaching note 5-595-016.

**Industrial Marketing** (with Professor V. Kasturi Rangan).  In *AMA Management Handbook, Third Edition*, edited by John J. Hampton.  New York:  Amacom Books, 1994, pp. 2-101 to 2-108.

**Managing Buyer-Supplier Relationships.**  Preface to *JIT II:  Revolution in Buying and Selling*, edited by Lance Dixon and Anne Millen Porter.  Newton, MA:  Cahners Publications, Inc., 1994

**Philip Morris:  Marlboro Friday (A) and (B).**  Harvard Business School case 9-596-001 and –002.

**Scope and Challenge of Business-to-Business Marketing** (with Professor V. Kasturi Rangan).  Harvard Business School class note 9-594-125.

**Vistakon:  1 Day Acuvue Disposable Contact Lenses** (with Professor Alvin J. Silk and Marie Bell).  Harvard Business School case 9-596-087.

**What is Industrial Marketing?** (with Professor V. Kasturi Rangan).  Harvard Business School class note 9-592-012.

**Blogging and Commentary**

I write posts and white papers at www.MMRStrategy.com.  Selected materials include:

**Litigation Surveys**

- "How to Measure False Advertising in a Litigation Survey" (November, 2012)

- "Using Surveys to Estimate Damages in Patent Infringement Matters" (October, 2012)

- "Apple vs. Samsung: Litigation Surveys as Evidence" (August, 2012)

- "What is the Theory Behind Your Lanham Act Survey?" (June, 2012)

- "Keyword Infringement Surveys: The New Frontier in Measuring Likelihood of Confusion" (June, 2012)

- "The Challenge of Replicating Marketplace Conditions in Intellectual Property Surveys" (May, 2012)

**Claim Substantiation**

- "When it Comes to 'Up To' Claims, Make Sure You Have the Right Substantiation" (February, 2013)

- "Critical Research Steps and Core Principles of Claim Substantiation" (white paper)

- "How Many Industries are Affected by Claim Substantiation?" (June, 2012)

- "Lessons in Claim Substantiation from the Pom Wonderful Decision" (May, 2012)

- "How Claim Substantiation Differs from Traditional Marketing Research" (May, 2012)

**Marketing and Marketing Research**

- "Lessons in Pricing Strategy from JCPenney" (May, 2013)

- "Why You Should (Almost) Never Use the van Westendorp Pricing Model" (March, 2013)

- "Three Types of Market Segmentation and the 2012 Presidential Election" (October, 2012)

- "Presidential Polls and the Quality of Marketing Research" (October, 2012)

- "Sizing the Potential of a New Market or New Product" (white paper)

**MMR**

- "MaxDiff vs. Conjoint:  Which is Better to Measure Consumer Preferences?" (white paper)

- "Ten Best Practices to Improve Your Concept and Product Tests" (white paper)

- "Using Choice-Base Market Segmentation to Improve Your Marketing Strategy" (white paper)

- "What Your Tracking Study Should Measure About Your Customers" (white paper)

- "Using Customer Journey Maps to Improve Your Customer Experience" (white paper)

- "How to Improve Your Usage and Attitude Study" (June, 2012)

- "Five Pitfalls of Market Segmentation and How to Avoid Them" (May, 2012)


**<u>Selected Courses Taken in MBA and Doctoral Programs</u>**

- <u>Economics and Finance</u>, including topics such as Managerial Economics; Financial Reporting and Accounting; Business, Government, and the International Economy; Corporate Finance; Product Costing; Microeconomic Theory.

- <u>Marketing and Strategy</u>, including topics such as Marketing; Marketing Foundations Readings; New Products; Marketing Implementation; Service Management; Research Issues in Marketing; Buyer Behavior; Industrial Marketing and Procurement; Industry and Competitive Analysis; Communications.

- <u>Sociology and Psychology</u>, including Organizational Behavior; Human Resources; Social Behavior in Organizations; Readings in Administration (two courses); Management Policy and Practice.

- <u>Statistics</u>, including Statistical Inference; Social Network Analysis; Applied Data Analysis; Analyzing Covariance Structures.

