# United States District Court

### EASTERN DISTRICT OF TEXAS
### TEXARKANA DIVISION

| | | |
|---|---|---|
| **TRAVELPASS GROUP, LLC, PARTNER** | § | |
| **FUSION, INC. and RESERVATION** | § | |
| **COUNTER, LLC** | § | |
| | § | |
| **v.** | § | **Case No. 5:18-cv-153-RWS-CMC** |
| | § | **SEALED** |
| **CAESARS ENTERTAINMENT** | § | |
| **CORPORATION, ET AL.** | § | |

---

## REPORT AND RECOMMENDATION
## OF THE UNITED STATES MAGISTRATE JUDGE

---

The above-referenced cause of action was referred to the undersigned United States Magistrate Judge for pre-trial purposes in accordance with 28 U.S.C. § 636. The following motions are before the Court:

> **Plaintiffs' Motion for Summary Judgment on Defendants' Counterclaims (Docket Entry # 558);**
>
> **Plaintiffs' Motion for Partial Summary Judgment on Defendants' Requests for Monetary Relief (Docket Entry # 560); and**
>
> **Defendants' Joint Motion for Summary Judgment on Likelihood of Confusion and Fair Use (Docket Entry # 565).**

The Court, having reviewed the relevant briefing and hearing arguments of counsel August 19, 2021, recommends the motions for summary judgment be **DENIED**.

## Table of Contents

I.      Background                                                                          4

A.      TravelPass' claims                                                                  4
B.      Marriott's counterclaims                                                            5

II.     Motions Regarding Marriott's Counterclaims                                          7

A.      TravelPass' motion for summary judgment regarding Marriott's counterclaims          7
B.      Marriott's motion for partial summary judgment on likelihood of confusion and fair  8
        use
C.      TravelPass' motion for partial summary judgment on Marriott's request for monetary  9
        relief

III.    Legal Standard                                                                      10

IV.     Summary judgment evidence                                                           12

A.      Parties' exhibits                                                                   12
        1.  TravelPass' exhibits attached to motion regarding Marriott's counterclaims      12
        2.  Marriott's exhibits                                                             13
        3.  TravelPass' objections to Marriott's exhibits                                   21
        4.  TravelPass' exhibits attached to motion regarding Marriott's request for monetary  26
            relief
B.      The evidence                                                                        27

V.      Section 43 of the Lanham Act and Common Law Unfair Competition Counterclaims        58

A.      Section 43 of the Lanham Act                                                        58
B.      Marriott's counterclaims                                                            62
C.      False advertising counterclaims                                                     62
        1.  Marriott's allegations                                                          62
        2.  Applicable law                                                                  63
        3.  Whether Marriott can establish elements for Lanham Act § 1125(a)(1)(B)          65
            false advertising counterclaims
            a.  Whether there is sufficient evidence TravelPass' advertising claims are     65
                false or misleading
                *Specific factual statements or puffery*                                    65
                *Falsity or deception*                                                      71
            b.  Whether there is sufficient evidence of materiality                         75
            c.  Whether there is sufficient evidence of likelihood of injury                80
D.      Trademark dilution counterclaim                                                     82
        1.  Marriott's allegations                                                          82

|  |  |  |
|---|---|---|
| 2. | Applicable law | 82 |
| 3. | Whether Marriott can establish elements for Lanham Act § 1125(c) trademark dilution counterclaims | 84 |

| VI. | Section 32 of the Lanham Act and Common Law Trademark Infringement Counterclaims | 89 |
|---|---|---|

| A. | Marriott's allegations | 89 |
| B. | Section 32 of the Lanham Act | 89 |
| C. | Analysis | 92 |
|  | 1. Legally protected mark | 92 |
|  | 2. Likelihood of confusion | 92 |
|  | a. Applicable law | 92 |
|  | b. Parties' assertions | 94 |
|  | c. The digits | 97 |
|  | d. Balancing the digits | 103 |

| VII. | Marriott's Request for Monetary Relief | 103 |
|---|---|---|

| A. | Parties' assertions | 103 |
| B. | Applicable law, generally | 105 |
| C. | Whether Marriott is entitled to seek monetary relief | 106 |
|  | 1. Compensable harm | 106 |
|  | 2. Disgorgement | 108 |
|  | a. Applicable law | 108 |
|  | b. Analysis | 110 |
|  | i. *Pebble Beach* factors | 110 |
|  | *Whether TravelPass had intent to confuse or deceive* | 110 |
|  | *Whether sales have been diverted* | 111 |
|  | *Adequacy of other remedies* | 111 |
|  | *Any unreasonable delay by Marriott* | 112 |
|  | *Public interest in making the misconduct unprofitable* | 112 |
|  | *Whether it is a case of palming off* | 113 |
|  | ii. Attribution | 114 |
|  | *Parties' assertions* | 114 |
|  | *Relevant caselaw* | 117 |
|  | *Discussion* | 121 |
|  | 3. Corrective advertising | 126 |
|  | a. Applicable law | 126 |
|  | b. Analysis | 126 |

| VIII. | Recommendation | 129 |
|---|---|---|

# I. BACKGROUND

## A.     TravelPass' claims

This is an antitrust case involving an alleged "horizontal conspiracy among the nation's leading hotel chains to limit or eliminate competition for internet ad placements in response to internet searches for hotel-branded keywords, a technique millions of customers use to book hotel rooms online each year."   Docket Entry # 468, ¶ 1. Plaintiff TravelPass Group, LLC and its predecessor or related entities, Reservation Counter, LLC, and Partner Fusion, Inc. (collectively, "TravelPass") are downstream online travel agencies ("OTAs") that sell hotel rooms from different chains to consumers in the United States. *Id.*, ¶¶ 5, 41. According to TravelPass, there are two types of OTAs: (1) Gatekeeper OTAs, including Expedia and Priceline, that maintain direct relationships with major hotel chains to market hotel inventory online and (2) Downstream OTAs, like TravelPass, that have affiliate agreements with Gatekeeper OTAs for access to hotel inventory. *Id.*, ¶¶ 5, 42. TravelPass' business model includes bidding on branded keyword search results to attract hotel consumers to the hotel inventory on its websites. *Id.*, ¶¶ 44, 48.

TravelPass originally filed this antitrust case against eight hotel chains ("Defendant Hotels"). As of this date, TravelPass' claims against Caesars Entertainment Corporation, Hilton Domestic Operating Company, Inc., Hyatt Corporation, Red Roof Inns, Inc., Wyndham Hotel Group, LLC, Choice Hotels International, Inc., and Six Continents Hotels, Inc.  have been dismissed, leaving only TravelPass' claims against Marriott International, Inc. ("Marriott"). According to TravelPass' Amended Complaint, which was filed on May 11, 2021, Defendant Hotels entered into a conspiracy, which had "three interlocking components," "with the purpose and intent of weakening both Gatekeeper and Downstream OTAs by excluding them from effective participation in branded

keyword search advertising." *Id.*, ¶ 9.

Specifically, TravelPass alleges as follows: (1) "Defendant Hotels and their co-conspirators protected their flanks by entering into a predicate bid-rigging agreement that prevented or eliminated direct competition among themselves for branded keywords;" (2) "Defendant Hotels and their co-conspirators agreed to leverage this security to negotiate more favorable terms with Gatekeeper OTAs like Expedia and Priceline;" and (3) "Defendant Hotels worked together to deny Downstream OTAs like TravelPass cost-effective access to hotel inventory, reducing or eliminating their ability to compete effectively for branded keyword search advertising placement." *Id.*, ¶¶ 11-13. TravelPass alleges Defendant Hotels' conspiracy "operated with the goal of limiting or eliminating competition from OTAs." *Id.*, ¶ 14.

## B.    Marriott's counterclaims

Marriott has filed counterclaims for trademark infringement under Section 32(1) of the Lanham Act (15 U.S.C. § 1114), false designation of origin and unfair competition under Section 43(a)(1)(A) of the Lanham Act (15 U.S.C. § 1125(a)(1)(A)), false advertising under Section 43(a)(1)(B) of the Lanham Act (15 U.S.C. § 1125(a)(1)(B)), trademark dilution under Section 43(c) of the Lanham Act (15 U.S.C. § 1125(c)), trademark infringement and unfair competition under Texas Common Law, and injury to Marriott's business reputation under Texas Business and Commerce Code §16.103. Docket Entry # 522 at pp. 22, ¶ 7. Marriott seeks injunctive relief, damages, an accounting of TravelPass' profits from its false advertising, infringement, misrepresentations and other wrongdoing, attorneys' fees, and such other relief as the Court deems just and proper. *Id.*

Marriott claims TravelPass engages in misleading and deceptive online advertising. *Id.* at

5

p. 21, ¶ 4. Specifically, Marriott alleges as follows:

> Without Marriott's authorization, TravelPass relies on Marriott trademarks and brand identifiers in the text of its advertisements, omitting any mention of TravelPass itself, to make it look as though the advertisements come directly from Marriott. TravelPass incorporates Marriott trademarks in the web addresses of the links included in TravelPass advertisements, also without Marriott's authorization, to suggest that the links lead to Marriott websites specific to the searched-for Marriott-branded hotel. But when a consumer clicks the link in the ad, the consumer is instead taken to one of TravelPass's own websites.

*Id*.

 According to Marriott, TravelPass continues the deception on its websites themselves. *Id*. at p. 21, ¶ 5. Marriott alleges "TravelPass's websites display Marriott's trademarks and particularly Marriott's distinctive, highly recognizable logo marks to an extent in excess of what is needed to simply identify a given Marriott-branded hotel in order to deliberately convey the misimpression that the TravelPass site is owned by, affiliated with, or otherwise connected to Marriott." *Id*.

Marriott further alleges TravelPass engages in false advertising by including allegedly false or misleading statements in its advertisements and landing pages. Specifically, Marriott alleges "TravelPass claims to offer the 'lowest prices,' but in fact TravelPass frequently offers lodging at Marriott hotels at prices *higher* than those offered to consumers who book directly with Marriott. Also, TravelPass falsely claims to abide by the cancellation policies of the hotels booked through its site." *Id*. at p. 23,  ¶ 6 (emphasis original). Marriott alleges TravelPass also regularly misleads consumers into believing that they will receive Marriott Rewards points when they book rooms through TravelPass, even though they will not. *Id*.

Six dispositive motions have recently been filed in this case, three of which the Court considers herein.  This plus the examination of the voluminous record and the extensive briefing before the Court has necessitated a lengthy opinion. The pretrial conference is scheduled before the

undersigned on October 20, 2021, with jury selection and trial scheduled October 25, 2021 before District Judge Schroeder.

## II. MOTIONS REGARDING MARRIOTT'S COUNTERCLAIMS

**A.    TravelPass' motion for summary judgment regarding Marriott's counterclaims**

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule CV-56, TravelPass moves for summary judgment dismissing Marriott's counterclaims for federal trademark infringement, federal unfair competition, false designation of origin, false advertising, federal trademark dilution, trademark infringement and unfair competition under Texas Common Law, and injury to business reputation (i.e. trademark dilution) under Texas Business and Commerce Code §16.103.[1] According to TravelPass, Marriott's counterclaims for false advertising should be dismissed because (1) the statements at issue are inactionable puffery, (2) the statements at issue are not literally false, (3) Marriott has no evidence the statements at issue actually deceived a substantial segment of potential consumers, (4) Marriott has no evidence the statements at issue were material to any customer's purchasing decision, and/or (5) Marriott has no evidence it was injured by the statements at issue.

TravelPass further asserts Marriott's counterclaims for trademark dilution fail as a matter of law because TravelPass has only used Marriott's trademarks to refer to Marriott's own goods. Finally, TravelPass contends Marriott's counterclaims for trademark infringement should be dismissed because Marriott has no competent evidence to show there is a likelihood of confusion.

In response, Marriott first addresses its false advertising claims. First, Marriott asserts TravelPass' statements are specific factual claims, not puffery. Second, Marriott asserts TravelPass'

---

[1] In its motion, TravelPass does not specifically address Marriott's claim under § 1125(a)(1)(A), which Marriott labels "false designation of origin" in its counterclaims.

advertising claims are false. Third, Marriott argues TravelPass' advertisements are deceptive and material. Fourth, Marriott contends TravelPass' false advertising harmed Marriott.

As to the second overall issue, Marriott argues TravelPass is not entitled to summary judgment on Marriott's trademark dilution claims. As to the third overall issue—regarding Marriott's counterclaim for trademark infringement—Marriott asserts summary judgment is appropriate in favor of Marriott for the reasons set forth in Defendants' Joint Motion for Summary Judgment on Likelihood of Confusion and Fair Use. Docket Entry # 565. Alternatively, Marriott asserts there are fact issues that preclude summary judgment in favor of TravelPass on the trademark infringement counterclaims. Specifically, Marriott asserts as follows: (1) TravelPass' infringement does not constitute fair use; (2) TravelPass actively sought to confuse consumers; (3) the record contains competent evidence of actual confusion; and (4) the consumer survey evidence further demonstrates actual confusion.

**B.     Marriott's motion for partial summary judgment on likelihood of confusion and fair use**

As noted above, Marriott has asserted counterclaims that include claims for trademark infringement in violation of the Lanham Act, 15 U.S.C. § 1114. TravelPass has asserted defenses that include fair use.  In its motion for partial summary judgment, Marriott asserts it is entitled to judgment as a matter of law that TravelPass' use of its trademarks is likely to create confusion and that TravelPass' use of its trademarks does not constitute either classic or nominative fair use.

Regarding customer confusion, Marriott asserts each and every "digit weighs in favor of" Marriott, and no "reasonable jury could find that the digits of confusion support anything other than a likelihood of confusion as the 'inescapable conclusion' of the record in this case is that TravelPass's activities have caused a likelihood of confusion (indeed, widespread actual

8

confusion)." Docket Entry # 565 at pp. 18, 24. Marriott contends TravelPass cannot claim that its use of Marriott's trademarks is permissible under the "fair use" doctrine. *Id*. at p. 24. According to Marriott, the asserted trademarks "are not descriptive of TravelPass's OTA products or services and are not being used by TravelPass in a descriptive manner. Rather, TravelPass's use of the Asserted Marks is a source-identifier for the Hotel Companies' services that TravelPass is marketing and selling to online consumers." *Id*. at p. 25. Thus, Marriott argues the "classic" fair use defense does not apply and should be dismissed. Marriott further asserts the nominative fair use defense does not apply because TravelPass used Marriott's marks excessively, "far beyond what is necessary to identify the services," and "also falsely suggested the identity of the hotel[] [itself] through the manner of its use." *Id*. at p. 26.

## C.   TravelPass' motion for partial summary judgment on Marriott's request for monetary relief

Noting Marriott is seeking disgorgement and corrective advertising damages, TravelPass also moves for summary judgment on counterclaim damages. According to TravelPass, Marriott has no evidence it has suffered any compensable harm; Marriott is not entitled to corrective advertising damages; and Marriott is not entitled to disgorgement. Regarding disgorgement specifically, TravelPass makes the following assertions.

First, according to TravelPass, Marriott has no evidence that TravelPass' profits are attributable to the alleged Lanham Act violations. Second, TravelPass contends Marriott admits TravelPass did not divert sales. Third, TravelPass argues there is no evidence TravelPass intended to confuse or deceive. According to TravelPass, if liability is found, injunctive relief would be sufficient. Additionally, TravelPass asserts Marriott has unreasonably delayed in asserting its rights (and may never have asserted them absent TravelPass' antitrust claims). Finally, TravelPass asserts

this case does not involve the public interest or palming off.

In response, Marriott first asserts TravelPass has not filed a statement of disputed facts as required by the Local Rules. According to Marriott, because TravelPass' motion is procedurally defective, the motion should be denied. Additionally, Marriott states the record is "flooded" with evidence that TravelPass never invested in its own brand; it has not established itself as a trusted, reputable brand. Instead, according to Marriott, TravelPass schemed to confuse customers who were searching for Marriott into believing they were dealing directly with Marriott. Marriott argues each of the tactics benefitted TravelPass and harmed Marriott.

With regard to disgorgement of TravelPass' profits, Marriott specifically asserts as follows: (1) TravelPass intended to confuse customers; (2) TravelPass diverted sales from Marriott; (3) injunctive relief is insufficient; (4) Marriott did not delay in asserting its rights; (5) TravelPass' conduct is akin to palming off; and (6) there is public interest in preventing misleading advertising and misuse of trademarks. Additionally, Marriott argues TravelPass bears the burden to show that its profits should not be attributed to its Lanham Act violations. Finally, Marriott argues it is entitled to corrective advertising damages.

### III. LEGAL STANDARD

The purpose of summary judgment is to isolate and dispose of factually unsupported claims or defenses. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). Summary judgment is proper if the pleadings, the discovery and disclosure materials on file, and any affidavits "[show] that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 248 (1986). The trial court must resolve all reasonable doubts in favor of the party opposing the motion for summary judgment. *Casey Enters., Inc. v. Am. Hardware Mut. Ins. Co.*, 655 F.2d 598, 602 (5th Cir. 1981) (citations omitted). The substantive law identifies which facts are material. *Anderson*, 477 U.S. at 248.

The party moving for summary judgment has the burden to show that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Id.* at 247. If the movant bears the burden of proof on a claim or defense on which it is moving for summary judgment, it must come forward with evidence that establishes "beyond peradventure *all* of the essential elements of the claim or defense." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986) (emphasis in original). Where the nonmovant bears the burden of proof, the movant may discharge its burden by showing there is an absence of evidence to support the nonmovant's case. *Celotex*, 477 U.S. at 325; *Byers v. Dallas Morning News, Inc.*, 209 F.3d 419, 424 (5th Cir. 2000). Once the movant has carried its burden, the nonmovant must "respond to the motion for summary judgment by setting forth particular facts indicating there is a genuine issue for trial." *Byers*, 209 F.3d at 424 (citing *Anderson*, 477 U.S. at 248-49). The nonmovant must adduce affirmative evidence. *Anderson*, 477 U.S. at 257. No "mere denial of material facts nor…unsworn allegations [nor] arguments and assertions in briefs or legal memoranda" will suffice to carry this burden. *Moayedi v. Compaq Computer Corp.*, 98 Fed. Appx. 335, 338 (5th Cir. 2004). Rather, the court requires "significant probative evidence" from the nonmovant in order to dismiss a request for summary judgment supported appropriately by the movant. *United States v. Lawrence*, 276 F.3d 193, 197 (5th Cir. 2001). The court must consider all of the evidence, but must refrain from making any credibility determinations or weighing the evidence. *See Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337,

343 (5th Cir. 2007).

As noted above, TravelPass moves for summary judgment on Marriott's counterclaims for false advertising, federal trademark dilution, federal trademark infringement and unfair competition, and common law claims for trademark infringement and unfair competition. In the Court's discussion of Marriott's trademark infringement counterclaims, the Court will also consider Marriott's motion for partial summary judgment on likelihood of confusion and unfair use. By separate motion, TravelPass moves for partial summary judgment on the issue of damages. After setting out the summary judgment evidence, the Court addresses each issue in turn below.

## IV. SUMMARY JUDGMENT EVIDENCE[2]

**A.    Parties' exhibits**

**1.    TravelPass' exhibits attached to motion regarding Marriott's counterclaims[3]**

[2] Because the various pending motions and related briefing may overlap, the Court has considered the entire admissible record in this case, including the evidence attached by the parties to other filings. *See* FED. R. CIV. P. 56 (c)(3) ("*Materials Not Cited*. The court need consider only the cited materials [filed with a motion for summary judgment or response], but it may consider other materials in the record.").

[3] As pointed out by Marriott, regrettably TravelPass' motions do not contain a statement of undisputed material facts, making it difficult to identify which material facts are in dispute. Even so, the Court does not recommend TravelPass' motions be denied for this reason.

[REDACTED]

### 2. Marriott's exhibits[4]

### a. Marriott's motion on likelihood of confusion and fair use

In support of its motion for partial summary judgment on likelihood of confusion and fair use, Marriott relies on the following evidence: (1) copies of certificates of registration and relevant assignment records for trademarks owned by Choice asserted in this case ("Ex. 1"); (2) copies of certificates of registration for trademarks owned by Marriott asserted in this case ("Ex. 2"); (3) copies of certificates of registration and relevant assignment records for trademarks owned by Six Continents asserted in this case ("Ex. 3"); (4) [REDACTED]

[REDACTED]

---

[4] In response to TravelPass' motion for summary judgment on Marriott's counterclaims, Marriott incorporates by reference its statement of undisputed material facts, as well as the cited evidence for each of those facts, contained in its motion for summary judgment on likelihood of confusion and unfair use.









The Court does not list herein the evidence attached to TravelPass' response to Marriott's motion. *See* Docket Entry # 604, Exhibits 1-27.