- <u>Research Methods and Research Design</u>, including Doctoral Research Seminar; Research Design and Measurement; Design of Field Research in Organizational Behavior; Intervention Research and Action Science.

**MMR**

### Dr. Bruce Isaacson Litigation Expert Witness Experience
#### December 2020

Cases in which Dr. Bruce Isaacson has testified as an expert, including written expert reports or testimony at deposition or trial, from 2014 to present.

**American Beverage Association, California Retailers Association, California State Outdoor Advertising Association v. The City and County of San Francisco**
U.S. District Court, Northern District of California San Francisco Division

**Barry Braverman, et al v. BMW of North America, LLC and BMW AG**
U.S. District Court, Central District of California Southern Division

**Glaxo Group Limited v. Respirent Pharmaceuticals Co., Ltd.**
U.S. District Court, Southern District of New York

**Sulzer Mixpac AG v. DXM Co., LTD and Dentazon Corporation**
U.S. District Court, Southern District of New York

**American Massage Therapy Association v. Implus Footcare, LLC**
United States Patent and Trademark Office, Trademark Trial and Appeal Board

**Richard Sotelo, on behalf of himself and all others similarly situated v. Rawlings Sporting Goods Company, Inc.**
U.S. District Court, Central District of California Western Division

**In Re: Application of Apple Inc. for TVOS Mark (86/632,177)**
United States Patent and Trademark Office, Trademark Trial and Appeal Board

**Susan Tran, on Behalf of Herself and all Others Similarly Situated v. Sioux Honey Association, Cooperative**
U.S. District Court, Central District of California Southern Division

**Sansi North America, LLC v. LG Electronics USA, Inc.**
U.S. District Court, Central District of California

**Lindsay and Jeff Aberin, Don Awtrey, Charles Burgess, John Kelly, Yun-Fei Lou, Joy Matza, and Melissa Yeung, individually and on behalf of all others similarly situated v. American Honda Motor Company**
U.S. District Court, Northern District of California

**Federal Trade Commission and Utah Division of Consumer Protection v. Nudge LLC et al**
U.S. District Court, District of Utah, Central Division

**Rockwell Automation, Inc. v. Radwell International, Inc.**
U.S. District Court, District of New Jersey

**MMR**

**James Demetriades, an individual v. Yelp, Inc., a Delaware corporation, et al.**
Superior Court of the State of California, County of Los Angeles, Central District

**In the Matter of Certain Pocket Lighters**
United States International Trade Commission, Washington, D.C.

**Vital Pharmaceuticals, Inc. v. Monster Energy Company and REIGN Beverage Company, LLC**
U.S. District Court, Southern District of Florida

**In the Matter of Certain Motorized Vehicles and Components Thereof**
United States International Trade Commission, Washington, D.C.

**Mahindra & Mahindra, Ltd. and Mahindra Automotive North America, Inc. v. FCA US LLC**
United States District Court, Eastern District of Michigan

**MGA Entertainment Inc. and The Little Tikes Company v. Dynacraft BSC, Inc. et al.**
U.S. District Court, Central District of California

**Fuse Chicken, LLC v. Amazon.com, Inc. and Does 1-10**
U.S. District Court, Northern District of Ohio

**Diamond Foods, Inc. v. Hottrix, LLC**
U.S. District Court, Northern District of California

**Steven A. Conner DPM, P.C. v. Optum360, LLC**
U.S. District Court, Eastern District of Pennsylvania

**Stephanie Escobar, individually and on behalf of all others similarly situated v. Just Born, Inc.**
U.S. District Court, Central District of California

**Daryl White, Jr., individually and on behalf of all others similarly situated v. Just Born, Inc.**
U.S. District Court, Western District of Missouri

**Forever 21 v. Gucci America, Inc.**
U.S. District Court, Central District of California Western Division

**Ezaki Glico Kabushiki Kaisha, d/b/a Ezaki Glico Co., LTD., and Ezaki Glico USA Corporation**
U.S. District Court, District of New Jersey

**GoPro, Inc. v. 360Heros, Inc.**
U.S. District Court, Northern District of California

**Monster Energy Company v. Integrated Supply Network, LLC**
U.S. District Court, Central District of California

MMR

**Lokai Holdings LLC v. Twin Tiger USA LLC, Twin Tiger World Markets LTD., Rory Coppock and Troy Coppock**
U.S. District Court, Southern District of New York