**b.     Marriott's response to TravelPass' motion regarding counterclaims**

In addition to certain evidence also attached to Defendants' Joint Motion for Summary Judgment on Likelihood of Confusion and Fair Use (which the Court does not duplicate herein),[5] Marriott relies on the following additional evidence in response to TravelPass' motion regarding Marriott's counterclaims (attached to Docket Entry #s 611, 613): (1) hotel search results ("Ex. 82");

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

---

[5] In its response, Marriott incorporates by reference the statement of undisputed material facts, as well as the cited evidence for each of those facts, contained in their motion for summary judgment on likelihood of confusion and fair use (Docket Entry #s 565, 566). The "LOC MSJ" facts and their exhibits are referred to as Docket Entry # 565, SUMF ¶ XX; Ex. XX. Citations to additional facts and their exhibits are referred to as SMF, ¶ XX and/or Ex. XX (with these exhibits being subsequently numbered from the LOC MSJ for ease of reference).

████████████████████████████████████████

████████████████████████████

The Court does not list herein the evidence attached to TravelPass' reply (Docket Entry # 640, Exhibits 1-3) or the evidence attached to Marriott's surreply (Docket Entry # 652, Exhibits 148-156).

**3.      TravelPass' objections to Marriott's evidence**

In TravelPass' response, TravelPass objects to Marriott's "compilation" exhibits (Docket Entry # 565, Exs. 36-38) as inadmissible hearsay.[6] Docket Entry # 604 at p. 2. As further asserted by TravelPass in its pending motion *in limine*, TravelPass does not seek a wholesale exclusion of consumer complaints as evidence of confusion. Rather, TravelPass contends Marriott should be precluded from mentioning consumer complaints that are (1) anonymous or unverified complaints from message boards; (2) second-hand emails from third parties; (3) complaints about brands not at issue in this lawsuit; and (4) duplicative compilations. *See* Docket Entry # 685 at pp. 7-12 (further arguing that to the extent Marriott seeks to offer consumer complaints as evidence of confusion, Marriott must be required to make a threshold showing that the complaints contain statements that show the alleged confusion was at least related to or caused by TravelPass).

Exhibit 37 is a 19-page chart containing twenty-five document descriptions entitled "Exemplary Evidence of Actual Confusion Received by Marriott." Docket Entry # 611-14.

_____

[6] Exhibit 36 to Marriott's response is the same compilation exhibit as Exhibit 36 to Defendants' Joint Motion for Summary Judgment on Likelihood of Confusion and Fair Use ("LOC MSJ") (complaints received by Choice). Exhibit 37 to Marriott's response is the same compilation exhibit as Exhibit 37 to Defendants' LOC MSJ (complaints received by Marriott). Exhibit 38 to Marriott's response is the same compilation exhibit as Exhibit 38 to Defendants' LOC MSJ (complaints received by IHG). *See* Declaration of Russell E. Blythe in Support of Defendants' Opposition to Plaintiffs' Motion for Summary Judgment on Defendants' Counterclaims. Docket Entry # 611-1.
   Because Marriott is the only remaining defendant/counterclaim plaintiff, the Court only considers TravelPass' objections to Exhibit 37.

Examples of documents referenced in the chart include the following: ███████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████

TravelPass argues these "types of secondhand references to unspecified statements by unidentifiable declarants are inadmissible hearsay and cannot be used to show actual confusion." Docket Entry # 604 at pp. 15-16 (citing *Smith Fiberglass Products, Inc. v. Ameron, Inc*., 7 F.3d 1327, 1330–31 (7th Cir.1993) (actual confusion evidence which lacks "an exact quote or even the identity of the person making the statement" is inadmissible hearsay); also citing, among other cases,

*Cross Trailers, Inc v. Cross Trailer Manufacturing and Sales, L.L.C.*, 363 F. Supp. 3d 774, 786 (W.D. Tex. 2018) (finding that exhibit to summary judgment was hearsay because it "consist[ed] entirely of statements referring to calls from others" and plaintiff did not establish an exception applied); *Texas Outhouse Inc v. Fresh Can, L.L.C.*, 266 F. Supp. 3d 928, 938-39 (S.D. Tex. 2017) (striking from declaration statement that "several customers have expressed that they thought Texas Outhouse and TWC [Texas Waste] are one and the same," as inadmissible hearsay)).

According to Marriott's reply, the evidence of actual confusion is competent and admissible. Docket Entry # 645 at p. 10. Specifically, Marriott asserts as follows:

> Evidence of consumer complaints is regularly admitted into evidence in trademark infringement and false advertising cases in the Fifth Circuit. *See, e.g.*, *Morris Jewelers, Inc. v. Gen. Elec. Credit Corp.*, 714 F.2d 32, 34 (5th Cir. 1983) (customer complaint letters were admissible and evidenced anger of customers, which 'translates into loss of goodwill'); *Mary Kay, Inc. v. Weber*, 601 F. Supp. 2d 839, 846-47 (N.D. Tex. 2009) (rejecting argument that email complaint was inadmissible as hearsay). Such evidence is admissible because they are (a) out of court assertions <u>not</u> offered for the truth of the matter asserted, or (b) hearsay, but subject to the state of mind exception. *See Armco, Inc. v. Armco Burglar Alarm Co.*, 693 F.2d 1155, 1160 and n.10 (5th Cir. 1982); *U.S. Risk of Virginia, LLC v. Lighthouse Programs LLC*, No. 3:06-CV-2033-L, 2008 WL 4387026 at *3 (N.D. Tex. Sept. 26, 2008).
>
> Courts in the Fifth Circuit have regularly relied on such evidence. *See, e.g., Mary Kay, Inc.*, 601 F. Supp. 2d at 859 (email from confused customer 'demonstrates that at least one individual was confused'); *ADT, LLC*, 145 F. Supp. 3d at 689 (news reports and customer complaints supported a finding of actual confusion); *Choice Hotels Int'l, Inc. v. Frontier Hotels, Inc.*, No. H-15-2355, 2016 WL 4367993, at *4 (S.D. Tex. Aug. 15, 2016) ('evidence of customer complaints and customer confusion shows that Choice Hotels has suffered irreparable injury'). Indeed, online reviews have been found to be admissible and competent evidence of actual confusion. *Choice Hotels Int'l, Inc. v. Cheema Invs., LLC,* No. 3:11-CV-01762-O, 2013 WL 12125998 (N.D. Tex. Feb. 20, 2013) (actual confusion evidenced by online reviews); *Hayward Indus., Inc. v. Saltwater Pool Supplies*, No. CV 20-6105 (KM)(ESK), 2021 WL 1940711, at *10 (D.N.J. May 14, 2021) (evidence of consumer dissatisfaction and confusion in online reviews established 'reputational harm to plaintiff and tarnish[ed] its good will'). *See also Elias v. Pilo*, 781 F. App'x 336, 338 (5th Cir. 2019) (crediting online Yelp reviews in the motion to dismiss context). TravelPass's arguments deriving from extra-circuit precedent should be

disregarded, and the Court should find the consumer complaints submitted by the Hotel Companies admissible and competent evidence of actual consumer confusion, as other courts in the Fifth Circuit routinely do.

*Id.* at pp. 10-11 (emphasis original).

Hearsay is an out-of-court statement offered for the truth of the matter asserted by the statement. *Cross Trailers*, 363 F. Supp. 3d at 785 (citing FED. R. EVID. 801(c)). Thus, obviously, a statement offered for a purpose other than the truth of the matter asserted therein is not hearsay. *Id.* (citing *Nester v. Textron, Inc.*, Civil Action No. 1:13-cv-00920, 2015 WL 7272249, at *7 (W.D. Tex. Nov. 17, 2015) (Ezra, J.)). In this vein, a question, which does not assert anything, is not hearsay. *Id.* (citing *U.S. v. Lewis*, 902 F.2d 1176, 1179 (5th Cir. 1990)). If a statement is shown to be hearsay, the party offering the statement must establish an exception applies.[7] *Id.* (citing *U.S. v. Fernandez-Roque*, 703 F.2d 808, 812 (5th Cir. 1983)).

In *Choice Hotels*, the hotel showed customers were actually confused by Cheema's actions by pointing to online reviews, dated after the termination of the franchise agreement, where customers referred to Cheema's establishment as a Choice Hotels property. *Cheema*, 2013 WL 12125998, at *3. In a later case involving Choice Hotels, the court noted, in the context of ruling on the plaintiff's motion for summary judgment, that "there were several negative guest reviews, including one from March 2016 where a guest complained that he or she was under the impression that the hotel was a COMFORT INN® until the guest attempted to lodge a complaint with COMFORT INN® and was alerted that the hotel was no longer affiliated with Choice Hotels." *Choice Hotels*, 2016 WL 4367993, at *2.

More recently, in rejecting the defendant's argument that the plaintiff should be faulted for

---

[7] In *Cross Trailers*, the plaintiff did not respond to the defendant's hearsay objection. *Cross Trailers*, 363 F. Supp. 3d at 786.

failing to present testimony from any customer on actual confusion (rather than presenting secondhand accounts through the owner's testimony), the Fifth Circuit Court of Appeals referenced its ruling in *Armco, Inc. v. Armco Burglar Alarm Company, Inc.*, 693 F.2d 1155 (5th Cir.1982).[8] *Streamline Prod. Sys., Inc. v. Streamline Mfg., Inc.*, 851 F.3d 440, 458 (5th Cir. 2017). In *Streamline*, the Fifth Circuit held as follows:

> We have previously rejected hearsay objections to indirect testimony about actual confusion, explaining that such evidence is not offered for the truth of the matter asserted but rather to show effect on consumers, namely, confusion. *Armco, Inc. v. Armco Burglar Alarm Co.*, 693 F.2d 1155, 1160 & n.10 (5th Cir. 1982). Therefore, SPSI's evidence of actual confusion is not entitled to any less weight by virtue of its source.

*Id.* Similarly here, the Court overrules TravelPass' hearsay objection.

TravelPass also continues to dispute the admissibility of the consumer survey evidence submitted by Dr. Bruce Isaacson on behalf of Marriott, asserting Marriott's reliance on the survey to show actual confusion is "inherently unreliable and irrelevant for the reasons TravelPass has set for[th] in its Motion to Exclude Defendants' Expert Bruce Isaacson. . . ." Docket Entry # 604 at p. 24. On September 29, 2021, the Court issued an Order Denying TravelPass' Motion to Exclude Isaacson. *See* Docket Entry # 699. For the reasons expressed therein, the Court finds the survey admissible for purposes of this Report and Recommendation.

What is more, Marriott asserts in its reply that the ultimate level of confusion measured by Dr. Isaacson – 15.2% – is well above the 7.7% confusion rate courts within the Fifth Circuit cite to as having been accepted as "strong evidence of likelihood of confusion" and further corroborates the actual confusion evidence. Docket Entry # 645 at pp. 7-8, n. 2 (citing *Tiffany & Broadway, Inc.*

---

[8] In *Armco*, the court stated that "[t]he testimony about phone calls . . . was not being offered to show that Armco and Armco Burglar Alarm were the same business, but to show that people *thought* they were." *Armco*, 693 F.2d at 1160 n. 10 (emphasis original).

*v. Comm'r of Pats. and Trademarks*, 167 F. Supp. 2d. 949, 955 (S.D. Tex. 2001); also citing *Exxon Corp. v. Tex. Motor Exch. of Hous., Inc.*, 628 F.2d 500, 507 (5th Cir. 1980) (15% level of confusion "strong evidence indicating a likelihood of confusion"); also citing *REMAX Intern., Inc. v. Trendsetter Realty, LLC*, 655 F. Supp. 2d 679, 706 (S.D. Tex. 2009)).   Any objection to Dr. Isaacson's survey is overruled.

**4.     TravelPass' exhibits attached to motion regarding Marriott's requests for monetary relief**

TravelPass relies on the following evidence in support of its motion for summary judgment regarding damages: ████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

███████

The Court does not list herein the evidence attached to Marriott's response to TravelPass'

motion (Docket Entry # 609, Exhibits 1-112), TravelPass' reply (Docket Entry # 639, Exhibits 1-4), or Marriott's surreply (Docket Entry # 655, Exhibit 147).

## B.    The evidence

## 1.    The parties

Marriott owns, manages, and/or franchises hotels nationwide. Docket Entry # 468, ¶¶ 34. According to TravelPass' Amended Complaint, Marriott controls approximately 6,000 hotel properties in 122 countries and territories; its U.S. brands include The Ritz-Carlton, St, Regis, JW Marriott, W Hotels, Marriott Hotels, Sheraton, Westin, Renaissance Hotels, Courtyard Hotels, Four Points, SpringHill Suites, Fairfield Inn & Suites, TownePlace Suites, and Residence Inn. *Id*. According to Marriott's counterclaims, as of March 31, 2019, there were 7,003 total properties in the United States and internationally operating under Marriott's hotel brands. Docket Entry # 522 at p. 24, ¶ 18.

TravelPass is a "downstream OTA" that began operations in 2009. Docket Entry # 468, ¶¶ 32, 41. TravelPass offers hotel room reservations through a call center and various websites, including reservationcounter.com, reservationdesk.com, and choosearoom.com. Becker Report at 2.1.1. ████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████

## 2.    Marriott's trademarks

Marriott owns U.S. Trademark Registration Nos. 899,900; 1,305,416; 1,329,051; 1,439,596; 1,562,811; 2,076,489; 2,308,002; 2,393,255; 2,504,099; 2,762,447; 2,765,288; 2,853,711; 3,635,353; 3,635,354; 3,635,357; 3,639,551; 3,783,934; 3,784,396; 3,808,481; 3,833,045; 3,857,699; 3,923,519; 3,952,240; 4,390,298; 4,390,299; 4,394,553; 4,539,498; 4,663,920; 4,722,193; 4,895,882; 4,955,012; 4,973,477; 4,996,260; 5,157,601; 5,172,735; 5,286,306; 5,556,849; 5,556,877; 5,618,981; 5,693,386; 5,710,599; 5,725,583; 5,880,482; and 904,029 (the "Marriott Marks"). *See* Declaration of Brendan C. Quinn in Support of Defendants' Joint Motion for Summary Judgment on Likelihood of Confusion and Fair Use ("Quinn Decl.") ¶ 3, Ex. 2.

There is no dispute Marriott is the owner of the Marriott Marks. Lowe 30(b)(6) Dep. at 45:16-22. TravelPass does not dispute the trademarks at issue in this case are valid trademarks. *Id.* at 45:23-46:3.

## 3.    Alleged infringing and misleading conduct

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████████████████████



display, that hotel branded term may be in the subdomain or the subfolder to identify



### a.   Evidence regarding TravelPass' "Book Direct Claims"

TravelPass included claims in its advertising that customers could "Book Direct," "Book Direct for Best Deals," and/or to engage in "Direct Booking" through TravelPass (collectively the "Book Direct Claims"). *See, e.g.*, Docket Entry # 565, SUMF ¶ 11; ████

████

████

████

████

████

████



**b.**    **Evidence regarding TravelPass' "Discount Claims"**

According to Marriott, also among the false claims that TravelPass included in its advertising were claims that, by booking through TravelPass, customers would receive a discount (collectively the "Discount Claims"). TravelPass' Discount Claims have taken various forms,

4.    **Customer Complaints**

a.    **Customers contacted Marriott**

Marriott has received complaints about customers who were confused because they booked with TravelPass thinking they had booked directly with the hotel. ██████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

██████████████████████████

b.    **Customers contacted TravelPass**

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████

████████████████████████████████████

██



████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████

### c.       Customers contacted third parties

In addition to making complaints to the Hotel Companies and TravelPass directly, customers lodged complaints with various third-party review sites, including Trust Pilot, Better Business Bureau, PissedConsumer, Yelp, ResellerRatings, RevDex, and ComplaintsBoard. Marriott asserts these complaints include further and significant volumes of actual confusion between TravelPass and the Hotel Companies, many of which are tied to TravelPass' alleged  infringing use of the Marriott Marks. ████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████

**5.**     **The Federal Trade Commission ("FTC") investigation**

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████

    ██████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████

**6.     Consumer survey evidence**

The Hotel Companies commissioned a likelihood of confusion survey by Dr. Bruce Isaacson based on relatively recent versions of TravelPass websites, *i.e.*, versions that post-date changes TravelPass made following the FTC investigation. Isaacson Report.

    ██████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████



████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████

**9.       Evidence regarding monetary relief**

**a.       Disgorgement**

*TravelPass' evidence and assertions*

Marriott's damages expert, Dr. Stephen Becker, ████████████████████████

████████████████████████████████████

██████

████████████████████████████████████

██████████████

███

████████████████████████████████████

████████

████████████████████████████████████



***Marriott's evidence and assertions***

Consumers were misled by TravelPass' misuse of Hotel Companies' trademarks to believe that TravelPass was Marriott when booking a room.



[REDACTED]

## V. SECTION 43 OF THE LANHAM ACT AND COMMON LAW UNFAIR COMPETITION CLAIMS[9]

### A.    Section 43 of the Lanham Act, 15 U.S.C. § 1125

Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), provides a cause of action for unfair

---

[9] The Fifth Circuit Court of Appeals recently stated it generally analyzes Lanham Act false advertising claims and common law unfair competition claims together. *Boltex Mfg. Co., L.P. v. Galperti, Inc*., 827 Fed. Appx. 401, 409 (5th Cir. 2020) (citing *King v. Ames*, 179 F.3d 370, 374–75 (5th Cir. 1999)).

competition. *Duperon Corp. v. Screening Sys. Int'l, Inc*., Civil Action No. 12-296-BAJ, 2013 WL 177418, at *2 (M.D. La. Jan. 16, 2013). While much of the Lanham Act addresses the registration, use, and infringement of trademarks and related marks, § 43(a), 15 U.S.C. § 1125(a) is one of the few provisions that goes beyond trademark protection. *Dastar Corp. v. Twentieth Century Fox Film Corp*., 539 U.S. 23, 28–29, 123 S. Ct. 2041, 2045, 156 L. Ed. 2d 18 (2003). However, § 43(a) "does not have boundless application as a remedy for unfair trade practices." *Id*. at 29 (quoting *Alfred Dunhill, Ltd. v. Interstate Cigar Co.*, 499 F.2d 232, 237 (2d Cir. 1974)). "[B]ecause of its inherently limited wording, § 43(a) can never be a federal 'codification' of the overall law of 'unfair competition,'" 4 J. McCarthy, Trademarks and Unfair Competition § 27:7, p. 27–14 (4th ed. 2002) (McCarthy), but can apply only to certain unfair trade practices prohibited by its text. *Dastar Corp*., 539 U.S. at 29.

Section 43(a) of the Lanham Act, 60 Stat. 441, codified at 15 U.S.C. § 1125(a),  provides as follows:

> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
>
> > (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
> >
> > (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

*Lexmark Int'l, Inc. v. Static Control Components, Inc*., 572 U.S. 118, 122, 134 S. Ct. 1377, 1384,

188 L. Ed. 2d 392 (2014). Section 1125(a) creates two distinct bases of liability: false association, § 1125(a)(1)(A), and false advertising, § 1125(a)(1)(B).[10] *Id*. (citing *Waits v. Frito–Lay, Inc*., 978 F.2d 1093, 1108 (9th Cir. 1992), *abrogated on other grounds by Lexmark*, 134 S.Ct. 1377).

Section **1125(a)(1)(A)** prohibits "false or misleading" claims that are "likely to cause confusion, or to cause mistake, or to deceive as to . . . the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person[.]" That provision is "the foremost federal vehicle for the assertion of . . . infringement of . . . unregistered marks, names and trade dress[.]" *Parks L.L.C. v. Tyson Foods, Inc*., 863 F.3d 220, 226 (3d Cir. 2017) (quoting 5 McCarthy on Trademarks § 27:9). Claims made under it are often called "false designation of origin" or "false association" claims. *Id*. at n. 1.05. The Supreme Court in *Lexmark* characterized claims under § 1125(a)(1)(A) as false association claims, 572 U.S. at 122, and the Court uses that term here. Unlike claims under "Section 1114 for trademark infringement, Section 1125(a) does not require a false association plaintiff to establish ownership of a trademark as an element of its cause of action." *Red River Bancshares, Inc. v. Red River Emps. Fed. Credit Union*, Civil Action No. 17-1370, 2019 WL 4727857, at *4 (W.D. La. Sept. 26, 2019) (citing *Belmora L.L.C. v. Bayer Consumer Care AG*, 819 F.3d 697, 706 (4th Cir. 2016), *cert. denied*, 137 S. Ct. 1202 (2017)); *see also id*. at *5 (noting "that it has long been established by the case law that the elements for a trademark infringement claim under Section 1114 are identical to those for a false association claim under Section 1125(a)(1)(A)").

---

[10] Prior to 1989, § 43(a) of the Lanham Act did not clearly distinguish between false association and false advertising claims and merely prohibited "false designation[s] of origin" generally. *Parks L.L.C. v. Tyson Foods, Inc*., 863 F.3d 220, 229 (3d Cir. 2017) (citations omitted). In 1989, the statute was amended by creating separate subsections covering false association and false advertising, and by adding the modifier "geographic" before "origin" in the false advertising subsection. *Id*. (citing 15 U.S.C.A. § 1125(a)(1)(B); also citing 5 McCarthy on Trademarks §§ 27:6, 27:7).