**Joann Martinelli, individually and on behalf of all others similarly situated v. Johnson & Johnson and McNeil Nutritionals, LLC**
U.S. District Court, Eastern District of California

**Strategic Partners, Inc. v. Vestagen Protective Technologies, Inc.**
U.S. District Court, Central District of California Western Division

**Federal Trade Commission v. Damian Kutzner, individually and as an officer of Brookstone Law P.C. (California), et al.**
U.S. District Court, Central District of California

**In Re: National Collegiate Athletic Association Athletic Grant-In-Aid Cap Antitrust Litigation**
U.S. District Court, Northern District of California Oakland Division

**Adidas America, Inc., Adidas AG, Adidas International Marketing B.V., Reebok International Ltd., and Reebok International Limited v. TRB Acquisitions LLC, et al.**
U.S. District Court, District of Oregon Portland Division

**Network-1 Technologies, Inc. v. Alcatel-Lucent USA Inc.,** *et al.*
U.S. District Court, Eastern District of Texas Tyler Division

**In the Matter of DIRECTV LLC v. Comcast Cable Communications**
National Advertising Division of the Better Business Bureau

**Sisters of Charity of Leavenworth Health System, Inc. v. Blue Cross and Blue Shield Association**
U.S. District Court, District of Colorado

**Pinkette Clothing, Inc. v. Cosmetic Warriors Limited dba Lush Handmade Cosmetics**
U.S. District Court, Central District of California

**LifeScan, Inc. and Johnson & Johnson v. PharmaTech Solutions, Inc. and Decision Diagnostics Corp.**
U.S. District Court, Northern District of California Oakland Division

**General Motors LLC Ignition Switch Litigation**
U.S. District Court, Southern District of New York

**Robert S. Davidson, d/b/a Plastertech v. The United States**
United States Court of Federal Claims

MMR

**Blue Cross and Blue Shield Association, an Illinois not-for-profit corporation v. Zoom Care, P.C.; Zoom Management, Inc.; Zoomcare; Zoom Care Health Plan; and Zoom Care Washington, P.L.L.C.**
U.S. District Court, Western District of Washington at Seattle

**Kosair Charities Committee, Inc. v. Norton Healthcare, Inc. et al.**
Jefferson Circuit Court, Division Five (5)

**Safelite Group, Inc. and Safelite Solutions LLC v. Lori Swanson, in her official capacity as Attorney General of the State of Minnesota, and Michael Rothman, in his official capacity as the Commissioner of the Minnesota Department of Commerce**
U.S. District Court, District of Minnesota

**Confederate Motors, Inc. v. FCA US LLC**
United States Patent and Trademark Office, Trademark Trial and Appeal Board

**Talking Rain Beverage Company, Inc. v. DS Services of America, Inc.**
U.S. District Court, Western District of Washington, at Seattle

**Farouk Systems, Inc. v. AG Global Products, LLC d/b/a FHI Heat, LLC and Shauky Gulamani**
U.S. District Court, Southern District of Texas Houston Division

**Federal Trade Commission v. LifeLock, Inc. a corporation; Robert J Maynard, Jr., individually and as an officer of LifeLock, Inc.; and Richard Todd Davis, individually and as an officer of LifeLock, Inc.**
U.S. District Court, District of Arizona

**Parallel Networks Licensing, LLC v. Microsoft Corporation**
U.S. District Court, District of Delaware

**Parallel Networks Licensing, LLC v. International Business Machines Corporation**
U.S. District Court, District of Delaware

**In the Matter of Certain Footwear Products (Complainant Converse Inc.)**
United States International Trade Commission, Washington DC

**Klauber Brothers, Inc. v. Forever 21 Retail Inc., International Intimates, Inc., and Does 1 through 10**
U.S. District Court, Central District of California

**Weber-Stephen Products LLC v. Sears Holdings Corporation, and Sears, Roebuck and Co.**
U.S. District Court, Northern District of Illinois Eastern Division