To establish a *prima facie* case for false advertising under **§ 1125(a)(1)(B)** of the Lanham Act, a plaintiff must show that (1) the defendant made a false or misleading statement of fact about a product; (2) the statement actually deceived or had the tendency to deceive a substantial segment of its audience; (3) the deception is material in that it is likely to influence the consumer's purchasing decision; (4) the statement entered interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result. *S & H Indus., Inc. v. Selander*, 932 F. Supp. 2d 754, 762 (N.D. Tex. 2013) (citing *Logan v. Burgers Ozark Country Cured Hams Inc*., 263 F.3d 447, 462 (5th Cir.2001); also citing *MCW, Inc. v. Badbusinessbureau.com, L.L.C.*, Civil Action No. 3:02–CV–2727–G, 2004 WL 833595, at *17 (N.D. Tex. Apr. 19, 2004)).

Claims for trademark dilution are authorized by the Trademark Dilution Revision Act of 2006 ("TDRA"),[11] which provides in relevant part as follows:

> Subject to the principles of equity, the owner of a *famous* mark ... shall be entitled to an injunction against another person who ... commences use of a mark or trade name in commerce that is likely to cause *dilution by blurring or dilution by tarnishment* of the famous mark, regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury.

*Louis Vuitton Malletier S.A. v. Haute Diggity Dog, L.L.C.*, 507 F.3d 252, 264 (4th Cir. 2007) (quoting 15 U.S.C.A. **§ 1125(c)(1)** (emphasis added in *Louis Vuitton*)). A mark is "famous" when it is "widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner." *Id*. (quoting 15 U.S.C.A § 1125(c)(2)(A)). Creating causes of action for only dilution by blurring and dilution by tarnishment, the TDRA defines "dilution by blurring" as the "association arising from the similarity between a mark or trade

---

[11] The TDRA, Pub.L. No. 109–312, 120 Stat. 1730 (2006), amended the Federal Trademark Dilution Act of 1995, Pub.L. No. 104–98, 109 Stat. 985 (1996), which added a "dilution" cause of action to § 43 of the Lanham Act. *Louis Vuitton Malletier S.A. v. Haute Diggity Dog, L.L.C.*, 507 F.3d 252, 264 n. 2 (4th Cir. 2007).

name and a famous mark that impairs the distinctiveness of the famous mark." *Id.* (quoting 15 U.S.C.A. § 1125(c)(2)(B)). It defines "dilution by tarnishment" as the "association arising from the similarity between a mark or trade name and a famous mark that harms the reputation of the famous mark." *Id.* (quoting 15 U.S.C.A. § 1125(c)(2)(C)).

## B.   Marriott's counterclaims

Marriott alleges TravelPass' use of the Marriott Marks constitutes false designation of origin and false representation with respect to the origin and nature of TravelPass' goods and services, constituting unfair competition in violation of Section 43(a) of the Lanham Act, 15 U.S.C., § 1125(a)(1)(A). TravelPass further alleges false advertising under 15 U.S.C. § 1125(a)(1)(B). Additionally, TravelPass alleges federal trademark dilution under 15 U.S.C. § 1125(c).

Considering TravelPass' motion addresses the false advertising claim first, the Court will do so as well, followed by the trademark dilution counterclaims under § 1125(c). The Court will incorporate Marriott's arguments into its consideration of TravelPass' motion below.

## C.   False Advertising counterclaims

## 1.   Marriott's allegations

In its Answer to Plaintiffs' Amended Complaint and Counterclaims, Marriott alleges as follows:

> 154. In claiming that it provides the 'best deal' in hotel booking and the 'lowest prices' on hotel rooms, TravelPass is making a material misrepresentation both as to its own prices as well as to Marriott's prices.
>
> 155. In claiming that the cancellation policies enforced on bookings made through TravelPass are identical to those a consumer would obtain through Marriott itself, TravelPass is making a material misrepresentation both as to its own cancellation policies and as to Marriott's.
>
> 156. Marriott has an interest in TravelPass refraining from deceiving consumers into

believing that TravelPass offers discounts on Marriott-branded hotel rooms and from falsely representing Marriott's prices.

157. TravelPass's false and misleading advertising has actually deceived or is likely to deceive a substantial portion of the intended audience.

Docket Entry # 522 at p. 62, ¶¶ 154-57.

## 2. Applicable law

The first basic element of a false advertising claim requires a plaintiff to show the defendant has made false or misleading statements as to his own product (or another's). *Seven-Up Co. v. Coca-Cola Co.*, 86 F.3d 1379, 1383 n. 3 (5th Cir. 1996). As part of this element, the court must determine whether the defendant may be said to have made false or misleading statements in the context of "commercial advertising or promotion." *Id*. "False or misleading" descriptions or representations create two different theories of recovery in a false advertising claim under the Lanham Act: a plaintiff must allege either (1) that the challenged representation is literally false or (2) that it is literally true but nevertheless misleading. *In re GNC Corp.*, 789 F.3d 505 (4th Cir. 2015); *see also IQ Prods. Co. v. Pennzoil Prods. Co.*, 305 F.3d 368, 375 (5th Cir. 2002) ("To obtain money damages for false advertising under § 43(a) of the Lanham Act, the plaintiff must first demonstrate that the advertisement was (1) literally false; or (2) likely to mislead and confuse customers.").

"For a statement to be literally false, the statement must be 'false on its face.'" *Boltex Mfg. Co., L.P. v. Ulma Piping USA Corp.*, Civil Action No. 4:17-CV-1400, 2019 WL 3766087, at *2 (S.D. Tex. Aug. 9, 2019), appeal dismissed, No. 20-20125, 2020 WL 5357819 (5th Cir. July 8, 2020) (quoting *Derrick Petrol. Servs. v. PLS, Inc.*, Civil Action No. H–14–1520, 2017 WL 3456920, at *5 (S.D. Tex. Aug. 11, 2017)). If the statements at issue are shown to be literally false, a court

must assume the statements actually misled consumers, without requiring any evidence of their impact on consumers. *Selander*, 932 F. Supp. 2d at 762 (citing *Logan*, 263 F.3d at 462; also citing *Pizza Hut, Inc. v. Papa John's Int'l, Inc.*, 227 F.3d 489, 497 (5th Cir.2000)). If the statements are either ambiguous or literally true but misleading, there is no such presumption, and a plaintiff must present evidence of actual consumer deception. *Selander*, 932 F. Supp. 2d at 762 (citing *Pizza Hut*, 227 F.3d at 497).

"The statements at issue must be a specific and measurable claim, capable of being proved false or being reasonably interpreted as a statement of objective fact." *Boltex*, 2019 WL 3766087, at *2 (quoting *Pizza Hut*, 227 F.3d at 496 (internal quotation omitted in *Boltex*))."[A] statement of fact is one that (1) admits of being adjudged true or false in a way that (2) admits of empirical verification." *Pizza Hut*, 227 F.3d at 496 (quoting *Presidio Enterprises, Inc. v. Warner Bros. Distrib. Corp.*, 784 F.2d 674, 679 (5th Cir. 1986)). One form of non-actionable statements of general opinion under Section 43(a) of the Lanham Act has been referred to as "puffery." *Id.* According to the Fifth Circuit, "non-actionable 'puffery' comes in at least two possible forms: (1) an exaggerated, blustering, and boasting statement upon which no reasonable buyer would be justified in relying; or (2) a general claim of superiority over comparable products that is so vague that it can be understood as nothing more than a mere expression of opinion."[12] *Id.*

---

[12] In *Pizza Hut*, after a three-week trial, the court denied Papa John's motion for a judgment as a matter of law, and, by special verdict, the jury found that the slogan, the sauce claims and the dough claims were "false or misleading" but that other ingredients claims were not. *Euro-Pro Operating L.L.C. v. TTI Floor Care N. Am.*, Civil Action No. 12-10568-DJC, 2012 WL 2865793, at *7 (D. Mass. July 11, 2012) (citing *Pizza Hut, Inc. v. Papa John's Int'l, Inc.*, 227 F.3d 489, 493 n. 2 and n. 3 (5th Cir. 2000)). The Fifth Circuit held the simple statement, "Better Pizza," epitomized the exaggerated advertising, blustering, and boasting by a manufacturer upon which no consumer would reasonably rely and was non-actionable puffery. *Pizza Hut*, 227 F.3d at 498. The court also held the phrase "Better Ingredients" was typical puffery. *Id.* at 499. As summarized by the court in *Euro-Pro Operating*, 2012 WL 2865793, at *7, the Fifth Circuit agreed further "there was sufficient evidence in the record to support the jury's conclusion that Papa John's sauce and dough advertisements were misleading—but not false—in their suggestion that Papa John's ingredients were superior," *Pizza Hut*, 227 F.3d at 501, and agreed further still that the slogan became misleading (but not literally false) when used

3.      **Whether Marriott can establish elements for Lanham Act § 1125(a)(1)(B) false advertising counterclaims**

a.      **Whether there is sufficient evidence TravelPass' advertising claims are false or misleading**

*Specific factual statements or puffery*

In its motion, TravelPass first asserts Marriott's false advertising claims should be dismissed because TravelPass' statements regarding savings, booking direct, and "lowest" and "best" prices are "classic, inactionable puffery."[13] Docket Entry # 558 at p. 4. Additionally, TravelPass asserts its "book direct" and "book direct for best deals" language is mere puffery because it is "entirely vague and general," as well as "too ambiguous and incomplete to be actionable." *Id*. at pp. 5-6. According to TravelPass, its "book direct" ads can be interpreted as referring to direct access to TravelPass' own website, call center, and booking agents. *Id*. at p. 6. ████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████

---

in conjunction with the sauce and dough claims, *id*. at 501–02, but found that Pizza Hut "failed to adduce evidence establishing that the misleading statement of fact conveyed by the ads and the slogan was material to the consumers to which the slogan was directed," and "because such evidence of materiality is necessary to establish liability under the Lanham Act" for allegations of misleading (but not literally false) advertising, held that "the district court erred in denying Papa John's motion for judgment as a matter of law." *Id*. at 502.

[13] In its response, Marriott points out TravelPass' motion focuses on what Marriott calls its Book Direct Claims and Discount Claims. Docket Entry # 611 at p. 19. According to Marriott, its false advertising allegations also include "other elements of TravelPass's advertising," including the generic terms chosen by TravePass as its "brands" – *e.g.*, Reservation Counter and Reservation Desk– which Marriott argues suggest a false association with the advertised hotel (*e.g.*, the reservation counter or reservation desk for Marriott brand hotels). *Id*. Marriott further alleges the landing pages for TravelPass' websites suggest a false association with the advertised hotel, *e.g.*, by emphasizing the branded hotel names, logos, photos, and loyalty programs, while minimizing any reference to TravelPass' name or operation as an unrelated entity. *Id*. at p. 19-20.

In its response, Marriott focuses on TravelPass' Book Direct and Discount Claims, asserting they do not fall within the narrow definition of puffery because they represent specific, factual statements. Docket Entry # 611 at pp. 14-16. In its reply, TravelPass argues, as an initial matter, that it is entitled to summary judgment on Marriott's false advertising claim because the only false and misleading statements it pleads in its counterclaims are "best deal" and lowest prices." Docket Entry # 640 at p. 1. Even though TravelPass' motion specifically addresses the "book direct" language, in its reply, TravelPass states "Marriott does not plead that TravelPass made a false or misleading statement about discounts or 'Book Direct' language." *Id*. TravelPass further asserts Marriott did not identify in its First Supplemental Response to TravelPass' First Set of Interrogatories any specific statements that it contends are false. *Id.*  TravelPass contends Marriott should not be permitted, at this late date, to allege such statements as a basis for their false advertisement claims. *Id*. at p. 3 (citing *Healthpoint, Ltd. v. Allen Pharm., L.L.C.*, Civil Action No. SA-07-CA-0526-XR, 2008 WL 728333, at *2 (W.D. Tex. Mar. 18, 2008) (dismissing false advertising claim because the plaintiffs had not alleged "any specific, false, or misleading statement" by the defendants)).

In its surreply, Marriott states TravelPass was "plainly on notice as to both Book Direct Claims and the Discount Claims." Docket Entry # 652 at p. 5. Pointing out false advertising claims are not subject to heightened pleading standards under Federal Rule of Civil Procedure 9(b), Marriott states it alleged TravelPass misled consumers into believing they were booking directly and that they would received discounts. *Id.* at p. 6 (citing Docket Entry # 522, ¶¶ 69-80, 98, 100-05, 154). Marriott alleges as follows in the introduction to its counterclaims:

- In a wide-ranging, long-running, and continuing scheme, TravelPass has been misappropriating Marriott's intellectual property to deliberately trick unsuspecting consumers into believing that they are booking reservations directly with Marriott, when in fact they are booking through TravelPass (Docket Entry

# 522 at p. 21, ¶ 3).

- TravelPass also falsely advertises its hotel booking services. TravelPass claims to offer the 'lowest prices,' but in fact TravelPass frequently offers lodging at Marriott hotels at prices *higher* than those offered to consumers who book directly with Marriott. Also, TravelPass falsely claims to abide by the cancellation policies of the hotels booked through its site. Marriott- booked hotel rooms are generally cancellable without penalty until at or near the day of travel, but TravelPass imposes draconian cancellation fees in Marriott's name without authorization or permission of Marriott. TravelPass also regularly misleads consumers into believing that they will receive Marriott Rewards points when they book rooms through TravelPass, even though they will not. (*Id*. at p. 22, ¶ 6).

Additionally, in its discussion of its trademarks, Marriott alleges as follows:

- As the FTC explained in its complaint against TravelPass, TravelPass'[] hotel booking advertising and marketing practices lead consumers to mistakenly believe that they 'are booking hotel rooms directly through the advertised hotel' and therefore that reservations made through TravelPass'[] websites 'are subject to the same terms and policies as those applicable to consumers who book hotel rooms directly with the hotel.' *See* Complaint for Permanent Injunction and Other Equitable Relief, *Federal Trade Commission v. Reservation Counter, LLC, et al.*, No. 17 Civ. 01304 (D. Utah Dec. 21, 2017) ("FTC Compl."), ¶ 20, attached as Exhibit A hereto.

- Upon information and belief, TravelPass'[] entire business depends on deliberately misleading consumers into incorrectly believing that they are booking either directly through the advertised hotel-branded hotel property or an affiliate operating directly for the hotel-branded property.

*Id*. at p. 34, ¶¶ 27-28.

As pointed out by Marriott in its surreply, Marriott alleges as follows specifically regarding

false advertising:

68. In addition to misappropriating Marriott's valuable and distinctive trademarks, TravelPass openly and explicitly deceives consumers by falsely claiming that they will get discounts on Marriott-branded hotel rooms by booking through TravelPass and that TravelPass abides by Marriott cancellation policies.

69. TravelPass'[] website falsely claims that it 'specialize[s] in providing travelers access to the lowest prices' and 'uncover[s] all the hotel options customers are

67

looking for at the best prices.'

70. Far from offering the claimed 'best prices' on Marriott-branded hotel rooms, though, TravelPass sells access to Marriott's hotel rooms at prices that are often *higher* than the prices charged for the same lodging on *marriott.com*. In doing so, TravelPass is also misrepresenting Marriott's actual prices.

\* \* \*

80. Upon information and belief, because TravelPass imposes its hidden fees on all consumers booking through the TravelPass Websites, consumers rarely—if ever—obtain 'the lowest prices' through TravelPass.

81. TravelPass also engages in false and misleading advertising regarding its cancellation fees.

\* \* \*

97. TravelPass'[] deliberate deception of consumers has resulted in a torrent of consumer complaints in numerous outlets, including directly to Marriott, to its individual hotel properties, and to the Better Business Bureau ('BBB').

98. Many of these complaints involve consumers who booked through TravelPass believing they were booking directly with Marriott, and as a result did not receive what they bargained for and what TravelPass represented that they would receive.

*Id.*, ¶¶ 68-70, 80-81, 97-98.

The Court finds Marriott's allegations are sufficient to put TravelPass on notice of both the Book Direct Claims and the Discount Claims. General allegations contained in the counterclaims referenced consumers who believed they were booking directly.  Marriott also alleges TravelPass falsely claimed consumers would get discounts on Marriott-branded hotel rooms.

What is more, Marriott identified both Book Direct Claims and Discount Claims in its supplemental responses to TravelPass' interrogatories. ████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██



According to Marriott, the Hotel Companies' witnesses further identified the Book Direct and Discount Claims as among the false or misleading statements made by TravelPass. Docket Entry # 652 at p. 6 ████████████████████████████████████████



The Court will consider both the Book Direct Claims and the Discount Claims as sufficiently and timely raised by Marriott. In its reply, other than argue the Discount Claims are untimely, TravelPass does not argue the Discount Claims constitute puffery. The Court finds the Discount Claims are specific, factual statements and not mere puffery.

Regarding the Book Direct Claims, TravelPass argues in its reply as follows:

The *Hackett* case, which Defendants fail to address and write off as 'context-specific' without any further explanation, is factually analogous to the facts in this

case. In *Hackett*, the court grappled with the issue of whether a vague or incomplete statement (such as 'Voted # 1 Best Show in Vegas') is a specific claim or 'simply exaggerated advertising which precludes reliance by consumers'. 2011 WL 4007531, at *5 (D. Nev. Sept. 8, 2011). The court found the latter, noting that if plaintiffs had included 'By X' ('Voted #1 Best Show in Vegas by X'), 'it would be false advertising unless X had actually voted the show "#1 Best in Vegas."' *Id*. Similarly here, if TravelPass stated 'Book Direct through Marriott,' and the link to book did not actually re-direct to Marriott, then that may constitute false advertising. **That situation does not exist here**. Defendants—the parties with the burden to prove each essential element of their claim—cannot show a false or misleading statement of fact where 'no one can take real meaning from the phrase' 'Book Direct' because the phrase lacks a subject and does not actually identify with whom a person is directly booking.

Docket Entry # 640 at p. 2 (emphasis original).

In *LegalForce RAPC Worldwide P.C. v. UpCounsel, Inc*., Civil Action No. 18-CV-02573-YGR, 2019 WL 160335, at *6 (N.D. Cal. Jan. 10, 2019), the court rejected a similar argument:

UpCounsel cites *Hackett v. Feeney*, No. 2:09-cv-02075-RLH-LRL, 2011 WL 4007531 (D. Nev. Sept. 8, 2011) in support of its argument that, in order to be actionable under the Lanham Act, the statement must answer the 'critical question "[Top 5%] *as determined by whom*[?]"' (Reply at 11 (emphasis supplied).) However, that case is distinguishable. First, it involves a #1 claim, namely 'Voted #1 Best Show in Vegas!' *Id*. at *4; *see also In re Century 21-RE/MAX Real Estate Advert. Claims Litig*., 882 F. Supp. 915, 923 (C.D. Cal. 1994) ('The word[ ] ... "#1" convey[s] no specific meaning and thus cannot be considered literally false.'). Moreover, the full quote from *Hackett* cited by UpCounsel provides: 'the[ ] words (voted, considered, rated, etc.) *in combination with* "#1 Best Show in Vegas" begs the question: By whom?' *Hackett*, 2011 WL 4007531, at *5 (emphasis supplied). Here, unlike in *Hackett*, none of the 5% statements say UpCounsel was voted/considered/rated as top 5%. Moreover, the '#1 Best Show in Vegas' statement at issue in *Hackett* is classic puffery because it made no reference to the category in which the show 'The Rat Pack is Back' was number one. Here, on the other hand, the 5% statement specifies a particular category as to which the 5% statement applies, namely the specific practice area. It cannot be said that no reasonable consumer would rely on such an assertion.

*Id*. at *6, n. 13.

Similarly here, the Court finds the *Hackett* case distinguishable. The Court agrees with

Marriott that the Book Direct Claims, considered in the context in which TravelPass used them, do not fall into either narrow category of puffery: "(1) an exaggerated, blustering, and boasting statement upon which no reasonable buyer would be justified in relying; or (2) a general claim of superiority over comparable products that is so vague that it can be understood as nothing more than a mere expression of opinion." *Pizza Hut*, 227 F.3d at 496-97.

As urged by Marriott, the Book Direct Claims appear in TravelPass' paid search ads that appear after a consumer searches for a specific brand-name hotel in a specific location. SMF, ¶ 5.

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████. According to Marriott, in this context, the phrase "book direct" is consistent with its plain and ordinary meaning, *i.e.*, that a consumer may book directly with the hotel by following the link in the ad. Marriott persuasively argues the complaints from consumers regarding TravelPass' advertising confirm that booking "direct" is widely understood as booking with the hotel, not a middleman like TravelPass. SMF, ¶¶ 9-10; *see also id.*, ¶ 7.

Having determined the Book Direct Claims and the Discount Claims are not puffery, the Court now considers whether there is sufficient evidence the statements were false or misleading.