**Church & Dwight Co., Inc. v. SPD Swiss Precision Diagnostics, GMBH**
U.S. District Court, Southern District of New York

**MMR**

**Robert Namer v. Broadcasting Board of Governors and Voice of America**
U.S. District Court, Eastern District of Louisiana

**Shannon Fabrics, Inc. v. Jo-Ann Stores, Inc.**
U.S. District Court, Central District of California

**Mars, Incorporated v. The Hershey Company and Hershey Chocolate & Confectionery Corporation**
U.S. District Court, Eastern District of Virginia Alexandria Division

**Fitbug Limited v. Fitbit, Inc.**
U.S. District Court, Northern District of California

**Patrick Dang and Michael Villa v. San Francisco Forty-Niners, LTD., et. al.**
U.S. District Court, Northern District of California

**Kreation Juicery, Inc. v. Eiman Shekarchi and April Shekarchi**
U.S. District Court, Central District of California

**Miracle 7, Inc. v. Halo Couture LLC**
U.S. District Court, Southern District of Florida

**Robert McCrary v. The Elations Company LLC**
U.S. District Court, Central District of California

**OraLabs, Inc., v. The Kind Group LLC**
U.S District Court, District of Colorado

**Philippe Charriol International Limited v. A'lor International Limited**
U.S. District Court, Southern District of California

**LegalZoom.com, Inc. v. Rocket Lawyer Incorporated**
U.S. District Court, Central District of California Western Division

**Benchmark Young Adult School, Inc., dba Benchmark Transitions v. Launchworks Life Services, LLC dba Mark Houston Recovery Center and Benchmark Recovery Center**
U.S. District Court, Southern District of California

**Diageo North America, Inc. v. Mexcor, Inc. and EJMV Investments, LLC**
U.S. District Court, Southern District of Texas, Houston Division

**Globefill Incorporated v. Elements Spirits, Inc. and Kim Brandi**
U.S. District Court, Central District of California

**MMR**

**Exhibit 4:**
**Survey Qualifying Questions and Main Questionnaire**

MMR Strategy Group
Study #642-005
December 2020

**Search Study**

**Qualifying Questions**

**[DO NOT PRE-SCREEN OR TARGET, EXCEPT TO MEET DEMOGRAPHIC QUOTAS.]**
**[DO NOT ALLOW RESPONDENTS TO GO BACK TO ANY PREVIOUS QUESTION.]**

Thank you for agreeing to participate in our survey.  If you need eyeglasses or contact lenses to see the screen clearly, please wear them to complete the survey.  Please answer every question honestly and to the best of your ability.  There are no right or wrong answers; we are only interested in your opinions.

On any question, if you don't know how to answer, it is all right to indicate that you don't know or you are not sure.  Please do not guess and please do not consult any other person or source, such as the Internet, while you complete this survey.

Once you start the survey, please complete it in one session without interruption.  Also, please do not use your browser's Back button to try to return to a prior question, as this will terminate your survey.

A.      What is your gender? **(SELECT ONE RESPONSE)**

        Female
        Male
        Prefer not to answer

**[IF "PREFER NOT TO ANSWER" OR QUOTA FILLED, TERMINATE AND SKIP TO Q.100.  IF RESPONSE DOES NOT MATCH PANEL DATA, COUNT AS "GENDER MISMATCH," TERMINATE AND SKIP TO Q.100. OTHERWISE, CONTINUE.]**

B.      What is your age? **(SELECT ONE RESPONSE)**

        20 years old or younger
        21 to 34 years old
        35 to 54 years old
        55 years old or older
        Prefer not to answer

**[IF "20 YEARS OLD OR YOUNGER," "PREFER NOT TO ANSWER," OR QUOTA FILLED, TERMINATE AND SKIP TO Q.100.  IF RESPONSE DOES NOT MATCH PANEL DATA, COUNT AS "AGE MISMATCH," TERMINATE AND SKIP TO Q.100.  OTHERWISE, CONTINUE.]**

Exhibit 4 - Isaacson Expert Report                                                                                          Page 1

C.      Please enter the ZIP code of your home address.

[_____]
**[FORCE 5-DIGIT NUMERIC RESPONSE]**

**[ASSIGN ZIP CODE TO REGION.  IF QUOTA FILLED, TERMINATE AND SKIP TO Q.100.  OTHERWISE, CONTINUE.]**

D.      This question asks about certain activities.  Due to the COVID-19 pandemic, some of these activities **[ROTATE ORDER: may or may not; may not or may]** be available, or you **[MATCH ORDER TO Q.D: may or may not; may not or may]** do them now.  Please answer thinking about your likelihood to do these activities if the pandemic had not occurred.