### *Falsity or deception*

According to TravelPass, even if the statements are actionable, Marriott has not evidenced literal falsity under Section 43(a) of the Lanham Act (and Texas common law unfair competition). TravelPass argues the phrase "Book Direct" is ambiguous, or true but misleading, but not a literally

false statement; thus, according to TravelPass, Marriott must shows that consumers were actually

misled. *See* Docket Entry # 640 at p. 4.

TravelPass further argues "there is substantial evidence in the record to show that

TravelPass' price and savings claims statements were, in fact, true." Docket Entry # 558 at p. 7

For example, in the deposition of IHG's corporate representative, TravelPass



Moreover, Defendants' reliance on their respective best rate guarantee programs do
not render TravelPass' price and savings claims false. By Defendants' own
admission, their best price guarantee programs are riddled with exceptions and
exclusions that do not apply to rates like Closed User Group rates and package rates,
through which TravelPass offers much of its savings. And, even if Defendants were
willing to match TravelPass' low prices in every circumstance – and they are not –
an offer to match a competitor's lowest price does not mean that the competitor no
longer offers the lowest prices. Rather, it simply means that there may be two
suppliers who are willing to offer the lowest price. Simply put, Defendants have no
evidence that any factual statement by TravelPass is or was literally false.

*Id*. at pp. 7-8 (internal footnotes omitted).

Marriott claims in response it has sufficiently evidenced that TravelPass' Book Direct and

Discount Claims are false statements of fact. As addressed above, Marriott persuasively argues the

plain and ordinary meaning of the "book direct" phrasing in the context of TravelPass' Book Direct

Claims is that a consumer may book directly with the hotel by following the link in the ad. Docket

Entry # 611 at p. 16. TravelPass operates no hotels of its own; as an affiliate of an OTA, its business

model is to sell the hotel inventory of other companies. *Id.* (citing SMF, ¶ 6). Thus, according to

Marriott, the "bookings that TravelPass offers are purely and exclusively indirect, with TravelPass

being at the end of a chain of middlemen between the consumer and the actual hotel." *Id.* at pp. 16-

17 ████████████████████████████████████████████████████████████████████

████████████████████████████ ████████████████████████████ According to

Marriott, at the very least, there is a fact dispute as to whether TravelPass's Book Direct Claims are

false or misleading.

Regarding TravelPass' Discount Claims, Marriott first relies on *OrthoAccel Technologies,*

*Inc. v. Propel Orthodontics, L.L.C.*, Civil Action No. 4:16cv350-ALM, 2017 WL 1506058 (E.D.

Tex. 2017) wherein the court denied the defendant's motion for partial summary judgment because

there was "at least a genuine issue of material fact existed regarding whether [the defendant's]

studies, tests, and data supported [its] advertising claims." *Id.* at *3. Additionally, Marriott contends

some courts have held a "completely unsubstantiated advertising claim" may be held *per se* false

"without additional evidence from the plaintiff to that effect." Docket Entry # 611 at p. 17 (citing

*Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.*, 290 F.3d

578, 590 (3d Cir. 2002) (finding "Mylanta Night Time Strength" product name and advertising to

be *per se* false where defendant failed to present evidence that the product was "specifically

formulated" for nighttime heartburn or remedied heartburn more effectively at night); also citing

*Pharmacia Corp. v. GlaxoSmithKline Consumer Healthcare, L.P.*, 292 F. Supp. 2d 611, 619 (D.N.J.

2003) (advertising claim was *per se* false where Pharmacia's own witnesses testified that they had

no evidence for the advertised claim); also citing *Kinetic Concepts, Inc. v. Bluesky Med. Grp. Inc.*,

No. SA-03-CA-0832-RF, 2005 WL 3068223, at *4 (W.D. Tex. Nov. 1, 2005) ("Unsubstantiated

comparison claims made in an advertisement have been found *per se* false.")).

Applying the law to the evidence in this case, Marriott states as follows:

TravelPass'[] Discount Claims are numerical claims that imply the existence of a specific underlying calculation. For example, a claimed discount of 'X% off' implies that there is a standard rate and that the rate TravelPass is offering is X% less than that standard rate. The Hotel Companies may prove that TravelPass'[] Discount Claims are false if the underlying data does not support the claim. *OrthoAccel*, 2017 WL 1506058, at *3.

But TravelPass—perhaps knowing the weakness of its analysis or even having never done the analysis at all—has never produced any such calculations. SMF, ¶¶ 13-15. Multiple TravelPass witnesses who were involved in making the Discount Claims ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ██████████████████ TravelPass has also pointed to examples of what it argues are customers getting a cheaper price when booking with TravelPass. *Id.* ¶ 16. However, these isolated instances of non-specific discounts are not substantiation for the specific discount claims TravelPass has made to consumers. ███████████████ ███████████████████████████████████████████████████████████ ████████ In the absence of any data to support TravelPass'[] Discount Claims, the court and the jury may consider these claims to be *per se* false.

Even if the Discount Claims are not *per se* false, there is at the very least a fact dispute as to whether those claims are false or misleading. As noted above, TravelPass appears to rely on isolated examples of rates that may be available under very specific circumstances, such as 'closed user group' rates. Dkt. 558 at 7. What TravelPass claims are 'closed user group' rates are not publicly available rates and have only recently been offered by TravelPass. SMF, ¶ 16. Moreover, TravelPass'[] Discount Claims are not qualified by stating that they apply only to closed user group rates, required a website login, or other such limitations. *Id.* ¶¶ 11, 16. TravelPass did not even offer its own lowest available rates. Instead, TravelPass forced its call-center agents to use an inventory supplier that had higher fees even when the exact same room was available in its system for a cheaper price and there was no benefit to the customer from the added fees. *Id.* ¶ 17. That inventory supplier—Getaroom—now represents the largest percentage of inventory for TravelPass. *Id.*

In addition to any increased rates customers pay through TravelPass'[] suppliers, TravelPass also charges customers booking fees that are separate from the commissions that it receives. *Id.* ¶ 18. TravelPass has acknowledged that, when comparing apples-to-apples publicly available rates for the same hotel on the same dates, consumers pay more when booking with TravelPass than if the consumer

booked with the inventory supplier where TravelPass got the room. *Id.* ¶ 19. Meanwhile, the Hotel Companies have lowest price guarantees to ensure that, contrary to TravelPass'[] unqualified discount claims, customers booking direct with the hotel would actually be receiving the best price for most bookings. *Id.* ¶ 20. On this record, whether TravelPass'[] Discount Claims are false or misleading is a question for the jury.

Docket Entry # 611 at pp. 17-19.

Marriott has introduced sufficient evidence that raises genuine issues of material fact regarding whether TravelPass' statements were either literally false or misleading. *See Greater Houston Transportation Co. v. Uber Techs., Inc.*, 155 F. Supp. 3d 670, 701 (S.D. Tex. 2015). The evidence presented requires a fact-intensive inquiry regarding the veracity of TravelPass' statements as a whole, and "clearly leaves a disputed issue of material fact that must be determined by the jury." *Id.* (citing *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1139, 1146 (9th Cir.1997) (reversing summary judgment where a reasonable juror could conclude advertisements were literally false)). "The literal falsity or misleading nature of a statement is a question of fact, and summary judgment should not be granted where a reasonable jury could determine the veracity of the statements at issue." *Greater Houston Transp.*, 155 F. Supp. 3d at 701 (citing, among other cases, *Mission Pharmacal Co. v. Virtus Pharmaceuticals, L.L.C.*, 23 F. Supp. 3d 748, 769 (W.D. Tex. 2014) (finding a genuine issue of material fact whether a competitor made false or misleading statements about its product)).

**b.    Whether there is sufficient evidence regarding materiality**

Though not explicitly mentioned in the text of the Lanham Act, many courts require plaintiffs to prove that a false or misleading advertisement is "likely to influence the purchasing decision" before permitting recovery based on it. *Gen. Steel Domestic Sales, L.L.C. v. Chumley*, 627 Fed. Appx. 682, 685 (10th Cir. 2015) (citing *Cashmere & Camel Hair Mfrs. Inst. v. Saks Fifth*

*Avenue*, 284 F.3d 302, 311 (1st Cir.2002) (quoting *Clorox Co. P.R. v. Proctor & Gamble Commercial Co.*, 228 F.3d 24, 33 n. 6 (1st Cir.2000)); also citing 5 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition §§ 27:24 n.1, 27:35 (2015)). Circuits that have imposed a materiality requirement are, however, split over who bears the burden of proof: some keep it with the plaintiff while others are willing to presume that at least some misstatements—usually literally false ones—are material. *Id.* (comparing, *e.g., Cashmere & Camel Hair Mfrs. Inst*., 284 F.3d at 310–11 (keeping the burden with the plaintiffs), with, e.g., *Pizza Hut, Inc. v. Papa John's Int'l, Inc*., 227 F.3d 489, 497 (5th Cir.2000) (presuming that a literally false statement is material).

As noted above, in the Fifth Circuit, for any statement that is proven literally false, the Court need not determine whether the marketing claims were material or deceived its audience. *See OrthoAccel Techs., Inc. v. Propel Orthodontics, L.L.C.*, Civil Action No. 4:16-CV-00350-ALM, 2017 WL 1495177, at *3 (E.D. Tex. Apr. 26, 2017) (citing *Pizza Hut*, 227 F.3d at 497 ("With respect to materiality, when the statements of fact at issue are shown to be literally false, the plaintiff need not introduce evidence on the issue of the impact the statements had on customers."); also citing *S&H Industries, Inc. v. Selander*, 932 F. Supp. 2d 754 (N.D. Tex. 2013) (citing *Logan*, 263 F.3d at 462; *Pizza Hut*, 227 F.3d at 497) ("If the statements at issue are shown to be literally false, a court must assume that the statements actually misled consumers, without requiring any evidence of their impact on consumers.")). Because the Court has found an issue of material fact with regard to whether TravelPass' Book Direct and Discount Claims are literally false or misleading, the Court cannot determine at this time whether Marriott has adequately demonstrated the materiality of TravelPass' representations. *See Greater Houston Transp*., 155 F. Supp. 3d at 702 (citing *Logan*, 263 F.3d at 462).

76

A determination of falsity would eliminate Marriott's burden to demonstrate the materiality of TravelPass' statements. *Greater Houston Transp.*, 155 F. Supp. 3d at 702. Therefore, the Court must allow for a determination of the nature of TravelPass' statements before reaching the question of whether Marriott should be subject to the increased burden of adducing evidence of materiality. *Id.* (citing *Cooper Tire & Rubber Co. v. Farese*, 423 F.3d 446, 455–56 (5th Cir.2005)). Accordingly, the Court finds that the question of the impact of TravelPass' statements, and the materiality of TravelPass' statements, remain a disputed fact issue. *Greater Houston Transp.*, 155 F. Supp. 3d at 702 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

In other words, if TravelPass' advertising claims are found to be misleading but not literally false, and thus no presumption applies, the Court agrees with Marriott that fact issues regarding materiality preclude summary judgment. ████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████

TravelPass argues Marriott has failed to proffer competent evidence of materiality. Docket Entry # 640 at p. 7. Although TravelPass does not dispute that customer complaints, under certain circumstances, may be admissible to prove the state of mind of the customer, TravelPass argues they are not "admissible to establish the truth of the matters asserted– in this case that the customer booked with TravelPass *because* of a specific false statement by TravelPass." *Id*. at pp. 7-8 (emphasis original). TravelPass further asserts Marriott has failed to designate an expert on the issue

of whether a substantial number of consumers were misled by the alleged false statements, and this failure to produce a consumer survey is fatal to its claim. *Id*. at p. 7.

The Court does not find the absence of a survey fatal to Marriott's false advertising claims. As urged by Marriott, deception can be shown by "evidence of actual consumer reaction to the challenged advertising," not just surveys. Docket Entry # 652 (citing, among other cases, *Pizza Hut*, 227 F.3d at 497). Nor is the Court convinced that consumer complaints cannot be used to provide materiality. However, even if they are inadmissible to prove materiality, the Court agrees with Marriott "the evidence of deception and materiality is further confirmed by other evidence,"

███████████████████████████████████████████████████

████████████████████████

c.    **Whether there is sufficient evidence of likelihood of injury**

The Court, having reviewed the evidence in the light most favorable to Marriott, finds Marriott has also sufficiently shown a genuine issue of material fact regarding the final element of a Lanham Act claim, likelihood of injury. *See Rail Scale, Inc. v. Balanced Railscale Certification, L.L.C.*, Civil Action No. 2:15-CV-02117-RSP, 2017 WL 319078, at *3 (E.D. Tex. Jan. 23, 2017). To recover money damages under the Lanham Act, a plaintiff seeking compensation for injury "must prove both actual damages and a causal link between defendant's violation and those damages."[14] *Robroy Indus.-Texas, L.L.C. v. Thomas & Betts Corp.*, Civil Action No. 2:15-CV-512-WCB, 2017 WL 1370545, at *2 (E.D. Tex. Apr. 10, 2017) (quoting *Rhone-Poulenc*

---

[14] In *Robroy*, the plaintiff invoked a line of cases holding that deliberately false or deceptive comparative advertising gives rise to a rebuttable presumption that the causation element of the Lanham Act cause of action is satisfied. *Robroy*, 2017 WL 1370545, at *3. The court noted a number of circuits have adopted the presumption of causation in cases involving a "two-competitor market," and "numerous district courts have reached the same conclusion, including district courts in the Fifth Circuit." *Id*. (collecting cases).

*Rorer Pharms., Inc. v. Marion Merrell Dow, Inc.*, 93 F.3d 511, 515 (8th Cir. 1996); also citing *Versign, Inc. v. XYZ.com L.L.C.*, 848 F.3d 292, 299 (4th Cir. 2017); also citing L.S. Heath & Son, Inc. v. AT&T Info. Sys., Inc., 9 F.3d 561, 575 (7th Cir. 1993); also citing *ALPO Petfoods, Inc. v. Ralston Purina Co.*, 913 F.2d 958, 959 (D.C. Cir. 1990)). The causation element requires the plaintiff to prove causation under the "proximate cause" standard. *Robroy*, 2017 WL 1370545, at *2 (citing *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1390-91 (2014)).

The Fifth Circuit has cautioned against conflating the injury requirement for the false advertising claim with the requirement that a plaintiff prove his actual damages in order to obtain relief. *See Logan v. Burgers Ozark Country Cured Hams Inc.*, 263 F.3d 447, 462–63 (5th Cir. 2001) (citing *Balance Dynamics Corp. v. Schmitt Indus.,* 204 F.3d 683, 689 (6th Cir.2000) (noting the importance of "clearly distinguishing the elements necessary to prove a breach of the Lanham Act from the elements necessary to justify a certain remedy for that breach")). Fifteen U.S.C. § 1117(a) provides for the following damages for a violation under 15 U.S.C. § 1125(a) for false advertising: "(1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action." *Logan*, 263 F.3d at 463 n. 11. Typically, injunctive relief is available even where a false advertising plaintiff cannot prove concrete enough damage to qualify for monetary relief. *Retractable Techs., Inc. v. Becton Dickinson & Co.*, 919 F.3d 869, 877 n. 35 (5th Cir. 2019).

The Court is not persuaded Marriott cannot prove it has suffered any damages arising from its Lanham Act counterclaims. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 135–36, 134 S. Ct. 1377, 1392, 188 L. Ed. 2d 392 (2014) (stating that even when a plaintiff cannot quantify its losses with "sufficient certainty to recover damages, it may still be entitled to injunctive relief under § 1116(a) (assuming it can prove a likelihood of future injury) or

disgorgement of the defendant's ill-gotten profits under § 1117(a)"). After a careful review of the record and the arguments presented, the Court is not convinced there are no material issues of fact entitling TravelPass to judgment as a matter of law on Marriott's false advertising counterclaim. *OrthoAccel*, 2017 WL 1495177, at *4. The Court recommends this part of TravelPass' motion be denied.

**D.      Trademark dilution counterclaims**

**1.      Marriott's allegations**

Marriott alleges TravelPass' commercial use of the Marriott Marks in connection with the sale of hotel services has diluted and is likely to dilute the distinctive quality of the Marriott Marks both by impairing the distinctiveness of the Marriott Marks, thereby lessening the capacity of those marks to identify and distinguish Marriott exclusively, and by harming and tarnishing the reputation of the famous Marriott Marks. Becker Report at 3.1.2.4. According to Marriott's counterclaims, as a result of the extensive use and promotion of the Marriott Marks in connection with the goods and services offered thereunder by Marriott for decades, many of the Marriott Marks have become famous throughout the United States, are highly distinctive of Marriott's goods and services, and are widely recognized among the consuming public as a designation of source of Marriott's goods and services. Docket Entry # 522 at p. 61, ¶ 142.

**2.      Applicable law**

To state a dilution claim under the Trademark Dilution Revision Act ("TDRA"),[15] Marriott must show that (i) it owns a famous and distinctive mark; (ii) that TravelPass has commenced using

---

[15] On September 1, 2012, a new version of the Texas Anti–Dilution Act, codified at Section 16.103 of the Texas Business and Commerce Code, went into effect, which replaced the prior version of the Anti-Dilution Act, Section 16.29. *Reservoir, Inc. v. Truesdell*, 1 F. Supp. 3d 598, 615, n.29 (S.D. Tex. 2014).

Marriott's marks in a manner that dilutes those marks; (iii) that the similarity between TravelPass' marks and the Marriott marks gives rise to an association between the two marks; and (iv) that the association is likely to impair the distinctiveness of the Marriott marks or harm the reputation of the Marriott marks. *Nat'l Bus. Forms & Printing, Inc. v. Ford Motor Co.*, 671 F.3d 526, 536 (5th Cir. 2012) (citing *Louis Vuitton*, 507 F.3d at 264–65).

"Trademark dilution is the weakening of the ability of a mark to clearly and unmistakably distinguish the source of a product," and occurs through blurring or tarnishing. *YETI Coolers, L.L.C. v. Imagen Brands, L.L.C.*, Civil Action No. 1:16-CV-00578-RP, 2017 WL 2199012, at *8 (W.D. Tex. May 18, 2017) (quoting *Scott Fetzer Co. v. House of Vacuums, Inc*., 381 F.3d 477, 489 (5th Cir. 2004)). "Blurring involves a diminution in the uniqueness or individuality of a mark because of its use on unrelated goods" whereas tarnishing occurs when the mark is linked to poor-quality products or is portrayed in a negative context, diminishing the public's view of the mark. *Id*. The Lanham Act provides protection against such dilution, but the scope of this protection is limited in several ways. First, it applies only to marks that are both famous and distinctive. 15 U.S.C. § 1125(c)(1). Second, it protects against only those who begin using the mark after the mark has become famous. *Id.* Third, the junior user's manner of using the mark must risk dilution by blurring or tarnishing. *Id.*

If Marriott proves its federal dilution claim, it thereby proves its Texas state law dilution claim, which has a lesser burden than the federal dilution claim. Texas law requires proof that the plaintiff (1) owns a distinctive mark, and (2) there is a likelihood of dilution. *Baylor Univ. v. Int'l Star, Inc*., Civil Action No. CIV.A. W-00-CA-231, 2001 WL 1796464, at *3 (W.D. Tex. Nov. 7, 2001) (citing *Exxon Corp. v. Oxxford Clothes, Inc*., 109 F.3d 1070, 1081 (5th Cir.), *cert. denied*, 522

U.S. 915 (1997);also citing TEX. BUS. & COMM. CODE § 16.29).

**3.      Whether Marriott can establish elements for Lanham Act § 1125(c) trademark dilution counterclaims**

TravelPass asserts Marriott's trademark dilution claims fail as a matter of law. According to TravelPass, "[i]t is well established, both in the Fifth Circuit and across the country, that there can be no cause of action for dilution where, as here, the defendant is using the plaintiff's trademark to refer to the plaintiff's own goods. Docket Entry # 558 at p. 16 (citing *Scott Fetzer*, 381 F.3d at 489–90 ("[plaintiff's] theory of tarnishing is untenable, and its dilution claims fail as a matter of law. Trademark law does not entitle markholders to control the aftermarket in marked products... Concluding otherwise would convert anti-dilution laws into a tool for manufacturers to police independent repair shops and second-hand sales.")).

In *Scott Fetzer,* the defendant—a vacuum repair and re-sale shop—placed a yellow-pages ad listing thirteen different vacuum brands without replicating their logos, including the plaintiff's "Kirby" brand. The plaintiff brought a dilution claim based on a theory of tarnishing, alleging the defendant "sometimes uses used parts" when rebuilding and reselling Kirby-brand vacuums, thereby tarnishing the Kirby mark. *Id.* at 489. The plaintiff complained customers would link the KIRBY mark to these purportedly inferior products. *Id.* The court rejected the dilution claim, reasoning that the plaintiff could not "control the aftermarket in marked product." *Id.* at 489-90.  According to the court, the plaintiff's "theory would allow a markholder to cry dilution every time a resold or repaired product reflected poorly on the mark it bore. Under this theory, any rusted-out Impala 'for sale' on blocks in a front yard would give rise to a cause of action for diluting the CHEVROLET mark." *Id.* at 490.