If it were not for the COVID-19 pandemic, which, if any, of the following activities would you be likely to do in the next 12 months?  For each type of activity, please answer **[MATCH ORDER TO Q.D:** yes, no,**]** or you don't know.  **(SELECT ONE RESPONSE FOR EACH ACTIVITY)**

**<u>RESPONSES</u>**
**[MATCH ORDER TO Q.D.  ANCHOR "I DON'T KNOW" LAST.]**
Yes, I <u>would be</u> likely to do this activity in the next 12 months
No, I <u>would not be</u> likely to do this activity in the next 12 months
I don't know

**<u>TYPES OF ACTIVITIES</u>**
**[RANDOMIZE.]**
Make a hotel room reservation
Make an airplane flight reservation
Make a rental car reservation
Make a restaurant reservation

**[IF "YES" TO "MAKE A HOTEL ROOM RESERVATION", CONTINUE.  OTHERWISE, TERMINATE AND SKIP TO Q.100.]**

E.    In the next 12 months, if you were going to make a reservation for a hotel room, which, if any, of the following methods would you be likely to use?  For each method, please answer **[MATCH ORDER TO Q.D.:** yes, no,**]** or you don't know.  **(SELECT ONE RESPONSE FOR EACH METHOD)**

**RESPONSES**
**[MATCH ORDER TO Q.D.]**
Yes, I <u>would be</u> likely to use this method in the next 12 months to make a reservation for a hotel room
No, I <u>would not be</u> likely to use this method in the next 12 months to make a reservation for a hotel room
I don't know

**METHODS**
**[RANDOMIZE.]**
Searching online using Google
Searching online using Bing
Calling a hotel
Calling a travel agency
Going directly to the website of a hotel
Going directly to the website of an online travel agency

**[IF "YES" TO "SEARCHING ONLINE USING GOOGLE" AND/OR "SEARCHING ONLINE USING BING," CONTINUE.  OTHERWISE, TERMINATE AND SKIP TO Q.100.]**

Exhibit 4 - Isaacson Expert Report                                                                   Page 3

F.    If you were making a hotel room reservation in the next 12 months, which, if any, of the following hotel brands would you be likely to consider?  For each brand, please answer **[MATCH ORDER TO Q.D.:** yes, no,**]** or you don't know.  **(SELECT ONE RESPONSE FOR EACH BRAND)**

**RESPONSES**
**[MATCH ORDER TO Q.D.]**
Yes, I <u>would</u> be likely to consider this brand if I were making a hotel room reservation in the next 12 months
No, I <u>would not</u> be likely to consider this brand if I were making a hotel room reservation in the next 12 months
I don't know

**BRANDS**
**[RANDOMIZE.]**
Comfort Inn
Harrah's
Hampton Inn
Holiday Inn Express
Marriott Marquis

Quality Inn
Caesar's Palace
Hilton Garden Inn
Sheraton
Candlewood Suites

**[IF "YES" TO "GOOGLE" IN Q.E AND "COMFORT INN" IN Q.F, CONTINUE.**
**IF "YES" TO "GOOGLE" IN Q.E AND "HARRAH'S" IN Q.F, CONTINUE.**
**IF "YES" TO "GOOGLE" IN Q.E AND "HAMPTON INN" IN Q.F, CONTINUE.**
**IF "YES" TO "BING" IN Q.E AND "HOLIDAY INN EXPRESS" IN Q.F, CONTINUE.**
**IF "YES" TO "GOOGLE" IN Q.E. AND "MARRIOTT MARQUIS" IN Q.F, CONTINUE.**
**OTHERWISE, TERMINATE AND SKIP TO Q.100.]**