In addition to the *Scott Fetzer* case, TravelPass relies on the Southern District of Florida's

holding in *Am. Airlines, Inc. v. Despegar.com USA, Inc*., Civil Action No. 13-22773-CIV, 2013 WL 12064859 (S.D. Fla. Nov. 13, 2013), a case involving trademark dilution and unfair competition claims brought by American Airlines against Despegar, an online travel agency. *Id.* at *1. In the *American Airlines* case, the plaintiff alleged the defendants used their websites "to perpetrate a fraudulent scheme consisting of discriminating against American by misrepresenting the air fares charged by American, charging higher ticketing fees for bookings on American flights than for bookings on other airlines, not disclosing improper fare tactics to actual or potential customer-travelers, and improperly shifting bookings to and from non-affiliated travel agencies to affect commission agreements."  *Id.* According to the plaintiff, the defendants' conduct harmed American and its trademarks by making it appear that American endorsed the improper business practices of charging higher fares for travel on American and misleading customers into believing fares for travel on American are higher than those published by American or any other carrier; it was likely to cause confusion and mistake, and deceive the public into believing the defendants and their fraudulent services originate with or are related to American, or are approved by American, when such was not the case; and the conduct harmed the business reputation of American and caused dilution of American's trademarks. *Id.* at *2.

In their motion to dismiss, the defendants insisted their activities did not constitute tarnishment because in displaying fares higher than those authorized by American, the defendants were not linking American to products lacking in quality or prestige. *Id*. at *6. In response, the plaintiff argued the defendants misunderstood their claim. *Id*. American asserted it did not want to be associated in any way with practices that deceived consumers; to this extent, the defendants' conduct damaged the goodwill and reputation of American. *Id*.

The court held the plain language of 15 U.S.C. § 1125(c)(1)(C) requires that there be a defendant's mark or product that is similar to and is harming a plaintiff's mark. *Id.* According to the court, "there is no cause of action for dilution where the defendant uses a plaintiff's mark not to denote the defendant's goods or services, but rather to identify goods or services as those of the plaintiff." *Id.* (citing *Allied Interstate L.L.C. v. Kimmel & Silverman P.C.*, Civil Action No. 12 CIV. 4204 LTS SN, 2013 WL 4245987, at *4 (S.D.N.Y. Aug. 12, 2013) (citation omitted in *American Airlines*)).[16] TravelPass argues Marriott's federal dilution counterclaim is no different than American's and thus warrant the same result. Docket Entry # 558 at p. 17 (further asserting the trademarks at issue merely identify Marriott's own goods and cannot sustain a claim for federal trademark dilution).

TravelPass further asserts Marriott's state law dilution claims fail for the same reasons. According to TravelPass, "Texas state courts have similarly held that as a matter of law there can be no blurring or tarnishment under Section 16.103 where a retailer has resold the mark owner's genuine product." *Id.* at pp. 17-18 (citing *John Paul Mitchell Systems v. Randalls Food Mkts, Inc.*, 17 S.W.3d 721, 736-37 (Tex. App.—Austin 2000, pet. denied) ("Both forms of dilution—tarnishment and blurring—require that the defendant use the plaintiff's trademark on the

---

[16] In *Allied*, the court noted the Second Circuit Court of Appeals does not recognize an action for dilution where the defendant uses a plaintiff's mark not to denote the defendant's goods or services, but rather to identify goods or services as those of the plaintiff. *Allied Interstate L.L.C. v. Kimmel & Silverman P.C.*, Civil Action No. 12 CIV. 4204 LTS SN, 2013 WL 4245987, at *4 (S.D.N.Y. Aug. 12, 2013). The court held as follows:

> Defendants' uses of the mark as a keyword and on its website identify Plaintiff and the services Plaintiff provides, and its use of Plaintiff's mark as a metatag denotes the relevance of Defendants' website to Internet users seeking information about Plaintiff. None of Plaintiffs' exhibits or factual proffers alleges plausibly that Defendants have utilized the Allied Mark or a similar mark in commerce in a manner that could dilute Plaintiff's mark by tarnishing it via association with Defendants' goods or services. Rather, Plaintiff complains that Defendants are advertising a service, identified under Defendants' own marks, that challenges the integrity of Plaintiff's services. The conduct described in the Complaint is outside the ambit of the federal dilution cause of action.

*Id.*

defendant's own goods.") (citing *Pebble Beach Co. v. Tour 18 I, Ltd.*, 942 F. Supp. 1513, 1564-67 (S.D. Tex. 1996), *aff'd as modified*, 155 F.3d 526 (5th Cir. 1998))). TravelPass claims that "[u]nder the standards set out in *Pebble Beach* and *Paul Mitchell*, there can be no claim for trademark dilution under Texas Business and Commerce Code Section 16.103 where, as here, the defendant is merely using the plaintiff's marks to sell the plaintiff's own products." *Id.* at p. 18.

In response, Marriott points out TravelPass has not argued there is an absence of a genuine factual dispute as to any of the elements of a trademark dilution claim. Docket Entry # 611 at p. 25. Rather, TravelPass argues it cannot be held liable because it merely resold Marriott's own products. According to Marriott, "TravelPass' factual premise is incorrect and the cases it cites can be readily distinguished." *Id.*

Substantively, Marriott makes three arguments. **First**, Marriott claims TravelPass is not merely a reseller of the Hotel Companies' products. On the contrary, TravelPass pretended to be the hotel itself. *Id.* (citing, *e.g.*, Docket Entry # 565 at 4-17; SMF, ¶¶ 5-10, 22-25) (further stating TravelPass' effort to portray itself as the hotel started with its paid search ads and extended to its websites and call center). Marriott further argues as follows:

> TravelPass was not merely reselling the Hotel Companies' hotel rooms; it was using the Hotel Companies' trademarks to describe TravelPass's websites as being affiliated with the Hotel Companies. In other words, TravelPass created the false impression that it was operating the Hotel Companies' reservation counters. TravelPass'[] use of hotel brand names in connection with its own generic brands regularly caused consumers to believe that TravelPass was acting as the reservation counter or reservation desk for the brand. . . . There is at least a genuine dispute of material fact as to whether TravelPass is merely a reseller of hotel reservations.

*Id.* at p. 26.

**Second**, Marriott asserts TravelPass, unlike the defendant in *Scott Fetzer*, pretended to be the hotel, in part by presenting its websites and brands as those of the hotel itself or an authorized

87

extension thereof. *Id*. Marriott states TravelPass was not advertising its hotel rooms through "nondescript" and "rudimentary" yellow-page advertising but instead featured the Marriott Marks in TravelPass' URLs paired with TravelPass' generic names of Reservation Counter and Reservation Desk. *Id*. According to Marriott, unauthorized use of a trademark in a domain URL has been found to be evidence of trademark dilution. *Id.* at pp. 26-27 (citing *Baylor Univ. v. Int'l Star, Inc*., No. CIV.A. W-00-CA-231, 2001 WL 1796464, at *3 (W.D. Tex. Nov. 7, 2001) (<baylorbears.com> domain diluted BAYLOR, BAYLOR UNIVERSITY, and BAYLOR BEARS marks); *AutoZone IP LLC v. Awad*, No. CV 17-13107, 2018 WL 6591910 (E.D. La. Dec. 12, 2018) (<unitedautozoneofgretna.com> diluted AUTOZONE mark); *Louis Vuitton Malletier & Oakley, Inc. v. Veit,* 211 F. Supp. 2d 567, 582 (E.D. Pa. 2002), *as amended* (<louisvuitton-replicas.com> was trademark dilution)).

**Third**, Marriott argues TravelPass' reliance on the *American Airlines* case is misplaced. *Id.* at p. 27. According to Marriott, there was no indication in that case that the defendant was describing its products as being an American Airlines product, whereas here, "TravelPass held itself out as though customers were booking rooms directly with the Hotel Companies or their authorized reservation counter or reservation desk." *Id.*

The Court is not convinced TravelPass is a mere reseller of Marriott hotel reservations. The evidence and allegations involved in this case are different than those involved in the cases relied upon by TravelPass. Marriott has presented evidence, sufficient to create a fact issue, as to whether TravelPass has prominently featured the hotels' marks, downplayed its own generic brands, used the hotels' marks in its website URLs, and relied upon misleading call-center scripts to imply that TravelPass was the hotel itself—or at least affiliated with it. According to Marriott, TravelPass' "use

of its own marks in conjunction with the Hotel Companies' marks to make it appear as though TravelPass is the 'reservation counter' or 'reservation desk' of the hotel is textbook trademark dilution." Docket entry # 652 at p. 10. There is a genuine issue of material fact that TravelPass, through its websites which incorporated the Marriott Marks, pretended to be the hotel itself, thus harming Marriott's Marks. The Court recommends this part of TravelPass' motion be denied.

## VI. SECTION 32 OF THE LANHAM ACT AND COMMON LAW TRADEMARK INFRINGEMENT CLAIMS

### A.    Marriott's allegations

Marriott also brings federal trademark infringement and common law trademark infringement counterclaims. Marriott alleges TravelPass' unauthorized use of the Marriott Marks in connection with the offering of services identical in type to those provided by Marriott under the Marriott Marks, and TravelPass' use of the Marriott Marks to advertise and market such services, is likely to cause confusion or to cause mistake or to deceive TravelPass' customers or potential consumers and the public as to the source or sponsorship of TravelPass's services. Becker Report at 3.1.2.1. According to Marriott, TravelPass' acts are intended to reap the benefit of the goodwill that Marriott has created in its Marriott Marks, and constitute infringement of Marriott's federally registered trademarks in violation of Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1). *Id*. Marriott asserts TravelPass' conduct has caused and continues to cause immediate and irreparable injury to Marriott. *Id*.

TravelPass has asserted defenses that include fair use. TravelPass asserts the defense of nominative fair use only. Docket Entry # 604 at p. 1, n. 2.

### B.    Section 32 of the Lanham Act

"Lawsuits for infringement of a registered trademark are governed by Lanham Act Section

89

32(1)." *Rolex Watch U.S.A., Inc. v. Beckertime, L.L.C., et al.*, Civil Action No. 4:20-CV-01060, 2021 WL 4311450, at *2 (N.D. Tex. Sept. 21, 2021) (quoting *Supreme Assembly, Order of Rainbow for Girls v. J.H. Ray Jewelry Co.*, 676 F.2d 1079, 1082 (5th Cir. 1982); also citing 15 U.S.C. § 1114). Section 32 of the Lanham Act provides a cause of action for infringement when, without the registrant's consent, one uses "in commerce, any reproduction, counterfeit, copy[,] or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion or to cause mistake or to deceive. . . ." *Healix Infusion Therapy, Inc. v. Healix, Inc.*, Civil Action No. H-17-357, 2018 WL 1801149, at *5 (S.D. Tex. Apr. 16, 2018) (quoting 15 U.S.C. § 1114(1)(a)). "A trademark or service mark is 'any word, name, symbol, or device or combination thereof' used by a person to 'identify and distinguish his or her goods [or services], including a unique product [or service],' from the goods or services of another and 'to indicate the source of the goods [or services], even if that source is unknown.'" *Id*. (quoting *Pebble Beach Co. v. Tour 18 I, Ltd.*, 155 F.3d 526, 536 (5th Cir. 1998) (quoting 15 U.S.C. § 1127)). To prove infringement, a plaintiff must show that it owns a legally protectable mark and that there is a likelihood of confusion between that mark and the defendants' allegedly infringing material. *Id*. (citing *Am. Rice Inc. v. Producers Rice Mill, Inc*., 518 F.3d 321, 329 (5th Cir. 2008)). The defendant bears the burden in challenging a registered mark's validity. *Id*. (citing *Pebble Beach Co. v. Tour 18 I, Ltd.*, 942 F.Supp. 1513, 1537 (S.D. Tex. 1996)).

The Fifth Circuit Court of Appeals assesses the likelihood of confusion based on the following "digits of confusion": "(1) strength of the plaintiff's mark; (2) similarity of design between the marks; (3) similarity of the products; (4) identity of retail outlets and purchasers; (5)

similarity of advertising media used; (6) the defendants' intent; (7) actual confusion; and (8) degree of care exercised by potential purchasers." *Id*. at *6 (quoting *Am. Rice*, 518 F.3d at 329 (citing *Oreck Corp. v. U.S. Floor Sys., Inc*., 803 F.2d 166, 170 (5th Cir. 1986))). The court must assess and weigh each digit to determine whether there is a likelihood of confusion. *Id.* "No one factor is dispositive, and a finding of a likelihood of confusion does not even require a positive finding on a majority of these 'digits of confusion.'" *Id.* (quoting *Elvis Presley Enters., Inc. v. Capece*, 141 F.3d 188, 194 (5th Cir. 1998) (quoting *Conan Props., Inc. v. Conans Pizza, Inc*., 752 F.2d 145, 150 (5th Cir. 1985))). "'Likelihood of confusion' means more than a mere possibility; the plaintiff must demonstrate a probability of confusion." *Id.* (quoting *Xtreme Lashes, L.L.C. v. Xtended Beauty, Inc*., 576 F.3d 221, 226 (5th Cir. 2009) (citing *Bd. of Supervisors La. State Univ. Agric. & Mech. Coll. v. Smack Apparel Co.*, 550 F.3d 465, 478)). "The determination of a likelihood of confusion under federal law is the same as the determination of a likelihood of confusion under Texas law for a trademark infringement claim," *Elvis Presley Enters*., 141 F.3d at 193, for unfair competition, *RE/MAX Int'l, Inc. v. Trendsetter Realty, L.L.C.*, 655 F.Supp.2d 679, 711 (S.D. Tex. 2009), and for false designation, *Philip Morris USA, Inc. v. Lee*, 547 F.Supp.2d 667, 674 (W.D. Tex. 2008). *Id.*

Although likelihood of confusion is generally a fact question, *Elvis Presley Enters*., 141 F.3d at 196, summary judgment may be proper if the undisputed facts in the "summary judgment record compel[] the conclusion that the movant is entitled to judgment as a matter of law." *Id.* (quoting *Smack Apparel*, 550 F.3d at 474 (citing *Beef/Eater Rests., Inc. v. James Burrough Ltd.*, 398 F.2d 637, 639 (5th Cir. 1968))). The question of likelihood of confusion requires the court to consider "the typical buyer exercising ordinary caution." *Id.* (quoting *Nat'l Bus. Forms & Printing, Inc. v. Ford Motor Co.*, 671 F.3d 526, 534 (5th Cir. 2012)).

C.      **Analysis**

1.      **Legally protectable mark**

To determine if a mark is legally protectable, courts look to see if the mark is registered and incontestable.  *Id*. "A certificate of registration of a mark upon the principal register. . . shall be prima facie evidence of the validity of the registered mark...of the owner's ownership of the mark, and of the owner's exclusive right to use the registered mark in commerce." *Id*. (quoting 15 U.S.C. § 1057(b); also citing 15 U.S.C. § 1115(a)). Upon "continuous use for five years subsequent to the date of" registration of a mark and provided such mark "is still in use in commerce" the mark becomes "incontestable." *Id*. (quoting  15 U.S.C. § 1065). "To the extent that the right to use the registered mark has become incontestable...the registration shall be conclusive evidence of the validity of the registered mark...of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce." *Id*. (quoting 15 U.S.C. § 1115(b)).

There is no dispute Marriott has legally protectable marks. TravelPass does not dispute that Marriott owns the Asserted Marks identified in Marriott's motion. Docket Entry # 604 at p. ,1 n. 3.

2.      **Likelihood of confusion**

a.      **Applicable law**

To prevail on a claim for trademark infringement, a party must show use of the mark "creates a likelihood of confusion in the minds of potential consumers." *Rolex*, 2021 WL 4311450, at *2 (quoting *Westchester Media v. PRL USA Holdings, Inc.*, 214 F.3d 658, 663 (5th Cir. 2000)). "'Trademark infringement occurs only when the use sought to be enjoined is likely to confuse purchasers with respect to such things as the product's source, its endorsement by the plaintiff, or its connection with the plaintiff.'" *Id*. (quoting *Supreme Assembly*, 676 F.2d at 1082 (quoting *Ky.*

*Fried Chicken Corp. v. Diversified Packaging Corp.*, 549 F.2d 368, 388 (5th Cir. 1977))).

"'Likelihood of confusion is synonymous with a probability of confusion, which is more than a mere possibility of confusion.'" *Id*. (quoting *Bd. of Supervisors for La. State Univ. Agric. & Mech. Coll. v. Smack Apparel Co.*, 550 F.3d 465, 478 (5th Cir. 2008) (quoting *Westchester Media*, 214 F.3d at 663–64)).

As noted above, "[i]n determining whether a likelihood of confusion exists, courts consider the following nonexhaustive list of factors: (1) the type of mark allegedly infringed, (2) the similarity between the two marks, (3) the similarity of the products or services, (4) the identity of the retail outlets and purchasers, (5) the identity of the advertising media used, (6) the defendant's intent, and (7) evidence of actual confusion." *Id*. (quoting *Westchester Media*, 214 F.3d at 664 (citing *Elvis Presley Enters., Inc. v. Capece*, 141 F.3d 188, 194 (5th Cir. 1998)) (other citations omitted in *Rolex*)). "Courts also consider (8) the degree of care exercised by potential purchasers." *Id*. (quoting *Bd. of Supervisors*, 550 F.3d at 478 (citing *Am. Rice*, 518 F.3d at 329).

Further, in cases involving the Lanham Act, "the presence of a likelihood of confusion disposes of the issue of infringement." *Id*. at *3 (quoting *Westchester Media*, 214 F.3d at 664). The elements of a claim for trademark infringement under Texas common law parallel those of a claim under federal law. *Choice Hotels Int'l, Inc. v. Cheema Invs., L.L.C.*, Civil Action No. 3:11-CV-01762-O, 2013 WL 12125998, at *4 (N.D. Tex. Feb. 20, 2013) (citations omitted). "A determination of a likelihood of confusion under federal law is sufficient to prove trademark infringement under Texas law." *Id*. (quoting *Dall. Cowboys Football Club, Ltd. v. Am.'s Team Props., Inc*., 616 F. Supp. 2d 622, 637 (N.D. Tex. 2009) (citing *Elvis Presley Enters., Inc. v. Capece*, 141 F.3d 188, 193 (5th Cir. 1998))).

"The nominative fair use doctrine provides that one who has lawfully copied another's product can tell the public what he has copied." *Alfa Laval Inc. v. Flowtrend, Inc*., Civil Action No. CV H-14-2597, 2016 WL 2625068, at *7 (S.D. Tex. May 9, 2016) (quoting *Bd. of Supervisors of La. St. Univ. v. Smack Apparel Co.*, 550 F.3d 465, 488 (5th Cir. 2008) (internal quotation and citation omitted in *Alfa*)). The doctrine permits one to "use another's mark truthfully to identify another's goods or services in order to describe or compare its product to the markholder's product." *Id.* The right of nominative fair use is limited, however, to uses that do not create "a likelihood of confusion as to source, sponsorship, affiliation, or approval." *Id*. To obtain the protection of the nominative fair use doctrine, "the defendant (1) may only use so much of the mark as necessary to identify the product or service and (2) may not do anything that suggests affiliation, sponsorship, or endorsement by the markholder." *Id*. (citing *Smack Apparel*, 550 F.3d at 489). The court ordinarily should consider a nominative fair use claim in conjunction with its likelihood-of-confusion analysis in order to avoid lowering the standard for confusion. *Smack Apparel*, 550 F.3d at 489.

**b.    Parties' assertions**

TravelPass asserts Marriott, to prevails on its counterclaims, must show that TravelPass' alleged use is likely to cause consumer confusion. Docket Entry # 558 at p. 19.  Again relying on *Scott Fetzer*, TravelPass argues confusion is not likely in this case because TravelPass merely used Marriott's marks to describe Marriott's own genuine goods (hotel rooms), as it is permitted to do as a reseller. *Id*. According to TravelPass, the first three digits – strength of the mark, mark similarity, and product similarity, "have little, if any import under the facts and circumstances of this case." *Id*. at p. 20 (acknowledging that in a non-reseller context, the second and third digits would

94

weigh in the markholder's favor because the exact marks and products at issue were used but stating the digits carry less weight in the reseller context and are neutral). TravelPass further asserts the fourth and fifth digits are not informative in cases involving close competitors. *Id*. (citing *Scott Fetzer*, 381 F.3d at 485 ("several of the digits appear to indicate confusion even if no confusion is likely")). TravelPass contends the sixth digit, TravelPass' intent, weighs against Marriott because there is, according to TravelPass, "ample evidence that TravelPass had a good faith legal basis for believing that it was entitled to use [Marriott's] marks in its capacity of [Marriott's] genuine hotel rooms."[17] *Id*. at p. 21. TravelPass further asserts the evidence, including Hotel Defendants' own testimony, shows there was nothing particularly unique about the appearance of or various elements incorporated in TravelPass' advertising when compared to the rest of the online travel industry at the time.[18]

Regarding the seventh digit – actual confusion – TravelPass argues as follows: (1) Marriott has no competent evidence of actual confusion (Marriott cannot show that consumer complaints represent more than *de minimus* confusion when compared to the volume of TravelPass' bookings for Marriott.); (2) Marriott's survey evidence does not create a fact issue on likelihood of confusion (Even if the Court does not exclude Dr. Isaacson's survey in its entirety, TravelPass argues the Court should afford the survey minimal evidentiary weight for the reasons set forth in its motion to



exclude.); and (3) ███████████████████████████████████████

████████████████████████████████████████████████

██████ Dr. Isaacson testified the Eveready format he used for the survey would not be the appropriate method for testing less well known brands and also stated that if he had tested different brands the results could have been different.). Finally, for the same reasons, TravelPass contends the Court should dismiss Marriott's common law claims for trademark infringement (and unfair competition discussed above).