Exhibit 4 - Isaacson Expert Report                                                                          Page 4

G.   Do you or does any member of your household work for any of these types of companies or organizations?  For each type of company or organization, please answer **[MATCH ORDER TO Q.D**: yes, no,**]** or I don't know.  **(SELECT ONE RESPONSE FOR EACH TYPE OF COMPANY OR ORGANIZATION)**

**RESPONSES**
**[MATCH ORDER TO Q.D.]**
Yes
No
I don't know

**TYPES OF COMPANIES OR ORGANIZATIONS**
**[RANDOMIZE.]**
An advertising or public relations agency
A marketing research company
A company that owns or operates a hotel
An Internet search engine
A travel agency or website that makes travel reservations

**[IF "NO" TO ALL, CONTINUE.  OTHERWISE, TERMINATE AND SKIP TO Q.100.]**


H.   In the past 30 days, how many surveys have you completed that involved hotels or travel?  **(SELECT ONE RESPONSE)**

**[REVERSE ORDER.  ANCHOR "I DON'T KNOW" LAST.]**
None
1 to 2
3 or more
I don't know

**[IF "NONE" OR "1 TO 2", CONTINUE.  OTHERWISE, TERMINATE AND SKIP TO Q.100.]**


I.   For quality control purposes, please select the number 7 from the list below.  **(SELECT ONE RESPONSE)**

1
3
5
7
9

**[IF "7," CONTINUE.  OTHERWISE, TERMINATE AND SKIP TO Q.100.]**

Exhibit 4 - Isaacson Expert Report                                                                                    Page 5

J.     Please indicate the type of device you are using to take this survey.  **(SELECT ONE RESPONSE)**

**[RANDOMIZE ORDER.  ANCHOR "OTHER" AND "I DON'T KNOW" LAST.]**
Desktop computer
Laptop computer
Tablet
Smartphone
Some other type of device not listed above
I don't know

**[IF "SMARTPHONE," "TABLET", "OTHER" OR "I DON'T KNOW," OR IF QUOTA FULL, TERMINATE AND SKIP TO Q.100.  OTHERWISE, CONTINUE.]**

K.     If you usually wear eyeglasses or contact lenses when you use a **[PIPE-IN DEVICE TYPE FROM Q.J; DO NOT BOLD OR CAPITALIZE]**, please wear them to complete the remainder of the survey.

**[CELL ASSIGNMENT: ASSIGN RESPONDENTS TO LEAST FULL QUALIFIED CELL.]**

|  | SEARCH ENGINE (Q.E) | BRAND (Q.F) | QUALIFIED CELLS | CITY (PIPE-IN) |
|---|---|---|---|---|
| **IF "YES" TO:** | Google | Comfort Inn | 1, 2 | Virginia Beach |
| **IF "YES" TO:** | Bing | Holiday Inn Express | 3, 4 | Savannah |
| **IF "YES" TO:** | Google | Marriott Marquis | 5, 6 | San Francisco |
| **IF "YES" TO:** | Google | Hampton Inn | 7, 8 | Dallas |
| **IF "YES" TO:** | Google | Harrah's | 9, 10 | Las Vegas |

Exhibit 4 - Isaacson Expert Report                                    Page 6

### Main Questionnaire

**[FOR QUESTIONS WITH [SEARCH ENGINE], [BRAND] AND [CITY] PIPE INS, PIPE IN "SEARCH ENGINE," "BRAND" AND "CITY" FOR ASSIGNED CELL AS SHOWN IN CELL ASSIGNMENT CHART.  DO NOT BOLD OR CAPITALIZE PIPE INS.]**

L.      Imagine that you are using **[SEARCH ENGINE]** to search for a hotel room at a **[BRAND]** hotel in **[CITY]**.  The image below shows the web page on **[SEARCH ENGINE]** with the search term "**[BRAND] [CITY]**" entered in the search bar.

Because this is an image, any links in the image are not active.

Please look at the web page as you normally would if you saw it while searching on **[SEARCH ENGINE]** for a hotel room at a **[BRAND]** hotel in **[CITY]**.  You may need to scroll to see the entire web page.