Marriott counters, claiming TravelPass is not entitled to summary judgment because there is a genuine dispute of material fact as to any likelihood of confusion. According to Marriott, any doubt concerning a likelihood of confusion should be resolved in the favor of the senior use, Marriott. Docket Entry # 611 at p. 28 (citing *Dallas Cowboys Football Club, Ltd. v. Am.'s Team Properties, Inc*., 616 F. Supp. 2d 622, 637 (N.D. Tex. 2009)). According to Marriott, the evidentiary record goes well beyond the "mere possibility" of confusion to show both a "probability" of confusion and, indeed, actual confusion. *Id*. (citing *Xtreme Lashes, L.L.C. v. Xtended Beauty, Inc*., 576 F.3d 221, 226 (5th Cir. 2009)). Substantively, Marriott argues as follows: (1) TravelPass' infringement does not constitute fair use; (2) TravelPass actively sought to confuse consumers; (3) the record contains extensive and competent evidence of actual confusion; and (4) the consumer survey evidence further demonstrates actual confusion.

Marriott goes further in its own motion for partial summary judgment, arguing it is entitled to summary judgment on likelihood of confusion and fair use. According to Marriott, given the record of actual confusion in this case, there can be no material dispute that TravelPass "built their business by misleading consumers into thinking they were booking directly with a hotel when, in

fact, consumers were booking with TravelPass, an online travel agency. TravelPass did this by, among other things, utilizing the Hotel Companies' trademarks prominently in advertising and on its websites, misleading consumers through its call centers, and by hiding its own identity by using generic names like Reservation Counter and Reservation Desk." Docket Entry # 565 at p. 1. In its motion, Marriott addresses the digits, arguing each and every digit weighs in favor of Marriott. *Id.* at pp. 18-24.

In its response to Marriott's motion, TravelPass asserts Marriott cannot disprove nominative fair use as a matter of law. Docket Entry # 604 at p. 25. According to TravelPass, at a minimum, there are genuine issues of material fact with respect to whether TravelPass has used the Asserted Marks more than necessary to refer to Marriott's hotel rooms and whether TravelPass has taken any action to suggest affiliation, sponsorship, or endorsement by the marketholder. *Id*. at p. 26. TravelPass states it must reference the specific hotel and hotel brands that it offers to consumers and it only uses Marriott's trademarks as is reasonably necessary in its ads and landing pages to describe hotel rooms owned and/or operated under Marriott's brands. TravelPass maintains it did not use the Marriott Marks in such a way that suggested sponsorship or endorsement of Marriott.

The Court finds there are genuine issues of material fact on the issue of fair use. Accordingly, the Court recommends that part of Marriott's motion for partial summary judgment be denied. The Court now examines whether the "digits of confusion" show a likelihood of confusion.

**c.    The digits**

*Type of mark*

The first digit of confusion, the type of the mark, "refers to the strength of the mark."

*Springboards To Educ., Inc. v. Houston Indep. Sch. Dist.*, 912 F.3d 805, 814 (5th Cir. 2019), as revised (Jan. 29, 2019), as revised (Feb. 14, 2019) (citing *Elvis Presley Enters.*, 141 F.3d at 201). The more distinct and recognizable the senior user's mark, "the greater the likelihood that consumers will confuse the junior user's use with that of the senior user." *Id.* The Fifth Circuit analyzes two factors in determining the strength of a mark: (1) the mark's position along the distinctiveness spectrum, and (2) "the standing of the mark in the marketplace." *Id.* (quoting *Am. Rice, Inc. v. Producers Rice Mill, Inc.*, 518 F.3d 321, 330 (5th Cir. 2008)).

A mark is either generic, descriptive, suggestive, or arbitrary and fanciful. *Bisous Bisous L.L.C. v. The Cle Grp., L.L.C.*, Civil Action No. 3:21-CV-1614-B, 2021 WL 3618042, at *5 (N.D. Tex. Aug. 16, 2021) (citing *Dall. Cowboys Football Club, Ltd. v. Am.'s Team Props., Inc.*, 616 F. Supp. 2d 622, 637 (N.D. Tex. 2009)). The more arbitrary or fanciful the mark, the stronger it is—and the more likely an infringing mark could cause consumer confusion. *Id.* "A generic term refers to a particular genus or class of which an individual article or service is but a member[.]" *Id.* (quoting *Soweco, Inc. v. Shell Oil Co.*, 617 F.2d 1178, 1183 (5th Cir. 1980) (quotation marks and citation omitted in *Bisous Bisous*)). "[I]t suggests the 'basic nature of articles or services.'" *Id.* (citation omitted in *Bisous Bisous*)). "A descriptive term identifies a characteristic or quality of" the item, such as its []color, odor, function, dimensions, or ingredients." *Id.* (quotation marks and citations omitted in *Bisous Bisous*)). Meanwhile, a "suggestive term suggests, rather than describes, some characteristic of the goods to which it is applied and requires the consumer to exercise his imagination to reach a conclusion as to the nature of those goods." *Id.* (quotation marks omitted in *Bisous Bisous*)). Finally, "[a]rbitrary or fanciful terms...bear no relationship to the product or service with which they are associated." *Id.* (quotation marks omitted in *Bisous Bisous*)).

98

According to Marriott, its marks are all federally registered trademarks, on the Principal Register, many of which are incontestable. Docket Entry # 565 at p. 18. In its response to Marriott's motion, TravelPass asserts Marriott has offered no evidence, other than the length of time the hotel companies have been in operation, to establish that each Asserted Mark is commercially strong. Docket Entry # 604 at pp. 4-5. TravelPass argues the evidence in the record proves that at least some of the Asserted Marks are relatively new or have low brand awareness. *Id.* at pp. 5-6 ███

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████.

As urged by Marriott in its reply, TravelPass does not dispute the strength of many of its "largest and iconic brands that have been asserted in this case." Docket Entry # 645 at p. 4, n. 1 (Marriott, Marriott JW, Courtyard by Marriott, Fairfield by Marriott). This factor favors Marriott.

### *Similarity of the marks, similarity of the products, identity of purchasers, and similarity of advertising media used*

Although the second through fifth digits may not fit perfectly into the facts of this case, the Court agrees with Marriott that they should not be completely ignored or found neutral. As urged by Marriott, the services TravelPass offers under the Hotel Companies' exact trademarks and logos, namely hotel booking services, are identical to those offered by the Hotel Companies. TravelPass' purchasers are the same class of consumers as those of Marriott. And TravelPass' advertising media, sponsored advertisements and internet webpages, are some of the same methods of advertising used by Marriott, "with TravelPass and Hotel Company advertisements often appearing side by side." Docket Entry # 565 at p. 19. Marriott argues each of these digits weighs in favor of a finding of

likelihood of confusion.

These digits suggest likelihood of confusion.

***Intent to confuse***

The sixth digit is intent to confuse. Although not necessary to a finding of likelihood of confusion, a defendant's intent to confuse may alone be sufficient to justify an inference that there is a likelihood of confusion. *Smack Apparel*, 550 F.3d at 481 (citation omitted). In *Smack Apparel*, the Fifth Circuit found "Smack's admitted intent and the similarity in appearance between Smack's shirts and the Universities' licensed products [was] strong evidence of a likelihood of confusion." *Id.* at 482.

Marriott asserts TravelPass "has taken multiple affirmative steps to mislead consumers into believing they are booking directly with the hotel." Docket Entry # 565 at p. 19. In addition to the generic names for its websites that call to mind the reservation counter of a hotel and the incorporation of the Asserted Marks into the URLs along with prominent hotel logos and a field on its checkout pages for collecting hotel rewards numbers, there is evidence that TravelPass placed its own telephone number directly below the address of the hotel on its websites. *Id.* There is also evidence that TravelPass used generic automated greetings and scripts that did not identity with whom the customer was speaking when the customer called the telephone number. *Id.* at pp. 19-20.



████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████

The Court finds this factor suggests a likelihood of confusion.

***Actual confusion***

The seventh digit is evidence of actual confusion. Marriott has presented extensive evidence regarding this factor, and this evidence is more than *de minimis,* even when compared to the volume of TravelPass' bookings for Marriott. Although TravelPass spends pages of its briefing objecting to the actual confusion evidence presented by Marriott, the Court cannot ignore the sheer volume of customer complaints presented in this case. As urged by Marriott in its reply, even assuming *arguendo* that certain of these criticisms are meritorious, TravelPass still is left with a "large pile of unaddressed actual confusion evidence that must be deemed admitted." Docket Entry # 645 at p. 11.



The Fifth Circuit has described itself as having set "a low bar for this showing, stating that a plaintiff need to provide 'very little proof of actual confusion. . . to prove likelihood of

confusion.'" *Streamline Prod. Sys., Inc. v. Streamline Mfg., Inc.*, 851 F.3d 440, 457 (5th Cir. 2017)

(quoting *Xtreme Lashes, L.L.C. v. Xtended Beauty, Inc.*, 576 F.3d 221, 229 (5th Cir. 2009)).

"[C]ourts may not ignore competent evidence of actual confusion," *id.*, and even a single incident

of actual confusion may be sufficient to support a finding of actual confusion, *id.* (citing *La. World

Exposition v. Logue*, 746 F.2d 1033, 1041 (5th Cir. 1984)). Moreover, once a plaintiff provides proof

of actual confusion, the defendant must provide "an almost overwhelming amount of proof. . .to

refute such proof." *Xtreme Lashes*, 576 F.3d at 229-30 (citation omitted).

This digit of confusion weighs in favor of finding a likelihood of confusion.

### d. Balancing the digits

Looking to the digits of confusion for guidance, which weigh in favor of a finding of

likelihood of confusion, the Court concludes a reasonable jury could find a likelihood of confusion.

However, the Court does not agree with Marriott that summary judgment should be granted in its

favor on this issue. The Court recommends both summary judgment motions be denied.

## VII. MARRIOTT'S REQUESTS FOR MONETARY RELIEF

### A. Parties' assertions

In its motion for partial summary judgment on Marriott's request for monetary relief,

TravelPass first argues Marriott has no evidence it has suffered any compensable harm. According

to TravelPass, Marriott is not entitled to corrective advertising damages. TravelPass further asserts

Marriott is not entitled to disgorgement. Specifically with regard to disgorgement, TravelPass argues

as follows: (1) Marriott has no evidence that TravelPass' profits are attributable to the alleged

Lanham Act violations; (2) Marriott admits TravelPass did not divert sales; (3) there is no evidence

TravelPass intended to confuse or deceive; (4) if liability is found, injunctive relief would be

103

sufficient; (5) Marriott has unreasonably delayed in asserting its rights (and may never have asserted them absent TravelPass' antitrust claims); and (6) this case does not involve the public interest of palming off.

In its response, Marriott asserts it has suffered harm, corrective advertising damages are required, and it is entitled to disgorgement of TravelPass' profits. Specifically regarding disgorgement, Marriott asserts TravelPass intended to confuse consumers; TravelPass diverted sales from Marriott; injunctive relief is insufficient; Marriott did not delay in asserting its rights; TravelPass' conduct is akin to palming off; and there is public interest in preventing misleading advertising and misuse of trademarks. According to Marriott, TravelPass – not Marriott – bears the burden to show that its profits should not be attributed to its Lanham Act violations.

Specifically regarding corrective advertising damages, Marriott argues it does not need to have identified a specific plan for future corrective advertising. *See* Docket Entry # 609 at p. 20. According to Marriott, it can show it has responded to TravelPass' misleading conduct in the past, including through past corrective advertising, and that there is an ongoing need to do so in the future. *Id.* (citing SMF, ¶¶ 1-12, 19). ████████████████████████

████████████████████████████████████████████████

████████████████████████     ████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████

████████

**B.      Applicable law, generally**

Under 15 U.S.C. § 1117(a), when a violation of section 1125(a), (c), or (d) is found, the plaintiff is entitled to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action." *Malletier v. Texas Int'l P'ship*, Civil Action No. H-10-2821, 2011 WL 13253847, at \*9 (S.D. Tex. Nov. 18, 2011) (quoting 15 U.S.C. § 1117(a)). In considering whether an award of profits under § 1117 is appropriate, courts may consider (1) whether the defendant had an intent to confuse or deceive; (2) whether sales have been diverted; (3) the adequacy of other remedies; (4) any unreasonable delay by the plaintiff in asserting his rights; (5) the public interest in making the misconduct unprofitable; and (6) whether it is a case of "palming off." *Neutron Depot, L.L.C. v. Bankrate, Inc.*, Civil Action No. AU-16-CA-01170-SS, 2018 WL 3014435, at \*3 (W.D. Tex. May 1, 2018), *aff'd sub nom. Neutron Depot, L.L.C. v. Bankrate, Inc.*, 798 Fed. Appx. 803 (5th Cir. 2020) (citing *Quick Techs., Inc. v. Sage Grp.*, 313 F.3d 338, 346–51 (5th Cir. 2003) (citing *Pebble Beach Co. v. Tour 18 Ltd.*, 155 F.3d 526 (5th Cir. 1998)). Courts in the Fifth Circuit rarely award profits if there is insufficient proof of actual damages or where the defendant lacked intent to confuse or deceive. *Id.* (citing *Texas Pig Stands, Inc. v. Hard Rock Cafe Int'l*, 951 F.2d 684, 694–97 (5th Cir. 1992) (declining to award profits absent evidence of lost sales or intent to deceive on the ground such award would be a "windfall"); also citing *Streamline Prod. Sys. v. Streamline Mfg.*, 851 F.3d 440, 459, 461 (5th Cir. 2017) (noting monetary damage awards under § 1117 are particularly inappropriate "in the absence of a showing of wrongful intent or if there is a lack of sufficient proof of actual damages" (internal quotation marks and citations omitted in *Neutron*))).

**C.     Whether Marriott is entitled to seek monetary relief**

**1.     Compensable harm**

As an initial matter, TravelPass asserts Marriott has failed, as a matter of law, to show any compensable harm to its business. Marriott, in its response, relies on the record evidence showing it has suffered both financial loss and loss of goodwill. Docket Entry # 609 at p. 8 (citing SMF, ¶¶ 1-10, CC Opp SMF ¶ 26, Exs. 5, 39; ███████████████████████████ ████████████████████████████████

Marriott further asserts there is no requirement that the Hotel Companies calculate actual damages before obtaining disgorgement of TravelPass' profits. *Id*. According to Marriott, the intent to benefit from a trademark owner's goodwill alone warrants the disgorgement of profits. *Id.* at p. 9 (citing *Klein-Becker USA, L.L.C. v. Englert*, 711 F.3d 1153, 1161-62 (10th Cir. 2013) (affirming disgorgement of profits from reseller); *Gentle Giant Moving Co. v. Gentle Giant Moving & Storage Inc.*, No. 17-cv-02762-PAB-NRN, 2019 WL 4200397, at *8 (D. Colo. Sept. 4, 2019) (awarding disgorgement of profits because "defendants' actions demonstrate a willful intent to benefit from the goodwill or reputation of plaintiff's business")). Marriott argues TravelPass' own authority recognizes that disgorgement of profits is appropriate if there is a showing of wrongful intent or if there is proof of actual damages. *Id.* (citing *Neutron Depot, L.L.C. v. Bankrate, Inc*., Civil Action No. AU-16-CA-01170-SS, 2018 WL 3014435, at *3 (W.D. Tex. May 1, 2018), *aff'd sub nom. Neutron Depot, L.L.C. v. Bankrate, Inc.*, 798 Fed. Appx.. 803 (5th Cir. 2020) (denying disgorgement when there was no evidence of wrongful intent and no evidence of lost sales); *see also Retractable Technologies, Inc. v. Becton Dickinson & Co.,* 919 F.3d 869, 882 (5th Cir. 2019) ("Even without sufficient evidence of diverted sales or palming off, proof of lost goodwill might weigh in favor of

disgorgement[.]").

In its reply, TravelPass argues Marriott relies on a five-page, self-serving declaration made by Alexander Pyhan, the Senior Vice President, Global Distribution of Marriott International, who was twice deposed in this case. Docket Entry # 639 at p. 3 (citing Docket Entry # 609, Ex. 138). In the Declaration of Alexander Pyhan ("Pyhan Decl."), Pyhan states, among other things, as follows:

For almost a century, Marriott has extensively used and promoted its Marriott Marks



In its surreply, Marriott argues TravelPass has cited no authority that there must be "financial loss" to award disgorgement of profits and "completely ignores the evidence of harm to [Marriott's] reputation and goodwill." Docket Entry # 655 at p. 1. According to Marriott, even the cases that TravelPass cites do not require proof of financial loss to support an award of disgorgement. *Id*. at

pp. 1-2 (citing *Retractable Techs*., 919 F.3d at 882 (holding that proof of lost goodwill may weigh in favor of disgorgement even when there is no evidence of diverted sales of palming off); also citing *Boltex*, 2019 WL 9143478 (holding that diverted sales "is only *one* of the six disgorgement factors" and "isn ot dispositive on its own")).   Even so, Marriott contends it has offered evidence of actual financial harm as well as loss of goodwill, harm to its brands, and profits gained by TravelPass as a result of its unlawful conduct. *Id*.; *see also id*. at p. 3 (stating Pyhan does not merely make a conclusory statement, but rather, provides the specific amount that Marriott loses with each lost direct booking) (citing Pyhan Decl., ¶ 13 ("For example, in 2019, an average OTA booking cost Marriott hotels approximately $14 more per night than when a consumer reserved a room through Marriott's direct digital booking.")).          Finally, Marriott argues that because it is not seeking actual damages, there is no requirement that Marriott, or Dr. Becker, quantify its financial losses. *Id*. at p. 4.

The Court finds Marriott has offered sufficient evidence of actual harm (SMF ¶¶ 1-10), including evidence regarding TravelPass' intent to utilize Marriott's marks, and its associated goodwill. *See* Docket Entry # 565, SUMF ¶¶10-13, 15-16, 19-20, 23; Ex. 4; Exs. 11-25; Exs. 29-32; Ex. 35. As to this issue, the Court agrees with Marriott there is a genuine question of material fact whether Marriott is entitled to monetary relief. The Court now considers the six non-exhaustive factors to determine whether disgorgement is equitable. The Court will then address the parties' dispute as to whose burden it is to prove attribution.

**2.      Disgorgement**

**a.      Applicable law**

Disgorgement of profits in a Lanham Act case is an equitable remedy.  *Chicago Mercantile*

*Exch. Inc. v. Ice Clear US, Inc.*, Civil Action No. 18 C 1376, 2021 WL 3630091, at *21 (N.D. Ill. Aug. 17, 2021) (citing *Ariel Investments L.L.C. v. Ariel Capital Advisors, L.L.C.*, Civil Action No. 15 C 3717, 2017 WL 1049464, at *2 (N.D. Ill. Mar. 20, 2017); *BASF Corp. v. Old World Trading Co., Inc.*, 41 F.3d 1081, 1092-96 (7th Cir. 1994) (noting the "Lanham Act allows the district court a wide range of legal and equitable remedies for a violation of the Act" including disgorgement of profits)). Disgorgement of profits is appropriate only if it is equitable and the defendant's profits are attributable to the Lanham Act violation. *Illinois Tool Works, Inc. v. Rust-Oleum Corp*., 955 F.3d 512, 514 (5th Cir. 2020) (citing *Retractable Techs., Inc. v. Becton Dickinson & Co.*, 919 F.3d 869, 875–76 (5th Cir. 2019)).