**[DISPLAY A THIN BLACK HORIZONTAL LINE FOLLOWED BY THREE EMPTY ROWS.  SHOW IMAGE KEYWORD SEARCH FOR ASSIGNED CELL.  DISPLAY THREE EMPTY ROWS FOLLOWED BY A THIN BLACK HORIZONTAL LINE.]**

Do you see the web page clearly?  **(SELECT ONE RESPONSE)**

<u>RESPONSES</u>
**[MATCH ORDER TO Q.D.]**
Yes, I <u>do</u> see the web page clearly
No, I <u>do not</u> see the web page clearly
I don't know

**[IF "YES," CONTINUE.  OTHERWISE, TERMINATE AND SKIP TO Q.100.]**

Exhibit 4 - Isaacson Expert Report                                                                    Page 7

M.    Please imagine that your search on **[SEARCH ENGINE]** for a hotel room at a **[BRAND]** hotel in **[CITY]** provided the search results shown in the image below.

Because this is an image, any links in the image are not active.

Please look at the search results as you normally would if you saw these search results while searching for a hotel room on **[SEARCH ENGINE]**. You may need to scroll to see all of the search results.

**[DISPLAY A THIN BLACK HORIZONTAL LINE FOLLOWED BY THREE EMPTY ROWS.  SHOW IMAGE KEYWORD SEARCH RESULTS FOR ASSIGNED CELL.  DISPLAY THREE EMPTY ROWS FOLLOWED BY A THIN BLACK HORIZONTAL LINE.]**

Do you see the search results clearly?  **(SELECT ONE RESPONSE)**

**<u>RESPONSES</u>**
**[MATCH ORDER TO Q.D.]**
Yes, I <u>do</u> see the search results clearly
No, I <u>do not</u> see the search results clearly
I don't know

**[IF "YES," CONTINUE.  OTHERWISE, TERMINATE AND SKIP TO Q.100.]**


N.    Below is one of the search results that was displayed in the image you just viewed.  As before, any links in the image are not active.

Please look at the search result as you normally would if you saw it while searching for a hotel room on **[SEARCH ENGINE]**.  You may need to scroll to see the entire search result.

**[DISPLAY A THIN BLACK HORIZONTAL LINE FOLLOWED BY THREE EMPTY ROWS.  SHOW IMAGE LISTING FROM THE SEARCH RESULTS FOR ASSIGNED CELL.  DISPLAY THREE EMPTY ROWS FOLLOWED BY A THIN BLACK HORIZONTAL LINE.]**

Do you see the search result clearly?  **(SELECT ONE RESPONSE)**

**<u>RESPONSES</u>**
**[MATCH ORDER TO Q.D.]**
Yes, I <u>do</u> see the search result clearly
No, I <u>do not</u> see the search result clearly
I don't know

**[IF "YES," CONTINUE.  OTHERWISE, TERMINATE AND SKIP TO Q.100.]**

Exhibit 4 - Isaacson Expert Report                                                                    Page 8

O.  Imagine you clicked the link displayed in the search result you just viewed, and the link directs you to the page from a website displayed in the image below.  As before, any links in the image are not active.

Please look at the page as you normally would if you saw it while searching for a hotel room on the Internet.  You may need to scroll to see the entire page.

**[DISPLAY A THIN BLACK HORIZONTAL LINE FOLLOWED BY THREE EMPTY ROWS.  SHOW IMAGE LANDING PAGE FOR ASSIGNED CELL.  DISPLAY THREE EMPTY ROWS FOLLOWED BY A THIN BLACK HORIZONTAL LINE.]**

Do you see the page clearly?  **(SELECT ONE RESPONSE)**

**RESPONSES**
**[MATCH ORDER TO Q.D.]**
Yes, I <u>do</u> see the page clearly
No, I <u>do not</u> see the page clearly
I don't know

**[IF "YES," CONTINUE.  OTHERWISE, TERMINATE AND SKIP TO Q.100.]**


1.  Below is the image you just viewed, which displays a page from a website.  To proceed, please answer the question which is located below the image.

As before, please do not guess.  If you do not know the answer to a question or do not have an opinion, please indicate that you do not know.