Fifth Circuit caselaw establishes two distinct considerations in assessing whether disgorgement is appropriate. *Retractable Techs., Inc. v. Becton Dickinson & Co.*, 919 F.3d 869, 875–76 (5th Cir. 2019). The first is whether disgorgement is equitable under the six factors set forth in *Pebble Beach Co. v. Tour 18 I Ltd.*:

> (1) whether the defendant had the intent to confuse or deceive, (2) whether sales have been diverted, (3) the adequacy of other remedies, (4) any unreasonable delay by the plaintiff in asserting his rights, (5) the public interest in making the misconduct unprofitable, and (6) whether it is a case of palming off.[20]

*Id*. at 876 (quoting *Pebble Beach Co. v. Tour 18 I Ltd.*, 155 F.3d 526, 554 (5th Cir. 1998), *abrogated on other grounds by TrafFix Devices, Inc. v. Mktg. Displays, Inc*., 532 U.S. 23, 121 S.Ct. 1255, 149 L.Ed.2d 164 (2001)). According to the Fifth Circuit, while these factors were formulated in the trademark infringement context, they also apply to false advertising. *Id*. at 876, n. 27 (citation omitted). The *Pebble Beach* factors are non-mandatory and non-exclusive: the district court is free

---

[20] "Palming off" or "passing off" "occurs when a producer misrepresents his own goods or services as someone else's." *Malletier v. Texas Int'l P'ship*, Civil Action No. H-10-2821, 2011 WL 13253847, at *9 (S.D. Tex. Nov. 18, 2011) (citing *Dastar Corp. v. Twentieth Century Fox Film Corp*., 539 US. 23, 28 n.1, 123 S. Ct. 2041 (2003)).

to consider other facts in assessing whether disgorgement of profits would be equitable, just as it may exercise discretion in weighing the individual factors. *Id.* at 876.

The second consideration is whether the defendant's profits are attributable to the Lanham Act violation. *Id.* (citing *Quick Techs., Inc. v. Sage Grp. PLC*, 313 F.3d 338, 350 (5th Cir. 2002) and *Tex. Pig Stands, Inc. v. Hard Rock Cafe Int'l, Inc.* (*Texas Pig Stands II* ), 966 F.2d 956, 957 (1992), on denial of reh'g).

**b.    Analysis**

**i.    *Pebble Beach* factors**

TravelPass asserts none of the *Pebble Beach* factors sway in Marriott's favor, while Marriott contends every factor weighs in its favor, or there are at least disputed facts as to each of the factors that preclude summary judgment. Docket Entry # 655 at p. 4 (citing *Mary Kay, Inc. v. Weber*, 661 F. Supp. 2d 632 (N.D. Tex. 2009)).[21]  As briefly summarized below, the Court finds there is at least a question of material fact as to the *Pebble Beach* factors, precluding summary judgment.

***Whether TravelPass had the intent to confuse or deceive***

TravelPass first asserts there is no evidence that it intended to confuse or deceive.



There is a material question as to TravelPass' intent.

---

[21] In *Mary Kay*, the court stated the Fifth Circuit in *Quick Technologies*, "made clear that where the jury is the fact-finder, it should be the one to consider the six factors in determining whether a plaintiff is entitled to a defendant's profits."  *Mary Kay, Inc. v. Weber*, 661 F. Supp. 2d 632, 638-39 (N.D. Tex. 2009) (citing *Quick Technologies, Inc. v. Sage Group PLC*, 313 F.3d 338, 349-50 (5th Cir.2002)).

### *Whether sales have been diverted*

TravelPass asserts Marriott has no evidence of actual diversion, "*i.e.*, that TravelPass'[] sales were directly 'taken' from [Marriott]." Docket Entry # 639 at p. 5. According to TravelPass, Marriott offers no evidence to show that, absent TravelPass' allegedly wrongful conduct, the allegedly deceived customers would have booked directly with the hotel rather than with TravelPass, a different OTA, or a different hotel. *Id.* at pp. 5-6. ██████████████████████████

██████████████████████████████████

Marriott asserts it has presented evidence that it would have received more revenue from a direct booking, and thus, there was actual diverted revenue. Docket Entry # 655 at pp. 5-6. According to Marriott, for every room that is booked with TravelPass, as opposed to directly with the hotel, "there is a diverted sale, even if the customer still stays in one of [Marriott's] properties." Docket Entry # 609 at p. 12.

### *Adequacy of other remedies*

According to TravelPass, if liability is found, injunctive relief would be sufficient. Marriott disagrees, asserting TravelPass would receive a windfall if it was permitted to retain the profits from use of Marriott's marks and goodwill. Docket Entry # 609 at p. 12. Furthermore, Marriott argues as follows:

> [T]here is evidence that an injunction alone would not prevent TravelPass from continuing to mislead consumers. Despite TravelPass entering into a consent judgment order with the FTC, which included a 20-year injunction, TravelPass has continued to misuse Hotel Companies' marks and mislead consumers. Dkt. 565, SUMF ¶¶ 32-36; Ex. 4; Exs. 51-54. As shown in the Hotel Companies' consumer survey, which was based on versions of TravelPass'[] advertising and websites in use after the FTC injunction, TravelPass continues to mislead a substantial number of consumers. Dkt. 565, SUMF ¶¶ 37-38; Ex. 6; Ex. 55. This evidence must be considered in the Hotel Companies' favor. Thus, there is at least a genuine issue of material fact as to whether an injunction would be sufficient, and as such, this factor

further weighs in favor of awarding disgorgement.

*Id.* at p. 13. There is a fact issue as to whether an injunction would be sufficient.

### Any unreasonable delay by Marriott

TravelPass argues Marriott "slept on [its] rights for more than seven years," and therefore disgorgement "would be inequitable under the circumstances and would provide future Lanham Act plaintiffs a perverse incentive to delay filing suit in hopes of arguing for a larger disgorgement award." Docket Entry # 560 at pp. 14-15. Although Marriott did not take legal action, Marriott states it "promptly and repeatedly contacted TravelPass to object to its misleading ads, websites, and call centers," and it worked with its industry partners to notify TravelPass of its objections and attempts to stop the alleged infringement and unfair competition. Docket Entry # 609 at p. 15. According to Marriott, it "put TravelPass on notice of [Marriott's] objections to its conduct almost immediately, repeatedly followed up to reiterate those objections, and filed [its] counterclaims within a few years of those efforts being unsuccessful." *Id*. at pp. 15-16.

At this stage, there is at least a genuine issue of material fact as to this factor.

### Public interest in making the misconduct unprofitable

TravelPass argues the public interest factor does not consider the public's interest in the product, but regulating trademark infringement and specific types of behavior. Docket Entry # 560 at p. 15. TravelPass argues "there is not greater or lesser public concern to this trademark case than there is for any other run-of-the-mill trademark or false advertising dispute." *Id*. at pp. 15-16. Again, Marriott disagrees.

Specifically, Marriott argues as follows:

The 'public interest is significantly served' by disgorgement of ill-gotten profits because consumers 'must rely on [plaintiff's] labeling.' *Boltex Mfg. Co.*, 2020 WL

112

598284, at *16 (finding disgorgement was 'necessary and proper.'). Indeed, the FTC investigated TravelPass because of concerns that consumers were confused by the deceptive pattern of TravelPass's practices. Dkt. 565, SUMF ¶¶ 32-36; Ex. 4; Exs. 51-54. The Better Business Bureau has also noted a pattern of complaints from confused consumers. Dkt. 565, SUMF ¶ 31; Ex. 4; Ex. 50. Clearly this goes beyond a 'run-of-the-mill trademark or false advertising dispute.' Mot. at 16.

Docket Entry # 609 at pp. 15-16. Again, there is a genuine issue of material fact as to this factor.

### Whether it is a case of palming off

Finally, according to TravelPass, Marriott concedes this case does not involve "palming off." Docket Entry # 639 at p. 7. Therefore, TravelPass argues this factor does not apply, and if it does, it weighs in TravelPass' favor. The Court is not convinced.

"Palming off" or "passing off" "occurs when a producer misrepresents his own goods or services as someone else's." *Malletier v. Texas Int'l P'ship*, Civil Action No. H-10-2821, 2011 WL 13253847, at *9 (S.D. Tex. Nov. 18, 2011) (citing *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 US. 23, 28 n.1, 123 S. Ct. 2041 (2003)). According to Marriott, while this case does not involve "palming off" in the traditional sense, the evidence shows TravelPass has used more of the Hotel Companies' marks than necessary as a reseller to identify the product. Docket Entry # 609 at p. 15 (citing Docket Entry # 565, SUMF ¶¶ 6-23; Ex. 2; Ex. 4; Ex. 6; Exs. 7-35). Marriott asserts, and has presented evidence suggesting, TravelPass is not passing off its own rooms as though they are Hotel Companies' rooms; but instead, TravelPass is passing itself off as the hotel company to make its sales. *Id*.

Having considered each of the *Pebble Beach* factors, the Court finds there is, at least, a genuine dispute of material fact as to Marriott's request for disgorgement. The Court now considers the second issue raised by TravelPass, both in its motion for partial summary judgment and in its motion to exclude testimony of Marriott's damages expert, Dr. Stephen Becker – whether it is

Marriott's burden to show that TravelPass' profits are attributable to the alleged Lanham Act violations, and if so, whether Marriott has met that burden.

## ii.    Attribution

### *Parties' assertions*

The parties hotly dispute whether TravelPass or Marriott bears the burden to apportion TravelPass' profits to any alleged infringement or false advertising. TravelPass, relying on the Fifth Circuit's recent case *Illinois Tool Works* (and some cases it cites), argues Marriott and Dr. Becker falsely assume TravelPass bears the burden to conduct the threshold analysis of how much, if any, of its profits are attributable to the allegedly wrongful conduct of infringement and false advertising.

According to the Fifth Circuit in *Illinois Tool Works* case, to show attribution, a plaintiff must "present evidence that the defendant benefitted from the alleged false advertising." *Illinois Tool Works, Inc. v. Rust-Oleum Corp.*, 955 F.3d 512, 515 (5th Cir. 2020), (quoting *Logan v. Burgers Ozark Cty. Cured Hams Inc.*, 263 F.3d 447, 465 (5th Cir. 2001)). The Fifth Circuit stated that without such evidence, a Lanham Act plaintiff cannot recover a defendant's profits even if disgorgement would otherwise be equitable. *Id.* (citing *Retractable Techs.*, 919 F.3d at 876).

Marriott claims TravelPass bears the burden to show that its profits should not be attributed to its Lanham Act violations, starting with Supreme Court precedent. According to Marriott, over a century ago, the Supreme Court held that "the owner of [an infringed] trademark is entitled to so much of the profit as resulted from the use of the trademark" and once a plaintiff establishes the "sales made under a simulated trademark," it did not have to apportion out "the profits attributable to defendant's use of the offending mark and those attributable to the intrinsic merit of defendant's shoes." Docket Entry # 609 at p. 16 (citing *Hamilton-Brown Shoe Co. v. Wolf Bros. & Co.,* 240 U.S.

114

251, 261-62 (1916)). Marriott states the Supreme Court reaffirmed trademark owners' entitlement to all profits resulting from an infringement of a mark without need for further apportionment three decades later in *Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge Co.,* 316 U.S. 203 (1942). *Id.* Marriott asserts these "same principles remain true today." *Id.* at p. 17 (citing *WMS Gaming, Inc. v. WPC Productions Ltd.*, 542 F.3d 601, 603 (7th Cir. 2008); also citing *Gucci Am., Inc. v. Bank of China*, 768 F.3d 122, 131 (2d Cir. 2014); also citing *Maltina Corp. v. Cawy Bottling Co.*, 613 F.2d 582, 586 (5th Cir. 1980)). Marriott also relies on the "plain language of the Lanham Act," which provides that "[i]n assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed." *Id.* (quoting 15 U.S.C. § 1117(a)).

In its briefing related to TravelPass' motion to exclude Marriott's damages expert, Dr. Stephen Becker, Marriott argues TravelPass confuses the parties' burden regarding disgorgement. Docket Entry # 644 at p. 1. Specifically, Marriott argues as follows:

> There are two different burdens related to disgorgement damages. The Hotel Companies must show (i) TravelPass'[] sales and (ii) a qualitative correlation between those sales and the unlawful conduct. *See, e.g.*, *Ill. Tool Works, Inc. v. Rust-Oleum Corp.*, 955 F. 3d 512, 514-15 (5th Cir. 2020). TravelPass must quantify any deductions to its sales, including deductions for sales, if any, that are not due to its wrongful conduct. *See, e.g.*, *Hamilton-Brown Shoe Co. v. Wolf Bros. & Co.*, 240 U.S. 251, 261-62 (1916); *Mishawaka Rubber & Woolen Mfg. Co. v. S. S. Kresge Co.*, 316 U.S. 203, 206-207 (1942). Neither the Hotel Companies nor Dr. Becker have any obligation to filter out profits resulting from TravelPass'[] Lanham Act violations from profits obtained for other reasons. *See Hamilton-Brown Shoe Co.*, 240 U.S. at 261-62; *Mishawaka Rubber & Woolen Mfg. Co.*, 316 U.S. at 206-07.
>
> TravelPass misstates the status of *Hamilton-Brown* and *Mishawaka* in the Fifth Circuit. Reply at 2. The Fifth Circuit and its District Courts have consistently recognized that the standards in *Hamilton-Brown* and *Mishawaka* apply to claims for disgorgement under the Lanham Act. *See, e.g., Pebble Beach Co. v. Tour 18 I Ltd.*, 155 F.3d 526, 555 (5th Cir. 1998) ('[t]he Supreme Court has held that the burden is upon the defendant to show that he made no profit from the infringing use of the mark' and 'that the plaintiff may receive a windfall, but… "where it is impossible to isolate the profits" from the infringing conduct, the windfall should go to the plaintiff

rather than the wrongdoer.' citing *Mishawaka*); *Tex. Pig Stands, Inc. v. Hard Rock Café Int'l, Inc.*, 966 F.2d 956, 957 (5th Cir. 1992) ('*Mishawaka* has been followed and cited numerous times in many federal courts'); *Sys. Forward Am., Inc. v. Martinez*, 129 F. App'x 88, 89 (5th Cir. 2005) (holding that '[infringer] bore the burden of proving that his infringement did not result in his financial benefit'); *Clearline Techs. Ltd. v. Cooper B-Line, Inc.*, 948 F. Supp. 2d 691, 707–08 (S.D. Tex. 2013) (noting 'the well-established principle that profits may be presumed to be attributable to infringement unless the defendant proves otherwise' and rejecting argument to the contrary).

*Id*. at pp. 1-2 (internal footnote omitted).

Marriott asserts numerous courts in other circuits similarly recognize that *Hamilton-Brown* and *Mishawaka* continue to apply under the Lanham Act. *Id.* at p. 2 (citing *WMS Gaming*, 542 F.3d at 608 ("[t]he Supreme Court has made it clear…the burden is the infringer's to prove that his infringement had no cash value in sales made by him. If he does not do so, the profits made on sales of goods bearing the infringing mark properly belong to the owner of the mark." 542 F.3d 601, 608 (7th Cir. 2008) (citing *Mishawaka* and awarding disgorgement of profits)); also citing *Nintendo of Am., Inc. v. Dragon Pac. Int'l*, 40 F.3d 1007, 1012 (9th Cir. 1994) ("[t]he burden is upon [defendant] to prove that sales were 'demonstrably not attributable' to the infringing mark" and citing *Mishawaka*); also citing *Adidas Am., Inc. v. Sketchers USA, Inc.*, No. 3:15-cv-01741-HZ, 2017 WL 3319190, at *27 (D. Or. Aug. 3, 2017) (same); *Zerorez Franchising Sys., Inc. v. Distinctive Cleaning, Inc.*, Civ. No. 13-2326 ADM/BRT, 2016 WL 2637801, at *6 (D. Minn. May 6, 2016) (same)); *see also Chicago Mercantile Exch. Inc. v. Ice Clear US, Inc.*, Civil Action No. 18 C 1376, 2021 WL 3630091, at *21 (N.D. Ill. Aug. 17, 2021) ("To recover the ICE Licensees' profits under the Lanham Act, CME's only burden was to prove the ICE Licensees' sales. Then the burden shifted to the ICE Licensees to "prove all elements of cost or deduction claimed.") (quoting 15 U.S.C. § 1117(a)).

116

### *Relevant caselaw*

In 1942, the Supreme Court set forth the standard for attribution of profits under the Lanham

Act:

> If it can be shown that the infringement had no relation to profits made by the defendant, that some purchasers bought goods bearing the infringing mark because of the defendant's recommendation or his reputation or for any reason other than a response to the diffused appeal of the plaintiff's symbol, the burden of showing this is upon the poacher. The plaintiff of course is not entitled to profits demonstrably not attributable to the unlawful use of his mark. The burden is the infringer's to prove that his infringement had no cash value in sales made by him. If he does not do so, the profits made on sales of goods bearing the infringing mark properly belong to the owner of the mark. There may well be a windfall to the trade-mark owner where it is impossible to isolate the profits which are attributable to the use of the infringing mark. But to hold otherwise would give the windfall to the wrongdoer. In the absence of his proving the contrary, it promotes honesty and comports with experience to assume that the wrongdoer who makes profits from the sales of goods bearing a mark belonging to another was enabled to do so because he was drawing upon the good will generated by that mark. And one who makes profits derived from the unlawful appropriation of a mark belonging to another cannot relieve himself of his obligation to restore the profits to their rightful owner merely by showing that the latter did not choose to use the mark in the particular manner employed by the wrongdoer.

*Romag Fasteners, Inc. v. Fossil, Inc.*, Civil Action No. 3:10CV1827 JBA, 2014 WL 3895905, at

*11–12 (D. Conn. Aug. 8, 2014) (quoting *Mishawaka Rubber & Woolen Mfg. Co. v. S. S. Kresge

Co.*, 316 U.S. 203, 206-207 (1942) (internal citation omitted in *Romag*)).

In *Pebble Beach*, which was decided in 1998, the Fifth Circuit Court of Appeals stated the

"Supreme Court has held that the burden is upon the defendant to show that he made no profit from

the infringing use of the mark." *Pebble Beach*, 155 F.3d at 555 (citing *Mishawaka*, 316 U.S. at 206,

62 S.Ct. 1022). Several years later, the Fifth Circuit held a "plaintiff will not be permitted to recover

any of the defendant's profits under 15 U.S.C. § 1117(a)" if the plaintiff fails "to present evidence

that the defendant benefitted from the alleged false advertising." *Logan v. Burgers Ozark Country*

*Cured Hams Inc*., 263 F.3d 447, 465 (5th Cir. 2001).

In *Logan*, James B. Logan filed a patent infringement suit against the Original HoneyBaked Ham Company of Georgia, Inc. and HoneyBaked Foods, Inc., for violating his patents for the spiral slicing method of cutting boneless turkey breasts. *Malletier v. Texas Int'l P'ship*, Civil Action No. H-10-2821, 2011 WL 13253847, at *10 (S.D. Tex. Nov. 18, 2011) (citing *Logan*, 263 F.3d at 449). In connection with the claim, Logan asserted Lanham Act violations for falsely advertising spiral sliced meat products. *Id*. (citing *Logan*, 263 F.3d at 450). The district court, analogizing to *Tex. Pig Stands, Inc. v. Hard Rock Café Int'l, Inc*., 951 F.2d 684 (*Texas Pig Stands I*) (5th Cir. 1992), found that "it was certain that HoneyBaked would have sold the same quantity of turkey breasts regardless of the slicing method," noted that there was evidence that "consumers did not care how the meat was sliced," and held "that Logan had failed to present evidence demonstrating that any of HoneyBaked's profits resulted from its violation of the Lanham Act." *Id*. (citing *Logan*, 263 F.3d at 464). The Fifth Circuit affirmed, holding that a "plaintiff will not be permitted to recover any of the defendant's profits under 15 U.S.C. § 1117(a)" if the plaintiff fails "to present evidence that the defendant benefitted from the alleged false advertising." *Id*. (citing *Logan*, 263 F.3d at 465).

In 2005, in affirming the district court's grant of injunctive and monetary relief in favor of the plaintiff, the Fifth Circuit simply stated "Martinez [the infringer] bore the burden of proving that his infringement did not result in his financial benefit." *Sys. Forward Am., Inc. v. Martinez*, 129 Fed. Appx. 88, 89 (5th Cir. 2005) (citing *Mishakawa*, 316 U.S. at 207).

In 2019, the Fifth Circuit in *Retractable Technologies* stated generally that the "second consideration is whether the defendant's profits are attributable to the Lanham Act violation." *Retractable Techs., Inc. v. Becton Dickinson & Co.*, 919 F.3d 869, 876 (5th Cir. 2019) (citing *Quick*

118

*Techs., Inc. v. Sage Grp. PLC*, 313 F.3d 338 (5th Cir. 2002) and *Tex. Pig Stands, Inc. v. Hard Rock Cafe Int'l, Inc.* (*Texas Pig Stands II* ), 966 F.2d 956, 957 (1992), on denial of reh'g).[22] Notably, in *Texas Pig Stands II*, the Fifth Circuit cited *Mishawaka* as the "overriding principle . . . from the Supreme Court . . . as to recovery of infringer's profits." *Texas Pig Stands II*, 966 F.2d at 957. The Fifth Circuit quoted the portion of *Mishawaka* stating "[t]he plaintiff, of course, is not entitled to profits demonstrably not attributable to the unlawful use of his mark," but did not cite the next sentence in *Mishawaka* wherein the Supreme Court stated the "burden is the infringer's to prove that his infringement had no cash value in sales made by him. If he does not do so, the profits made on sales of goods bearing the infringing mark properly belong to the owner of the mark. *Mishawaka*, 316 U.S. 203, 206–07, 62 S. Ct. 1022, 1024–25, 86 L. Ed. 1381 (citing *Hamilton-Brown*, 240 U.S. 251, 36 S.Ct. 269, 60 L.Ed. 629).