**[DISPLAY A THIN BLACK HORIZONTAL LINE FOLLOWED BY THREE EMPTY ROWS.  SHOW IMAGE LANDING PAGE FOR ASSIGNED CELL.  DISPLAY THREE EMPTY ROWS FOLLOWED BY A THIN BLACK HORIZONTAL LINE.]**

What company or brand do you think owns or operates this website?  Please be as specific as possible.  If you don't know, please select the box labeled "I don't know."

```



```

❑ I don't know.  **[EXCLUSIVE]**

**[IF "I DON'T KNOW," SKIP TO Q.3.  OTHERWISE, CONTINUE.]**

Exhibit 4 - Isaacson Expert Report                                                    Page 9

2.      The question is located below the image.

**[DISPLAY A THIN BLACK HORIZONTAL LINE FOLLOWED BY THREE EMPTY ROWS.  SHOW IMAGE LANDING PAGE FOR ASSIGNED CELL.  DISPLAY THREE EMPTY ROWS FOLLOWED BY A THIN BLACK HORIZONTAL LINE.]**

What makes you think that?  Please be as specific as possible.

☐  I don't know.  **[EXCLUSIVE]**

**[IF ASKED, REQUIRE A RESPONDENT TO PROVIDE AN ANSWER IN THE TEXT BOX OR SELECT "I DON'T KNOW."  OTHERWISE, PROVIDE THIS MESSAGE,** "You must provide an answer or check the box labeled 'I don't know.'"**]**

3.      Please re-enter the ZIP code of your home address.

[_____]
**[FORCE 5-DIGIT NUMERIC RESPONSE]**

**[IF ZIP CODE DOES NOT MATCH Q.C, CONTINUE.  OTHERWISE, SKIP TO Q.5.]**

4.      To verify, please re-enter the ZIP code of your home address.

[_____]
**[FORCE 5-DIGIT NUMERIC RESPONSE]**

**[IF ZIP CODE MATCHES Q.C, CONTINUE.  OTHERWISE, TERMINATE AND SKIP TO Q.100.]**

5.      Please read the statement that follows and click either "I agree" or "I disagree."  If any portion of the statement is not true, please click "I disagree."

**STATEMENT**
I am the person who was invited to participate in this survey.  I completed this survey myself, without assistance or advice from any other person or source, and in accordance with the instructions provided in the survey.  The answers I have provided are truthful expressions of my situation and opinions.



Your response to the above statement will not affect your rewards for completing the survey.


**[IF "I DISAGREE," COUNT RESPONDENT AS TERMINATED.  DO NOT COUNT AS A COMPLETED INTERVIEW AND DO NOT COUNT TOWARD QUOTAS.  REGARDLESS OF ANSWER, CONTINUE AND REWARD RESPONDENT FOR COMPLETION.  DISPLAY Q.6, DO NOT DISPLAY Q.100.]**


6.      Thank you for completing our survey.


**[IF TERMINATED, SHOW Q.100.]**

Q.100.  Thank you for your interest in this survey.  However, we are looking for individuals with specific qualifications.

Exhibit 4 - Isaacson Expert Report                                                                    Page 11

**Exhibit 5:**
**Description of Survey Demographics**

**Description of Survey Demographics**

The demographics of the survey, in terms of age, gender, and region, were set after considering demographic data from a variety of sources. Those sources are shown below in Table A. Table A also shows the demographics of the survey database.

Table A provides the following sources:

1. <u>General population of the U.S.</u>: Describes the general population of the United States, according to the U.S. Census Bureau.

2. <u>Data from TravelPass</u>: ███████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████
██████████████

3. <u>Data from Hampton Inn, Comfort Inn, and Harrah's</u>: ██████████████████
████████████████████████████████████

4. <u>Survey database</u>: Describes the demographics of the survey database.

Where necessary, data sources were re-based to match the data categories of the survey, and to add to 100%.

Exhibit 5 - Isaacson Expert Report                                                                 Page 1





Exhibit 5 - Isaacson Expert Report

HIGHLY CONFIDENTIAL --
SUBJECT TO PROTECTIVE ORDER

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing document was served by electronic mail on all counsel of record on this the 30th day of December, 2020.

/s/ Lauren Cury
Lauren Cury