The Fifth Circuit in *Retractable Technologies* then cited *Logan* for the proposition that "where a plaintiff who has brought a Lanham Act claim for false advertising has failed to present

---

[22] In *Quick Technologies*, one of the cases cited by the court in *Retractable Technologies*, the Fifth Circuit stated as follows:

> As we have previously held, 'a markholder is only entitled to those profits attributable to the unlawful use of its mark.' [*Pebble Beach Co.*, 155 F.3d at 554] (citing *Texas Pig Stands, Inc.*, 951 F.2d at 696). In *Texas Pig Stands, Inc.*, we concluded that there was no evidence whatsoever that Hard Rock Café used Texas Pig Stands' good will to sell its pig sandwiches. 951 F.2d at 696. As the trial court in *Texas Pig Stands, Inc.* summarized the situation, 'Hard Rock would have sold just as many pig sandwiches by any other name and . . . there is no basis for inferring that any of the profits received by [Hard Rock] from the sale of pig sandwiches are attributable to infringement.' *Id.* (internal quotations omitted). The defendant in *Texas Pig Stands, Inc.* 'sold pig sandwiches knowing of plaintiff's mark, [but] it appears this was done not as an attempt to profit from the mark but rather in simple disregard of plaintiff's rights.' *Id.* at 695. We believe this case poses a similar situation. Thus, as in *Texas Pig Stands, Inc.*, '[t]he granted permanent injunction adequately remedies the complained-of infringement, and awarding [the plaintiff] any of [the defendant's] profits would be far from equitable—it would be a windfall.' *Id.* at 696. Section 1117(a) affords wide discretion to the district court to apply principles of equity when a claim for profits is made. Having considered the record as a whole, we find no abuse of discretion by the district court when it declined to award profits to QTI in the judgment entered on May 30, 2001.

*Quick Techs., Inc. v. Sage Grp. PLC*, 313 F.3d 338, 350 (5th Cir. 2002).

evidence that the defendant benefit[t]ed from the alleged false advertising, the plaintiff will not be permitted to recover any of the defendant's profits,' even where the *Pebble Beach* test favors disgorgement." *Retractable Techs.*, 919 F.3d at 876 (citing *Logan*, 263 F.3d at 464). In holding the district court did not err in denying disgorgement on remand, the Fifth Circuit noted there was no evidence of loss of goodwill, no evidence of palming off, and no evidence of diverted sales.[23]

---

[23] *Retractable Technologies*, a case originating in this district, has a complex history. As stated in the majority's recitation of the procedural history, the jury found for Retractable Technologies, Inc. (RTI) on one of its antitrust claims, attempted monopolization of the market for safety syringes, and all the Lanham Act false advertising claims. *Retractable Techs., Inc. v. Becton Dickinson & Co.*, 919 F.3d 869, 884 (5th Cir. 2019) (dissenting op.). The jury awarded $ 113.5 million in antitrust damages. The district court trebled the antitrust damages and added attorneys' fees, resulting in a total of approximately $ 352 million. The district court concluded that RTI was entitled to disgorgement of Becton Dickinson & Co.'s (BD) profits under 15 U.S.C. § 1117(a), but, found that the trebled antitrust damages and injunction were potentially adequate remedies.

Specifically, the district court found that, under the factors outlined in *Pebble Beach Co. v. Tour 18 I Ltd.*, 155 F.3d 526, 554 (5th Cir. 1998), four of the six factors favored disgorgement: 1) that BD had the intent to confuse or deceive; 2) that sales were at least slightly diverted; 3) that RTI did not unreasonably delay; and 4) public interest in making misconduct profitable. The court concluded that the two remaining factors, the adequacy of other remedies and whether it was a case of palming off, disfavored disgorgement. *Id.* at 884-85. The district court also granted a six-part injunction prohibiting BD from making certain advertising claims about needle sharpness for five years and about medical savings for three years; to notify various entities about its false statements; to post notice on its website for three years; and implement a training program for employees and distributors. *Id.* at 885.

On its first appeal, the Fifth Circuit reversed BD's antitrust liability, meaning RTI was no longer entitled to the $ 352 million in trebled antitrust damages, and remanded for a new assessment of disgorgement remedies based on the Lanham Act false advertising claims. *Id.* (citing *Retractable Techs., Inc. v. Becton Dickinson & Co.*, 842 F.3d 883 (5th Cir. 2016). Regarding the *Pebble Beach* factors, the panel affirmed three portions: 1) The district court's conclusion that at least some of BD's profits were attributable to false advertising; 2) the finding that BD intended to confuse or deceive; and 3) the finding that RTI did not unreasonably delay. *Id.* (citing *Retractable Techs.*, 842 F.3d at 901).

On remand, the district court evaluated the equities of disgorgement under the *Pebble Beach* factors and found that disgorgement was not warranted. Specifically, the district court found that public interest favored disgorgement, but that RTI had not shown diversion of sales or palming off. The remand court further weighted both diversion and palming off more heavily than the other factors and found that prior temporary injunctive relief was an adequate remedy. RTI then filed its appeal. *Id.* In the second appeal, the majority affirmed.

As pointed out by the dissenting opinion, the district court had previously determined that the diversion factor at least slightly indicated that sales had been diverted, and the Fifth Circuit had affirmed that finding as follows:

> BD first argues that RTI failed to identify what portion of BD's profits (if any) were attributable to false advertising. . . . *We find no clear error in the district court's conclusion that at least some portion of BD's profits were attributable to the false advertising. Indeed, BD acknowledged in the district court, its expert witness's opinion that $ 7.2 million in profits—netting to $ 560,000 after deductions for costs and expenses—could be attributable to the waste space advertisements.* In *Logan* or *Texas Pig Stands*, by contrast, there was no evidence of attribution. Similarly unassailable is the finding that BD had the intent to confuse or deceive by continuing to use advertisements it knew were false. That BD may not have willfully engaged in false advertising does not change this analysis because a finding of willfulness is not a prerequisite to remedial disgorgement. *Quick Techs.*, 313 F.3d at 349. Finally, we have approved the district court's finding that RTI did not unreasonably delay.

Recently, the Fifth Circuit stated that to show attribution, a plaintiff must "present evidence that the defendant benefitted from the alleged false advertising." *Illinois Tool Works*, 955 F.3d at 515 (quoting *Logan*, 263 F.3d at 465). The Fifth Circuit stated that without such evidence, a Lanham Act plaintiff cannot recover a defendant's profits even if disgorgement would otherwise be equitable. *Id.* (citing *Retractable Techs.*, 919 F.3d at 876). In *Illinois Tool Works*, the Fifth Circuit held the district court found that disgorgement was equitable, but did not adequately analyze whether Rust-Oleum's profits were attributable to the Lanham Act violation. According to the Fifth Circuit, Illinois Tool Works failed to present sufficient evidence of attribution; it cited "nothing that link[ed] Rust-Oleum's false advertising to its profits, that permits a reasonable inference that the false advertising generated profits, or that shows that even a single consumer purchased RainBrella because of the false advertising." *Id.*

### Discussion

TravelPass, relying on *Illinois Tool Works*, argues Dr. Becker did not properly determine the profits attributable to his disgorgement opinions, and thus, his opinions are unreliable. Contemporaneously with this Report and Recommendation, the Court is entering an Order Denying TravelPass' Motion to Exclude Becker. In that order, the Court states as follows:

> The Court need not decide the burden issue in the context of this *Daubert* motion. Although the Court will consider in its Report and Recommendation on Marriott's counterclaims whether Marriott is required to present evidence that TravelPass benefitted from the alleged false advertising or whether it is TravelPass' burden to quantify any deductions to its sales that are not due to its alleged wrongful conduct, TravelPass has not convinced the Court that 'the failure of a damages expert to consider whether a sale was attributable to the allegedly wrongful conduct is a critical error that undermines the opinion entirely.' Docket Entry # 559 at p. 8. Put

*Id.* at 885 (emphasis original).

121

> simply, the Court agrees with Marriott that TravelPass' criticism that Dr. Becker did not calculate any deductions to its profits is not a basis to exclude his testimony.

Order Denying TravelPass' Motion to Exclude Becker at p. 12.

Despite the recent assertions by the Fifth Circuit, the Court is not convinced, having considered all of the relevant caselaw on this issue as well as the language of § 1117, that Marriott's view of the appropriate burdens is incorrect. In *Gen. Steel Domestic Sales, L.L.C. v. Chumley*, 627 Fed. Appx. 682 (10th Cir. 2015), the district court ordered disgorgement of profits; in calculating the amount of disgorgement, the "district court adopted a burden-shifting framework that required General Steel to prove Armstrong's gross profits during the period in question and Armstrong to prove which portion of those profits wasn't attributable to its Lanham Act violations." *Id*. at 686.

On appeal, the Tenth Circuit Court of Appeals noted "Armstrong never came forward with the latter type of evidence, and it now argue[d] that the whole burden-shifting endeavor was an improper way to go about figuring the appropriate amount of profits to disgorge." *Id*. The Tenth Circuit disagreed, first addressing the language of 15 U.S.C. § 1117. *Id*. Specifically, the Tenth Circuit reasoned as follows:

> The Act's remedial provision says that when a plaintiff proves false advertising or trademark infringement, he is 'entitled, ... subject to the principles of equity, to recover ... defendant's profits.' 15 U.S.C. § 1117(a). The statute goes on: 'In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed.' *Id.* Pretty plainly this language anticipates the sort of burden shifting the district court applied. Indeed, this framework is routinely used in trademark infringement cases. *See, e.g., Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge Co.*, 316 U.S. 203, 206–07, 62 S.Ct. 1022, 86 L.Ed. 1381 (1942); *Lindy Pen Co. v. Bic Pen Corp*., 982 F.2d 1400, 1408 (9th Cir.1993). And many courts have employed it in false advertising cases too. *See, e.g., Merck Eprova AG v. Gnosis S.p.A*, 760 F.3d 247, 251, 261–62 (2d Cir.2014); *Rexall Sundown, Inc. v. Perrigo Co.*, 707 F.Supp.2d 357, 359 (E.D.N.Y.2010); *Aviva Sports, Inc. v. Fingerhut Direct Mktg., Inc*., 829 F.Supp.2d 802, 819 (D.Minn.2011). That shouldn't come as much of a surprise, for not only does the statutory text speak to both sorts of claims in the same voice, it more or less

tracks common law remedies for false advertising. At common law, after all, once a plaintiff proved slander per se or libel, general damages were often presumed. See 50 Am. Jur. 2d Libel and Slander § 478; Marc A. Franklin & Daniel J. Bussel, The Plaintiff's Burden in Defamation: Awareness and Falsity, 25 Wm. & Mary L. Rev. 825, 826 & n.4 (1984).

The cases Armstrong cites in support of its contrary position don't address the propriety of a burden-shifting regime for determining the quantum of monetary relief—let alone reject it. Instead, they stand for the proposition that 'unless there is some proof that plaintiff lost sales or profits, or that defendant gained them, the principles of equity do not warrant an award of defendant's profits.' *Balance Dynamics Corp. v. Schmitt Indus., Inc.*, 204 F.3d 683, 695 (6th Cir.2000); *see also Logan v. Burgers Ozark Country Cured Hams Inc*., 263 F.3d 447, 464 (5th Cir.2001). We don't question the propriety of this principle, only its relevance when it comes to determining not whether monetary relief should be awarded but whether (as here) to employ the statutorily prescribed burden-shifting procedure to ascertain its amount.

*Id.* at 686-87.

The court in *Malletier*, relying on *Mishawake*, stated that an "infringer who claims the profits are not attributable to the unlawful use of his mark has the burden of showing that the infringement had no relation to profits made by the infringer. *Malletier v. Texas Int'l P'ship*, Civil Action No. CV H-10-2821, 2011 WL 13253847, at *9 (S.D. Tex. Nov. 18, 2011) (citing *Mishawaka*, 316 U.S. at 206-07). The court held that, unlike in *Texas Pig Stands I* and *Logan* in which the plaintiffs presented no evidence linking profits to the Lanham Act violations, Louis Vuitton had presented enough evidence that the defendants benefitted from the Center's tenants' infringement to survive summary judgment. *Id*. at *10.

Two years later, another judge in the Southern District of Texas rejected the defendant's argument that the plaintiff must prove that the defendant's profits were attributable to its infringement. *Clearline Techs. Ltd. v. Cooper B-Line, Inc.*, 948 F. Supp. 2d 691, 707 (S.D. Tex. 2013) (noting the defendant relied on, among other non-Fifth Circuit cases, *Pebble Beach*, 155 F.3d

at 554-55 and *Quick Technologies*, 313 F.3d at 350, both of which were "silent on who bears the burden of proving whether a defendant's profits are attributable to infringement"). According to the court in *Clearline Technologies*, none of the cases controverts the "well-established principle that profits may be presumed to be attributable to infringement unless the defendant proves otherwise." *Id*. at 707–08 (further noting language that the burden is on the plaintiff to prove that a defendant's sales were attributable to its infringing use of the plaintiff's trademarks "is contrary to the language of the Lanham Act, Supreme Court precedent, and the majority of circuit precedent").

In 2017, District Judge Ron Clark of the Eastern District of Texas stated simply that "[i]n cases where trademark infringement or false advertising is found, courts apply a presumption that any sales made using the mark or false advertising were made because of that conduct, and the profits from those sales are receivable." *Neal Techs., Inc. v. Unique Motorsports, Inc*., Civil Action No. 4:15-CV-385, 2017 WL 2903175, at *9 (E.D. Tex. Jan. 20, 2017) (citing *Misharaka*, 316 U.S. at 206–07; also citing *Sys. Forward Am., Inc. v. Martinez*, 129 Fed. Appx. 88, 89 (5th Cir. 2005)).

Although these cases from within the Fifth Circuit predate the *Illinois Tool Works* opinion, the Court notes that one court in the Fifth Circuit has recently distinguished *Illinois Tool Works*, noting in *Illinois Tool Works* there was no evidence linking defendant's false advertising to its profits. In *Boltex Mfg. Co., L.P. v. Ulma Piping USA Corp.*, Civil Action No. 4:17-CV-1400, 2020 WL 3525485 (S.D. Tex. Apr. 21, 2020), the court considered the defendants' motion to alter or amend the final judgment. *Id*. at *1. One of the grounds for altering the final judgment was that the award of disgorgement was manifestly erroneous. *Id*. The defendants argued the Fifth Circuit's recent decision in *Illinois Tool Works* favored striking the disgorgement award. *Id*. The defendants also argued, for the first time in its notice of supplemental authority, that the court did not properly

124

determine the profits attributable to its Lanham Act Award. *Id*. at *1, n. 1.

The court in *Boltex* rejected the argument, finding "the jury's advisory finding was properly supported by the ample evidence in the case that distributors would not accept non-normalized flanges when they thought they were paying for normalized flanges and that Ulma profited from falsely advertising their flanges, as normalization is a costly process and normalized flanges demand a price premium." *Id*. According to the court, this was "in sharp contrast to the plaintiff in *Illinois Tool Works* who failed to cite anything 'that link[ed] [defendant's] false advertising to its profits, that permit[ted] a reasonable inference that the false advertising generated profits, or that show[ed] that even a single consumer purchased [the accused product] because of the false advertising.'" *Id.* (quoting *Illinois Tool Works*, 2020 WL 1808871, at *2). The court further noted as follows:

> The only novel aspect of the *Illinois Tool Works* involved overturning an award of several hundred thousand dollars for corrective advertising, because the plaintiff never asserted plans to run corrective advertising or how much such advertising would cost. The only applicable principle to be drawn from this is that an award under 15 U.S.C. § 1117(a) must be calculated to achieve equity. The Court has already addressed why the disgorgement award here achieves equity and does not believe it is necessary to retread old ground. . . . Thus, the Court denies Defendants' motion to alter or amend the disgorgement award.

*Boltex*, 2020 WL 3525485, at *1.

Here, the Court leaves it to District Judge Schroeder to determine the overriding issue of whether the language of the Lanham Act and Supreme Court precedent will control over recent statements from the Fifth Circuit.[24] Without deciding the issue, the Court concludes Marriott has presented sufficient evidence to survive summary judgment. As noted by the court in *Boltex*, the record before the Court is "in sharp contrast to the plaintiff in *Illinois Tool Works* who failed to cite

---

[24] The parties are invited to brief this issue further in any objections to the Report and Recommendation, including any guidance, if any, as to appropriate jury instructions.

125

anything 'that link[ed] [defendant's] false advertising to its profits, that permit[ted] a reasonable inference that the false advertising generated profits, or that show[ed] that even a single consumer purchased [the accused product] because of the false advertising.'" *Boltex*, 2020 WL 3525485, at *1.

The Court recommends this part of TravelPass' motion be denied.

### 3.    Corrective advertising

### a.    Applicable law

As for corrective advertising costs, the purpose of this award is to "counteract the public confusion resulting from a defendant's trademark infringement." *Firebirds Int'l, L.L.C. v. Firebird Rest. Grp., L.L.C.*, 397 F. Supp. 3d 847, 872–73 (N.D. Tex. 2019) (quoting *ClearChoice Holdings, L.L.C. v. Clear Choice Dental, PLLC*, Civil Action No. H-14-03569, 2016 WL 8136622, at *1 (S.D. Tex. Dec. 23, 2016), *report and recommendation adopted*, No. CV H-14-3569, 2017 WL 416962 (S.D. Tex. Jan. 30, 2017), modified in part, No. CV H-14-3569, 2018 WL 1710173 (S.D. Tex. Apr. 9, 2018), and modified in part, No. CV H-14-3569, 2018 WL 1710173 (S.D. Tex. Apr. 9, 2018) (alterations incorporated in Firebirds) (quoting *Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co.*, 561 F.2d 1365, 1374–75 (10th Cir. 1977))). Corrective advertising damages can include costs spent pre-trial or prospective costs. *Id.* at 873 (citing *ClearChoice*, 2016 WL 8136622, at*6.

### b.    Analysis

TravelPass addresses this damages category in its motion to exclude and motion for summary judgment. TravelPass argues Marriott is not entitled to corrective advertising damages as a matter of law. Again relying on *Illinois Tool Works*, TravelPass argues Dr. Becker's corrective advertising opinion is "purely speculative and ignores recent Fifth Circuit case law." Docket Entry # 605 at p.

4. According to TravelPass, just like in *Illinois Tool Works*, Marriott has offered no evidence that would support an award of corrective advertising damages. Docket Entry # 560 at p. 5.

In *Illinois Tool Works*, the Fifth Circuit found the corrective advertising award was unsupportable. The Fifth Circuit stated as follows:

> We have never explicitly condoned a prospective corrective-advertising award, but see no principled reason to prohibit them categorically—some plaintiffs might not be able to afford corrective advertising before receiving an award. Whatever the contours of proving such an award might be, we need not decide them today, because Illinois Tool Works has offered no evidence that could support the award.

*Illinois Tool Works*, 955 F.3d at 515. According to the Fifth Circuit, Illinois Tool Works had "never even asserted that it plans corrective advertising. It did not say what the advertising might consist of, offer a ballpark figure of what it might cost, or provide even a rough methodology for the jury to estimate the cost." *Id*. at 516.

Here, according to TravelPass, █████████████████████████████
████████████████████████  ████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

█

Although this is a close call, the Court recommends the Court reserve a ruling on this issue until after the evidence is presented. At this time, the Court recommends TravelPass' request for summary judgment on Marriott's claim for corrective advertising damages be denied.

# VIII. RECOMMENDATION

Based on the foregoing, it is

**RECOMMENDED** that Plaintiffs' Motion for Summary Judgment on Defendants' Counterclaims (Docket Entry # 558); Plaintiffs' Motion for Partial Summary Judgment on Defendants' Requests for Monetary Relief (Docket Entry # 560); and Defendants' Joint Motion for Summary Judgment on Likelihood of Confusion and Fair Use (Docket Entry # 565) be **DENIED**.

## Objections

Ordinarily, any party may serve and file written objections to the findings and recommendations of the magistrate judge within fourteen (14) days after receipt of the magistrate judge's report. 28 U.S.C.A. 636(b)(1)(C). Here, considering the rapidly-approaching trial, the Court expedites the time for the parties to file objections to eight (8) days from date of entry of the Report and Recommendation. Any objections shall be filed on or before **October 20, 2021.**

In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. A party's failure to file written objections to the findings, conclusions and recommendations contained in this Report within fourteen days after being served with a copy shall bar that party from de novo review by the district judge of those findings, conclusions and recommendations and, except on grounds of plain error, from appellate review of unobjected-to factual findings and legal conclusions accepted and adopted by the district court. *Douglass v. United Servs. Auto. Ass'n*., 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc), superseded by statute on other grounds, 28 U.S.C. §

636(b)(1) (extending the time to file objections from ten to fourteen days).

**SIGNED this 12th day of October, 2021.**

CAROLINE M. CRAVEN
UNITED STATES MAGISTRATE JUDGE